UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

AUTOMOBILE CLUB OF NEW YORK, INC. d/b/a          11 CIV 6746
AAA NEW YORK AND AAA NORTH JERSEY, INC.,          (RJH)

                        Plaintiffs,

            v.

THE PORT AUTHORITY OF NEW YORK AND
NEW JERSEY,

                        Defendant.

------------------------------------------------------------------X

**MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS'
APPLICATION FOR A PRELIMINARY INJUNCTION AND
IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...........................................................................................1

STATEMENT OF FACTS .................................................................................................2

POINT I:   Plaintiffs' Application For A Mandatory Preliminary Injunction Should Be
           Denied Because They Failed To Meet The Minimum Requirements For
           This Extraordinary Relief ........................................................................................5

    A.     The Standard for Obtaining a Mandatory Preliminary Injunction
           Against a Governmental Entity is Higher and a Balancing of the
           Equities is Not Required .....................................................................................5

    B.     Plaintiffs Have Failed to Show Irreparable Harm ...........................................7

    C.     In the Event This Court looks to the Second Requirement, Injunctive
           Relief Should be Denied Since Plaintiffs Have Failed to Demonstrate
           a Likelihood of Success on the Merits ..............................................................8

           (i)     Plaintiffs Have No Private Right of Action
                   Under the Highway Act ......................................................................9

           (ii)    Plaintiffs Have Asserted No Facts to Support the
                   Claim that the Toll Increases Are Not "Just and
                   Reasonable" Under the Highway Act ...............................................13

           (iii)   The Toll Increases Do Not Violate The Dormant
                   Commerce Clause ..............................................................................15

POINT II:  Plaintiffs' Complaint Should be Dismissed Since They Have Failed
           To State a Claim Under The Highway Act or The Dormant Commerce
           Clause .................................................................................................................18

           (i)     There Is No Private Right of Action Under The Highway
                   Act .....................................................................................................18

           (ii)    The Complaint Fails to State Claims Under Either The
                   Highway Act or The Dormant Commerce Clause .............................18

CONCLUSION .................................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Alexander v. Sandoval,*
    532 U.S. 275, 121 S. Ct. 1511 (2001)..................................................................10,11,12

*Almontaser v. N.Y. City Dep't of Educ.,*
    519 F.3d 505 (2d Cir. 2008)..................................................................................7

*American Trucking Ass'n v. Delaware River Joint Toll Bridge Comm'n,*
    458 F.3d 291 (3d Cir. 2006)......................................................9,10,11,12,13,18

*Ashcroft v. Iqbal,*
    556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)........................................19

*Automobile Club v. Port Authority of New York and New Jersey,*
    706 F.Supp. 264 (S.D.N.Y. 1989) ......................................................................2,14

*Automobile Club of New York, Inc., et al. v. The Port Auth. of New York and New Jersey,*
    887 F.2d 417 (2d Cir. 1989).........................................................2, 9,10, 13,17

*Barnhart v. Sigmon Coal Co.,*
    534 U.S. 438, 122 S. Ct. 941 (2002).....................................................................12

*Beal v. Stern,*
    184 F.3d 117 (2d Cir. 1999)..................................................................................6

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 544 (2007)..............................................................................................19

*Bellikoff v. Eaton Vance Corp.,*
    481 F.3d 110 (2d Cir. 2007)..................................................................10,11,12

*Borey v. Nat'l Union Fire Ins. Co.,*
    934 F.2d 30 (2d Cir. 1991)....................................................................................7

*Bridgeport and Port Jefferson Steamboat Co., et al. v. Bridgeport Port Auth.,*
    2004 WL 840140 (D. Conn. Apr. 15, 2004)............................................. 8, 11, 12

*Bridgeport and Port Jefferson Steamboat Co. v. Bridgeport Port Auth.,*
    567 F.3d 79 (2d Cir. 2009)...............................................................................16, 17

*Buffalo Forge Co. v. Ampco-Pittsburgh Corp.*,
  638 F.2d 568 (2d Cir. 1981)..................................................................................................5

*Cannon v. University of Chicago*,
  441 U.S. 677, 99 S. Ct. 1946 (1979)...............................................................................10, 11

*Chrysler Corp. v. Brown*,
  441 U.S. 281, 99 S. Ct. 1705 (1979)......................................................................................12

*Conn. Dept. of Env'l Prot. v. Occupational Safety & Health Admin.*,
  356 F.3d 226 (2d Cir. 2004)...................................................................................................6

*Consumer Product Safety Commission v. GTE Sylvania, Inc.*,
  447 U.S. 102, 100 S. Ct 2051 (1980)......................................................................................12

*CTS Corp. v. Dynamics Corp. of America*,
  481 U.S. 69 (1987)................................................................................................................15

*Evansville-Vanderburgh Airport Authority District v. Delta Airlines, Inc.*,
  405 U.S. 707 (1972)........................................................................................................15,16

*Forest City Daly Housing, Inc. v. Town of No. Hempstead*,
  175 F.3d 144, 150 (2d Cir. 1999).......................................................................................7,13

*Freedom Holdings, Inc. v. Spitzer*,
  408 F.3d 112 (2d Cir. 2005)....................................................................................................7

*Gonzaga Univ v. Doe*,
  536 U.S. 273, 122 S. Ct. 2268 (2002)....................................................................................11

*Grand River Enter. Six Nations, Ltd. v. Pryor*,
  481 F.3d 60 (2d Cir. 2007)..................................................................................................5,6

*Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*,
  286 F.3d 613 (2d Cir. 2002)..................................................................................................10

*Hardy v. Fischer*,
  701 F. Supp. 2d 614 (S.D.N.Y. 2010)................................................................................7,13

*Lynch v. City of New York*,
  589 F.3d 94 (2d Cir. 2009).....................................................................................................6

*M.F. v. State of N.Y. Executive Dep't Division of Parole*,
  640 F.3d 491 (2d Cir. 2010)..................................................................................................10

*Molinari v. New York Triborough Bridge and Tunnel Authority*,
  838 F.Supp. 718 (E.D.N.Y. 1993) .........................................................................................10

*Northwest Airlines, Inc. v. County of Kent,*
  510 U.S. 355 (1994)......................................................................................16, 17

*Olmsted v. Pruco Life Ins. Co.,*
  283 F.3d 429, 435 (2d Cir. 2002)........................................................................ 12

*Patel v. Contemporary Classics of Beverly Hills,*
  259 F.3d 123 (2d Cir. 2001).................................................................................18

*Plaza Health Laboratories, Inc. v. Perales,*
  878 F.2d 577 (2d Cir. 1989)...................................................................................6

*Rodriguez ex. rel. Rodriguez v. DeBuono,*
  175 F.3d 227 (2d Cir. 1999)...................................................................................7

*Seifts v. Consumer Health Solutions, LLC,*
  2011 WL 4542905 (S.D.N.Y. Sept. 30, 2011).....................................................19

*Selevan v. New York Thruway Authority,*
  584 F.3d 82 (2d Cir. 2009)...................................................................................16

*Shapiro v. Cadman Towers, Inc.,*
  51 F.3d 328 (2d Cir. 1995).....................................................................................7

*Sperry Int'l Trade, Inc. v. Government of Israel,*
  670 F.2d 8 (2d Cir. 1982).......................................................................................8

*Starr v. Sony BMG Music Entertainment,*
  592 F.3d 314 (2d Cir. 2010).................................................................................19

**STATUTES**

33 U.S.C. § 508..................................................................................................1, 13

N.Y. Unconsol. Law § 6401, N.J.S.A. 32:1-1 ...........................................................2

N.Y. Unconsol. Law § 6501, N.J.S.A. 32:1-118 *et seq.* ...................................2, 3, 6

**OTHER AUTHORITIES**

Fed.R.Civ.P. Rule 12(c)...............................................................................1, 18, 20

Rule 12(b)(6)...........................................................................................................18

## PRELIMINARY STATEMENT

The Port Authority of New York and New Jersey (the "Port Authority") submits this memorandum of law in opposition to Plaintiffs', Automobile Club of New York, Inc. d/b/a AAA New York and AAA North Jersey, Inc.'s application for a preliminary injunction and in support of the Port Authority's motion to dismiss.[1]   Plaintiffs' belated application for preliminary injunctive relief seeks to roll back the increase in the tolls, which went into effect on September 18, 2011, on all Port Authority bridges and tunnels within the Interstate Transportation Network ("ITN"). Plaintiffs have two claims based on a common set of erroneous facts – they claim a violation of 33 U.S.C.   § 508 ("the Highway Act") and of the dormant Commerce Clause.  A preliminary injunction should not issue because Plaintiffs have failed to establish the required elements for a mandatory preliminary injunction against a governmental.   These required elements are irreparable harm and a clear or substantial likelihood of success on the merits.

This action should also be dismissed under Fed.R.Civ.P. 12(c) on the grounds that Plaintiffs have failed to state a claim upon which this Court may grant relief.  First, the Highway Act does not create a private right of action and, even assuming Plaintiffs may seek relief under the Highway Act, the Complaint fails to state a claim since Plaintiffs have not alleged sufficient facts for this Court to find that the toll increases are not "just and reasonable".  Plaintiffs have also failed to show a violation of the dormant Commerce Clause. Simply put, Plaintiffs' entire case hinges on their mistaken allegation that the toll increases will fund the redevelopment of the World Trade Center ("WTC"), a facility outside the ITN.   Rather, the toll increases will be completely absorbed by the expenses of the facilities solely within the ITN.

---

[1] By letter dated October 4, 2011, Plaintiffs informed the Court that they had withdraw their request for production of the Port Authority's $25.1 billion Capital Plan.  As such, this portion of Plaintiffs' application should be deemed moot.

1

## STATEMENT OF FACTS

The Port Authority, a bi-state governmental agency created by Compact between the States of New York and New Jersey with the consent of the Congress of the United States, was created, in part, to better coordinate the terminal, transportation and other facilities of commerce in, about and through the Port of New York. *See* McKinney's N.Y. Unconsol. Law § 6401, *et seq.*, N.J.S.A. 32:1-1 *et seq.* As part of its essential governmental functions, the Port Authority is responsible for the construction, maintenance, operation and control of all vehicular bridges and tunnels connecting New York and New Jersey, which lie within a 25-mile radius of the Statue of Liberty (*i.e.*, the Bayonne Bridge, the Outerbridge Crossing, the Goethals Bridge, the George Washington Bridge, the Holland Tunnel and the Lincoln Tunnel). *See* McKinney's N.Y. Unconsol. Law § 6501, *et seq.*, N.J.S.A. 32:1-118 *et seq.* These bridges and tunnels, together with the three Port Authority bus terminals, the Port Authority Trans-Hudson interurban rapid transit system between New York and New Jersey ("PATH") and the Trans-Hudson Ferry Service, constitute the Port Authority's ITN, which was identified in a prior case between the same parties as an "integrated, interdependent transportation system." *See*, *Automobile Club of New York, Inc., et al. v. The Port Auth. of New York and New Jersey*, 887 F.2d 417, 418, 421, 423 (2d Cir. 1989) (quoting *Automobile Club of New York, Inc., et al. v. Port Auth. of New York and New Jersey*, 706 F.Supp. 264, 280 (S.D.N.Y. 1989))

The Port Authority is governed by a Board of twelve Commissioners, six appointed by the respective Governor of each state with the consent of that State's Senate. The actions the Commissioners take at meetings, which are open to the public, are subject to gubernatorial review for a period of ten business days. The governors may veto the action of the Commissioners from their respective State at any time during the ten-business-day period.

2

In accordance with the bi-state statutes, the Port Authority is authorized to collect tolls at its bridge and tunnel facilities. *See* McKinney's N.Y. Unconsol. Law § 6501,*et seq.*, N.J.S.A. 32:1-118 *et seq.* On August 5, 2011, the Port Authority announced in a press release a proposed toll increase on its tunnels and bridges and a fare increase for PATH. Pursuant to long-established policy, the Port Authority published notices in both states of the proposed toll and fare increases. *See* Exhibit A to the Affidavit of Karen Eastman ("Eastman Aff.") sworn to November 3, 2011. The notices informed the public that hearings would be held at designated locations to provide the public with an opportunity to comment on the proposed toll and fare increases.

On August 19, 2011, the Port Authority Board of Commissioners met and approved a modified toll increase schedule beginning on September 18, 2011 that was modified from the initially proposed increases. *See* Eastman Aff., Ex. B, Board Meeting Minutes. The initially proposed increases were reduced based upon a review of the comments received during public hearings and the guidance of the Governors of New York and New Jersey, to the following: (1) tolls on cars using E-ZPass® would be $7.50 for off-peak and $9.50 for peak effective September 18, 2011 and will increase 75 cents in December of each year from 2012-2015 for a total increase of $4.50 over five years; (2) tolls on cars paying with cash would increase to $12.00 and increase $1.00 in December each year through 2015. Fares on PATH will increase 25 cents per year for the next four years. After the Board of Commissioners approved the toll and fare increases, the Minutes of such action were forwarded to the Governors of New York and New Jersey for review. The ten-business-day gubernatorial review period expired without the exercise of a veto by either Governor and the increases went into effect on September 18, 2011. *See* Eastman Aff. Exs. C & D.

The toll and fare increases were necessitated by the Preliminary Capital Plan for maintaining the ITN in a state of good repair, providing security and replacing aging infrastructure where necessary. *See* Affidavit of Michael Fabiano ("Fabiano Aff.") sworn to November 4, 2011, ¶¶ 2-5. Most of the facilities in the ITN are over fifty years old and require significant ongoing maintenance and repair, as well as security upgrades. The increased volume of traffic and the size of the vehicles has caused deterioration of the bridges, tunnels and bus terminals, which the Port Authority has determined must be addressed by substantial capital expenditures over the next ten years. For example, the following projects are scheduled to be undertaken over the next ten years: (1) George Washington Bridge – replace cables and suspenders at an estimated cost of $544 million. (2) Lincoln Tunnel – planning to replace the "helix" from the tunnel toward the New Jersey Turnpike at an estimated cost of $116 million, and replacement of the access roadway infrastructure at an estimated cost of $1.8 billion. (3) PATH – refurbish and replace infrastructure at a cost of $3.057 billion. (4) the Bayonne Bridge - raise the Bayonne Bridge roadway passage to accommodate large ships and to meet modern highway and structure design standard at an estimated cost of $1.246 billion. *See* Fabiano Aff. ¶ 7. The Preliminary Capital Plan, which has not yet been approved by the Board of Commissioners, includes $10.786 billion in capital expenditures for the ITN between 2011-2020. *See* Fabiano Aff., ¶ 5, Ex. A.

The cash flow analyses shows that every dollar generated by the toll and fare increases goes back into the ITN. See Fabiano Aff., ¶¶ 13-14, Ex E. The cash flow analysis for the ITN also shows that for 2007-2010, after deducting the cost of operations and allocated expenses direct payment of capital expenditures, debt service allocated to the Port Authority's Consolidated Bonds issued for capital expenditures and the private financing of the Goethals

Bridge replacement project and payments into the General Reserve Fund required as a result of the issuance of such Consolidated Bonds and private financing, the ITN showed a loss of $636 million. *See* Fabiano Aff., Exs. B and C. The Port Authority generally issues 30-year tax exempt Consolidated Bonds to finance a portion of its capital projects. The projected analysis based on payment of ITN capital expenditures by means of 50% cash (direct payment)/50% debt, using the identical amount of revenues, expenses, net revenues, current interest payments, current principal payments and the private financing of the Goethals Bridge replacement project provides $5.393 billion in cash payments. The balance of $5.393 billion of the $10.786 billion is being financed through the issuance of Consolidated Bonds which are repaid over a 30-year period and the private financing of the Goethals Bridge replacement project. The spreading of these payments over 30 years reduces the net loss at year end 2020 to $51 million. *See* Fabiano Aff., ¶¶ 12-13, Ex. E.

**POINT I**

**PLAINTIFFS' APPLICATION FOR A MANDATORY
PRELIMINARY INJUNCTION SHOULD BE DENIED BECAUSE
THEY FAIL TO MEET THE MINIMUM REQUIREMENTS FOR
THIS EXTRAORDINARY RELIEF**

**A.    The Standard for Obtaining a Mandatory Preliminary Injunction Against a
Governmental Entity is Higher and a Balancing of the Equities is Not Required**

Preliminary injunctive relief "is an extraordinary and drastic remedy which should not be routinely granted." *Buffalo Forge Co. v. Ampco-Pittsburgh Corp.*, 638 F.2d 568, 569 (2d Cir. 1981) (internal quotation marks omitted); *see also Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) ("[Injunctive relief], however, is a drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.") (internal quotation marks omitted). A party seeking a preliminary injunction must establish (1)

5

irreparable harm, and (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them a fair ground for litigation, plus a balance of the hardships tipping decidedly in its favor. *See, e.g., Lynch v. City of New York*, 589 F.3d 94, 98 (2d Cir. 2009) (quoting *Plaza Health Laboratories, Inc. v. Perales*, 878 F.2d 577, 580 (2d Cir. 1989).

The Second Circuit has further held that "when the moving party seeks to stay governmental action taken in the public interest pursuant to a statutory or regulatory scheme, the injunction should be granted only if the moving party meets the more rigorous likelihood-of-success standard." *Conn. Dept. of Env'l Prot. v. Occupational Safety & Health Admin.*, 356 F.3d 226, 230-31 (2d Cir. 2004) (quoting *Beal v. Stern*, 184 F.3d 117, 122 (2d Cir. 1999)). In such cases, "the district court should not apply the less rigorous fair-ground-for-litigation standard and should not grant the injunction unless the moving party establishes, along with irreparable injury, a likelihood that he will succeed on the merits of his claim." *Plaza Health*, 878 F.2d at 580. Plaintiffs concede that the Port Authority's power to raise tolls is governed by the statutory framework of McKinney's N.Y. Unconsol. Law § 6501 *et. seq.* and N.J.S.A. 32:1-118 *et seq.* and thus constitutes governmental action. *See* Complaint, pp. 3-5.

It is also undisputed that the toll and fare increases went into effect before Plaintiffs commenced this action and that they are, therefore, seeking to change the *status quo*. Where as here "'an injunction will alter, rather than maintain, the *status quo*' ... an even more rigorous standard applies – the movant must show a 'clear' or 'substantial' showing of likelihood of success." *Hardy v. Fischer*, 701 F. Supp. 2d 614, 619 (S.D.N.Y. 2010) (*quoting Forest City Daly Housing, Inc. v. Town of No. Hempstead,* 175 F.3d 144, 150 (2d Cir 1999); *see also Almontaser v. N.Y. City Dep't of Educ.*, 519 F.3d 505, 508 (2d Cir. 2008) ("[When seeking] an

injunction altering, rather than maintaining, the *status quo*, [movant] must meet the more rigorous standard of demonstrating a clear or substantial showing of a likelihood of success on the merits.") (internal quotations and citation omitted). Therefore, Plaintiffs' application for a mandatory preliminary injunction should be denied unless they satisfy the standards of irreparable injury and a clear or substantial likelihood of success.

**B.     Plaintiffs Have Failed to Show Irreparable Harm**

In order to demonstrate irreparable harm, Plaintiffs must show "that absent a preliminary injunction they will suffer 'an injury that is neither remote nor speculative, but actual and imminent,' and one that cannot be remedied 'if a court waits until the end of trial to resolve the harm.'" *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 114 (2d Cir. 2005) (quoting *Rodriguez ex. rel. Rodriguez v. DeBuono*, 175 F.3d 227, 234, 235 (2d Cir. 1999)). "Irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Freedom Holdings*, 408 F.3d at 114 (quoting *Rodriguez*, 175 F.3d at 233-34). The Second Circuit ruled that a showing of irreparable harm is an essential prerequisite to injunctive relief stating: "[T]he moving party must first demonstrate that [the alleged irreparable harm] is likely before the other requirements for the issuance of an injunction will be considered." *Id.* "[M]ere possibility of irreparable harm is insufficient to justify the drastic remedy of a preliminary injunction." *Borey v. Nat'l Union Fire Ins. Co.*, 934 F.2d 30, 34 (2d Cir. 1991).

To establish irreparable harm, a plaintiff must also show that the injury "cannot be remedied by an award of monetary damages." *Shapiro v. Cadman Towers, Inc.*, 51 F.3d 328, 332 (2d Cir. 1995); *see also Sperry Int'l Trade, Inc. v. Government of Israel*, 670 F.2d 8, 12 (2d Cir. 1982) ("[P]reliminary injunction is inappropriate where the potential harm is strictly financial."). Here, Plaintiffs claim their harm cannot be remedied by money damages because, if

the Court finds the toll increase illegal, it would be impossible to locate and make refunds to motorists that have paid the increased tolls. *See* Memorandum of Law in Support of Plaintiffs motion for a Preliminary Injunction ("Pl. Br."), p. 5. This is not the case, since if the Plaintiffs prevail, there are various ways to refund the increase. Should this Court deem the toll increase unlawful, 78.9% of the drivers traveling the affected bridges and tunnels use E-Z Pass® and could have their accounts credited. *See* Fabiano Aff., ¶ 16. Cash users could receive a discount on the cash toll as reimbursement. *See* Fabiano Aff., ¶ 16.

In *Bridgeport and Port Jefferson Steamboat Co., et al. v. Bridgeport Port Auth.*, 2004 WL 840140 (D. Conn. Apr. 15, 2004), plaintiffs advanced a similar argument when they requested a preliminary injunction enjoining the Bridgeport Port Authority from collecting a ticket surcharge on ferry passengers. *Id.* at *2. Plaintiffs in the *Bridgeport* litigation argued that previous ferry passengers could not be located if refunds were ordered by the court. *Id.* at *4. In denying the motion for a preliminary injunction, the district court noted:

> [W]hile the individual passenger plaintiffs have demonstrated that they will be harmed by the surcharge, the Court finds that the Port Authority will be able to reimburse the individual plaintiffs for those amounts if the Court orders it later in the litigation.... As to whether all the passengers could be located to receive their portion of any repayment, the plaintiffs have not shown that it would be unlikely or that another method of relief is unavailable. *Id.*

Since, losses incurred by the Plaintiffs' members are monetary and can be remedied with credits or discounts. Plaintiffs have failed to meet the first and foremost requirement for injunctive relief. This Court need inquire no further in denying the injunction.

**C.    In the Event This Court Looks to the Second Requirement, Injunctive Relief Should be Denied Since Plaintiffs Have Failed to Demonstrate a Likelihood of Success on the Merits**

Plaintiffs' application must also fail because they have not and cannot demonstrate a likelihood of success on the merits. Plaintiffs are precluded from bringing an action under the

Highway Act, because this statute does not create a private right of action. Further, Plaintiffs cannot show the new tolls are not "just and reasonable" and thus violate the Highway Act or that they violate the dormant Commerce Clause. Here the toll and fare increases adopted by the Port Authority are for the purposes of keeping the ITN in a state of good repair and providing safety and security enhancements for the public using these facilities. *See* Fabiano Aff., ¶¶ 1-7, Ex. A.

### (i)   Plaintiffs Have No Private Right of Action Under the Highway Act

Plaintiffs acknowledge that the United States Court of Appeals for the Third Circuit has held that private litigants do not enjoy a private right of action under the Highway Act in *American Trucking Ass'n v. Delaware River Joint Toll Bridge Comm'n*, 458 F.3d 291 (3d Cir. 2006). Plaintiffs ask that this Court ignore that precedent and hold to the contrary, relying only upon (1) the Second Circuit's decision in *Automobile Club of New York, Inc. v. Port Authority of New York and New Jersey*, 887 F.2d 417 (2d Cir. 1989), which, in rejecting a challenge by Plaintiffs under the Highway Act to a prior toll increase did *not* address, much less hold, that a private right of action was created by the statute, and (2) certain language of the legislative history – namely, floor statements of two members of Congress. Pl. Br. at 7-8[2]. The relevant law established by the Supreme Court and applied by the Second Circuit on the issue of whether a statute creates a private right of action leads to the ineluctable conclusion that no such right exists under the Highway Act.

"Congressional intent is the keystone as to whether a private right of action exists for a federal statute." *Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110, 116 (2d Cir. 2007). Whether a federal statute vests private litigants with a right of action for violation of the statute is determined by " ' the single question of whether congressional intent to create a private cause of

---

[2] *Amici Curiae* rely on different legislative history with the same content for the proposition that 33 U.S.C. § 508 creates a private right of action. Brief of *Amicus [sic] Curiae*, at 4-5.

action can be found in the relevant statute.' " *M.F. v. State of N.Y. Executive Dep't Division of Parole*, 640 F.3d 491, 495 (2d Cir. 2010), *quoting Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*, 286 F.3d 613, 619 (2d Cir. 2002). In the absence of such intent in the statute at issue, a private cause of action does not exist, and courts may not create one, irrespective of whether the existence of a private right of action would be desirable as matter of policy, or how compatible it may be with the statute. *Alexander v. Sandoval*, 532 U.S. 275, 286-87, 121 S. Ct. 1511, 1519-20 (2001); *M.F. v. State of N.Y. Executive Dep't Division of Parole*, 640 F.3d at 495; *Bellikoff v. Eaton Vance Corp.*, 481 F.3d at 116.[3]

No language in the Highway Act explicitly provides for a private right of action. *American Trucking Ass'n v. Delaware River Joint Toll Bridge Comm'n*, 458 F.3d at 297. "Section 508 not only fails to create explicitly such a cause of action, it also lacks the kind of 'right-or-duty-creating language' that 'has generally been the most accurate indicator of the propriety of implication of a cause of action.' " *Molinari v. New York Triborough Bridge and Tunnel Authority*, 838 F.Supp. 718, 724 (E.D.N.Y. 1993), *quoting Cannon v. University of Chicago*, 441 U.S. 677, 690 n. 13, 99 S. Ct. 1946, 1954 n. 13 (1979). Because the language of the Highway Act does not provide for a private right of action, any determination of the issue of whether the statute *does* create a private right of action '*begin[s] with the presumption* that Congress did *not* intend one." *Bellikoff v. Eaton Vance Corp.*, 481 F.3d at 116 (emphasis added).

Furthermore, the language of the Highway Act indicates a lack of congressional intent to create a private right of action. The statute makes no reference at all to any specific person or persons protected by the statute, such as Plaintiffs and their members. The absence of any

---

[3] This principle alone precludes any determination that a court may *sub silentio* find that a statute creates a private right of action, which is the argument advanced by Plaintiffs with respect to the Second Circuit's decision in in *Automobile Club of New York, Inc. v. Port Authority of New York and New Jersey, supra*.

reference to any party who may be the beneficiary of the statute precludes a finding that creates an implied right of action. *Bellikoff v. Eaton Vance Corp.*, 481 F.3d at 116; *American Trucking Ass'n v. Delaware River Joint Toll Bridge Comm'n*, 458 F.3d at 296.

The fact that Plaintiffs may be among the members of the public who benefit from the Highway Act is also insufficient to create a private right of action. For a statute to be interpreted as creating an implied right of action, "[t]he statutory text 'must be "phrased in terms of the persons benefitted." ' " *Id.* at 297, *quoting Gonzaga Univ. v. Doe*, 536 U.S. 273, 284, 122 S. Ct. 2268, 2275 (2002). The fact that the public at large benefits from a statute's enactment is insufficient to find that the statute creates a private right of action. *Cannon v. Univ. of Chicago*, 441 U.S. 677, 690-93, 99 S. Ct. 1946, 1954-55 (1979); *American Trucking Ass'n v. Delaware River Joint Toll Bridge Comm'n.* 458 F.3d at 298.

The reliance by Plaintiffs and *Amici Curiae* on the legislative history of the Highway Act in an attempt to demonstrate that the statute creates a private right of action is unavailing. First, when a statute does not contain any ambiguity as to whether it creates a private right of action, legislative history cannot be invoked to create such a right of action. "In determining whether statutes create private rights of action, as in interpreting statutes generally, legal context matters only to the extent it clarifies text." *Alexander v. Sandoval*, 532 U.S. at 288, 121 S. Ct. at 1520; *Bellikoff v. Eaton Vance Corp.*, 481 F.2d at 117. Since the Highway Act is not ambiguous with respect to the creation of a private right of action, recourse to legislative history to infer a private right of action would be improper and incorrect.

Furthermore, the legislative history relied upon by Plaintiffs and *Amici Curiae* are floor statements of only two members of Congress. As the Supreme Court has stated, "Floor statements from two Senators cannot amend the clear and unambiguous language of a statute.

We see no reason to give greater weight to the views of two Senators than to the collective votes of both Houses, which are memorialized in the unambiguous statutory text." *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 457, 122 S. Ct. 941, 954 (2002); *see, Consumer Product Safety Commission v. GTE Sylvania, Inc.*, 447 U.S. 102, 118, 100 S. Ct 2051, 2061 (1980) (floor statement of legislative sponsor not controlling as to meaning of statute); *Chrysler Corp. v. Brown*, 441 U.S. 281, 99 S. Ct. 1705 (1979) (same).

Assuming *arguendo* that recourse to the legislative history of the Highway Act were proper, the language of the legislative history relied upon by Plaintiffs and *Amici Curiae* itself does not contain wording which would support an inference that the Highway Act creates a private right of action, to wit:

> Neither section 135 nor the statement of managers changes the standard to be applied in determining whether a toll increase is just and reasonable. The only thing that we have changed is the forum for making the determination. Toll increases will no longer be subject to review by the Department of Transportation; instead the decision will be left to the courts in the event of a challenge.

*See* Pl. Br. at 8; Brief of *Amicus [sic] Curiae*, at 5.

This wording does not imply the creation of a private right of action. *Bellikoff v. Eaton Vance Corp.*, 481 F.3d at 116, quoting *Olmsted v. Pruco Life Ins. Co.* 283 F.3d at 435 (2d Cir. 2002).

In *American Trucking Ass'n v. Delaware River Joint Toll Bridge Comm'n,* the Third Circuit conducted an exhaustive review of the legislative history of the Highway Act and concluded that any indication in such history favoring recognition of a private right of action was outweighed by other elements of the legislative history and by the absence of rights-creating language in the statute itself:

> Where, as here, a statute is devoid of any right-creating language, there need be a more compelling indication in the legislative history before this court can recognize a right of action. It is not the province of a federal

court to confer rights where statutory language is silent, or to "engraft a remedy on a statute, no matter how salutary, that Congress did not intend to provide." *Sierra Club,* 451 U.S. at 297, 101 S. Ct. 1775. On this basis, the indicia of a right of action under § 508 are simply not strong enough to support a conclusion that such a right can be inferred. Id. at 303.

*The American Trucking Ass'n* court reasoned that, in the absence of language in the statute that explicitly creates a private right of action, "a court may find such a right implied only where it may confidently conclude Congress so intended." *Id.* (internal quotations and citation omitted).

For the foregoing reasons, the Port Authority respectfully submits that Plaintiffs do not enjoy a private right of action under the Highway Act.

> **(ii)    Plaintiffs Have Asserted No Facts to Support the Claim That The Toll Increases Are Not "Just and Reasonable" Under The Highway Act**

The Port Authority's decision to raise tolls satisfies the "just and reasonable" standard under § 508 of the Highway Act because all of the increased revenue is going into the ITN (*see,* Fabiano Aff. ¶¶ 1-7, Exs. A & E). Section 508 of the Highway Act states:

> Tolls for passage or transit over any bridge constructed under the authority of the Act of March 23, 1906 (34 Stat. 84; 33 U.S.C. 491-498), commonly known as the "Bridge Act of 1906", the General Bridge Act of 1946, and the International Bridge Act of 1972 shall be just and reasonable. 33 U.S.C. § 508.

In *Automobile Club of New York, Inc. v. Port Authority,* 887 F.2d 417 (2d Cir. 1989) ("*AAA v. Port Authority*"), the Second Circuit articulated the standard for a "just and reasonable" toll increase in a case involving the same litigants to this action. Plaintiffs challenged the Port Authority's inclusion of PATH in the rate base for setting a 1987 toll increase on bridges and tunnels. *Id.* at 417. The Circuit upheld the appropriateness of including PATH in the rate base because there was "functional relationship" between PATH and the bridges and tunnels. *Id.* at 423. The Circuit affirmed the lower court's finding "that the Port Authority's bridges, tunnels,

13

bus terminals, bus programs and PATH constitute an 'integrated, interdependent transportation system'", which the Port Authority now refers to as the ITN. *Id.* (quoting *Automobile Club v. Port Auth.*, 706 F.Supp. 264, 280 (S.D.N.Y. 1989)).

Here, the Port Authority's 2011 toll increase is clearly "just and reasonable" as the proceeds of the increase are going into the ITN and are not, as Plaintiffs claim, being used to fund the WTC redevelopment. This is so because with the necessary capital expenditures of $10.876 billion contemplated in the Preliminary Capital Plain 2011-2020, and including the toll and fare increases, the ITN will still lose $51 million by the end of 2020 (*see* Fabiano Aff. ¶ 13, Exs. A & E). Plaintiffs' reliance on Port Authority press releases is misplaced since these statements merely discuss various capital needs and expenditures for all Port Authority facilities over the next ten years, as well as the overall $25.1 billion budget to cover all of these capital programs. *See* Affidavit of Marta Genovese, Exs. D & G ("Genovese Aff."). Nowhere do these press releases state or even imply that the toll and fare increases are for the WTC.

Plaintiffs also mistakenly rely on operating revenues and expenses taken from the Port Authority's 2011 budget to assert that the ITN shows sufficient profit to "pay for projects functionally related to the ITN". *See* Complaint ¶ 41. As the ten-year cash flow analysis for the ITN shows, there is no money left over to fund any other project even with the fare increase and the use of bonds proceeds to fund 50% of the capital expenditures in the Preliminary Capital Plan. The Complaint, which uses net operating expenses to support the claim that the toll increase is not "just and reasonable", fails to consider the following non-operating expenses: allocated costs, capital expenditures, debt service allocated to the Port Authority's Consolidated Bonds issued for capital expenditures at the ITN and the private financing of the Goethals Bridge replacement project, and payments into the General Reserve Fund (in an amount equal to 10% of

the Consolidated Bonds and the private financing of the Goethals Bridge) required as a result of the issuance of such Consolidated Bonds and Goethals Bridge private financing. *See* Fabiano Aff. ¶¶ 8-10. Plaintiffs make the identical mistake where they argue that ITN is operating at a profit. *See* Genovese Aff. ¶¶ 17-18. Moreover, Plaintiffs' numbers, which do not quite compute, look only at the bridges and tunnels and do not include PATH, which runs at a substantial annual deficit. Id.

### (iii)   The Toll Increases Do Not Violate The Dormant Commerce Clause

The Commerce Clause grants Congress the power "[t]o regulate Commerce ... among the several States." U.S. Const. Art. I, § 8, cl. 3. The Supreme Court has long-held that this power contains negative implications, commonly referred to as the "dormant Commerce Clause" restricting States' power to regulate interstate commerce. *CTS Corp. v. Dynamics Corp. of America*, 481 U.S. 69, 87 (1987).

In *Evansville-Vanderburgh Airport Authority District v. Delta Airlines, Inc.*, 405 U.S. 707 (1972), the Supreme Court first announced its test for determining the constitutionality of airport user fees imposed on commercial airlines. The Supreme Court stated that:

> [A] charge designed only to make the user of state-provided facilities pay a reasonable fee to help defray the costs of their construction and maintenance may constitutionally be imposed ... so long as the toll is based on some fair approximation of use or privilege for use ... and is neither discriminatory against interstate commerce nor excessive in comparison with the governmental benefit conferred. *Id.* at 714, 716-17.

In *Northwest Airlines, Inc. v. County of Kent*, 510 U.S. 355 (1994), the Supreme Court went back to its *Evansville* decision and formulated a three-prong test to determine the reasonableness of fees for the use of state-provided facilities. Under the Court's test, a fee is reasonable and constitutionally permissible "if it (1) is based on some fair approximation of use

of the facilities, (2) is not excessive in relation to the benefits conferred, and (3) does not discriminate against interstate commerce." *Id.* at 369 (citing, *Evansville-Vandenburgh Airport Authority District v. Delta Airlines, Inc.*, 405 U.S. 707 (1972)). In 2009, the Second Circuit endorsed the *Northwest Airlines* test to evaluate the constitutionality of highway toll pricing. *See Selevan v. New York Thruway Authority*, 584 F.3d 82, 98 (2d Cir. 2009). Here, it is nowhere claimed that the toll and fare increase discriminates against interstate commerce. Since revenues from the toll and fare increases are being used to support the ITN, the toll and fare revenues *a fortiori* are based on a fair approximation of use of those facilities. Plaintiffs make no case that the toll increase, which will still result in a system deficit, are excessive in relation to the benefits conferred.

Moreover, Plaintiffs' reliance on *Bridgeport and Port Jefferson Steamboat Co. v. Bridgeport Port Auth.*, 567 F.3d 79 (2d Cir. 2009), is misplaced. In *Bridgeport*, the Second Circuit addressed a dormant Commerce Clause claim concerning the constitutionality of a passenger fee imposed on interstate ferry passengers between New York and Connecticut. In striking down the fee, the Court held that the Bridgeport Port Authority's fee exceeded the limits of "both a fair approximation of use and excessiveness...." *Id.* at 87. However, the *Bridgeport* case is clearly distinguishable from Plaintiffs' claims and in fact buttresses the Port Authority's position in this case.

In *Bridgeport*, the Bridgeport Port Authority "used the revenue from the passenger fee and the [ferry's] lease to pay for essentially all of its operating expenses, including all salaries, health benefits, pension payments, payroll taxes, telephone, utilities, office equipment, travel, charitable contributions, and automobile and lease expenses." *Id.* at 83. However, in *Bridgeport*, the Court recognized that "[a] user fee ... may reasonably support the budget of a

16

governmental unit that operates facilities that bear at least a 'functional relationship' to facilities used by the fee payers." *Id.* at 87 (citing *Automobile Club of New York, Inc. v. The Port Authority of New York and New Jersey*, 887 F.2d 417, 421 (2d Cir. 1989). In *Bridgeport*, the Port Authority used ferry passengers to fund tasks "only some of which afford[ed] actual or potential benefits to ferry passengers," Id. By stark contrast, the ITN does not generate excess cash. In fact, as the schedules annexed to the Fabiano affidavit show, the ITN operates at a deficit and will continue to operate at a deficit even with the toll and fare increases. The Port Authority must consequently find revenue from other sources to support the ITN.

Plaintiffs' Commerce Clause argument centers on the first two prongs of the *Northwest Airlines* test, but does not allege that the Port Authority's toll increase discriminates against interstate commerce. *See* Pl. Br., 8-10. The Second Circuit has recognized that both the "fair approximation" and "excessiveness" prongs are related. *See Bridgeport*, 567 F.3d at 86 (noting that "the 'fair approximation' and the 'excessiveness' criteria substantially overlap" and addressing them together). Plaintiffs claim that the toll increase violates both the "fair approximation of use" and "excessiveness" prongs of the *Northwest Airlines* test is rebutted by the Preliminary Capital Plan for the ITN showing $10.786 billion in capital expenditures over the next decade and the cash flow analyses which show that with the non-operating expenditures of the ITN over the same period, it suffers a loss. *See* Fabiano Aff.¶¶ 1-8, Exs A, D, E. Moreover, it is significant that a comparison of tolls for similar tunnels and bridges operated by the Metropolitan Transportation Authority ("MTA") shows that the tolls increase still puts the Port Authority tolls below the tolls set by the MTA in 2010. *See* Mark Muriello affidavit (Muriello Aff.) sworn to November 2, 2011). The Port Authority's 2011 toll increase is clearly

constitutional as the proceeds of the increase are going entirely into the ITN and not, as Plaintiffs claim, being used to fund the WTC development. *See* Fabiano Aff., ¶¶.1-9.

Plaintiffs have not and cannot show that the toll increases do not reflect "a fair approximation of use" or that they are "excessive" in relation to the benefit conferred. Accordingly, Plaintiffs' dormant Commerce Clause claim fails markedly short of meeting the requirement for obtaining a mandatory preliminary injunction against the Port Authority.

POINT II

**PLAINTIFFS' COMPLAINT SHOULD BE DISMISSED
SINCE THEY HAVE FAILED TO STATE A CLAIM
UNDER THE HIGHWAY ACT OR THE DORMANT
COMMERCE CLAUSE**

**i)   There is No Private Right of Action Under The Highway Act**

As previously argued, *infra*, Plaintiffs' claim under the Highway Act should be dismissed as a matter of law since there is no private right of action created by this statute. See *American Trucking Ass'n v. Delaware River Joint Toll Bridge Comm'n,* 458 F.3d 291 (3d Cir. 2006).

**ii)   The Complaint Fails to State Claims Under Either the Highway Act
Or The Dormant Commerce Clause**

Rule 12(c) states: "[a]fter the pleadings are closed – but early enough not to delay trial – a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). "The standard for granting a Rule 12(c) motion for judgment on the pleadings is identical to that of a Rule 12(b)(6) motion for failure to state a claim." *Patel v. Contemporary Classics of Beverly Hills*, 259 F.3d 123, 126 (2d Cir. 2001). To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

18

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft*, 129 S.Ct. at 1949. "Thus the Court is 'not bound to accept as true a legal conclusion couched as a factual allegation' and 'threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Seifts v. Consumer Health Solutions, LLC*, 2011 WL 4542905, at *3 (S.D.N.Y. Sept. 30, 2011) (quoting *Ashcroft*, 129 S.Ct. at 1949). If plaintiff's factual allegations "permit no reasonable inference stronger than the 'mere possibility of misconduct,' the complaint should be dismissed." *Seifts*, 2011 WL 4542905 at *3 (quoting *Starr v. Sony BMG Music Entertainment*, 592 F.3d 314 at 321 (2d Cir. 2010).

Here, Plaintiffs have relied solely on press releases and their extraction of net revenues from the Port Authority's 2010 operating budget for the ITN to state their case. *See* Complaint ¶¶ 34-35, 39-41. The Port Authority's Preliminary Capital Plan for the ITN for 2011-2020 and its cash flow analyses for the same period show the Plaintiffs have based their claims on incomplete data from which they drew unsound conclusions. The historical data shows the ITN lost $636 million between 2007-2010. The cash flow analysis for the period 2011-2020 shows that even with the fare increase and financing 50% of the needed capital expenditures, the Port Authority will lose $51 million by the end of 2020. If the capital expenditures were financed entirely with cash, the cash flow analysis shows that the ITN would lose $2.854 billion by the end of 2020. *See* Fabiano Aff., Exs. C, D & E. Thus, there is no money left in the ITN to fund any part of the WTC.

The Port Authority respectfully submits that the Complaint should be dismissed pursuant to Fed. R. Civ. P. 12(c), inasmuch as it states no cognizable claim that the Port Authority's toll increase violated either the Highway Act or the dormant Commerce Clause.

## CONCLUSION

For the foregoing reasons, the Port Authority respectfully requests that this Court deny

Plaintiffs' application for a preliminary injunction, dismiss Plaintiffs' claims with prejudice, and

grant such other and further relief as this Court deems proper and just.

Dated:   New York, New York
         November 4, 2011

                              Respectfully yours
                              JAMES M. BEGLEY, ESQ.
                              *Attorney for Defendant*
                              The Port Authority of New York and New Jersey


                              BY: _____
                                  Kathleen Gill Miller (KGM4346)
                                  225 Park Avenue South, 13th Floor
                                  New York, New York 10003
                                  Telephone No.:  (212) 435-3435\4

                              On the Brief:  Carlene McIntyre
                                             Arnold Kolikoff
                                             David Kromm

TO:   Michael F. Fitzgerald, Esq.
      FARRELL FRITZ, P.C.
      *Attorneys for Plaintiff Automobile*
      *Club of New York, Inc. d/b/a AAA*
      *New York and AAA North Jersey, Inc.*
      370 Lexington Avenue, Suite 800
      New York, New York 10017
      Telephone No.:  (212) 687-1230
      (Via ECF)