```
                  UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF NEW YORK

In re:                               :
                                        Docket #11cv6746
AUTOMOBILE CLUB OF NEW YORK,         : 1:11-cv-06746-RKE-HBP

                    Plaintiff,       :

   - against -                       :

THE PORT AUTHORITY OF NEW YORK       : New York, New York
AND NEW JERSEY,                        June 19, 2012
                    Defendant.       :

------------------------------------ :

                   PROCEEDINGS BEFORE
                HONORABLE HENRY PITMAN,
         UNITED STATES DISTRICT COURT MAGISTRATE JUDGE


APPEARANCES:

For Plaintiff:           FARRELL FRITZ, PC
                         BY:  KEVIN P. MULRY, ESQ.
                              MARTA GENOVESE, ESQ.
                         1320 Reckson Plaza
                         Uniondale, New York 11556
                         (516) 227-0620


For the Defendants:      THE PORT AUTHORITY OF NEW YORK AND
                         NEW JERSEY
                         BY:  KATHLEEN GILL MILLER, ESQ.
                              CARLENE V. MCINTYRE, ESQ.
                              DAVID KROMM, ESQ.
                         225 Park Avenue South
                         New York, New York, 10003
                         (212) 435-3434



Transcription Service:   Carole Ludwig, Transcription Services
                         141 East Third Street #3E
                         New York, New York 10009
                         Phone:  (212) 420-0771
                         Fax:  (212) 420-6007


Proceedings recorded by electronic sound recording;
Transcript produced by transcription service
```

**INDEX**

**E X A M I N A T I O N S**

| Witness | Direct | Cross | Re-Direct | Re-Cross |
|---------|--------|-------|-----------|----------|
| None | | | | |

**E X H I B I T S**

| Exhibit Number | Description | ID | In | Voir Dire |
|----------------|-------------|----|----|-----------|
| None | | | | |

1

2          THE CLERK:   Automobile Club of New York against the

3  Port Authority of New York and New Jersey.  Counsel, please

4  state your name for the record.

5          MR. KEVIN MULRY:  For plaintiff, AAA, Kevin Mulry

6  and Michael Fitzgerald from Farrell Fritz.  With us also is

7  Marta Genovese, counsel at AAA.  Good afternoon, Your Honor.

8          HONORABLE HENRY PITMAN (THE COURT):   Good

9  afternoon.

10          MS. KATHLEEN MILLER:  Good afternoon, Your Honor,

11  Kathy Miller for the Port Authority of New York and New

12  Jersey, and with me is David Kromm and Carlene McIntyre.

13          THE COURT:  All right, good afternoon.  We're here

14  outstanding resolve the discovery disputes that are raised

15  in the June 15 joint letter that I received from counsel.

16  And I'd like to go through the issues in the order in which

17  they appear in the letter.

18          All right, the first topic is identified as "the

19  Port Authority should be required to respond to the document

20  request by stating whether or not they will be producing all

21  responsive documents."  I thought the Port Authority's

22  position, as set forth in the letter, clarified that.  And I

23  understand them to be saying — well, let me ask Miss Miller.

24  I understand the Port Authority to be saying that with,

25  except for the exceptions specifically noted in the letter,

```
 1                                                    4
 2  that the Port Authority is producing all responsive
 3  documents in its possession, custody, or control.
 4            MS. MILLER:   That's correct, Your Honor.  Now, we
 5  haven't finished --
 6            THE COURT:   Right.
 7            MS. MILLER:   -- you know, we've done this
 8  document poll, the email poll.  And the other issue that
 9  remains outstanding which the Court raised with plaintiff,
10  and I did raise with plaintiff too in our conversation
11  before this letter, and that is with respect to the
12  allocations to the bond fund which has been raised several
13  times, what level of granularity did they want to go to, and
14  I didn't get a response from plaintiffs on that.  So I know
15  they don't want the daily receipts from the George
16  Washington Bridge because that's been scoffed at.  But the
17  next level, they have been given the annual allocation to
18  the consolidated bond fund, that was exhibit H.
19            The next level of granularity below that, and I
20  have endeavored to pull that on my own, and I'll provide
21  that, would be the monthly allocations.  I can provide the
22  monthly allocations.  And then that, for some reason,
23  doesn't answer the question, whatever question is in
24  plaintiff's mind, we'll have to come back and discuss
25  further what level granularity they want to go to with
```

1

2  respect to the bond funds.

3         And, again, I think perhaps there's been some lack

4  of understanding of the Port Authority's financial

5  statements which are posted online.  I think perhaps I can

6  assist counsel by giving them copies of those schedules that

7  we believe show the allocation, the 10 percent allocation to

8  the general reserve fund, another topic that counsel has

9  raised with us.  Those are actually in schedules that are

10  attached to the Port Authority's annual financial statements

11  which are posted online.

12         If it would assist counsel, we'll pull those

13  schedules, copies of those schedules, and we'll give them

14  those schedules and so that they'll have them and they'll

15  know what it is we're saying in particular supports the

16  exhibits to the Fabiano affidavit.  And I tried to explain

17  to counsel that the exhibits to the Fabiano affidavit which

18  were submitted in support of our motion to dismiss, in

19  opposition to the preliminary injunction, were documents

20  created to this litigation.  They were created, they were

21  extracted from the annual financial statements to show that

22  the interstate transportation network, in fact, loses a

23  significant amount of money.  And they were --

24         THE COURT:  I'm not trying to cut you off, but I

25  think you may be getting beyond what topic 1 was addressing.

```
 1                                                      6
 2   I'm not trying to cut you off, but I think you've --
 3              MS. MILLER:   Well, topic 1 covers quite a --
 4              THE COURT:   -- gone several yards beyond it.
 5              MS. MILLER:   -- few of the requests, and I can't,
 6   as I stand here now and look at perhaps 20 numbers here, I
 7   can't remember which ones went to the consolidated bond
 8   fund.  So I'm trying to address that generally.
 9              THE COURT:   No, but my understanding is that the
10   issue there was really sort of one as to the completeness of
11   the Port Authority's response.  Is that --
12              MR. MULRY:   Yes, that's correct.
13              THE COURT:   -- the issue you were raising?
14              MR. MULRY:   That's correct, Your Honor --
15              THE COURT:   And my understanding is, except for
16   the specific exceptions described in the Port Authority's
17   position, the Port Authority is providing all responsive
18   documents in his possession, custody, or control.
19              MR. MULRY:   Our understanding --
20              MS. MILLER:   Right, and with the exception of
21   going to the level of granularity that plaintiff --
22              THE COURT:   Right.
23              MS. MILLER:   -- wanted with the consolidated bond
24   reserve fund and the general reserve fund.
25              MR. MULRY:   Our understanding based on what's
```

1

2   said in the letter and what's been said in court is that

3   unless there's a stated objection to one of the responses,

4   the Port Authority is producing all responsive documents

5   within their custody and control.

6            THE COURT:   Well, except, I mean, again, except

7   for the last point that Miss Miller raised.

8            MR. MULRY:   Right.

9            THE COURT:   I mean you're not looking for the

10  daily counts on tolls and things like that.

11           MR. MULRY:   The general concern with the first

12  category is that from the document response it's not clear

13  that the Port Authority is saying that it's producing all

14  responsive documents.  That's our understanding based on

15  what's been said in letters and in court.

16           THE COURT:   Okay.

17           MR. MULRY:   Your Honor, if you wanted me to

18  address the consolidated bond fund and the reserve fund now,

19  I can do that or whichever order --

20           THE COURT:   I'm not even sure that was really one

21  of the topics raised here, was it?

22           MR. MULRY:   Well, there is – towards the end with

23  respect to we anticipate making a motion --

24           THE COURT:   Okay.  All right.

25           MR. MULRY:   With respect to the --

1                                                                8

2            THE COURT:   Let's go through the letter in the

3    order set out in the letter.

4            With respect to the litigation hold, I'm not sure,

5    you know, I understand plaintiff's point.  I'm not sure

6    there's an issue to be resolved here at this point or if

7    plaintiff is seeking some relief.  If plaintiff is seeking

8    some relief, it's not clear to me what that is.  So maybe

9    you want to elaborate on that a little bit, Mr. Mulry.

10           MR. MULRY:   Your Honor, we don't believe there's

11   an issue immediate.  We did want to alert the judge, alert

12   Your Honor to this issue and what we see as a significant

13   concern.  If emails are automatically deleted after 120 days

14   and a written litigation hold was not in place until May 25,

15   that would only take you to January of this year 2012.  It

16   wouldn't capture anything from 2011 which includes the

17   summertime of 2011 when the toll increase was being proposed

18   and when it was approved in August of 2012.

19           So we raise that as a concern at this point,

20   although I don't believe there's an issue to be presented to

21   the court.  It was raised at the last conference, so we

22   wanted you to be aware that we see that as a very

23   significant issue in the case.

24           MS. MILLER:   Your Honor, may I respond to that?

25           THE COURT:   Okay.

1

2          MS. MILLER:   I mean I pretty much said it in my

3   letter.  In the first place plaintiffs told the court, in

4   open court, that, back on October 6, within a few days after

5   having commenced this lawsuit, that they didn't want any

6   discovery.  So there was no reason for the Port Authority to

7   issue a major litigation hold.  We spoke verbally to those

8   people in management and budget and finance who were sizing

9   the toll increase and working on it and told them to

10   preserve any documents that they had.

11          It wasn't until Judge Holwell came down with his

12   decision denying their application for preliminary

13   injunction and indicating that he was converting our motion

14   to dismiss to a motion for summary judgment and allowing

15   limited discovery that plaintiff suddenly came forward with

16   57 categories of document requests.

17          But fortuitously, even though there is an

18   automatic delete 120 days after an email is created, the

19   major player, so to speak, in this case, David Sampson, the

20   Chairman, Patrick Foye, the Executive Director, William

21   Baroni, the Deputy Executive Director, Karen Eastman, the

22   Secretary, Michael Fabiano, the Chief Financial Officer,

23   Christopher Ward, the former Executive Director, and their

24   assistants all had litigation holds on their computers for

25   prior matters so that, absent a delete by any of those

1

2  individuals, there would not be an automatic cleanup on

3  their computers.  And that went back to the Greek Church

4  case and that predates this litigation.

5          So we're not really – the major decision-makers at

6  the Port Authority have litigation holds on their computers

7  and anything would have been preserved unless that

8  individual deleted.  Now, I can't control --

9          THE COURT:   Well, again, I'm not trying to cut

10 you off, but I'm not sure there's anything to be resolved at

11 this point because they're not seeking, the plaintiffs are

12 not seeking any relief at this point with respect to the

13 fact that the litigation hold was not put in place until May

14 25.  I mean whether this is an issue down the road is

15 something that should probably be addressed down the road.

16          I mean at this point I'm either, I mean they're

17 not asking me to bless or condemn what the Port Authority

18 has done, and I'm not sure you're asking me to bless or

19 condemn what the Port Authority has done.

20          MS. MILLER:   No, but I'm highlighting that for

21 the key players that litigation hold, there was already a

22 litigation hold in place from other cases on their

23 computers.

24          THE COURT:   I'm not sure that we need to prolong

25 the discussion though because there's nothing to be decided

1

2   in this regard.

3          MS. MILLER:   Very well.

4          THE COURT:   Okay?

5          MR. MULRY:   Your Honor, if I could just address

6   one inaccuracy in the letter, and just now Port Authority

7   counsel was asserting that AAA had told Judge Holwell that

8   we didn't want any discovery.  That's not accurate.  The

9   question was whether there would be discovery, early

10  discovery with respect to the preliminary injunction

11  application, and the judge – AAA did ask Judge Holwell to

12  rule on the preliminary injunction application without

13  discovery so that it would not be broken up in piecemeal.

14  But if the case going forward --

15          THE COURT:   Was there a record before Judge

16  Holwell?

17          MR. MULRY:   I don't know that any conferences

18  were described, but in his opinion – and this is at page 14

19  of Judge Holwell's decision – he said, "While the Court

20  offered AAA an opportunity for early discovery in connection

21  with its application for a preliminary injunction, no such

22  offer was extended in connection with the Port Authority's

23  motion," referring to the motion to dismiss which he was

24  converting to a motion for summary judgment.

25          So in the decision itself, Judge Holwell

1

2    recognizes that the issue of whether there should be

3    discovery was directed to the application for a preliminary

4    injunction.

5            MS. MILLER:   Well, that's true, but there was no

6    caveat issued at the time.

7            THE COURT:   I'm not --

8            MS. MILLER:   That they do --

9            THE COURT:   I'm not --

10           MS. MILLER:   That they were reserving.

11           THE COURT:   I'm still confused about what we're,

12   what issue there is to be resolved with respect to the

13   presence or absence of the litigation hold.

14           MR. MULRY:   Judge, from AAA's perspective there's

15   no issue to resolved.   I didn't want to let that --

16           THE COURT:   I understand.   I understand why you

17   said it.

18           MR. MULRY:   -- that issue unresponded to.

19           THE COURT:   Miss Miller, what'd you want to say?

20           MS. MILLER:   Judge, I don't believe that - I was

21   sitting in another courtroom in the Eastern District and

22   participating in that conference by phone, but I'm unaware

23   as to whether that conference was recorded.   We would have

24   to inquire.   I can tell you that my memory of that

25   conference, that telephone conference was there was no

1

2  statement by counsel on the record that they didn't want

3  discovery now but they might want discovery later.  There

4  was no such reservation.  And, in fact, I have no

5  recollection of they're coming in on the motions saying that

6  the motion shouldn't be decided because they didn't have

7  discovery and they needed discovery.

8          So the push for discovery came following the

9  decision by Judge Holwell at the end of February, and --

10          THE COURT:   Well, maybe it's an interesting

11  question as to whether or not counsel's representations

12  concerning discovery, if any such representations were made,

13  have any effect on the legal obligation to put a litigation

14  hold in place is an interesting issue, but that sounds like

15  it may be an issue for another day.  At this point no one's

16  asking me to take any action with respect to the presence or

17  absence of a litigation hold, so I don't know that there's –

18  I understand the parties have divergent views as to whether

19  it was necessary here, but I'm not sure if there's anything

20  to decide in that regard.

21          The third topic, the Port Authority's search for

22  responsive documents must include all persons who could

23  reasonably be expected to possess responsive documents,

24  which I think is probably a correct statement as a matter of

25  law.  In its response the Port Authority says, "The Port

14

1

2  Authority has requested all of its employees involved in

3  working on sizing the toll increase and ten-year preliminary

4  capital plan to provide all of their documents and emails

5  relating to this work."  Mr. Mulry, is it plaintiff's

6  position that that universe is deficient and if so how?

7           MR. MULRY:   Judge, this is an issue that we're

8  raising for the court so you're aware of it's a concern that

9  a selected group of individuals have been asked to collect

10 documents and in some cases self-collect documents.  We

11 can't – we're not in a position to say that there are other

12 people who have responsive documents that may come out in

13 discovery, but this is an issue we wanted to raise with the

14 court and with Port Authority at this stage so that we're

15 not addressing it hopefully at a later stage in the case.

16           But I don't think there's a question for the

17 court, issue for the court to resolve at this point.

18           THE COURT:   No, I mean, look, as I understand the

19 Federal Rules of Civil Procedure, party's obligation is, a

20 party who receives a discovery request has the obligation,

21 if they're not objecting to the request, to produce all

22 documents in its possession, in the party's possession,

23 custody, or control, and concomitant with that is an

24 obligation to search all repositories or locations which

25 could reasonably be expected to have responsive documents.

1

2          You know, I suspect the individuals in the toll

3   booth at the George Washington Bridge probably are not

4   someone whose files need to be searched, if they have any

5   files.  You know, there are other people higher up in the

6   Port Authority whose files do have to be searched, and I

7   mean at least facially it doesn't appear that there's a

8   deficiency in the size of the circle the Port Authority has

9   drawn for the document search.  I mean if you think there's

10  - I mean and maybe you agree, at least at this point

11  facially, at least it appears that the circle's been

12  appropriately drawn.

13          MR. MULRY:   At this point we don't have a basis

14  to say it's not been appropriately drawn.  But we have a

15  concern that it's --

16          THE COURT:   Yeah, well, I mean --

17          MR. MULRY:   -- it's a small group.

18          THE COURT:   It's the responding party's

19  obligation to draw the circle in the first instance, and if

20  an appropriate repository has not been searched, the party

21  receiving the document request cannot assert as a defense,

22  well, my adversary didn't tell me to search X's files.  But

23  I mean, again, it sounds like there's no issue on this

24  matter.  I mean, Miss Miller, do you want to add anything?

25          MS. MILLER:   No, Your Honor, as I indicated in my

1  
2  letter though on the 12th, we expanded it beyond those who

3  were working in management and budget and the executive

4  staff to include at counsel's request anybody in media

5  relations.  We have three or four people in that category

6  whose computers are being searched also.

7           THE COURT:   All right.  The next topic, the

8  review of responsive paper and electronic documents

9  including emails should be conducted by attorneys and not be

10 a self-selection by custodians.  Again, in the Port

11 Authority's response it says, I think this is the third

12 sentence in the Port Authority's position, "Moreover, with

13 the exception of Karen Eastman, at their request the law

14 department assisted each of these individuals searching

15 their computers."  And that is they didn't search, the law

16 department didn't search paper documents, the law department

17 just assisted with the computer search, Miss Miller, is that

18 what that means?

19           MS. MILLER:   No, the law department requested any

20 paper files, but in addition the law department is searching

21 not only emails, assisted these individuals searching not

22 only emails but any stored files.  If somebody created a

23 file in their computer for toll and fare increase, for

24 instance, any documents stored in that file are also being

25 searched.  So it's not just emails.  It's any document in

 1  their computer, in their computer files, or any hard copies.

 2          THE COURT:   But, for example, Mr. Foye - I'm just

 3  trying to understand a little bit more what the Port

 4  Authority's position is here.  With respect to Mr. Foye, for

 5  example, were counsel involved in the search of Mr. Foye's

 6  paper documents for responsive documents?

 7          MS. MILLER:   Not counsel, Your Honor, the law

 8  department.  We had --

 9          THE COURT:   I think the law department - law

10  department's attorneys, is it not?

11          MS. MILLER:   No, it's a paralegal specialist and

12  a technical person employed by the Port Authority --

13          THE COURT:   I see.

14          MS. MILLER:   -- who had the search terms which I

15  put in my letter, were very, very broad search terms, and

16  the paralegal specialist and the law department's technical

17  services person together went in to the computers and --

18          THE COURT:   No, I'm talking about the hard copy

19  files, who made, who reviewed Mr. Foye's hard copy files for

20  his responsive documents?

21          MS. MILLER:   None have been reviewed yet.  The

22  collection has just been completed of documents.  Those will

23  be reviewed by counsel.  The size of this collection was

24  pretty enormous.  And the search terms used were fairly

1    broad.  So we've now pulled in fares and tolls from the

2    airports, so we now have collected thousands of documents

3    and we have to go through those and cull them down.  But

4    we'll probably have some paralegals working on this as well

5    as attorneys, Your Honor, because we don't have enough staff

6    to staff several thousand documents with attorneys.

7              THE COURT:   Mr. Mulry, is there - I'm not aware

8    of any legal authority that says counsel needs to be

9    involved in the initial selection of documents to be

10   produced.  Counsel certainly has an obligation to explain to

11   his or her client what a Rule 34 requests means and what

12   obligations a Rule 34 request gives rise to, but I don't

13   know - certainly, there's nothing wrong with counsel going

14   out and asking to look through the client's file cabinets or

15   look through the computer itself, but I'm not aware of any

16   legal authority that says that's what counsel must do.

17             MR. MULRY:   Well, the --

18             THE COURT:   What seems to be what you're

19   advocating in the AAA's position.

20             MR. MULRY:   The Pension Committee case does say

21   that one may not place total reliance on an employee to

22   search and select what the employee believes to be

23   responsive without any supervision from counsel.  Because

24   someone who is not counsel and understanding the case and

the obligations may not know what to search for, what is the
scope of relevant documents.  And that's the concern we
have, particularly with respect to the high level people who
from the Port Authority letter it seems were doing a self-
selection of documents, and then documents were placed to a
secure link.

Now, the Port Authority response in this letter
indicates that the law department assisted.  It's clear what
that assistance is, and it's apparently not attorneys.  So
the concern we had in putting these issues before the Port
Authority and the court was in making sure that it's clear
that what the Port Authority is doing in collection of
documents should comport with the obligation and that it
would not be sufficient for the Port Authority employees to
simply look through their files and decide what is and is
not relevant.

THE COURT:   Well, what do you believe has to be
done?

MR. MULRY:   Well, the attorneys --

THE COURT:   That's, at least in my experience in
practice, that that – it was not uncommon for the attorney
to either speak with the client or to draft written
instructions to the client telling the client what needed to
be produced, but it was the exceptional case where counsel

1
2    in the first instance went out and looked through the file

3    cabinet.

4              MR. MULRY:   Well, here what was reported was it

5    seemed as if employees were being asked to decide what it is

6    relevant based on a description of the document requests.

7    The --

8              THE COURT:   Well, if that's – even if that's –

9    well, were they being asked to decide what was relevant or

10   were they being asked to retrieve certain categories of

11   documents?

12             MR. MULRY:   Well, that's unclear.   Part of what

13   we were doing here, given where we are in discovery, is

14   laying out issues – and just so you understand the context

15   of the letter, based on Miss Miller's schedule, we didn't –

16   she was not available to meet and confer until the 13th.   I

17   was unfortunately unavailable that day.   So we met and

18   conferred --

19             THE COURT:   The letter is very helpful.   I've got

20   no negative comments about the letter.   I found the letter

21   very helpful.

22             MR. MULRY:   Well, just so you're aware that the

23   letter was essentially drafted Thursday night to Friday, so

24   the Port Authority positions – this is not a letter where

25   both sides were hashing out what the various positions were.

1

2  You have our position and then the Port Authority position

3  which we saw for the first time late Friday, and then it was

4  simply filed.

5          So one thing we wanted to do, in this letter,

6  raise the issues we saw based on the representations that

7  had been made so far and what had been given to us in the

8  responses.  So some of the responses we've received from the

9  Port Authority in this letter may address some of the

10 issues, but we're not doing the production.  They're doing

11 that.

12          I think a big goal with a lot of these categories

13 is to make sure that the parties and the court are aware of

14 what has to happen going forward so that we're not six weeks

15 down the road having discovery motions.

16          MS. MILLER:   Your Honor, may I respond?

17          THE COURT:   Go ahead.

18          MS. MILLER:   As I said in my letter of June 8 to

19 Mr. Mulry, we have gone well beyond what we think would be

20 required.  We've expanded the universe of people whose

21 computers are being searched.  The individuals who were

22 asked to connect to a link and provide the documents

23 according to the search terms that I gave them, and as I

24 told this court, and they're in my letter of June 8, they're

25 very broad search terms – tolls, fares, you know, toll

1
2  increases, extremely broad search terms.  These would bring

3  in anything connected to that, including anything related to

4  the consolidated bonds or – it's going to bring in thousands

5  of pages because they're such broad terms.

6            But I selected these terms.  I worked with the

7  paralegal specialist and the technical service person who

8  was setting up the links.  As it turned out, most of those

9  people who had exempt computers – and when I say exempt, our

10 technical service is not authorized to go into their

11 computers because of security reasons.  We're talking about

12 the executive director, the deputy executive director,

13 people at that level.  Those people reached out to us and

14 said, no, come and help us, do the link and unload the

15 documents.  With the exception of Karen Eastman, virtually

16 everybody in that category has had our paralegal specialist

17 and our technical service person going to their computers to

18 download the documents.

19            And I've been supervising, to the extent I can,

20 Your Honor, I'm not a technical person.  I really can't tell

21 them how to do this.  You know, I can just explain to them

22 the universe of documents we're looking for and that we want

23 to get a greater universe and then we'll cull out from that

24 universe what's related to this action and produce it.  So

25 it's not like we started narrow.  We started extremely

1  broad.

2          THE COURT:   To the extent that this subject

3  matter needs a ruling, I don't think that counsel needs to

4  be involved at the initial search of the repositories, needs

5  to physically conduct a search of the paper files or needs

6  to physically conduct the search of the computers.   I mean

7  it is incumbent upon counsel to ensure that the client

8  understands what responsive documents needs to be produced,

9  and if counsel fails to do so, the client may pay the price.

10  But to the – it does – I mean it does not sound – it does

11  not sound like there's a basis at this time for an order to

12  the Port Authority to have greater involvement by counsel

13  with respect to the collection of documents.

14          All right, the next item is the Port Authority

15  should be required to search the emails of commissioners,

16  and, again, I mean it sounds like the commissioners' emails

17  are being searched.

18          MR. MULRY:   Yes, I believe it seems that the

19  commissioners are searching their own emails.   With respect

20  to that, sort of following in Your Honor's ruling, one thing

21  AAA should be advised which commissioners' emails have been

22  searched and which have not so that we can determine if

23  subpoenas would be necessary, and at that point we would

24  want to know if the Port Authority would be accepting

```
 1                                                    24
 2   subpoenas on behalf of the commissioners and representing
 3   them.
 4              THE COURT:   Let me ask you --
 5              MS. MILLER:    We'd be --
 6              THE COURT:   Let me ask you a question, then I'll
 7   hear anything you want to tell me.  Is there any objection
 8   to advising plaintiffs which commissioners' emails are being
 9   searched and from which responsive documents are being
10   produced?
11              MS. MILLER:   Most of the commissioners are
12   searching their own, Your Honor.  In one or two cases, I
13   know of one case where the commissioner invited the Port
14   Authority paralegal specialist and our law department
15   technical services person to go and download documents from
16   his computer.  That's Commissioner Lindford.  I don't know
17   if that was done in any other cases or whether the
18   commissioners, and, again, these are their private
19   computers.  They're in their own homes or their own offices.
20   They're not Port Authority computers, and the commissioners,
21   with the exception of David Sampson, do not have Port
22   Authority email.
23              So we will either have a certificate from them if
24   they have no emails or documents on their computer, that
25   they have nothing, or we'll provide whatever documents that
```

1

2  particular commissioner has provided to us and indicate

3  which commissioner those documents came from.

4       THE COURT:  All right, it sounded like what Mr.

5  Mulry was seeking was either confirmation that emails are

6  being produced from all, responsive emails are being

7  produced from all commissioners' computers or identification

8  of any commissioners who have refused to have their

9  computers searched.  Am I understanding you correctly, Mr.

10  Mulry?

11       MR. MULRY:  Yes, we want to know what is being

12  searched, what is not being searched.

13       THE COURT:  He just wants to know whether or not

14  you're capturing the emails of all the commissioners or some

15  commissioners --

16       MS. MILLER:  As far as I know --

17       THE COURT:  -- who are not cooperating.

18       MS. MILLER:  As far as I know, Your Honor,

19  everyone is cooperating.  We haven't heard from anyone who

20  said they wouldn't do the search.  I believe we are getting

21  certificates from several of the commissioners who say they

22  have nothing on their computer.

23       THE COURT:  All right.  Well, when you complete

24  the production, is there any objection to either confirming

25  that all commissioners' computers have been searched or

1

2   identifying the commissioners whose computers have not been

3   searched?  Any objection to doing that?

4            MS. MILLER:   I don't have any objection to doing

5   that as long as the court understands the computes were

6   searched by the commissioners or their staff at their

7   business.  We didn't go in and do the search.  We provided a

8   link to the commissioners to give us any documents.

9            THE COURT:   Yeah, I understand, but I'm presuming

10  the commissioners wouldn't dissemble to the Port Authority's

11  law department.

12           MR. MULRY:   And, Your Honor, presumably the

13  commissioners will be searching for hard copies as well I

14  would expect.

15           THE COURT:   Is that – are the commissioners also

16  searching for hard copy, Miss Miller?

17           MS. MILLER:   It's my understanding they were

18  asked to provide, those who had files, but I don't believe

19  anybody has provided any.  Again, I can't say for certain,

20  but I don't believe anybody has provided any hard copy

21  files.

22           THE COURT:   Well, I mean, again, this is not –

23  what I think Mr. Mulry is looking for is he's just looking,

24  he's seeking to make sure that the commissioners' paper and

25  electronic files have been reviewed for responsive documents

1
2  and that responsive, non-privileged documents have been

3  produced.  I mean it sounds like if some commissioner has

4  been reluctant or unwilling to cooperate with the law

5  department, he's willing to serve a subpoena on the

6  commissioner, but he's just trying to find out whether or

7  not that task needs to be done, which seems to me to be a

8  fair question.

9          MS. MILLER:  Yes, Your Honor, I would be happy to

10  let him know.  As far as I know, everybody has been very

11  cooperative.

12          THE COURT:  Okay.  All right.  The Port Authority

13  should be required to state if a search for responsive

14  documents was conducted when it responds that there are not

15  responsive documents.  I think that's implicit and probably

16  required under Rule 26.  Isn't there a requirement about

17  what it means when you've sign a discovery response?  Hold

18  on one second, let me just find the provision.

19          (pause in proceeding)

20          THE COURT:  26(g)(1), "Every disclosure under

21  26(a)(1) or (a)(3) and every discovery request, response, or

22  objection must be signed by at least one attorney of record

23  in the attorney's own name or by the party personally if

24  unrepresented and must state the signer's address, email

25  address, and telephone number.  By signing it, an attorney

1

2  or party certifies that to the best of the person's

3  knowledge, information, and belief formed after reasonable

4  inquiry, (b) with respect to a discovery request, response,

5  or objection, it is consistent with the rules and warranted

6  by existing law or by a non-frivolous argument or extending

7  or modifying or reversing existing law or for establishing

8  new law, (2) not interposed for any improper purpose such as

9  to harass, cause unnecessary delay or needlessly increase

10  the cost of litigation, and (3) neither unreasonably nor

11  unduly burdensome or expensive considering the needs of the

12  case, prior discovery in the case, and the amount in

13  controversy and the importance of the issues at stake in the

14  action."

15          I would think the "after reasonable inquiry"

16  language would require that counsel perform, counsel make

17  reasonable inquiry before confirming that there are no such

18  documents.

19          MR. MULRY:   Yes, Your Honor, based on what's been

20  said here and in the letters, our understanding is that when

21  the Port Authority says there are no documents, they're

22  saying that a search was conducted and that there are no

23  responsive documents.

24          THE COURT:   Well, yeah --

25          MS. MILLER:   That's not quite correct, Your

1

2  Honor.

3        THE COURT:   Pardon?

4        MS. MILLER:   That's not quite correct.   I did

5  make a reasonable inquiry.   As I told the court the last

6  time I was here, I assembled a large number of people in a

7  conference room that was not only Mike Fabiano but everybody

8  who worked with him on putting together the papers, his

9  affidavit and the exhibits, who extracted the information

10  about the interstate transportation network.   I had all

11  those people gathered in a room, and we went through each

12  and every document request.

13        And it was explained to me as I've tried to

14  explain to the court, perhaps not too clearly, tried to

15  explain to counsel that the Port Authority keeps its

16  financials and keeps its actual finances, they are pooled.

17  The consolidated bond fund is pooled, our revenues are

18  pooled.   We are a pooled agency by statute.   So a number of

19  the documents that plaintiff is requesting don't exist.

20  There are none because that's not how we keep our records.

21  And, therefore, I didn't make a search for records when

22  somebody told me you're not going to find any such records

23  because that's not how we keep our financials.   I didn't

24  then say, well, make a search for them anyway.

25        So my inquiry was are there such records?   If

1

2    there are potentially records, then I asked them to make a

3    search.  If they told me the Port Authority does not keep

4    those kind of records because of the nature of the agency,

5    then I did not ask them to make a search, and I simply

6    responded there are none.  And there were a number of

7    requests that were for, specifically for documents related

8    to the interstate transportation network, and we don't have

9    those documents other than the exhibits to the affidavit of

10   Michael Fabiano that was submitted in support of our motion

11   to dismiss and in opposition to the application for a

12   preliminary injunction.

13          THE COURT:   Well, let me come back to Mr. Mulry

14   for a minute.  Mr. Mulry, suppose in some circumstances an

15   actual search need not be produced as long as there's a

16   reasonable inquiry, as the rule requires.  I mean, if, you

17   know, to take a simple example, if by the nature of the

18   request the responding party knows that it doesn't have

19   responsive documents, I'm not sure that a search actually

20   needs to be done.

21          If, for example, you know, I'm assuming, and maybe

22   rightly or wrongly, that Miss Miller has never intended a

23   Super Bowl, and I mean if you served a document request

24   asking for all documents concerning Miss Miller's attendance

25   at Super Bowl X, I mean I'm not sure – and, again, assuming

1

2   Miss Miller knows she's never attended the Super Bowl, I'm

3   not sure someone needs to go out and search for responsive

4   documents.

5            MR. MULRY:   I think that's correct, Your Honor.

6   It depends on the circumstances.

7            THE COURT:   Yeah.

8            MR. MULRY:   Here, the statement that there are

9   not documents was stated for a number of the requests, and

10  as I understand the argument, the argument is that you have

11  the bridges and tunnels, you have the Port Authority, I'm

12  sorry, you have the airports, you have the World Trade

13  Center, those various lines of business.  Because all the

14  records are consolidated, my understanding is that there are

15  no records or there are few records for the ITN, which

16  creates a significant problem where Second Circuit law is

17  that the ITN revenues can only be used for ITN expenses.

18            So what many of the discovery requests are

19  directed to is the issue of how do you account for the money

20  that comes into the ITN and then the money that goes out?

21  Where does the money that go out go and is it going outside

22  the ITN?  And not to get too afield from the topic we're on,

23  but that's why the reserve funds are so important.  There's

24  a general reserve fund which has a requirement of 10 percent

25  of the outstanding bonds to be put in that reserve fund;

1

2 then there's also a consolidated bond reserve fund that has

3 monies from all parts of the Port Authority going into it.

4 And we know, for example, in three years, in a three-year

5 period in the late 2008/2009/2010, approximately a billion

6 dollars from those went out of the bond fund for various

7 capital expenditures, which from the public records it

8 appears that some significant portion of that went to the

9 World Trade Center.

10        Well, where does that money come from?  The World

11 Trade Center is not making money, not bringing money into

12 the consolidated funds since 2001.  Is it the Port

13 Authority's position that all of those funds are coming from

14 the airports?  Because we know from the public records that

15 the bulk of the revenues for the Port Authority on a whole

16 come from bridges and tunnels on the one hand and airports

17 on the other.  So that goes to the issue that we're seeking

18 discovery on of funds from the ITN going into these reserve

19 funds over the years and then at a certain point monies

20 taken out for capital expenditures, including expenditures

21 outside the ITN.

22        And from the discovery responses the Port

23 Authority has no control, no check on what's the ITN money

24 going into the reserve funds and what's the ITN money coming

25 out.  And that, you know --

1

2          THE COURT:   Well, maybe, maybe not.   I mean there

3   are limitations inherent in document requests.   The response

4   there are none may be entirely accurate, but the documents

5   may exist in another form or maybe the existence of checks

6   and controls is something that's better explored in

7   deposition.   I mean, look, what inference is drawn from the

8   discovery response is I suppose a function who's drawing the

9   inference, but –

10          I guess the issue here is whether or not there's a

11   good faith basis, after reasonable inquiry, for the response

12   there are none.   And I mean if you have questions about the

13   correctness of a response, there are none, you know, I think

14   there are two alternatives open to you.   You can call Miss

15   Miller and see if, and, you know, have a meet and confer

16   over the telephone, or, alternatively, in terms of tracing

17   the ITN funds in the manner you've just described, you can

18   explore that at a deposition.

19          MR. MULRY:   And we have noticed the deposition of

20   Rosemary Chercolo who's been identified as someone within

21   Mr. Fabiano's group at the Port Authority --

22          MS. MILLER:   Well, I was told --

23          MR. MULRY:   -- from among other things, that

24   purpose.

25          MS. MILLER:   Miss Chericolo is being sought to

1

2  find out whether there are any additional documents.

3  Obviously, Mike Fabiano, who did the affidavit in support of

4  the motion to dismiss, would be the person to depose as to

5  where the funds come in and where the funds come out.  But

6  does the Port Authority know where the funds come from and

7  where they do?  Absolutely.  Of course, we do.  Mike Fabiano

8  could not have created his affidavit if he didn't know where

9  the monies came into the interstate transportation network

10  and where they went out.

11        And a significant portion of them go out to the

12  PATH train but also a significant portion will be going out

13  for the capital plan which requires, as this court knows,

14  you know, the replacement of the suspenders on the George

15  Washington Bridge, raising the Bayonne Bridge, rebuilding

16  the Pulaski Skyway.  There are a number of major capital

17  projects in the interstate transportation network, and we

18  know where those fund go.  We know where the bonds are

19  because those are the only tax-free bonds.

20        So because we consolidate our monies doesn't mean

21  we don't know where the monies go.  We do know where the

22  monies go.

23        THE COURT:  Okay.  I think we may be getting into

24  — I'm not sure that really addresses the discovery issue

25  here, but I mean that's more of a substantive contention

1
2 than a discovery issue.  I mean, you know what, what

3 sometimes happens, Mr. Mulry, is, in many litigations, is

4 that a party will serve an initial discovery request, get

5 some documents, wonder why there aren't other documents,

6 take a deposition of a witness or two, and get a better

7 understanding of what classes of documents the adversary has

8 that may be relevant and then serve a second round of

9 document requests.

10             MR. MULRY:   Yes, Your Honor, that's what --

11             THE COURT:   I mean it's --

12             MR. MULRY:   -- we're anticipating.

13             THE COURT:   -- not unusual for things to happen

14 that way.

15             MR. MULRY:   Yes.  Your Honor, there was one topic

16 that we would skip, just to make you aware of.  It does not

17 have two different positions.  Just to advise the court --

18             THE COURT:   The email search terms?

19             MR. MULRY:   Yeah, the Port Authority was going to

20 advise us of the search capability of their system, because

21 we agree, the search terms that were in Miss Miller's letter

22 are very broad, and if the search can be done with two

23 terms, with an "and" or within 20 words, that may be more

24 streamline.  We also this - this gets to an issue we started

25 to talk about a little earlier.  We, for example, believe

2   the search terms should include search terms related to the

3   consolidated bond reserve fund and the general reserve fund

4   because those are important issues with respect to where

5   does the ITN money go and how is it accounted for.

6           MS. MILLER:   Really, we wanted to do a broad

7   search, Your Honor, to avoid repetitious searches, and we'd

8   rather cull through the documents that we have and eliminate

9   those pretty quickly that relate to the airports and other

10  facilities.

11          But I am told, and, again, I haven't spoken to the

12  technical person, but I spoke to the paralegal specialist

13  working with him, that because the search terms that I put

14  in were so broad, that if consolidated bond would come up in

15  connection with tolls, I mean if I put in tolls, fares,

16  interstate transportation network, anything that related to

17  consolidated bonds or the general reserve fund would be

18  pulled up in that search because it's an overly broad

19  search.

20          So rather than go back and do a second search at

21  this time and risk being criticized for not having pulled in

22  enough documents, we're pulling in all the documents, and

23  we'll go through them.   So that consolidated bond and

24  reserve fund would have been pulled in if it was any way

25  connected to tolls, that's what I'm told.

 1

 2              THE COURT:   Go ahead.

 3              MR. MULRY:   I don't think that we would agree

 4   that necessarily all documents related to the bond fund

 5   would necessarily be captured in a search that asks for

 6   tolls and fares, but that's why we would want some input

 7   into the issue of --

 8              MS. MILLER:   Well, that's correct, but we don't -

 9   -

10              MR. MULRY:   -- search terms.

11              THE COURT:   I'm looking at your - I think it's

12   your letter, Miss Miller, it's exhibit B.  It is your

13   letter.  Your letter dated June 8, 2012, page 3, the search

14   terms suggested are as follows:  toll, fare, toll increase,

15   toll increase, fare increase, toll hike, etc.  And among

16   those terms, consolidated bond fund and reserve fund does

17   not appear --

18              MS. MILLER:   No, it does not appear, Your Honor,

19   but I'm told it would come up.

20              THE COURT:   But I'm not sure someone can tell you

21   with certainty that those terms are going to retrieve

22   documents with those two expressions in them.

23              MS. MILLER:   You know, I made a preliminary

24   inquiry, and I was told that if consolidated bond or general

25   reserve fund, in connection with toll or fare or the

1

2   interstate network was a topic, that it would come up.  But

3   if we put in consolidated bond reserve fund and general

4   reserve fund, we're going to pull in thousands and thousands

5   of documents because we're going to pull in every other

6   facility for which we issued bonds, which is what we do on a

7   regular basis, Your Honor.  So we're talking thousands and

8   thousands of documents.

9           I can inquire further, but I was told that it

10  would be pulled up.

11          THE COURT:   Well, what you may want to do, and I

12  say this by way of suggestion not by way of direction, is

13  that with e-discovery usually the bulk of the expense is not

14  incurred doing the electronic search itself.  The bulk of

15  the expense is the attorney time that occurs or that is

16  expended later when the documents are reviewed for, or

17  manually reviewed by a warm body for responsiveness and

18  privilege, that the electronic search itself is usually not

19  a terribly expensive undertaking.

20          What you may want to do, and again, I say this by

21  way of suggestion, not by of an order, but what you may want

22  to do is when you do the electronic search, do the search

23  including the electronic term search, consolidated bond fund

24  and general reserve fund I think were the two terms that Mr.

25  Mulry mentioned, and maybe just segregate the results.

1
2  Don't search it manually, save yourself that expense, and

3  see if the plaintiffs are happy with the response they get

4  to the other terms.  And this way if we need to litigate

5  about the general bond fund, the search terms consolidated

6  bond fund or general reserve fund, at least the electronic

7  documents will have already been culled, will already been

8  set aside.  But don't do the manual review yet.  Do you

9  understand what I'm – I'm not terribly sophisticated when it

10  comes to e-discovery terms, so maybe I'm not communicating

11  effectively.  I hope I am.  Do you understand what I'm

12  suggesting?

13          MS. MILLER:   I do, but I would ask that the

14  court, if we're going to do something like that, we should

15  do consolidated bond fund and toll, because otherwise we're

16  going to pull in everything.  Everything.  I mean we really

17  are going to have --

18          THE COURT:   That's a fair point.  That's a fair

19  point.

20          MS. MILLER:   For the – and this would be for Port

21  Authority computers only, correct?  You're not asking us to

22  go back to the commissioners?

23          THE COURT:   Well, the discovery obligation

24  extends to documents in the party's possession, custody, or

25  control.  So it's a question of what is in the Port

                                                                    40

1

2  Authority's possession, custody, or control.

3          MS. MILLER:   Well, technically we don't control

4  the commissioner's private computers.   I mean --

5          THE COURT:   Well, if --

6          MS. MILLER:   We've asked --

7          THE COURT:   -- their private computers are not

8  within your possession, custody, or control, the search

9  obligation doesn't extend to them.

10          MS. MILLER:   Right, but we have, in this

11  litigation we have gone the extra mile and asked them to do

12  the search on all the search terms that were indicated in my

13  letter.

14          THE COURT:   But I mean it does sound like the

15  search terms you have on page 3 of your June 8 letter are

16  going to yield a wealth of documents that the plaintiffs

17  will find of interest.   So it may be that you'll never have

18  to, we'll never have to cross the bridge about consolidated

19  bond fund or general reserve fund.   My understanding is it's

20  not an expensive undertaking to run the electronic search

21  and segregate the product of specific search terms.   But,

22  again, I say that by way of suggestion not by of order.

23          All right.   The next topic is privilege, and it

24  looks like the response is that no privileges have been

25  asserted.

```
 1                                                      41

 2              MR. MULRY:   That is the response.

 3              THE COURT:   All right, so there's nothing to

 4   fight about there.   The next topic I'm a little at sea at.

 5   The Port Authority should be required to advise of any

 6   repositories that may have responsive documents that have

 7   not been searched and the reason why.   I mean, Mr. Mulry, in

 8   any organization there's always a chance of things being

 9   misfiled.   You know, if there's a reasonable prospect that a

10   repository has responsive documents, it's got to be

11   searched.   I'm not sure what you're looking for here.

12              MR. MULRY:   This goes primarily to one of the

13   issues we discussed at the last conference.   If, for

14   example, there are backup tapes that under Rule 26 arguably

15   would be not reasonably accessible, we are entitled to know

16   that the Port Authority has those and they're not being

17   searched, and we can discuss whether or not that becomes an

18   issue.   Where this is especially of concern is if the

19   representation is that after 120 days emails on the Port

20   Authority system are deleted and then, as I understand it,

21   are not retrievable again, we want to know if that is, in

22   fact, if that's correct or if there are backup tapes that

23   exist such that those can be recreated and there may be an

24   issue under Rule 26 of whether those should be searched or

25   under what conditions.   But it's primarily understanding are
```

                                                                42

there repositories, particularly with respect to electronic

information, that have not been searched for some reason

such as their backup tapes --

        THE COURT:   So you're only look for

identification of repositories that haven't been searched

because defendant is taking a position that they're

reasonably accessible?

        MR. MULRY:   Yes, or for some other reason.  Not

really the issue of something's been misfiled so there may

be a file cabinet out there where something was placed.  It

is of particular concern with the issue of emails that are

automatically deleted.  Is it correct that those --

        THE COURT:   I mean I'm just trying to get, trying

to get some focus here.  Are you looking for repositories

that fall within Rule 26(b)(2)(b)?

        MR. MULRY:   Primarily --

        THE COURT:   (b)(2)(b) reads "specific limitations

on electronically stored information.  A party need not

provide discovery of electronically stored information from

sources that the party identifies as not reasonably

accessible because of undue burden or cost."

        MR. MULRY:   Yes, that's --

        THE COURT:   Is that what you're looking for?

        MR. MULRY:   That's the primary basis for this

1  section.

2         THE COURT:   All right.   Are there any such

3  repositories, Miss Miller?   And understand he's not seeking

4  to compel discovery of those repositories right now.   He's

5  just seeking identification of any such repositories if they

6  exist.

7         MS. MILLER:   It's my understanding, Your Honor,

8  and I've made reasonable inquiry, but I can always make

9  further reasonable inquiry, that emails that are deleted

10 after 120 days are not recoverable, that they are not backed

11 up.   That backup is for saved files.

12        THE COURT:   All right.   Does the Port Authority

13 have backup tapes?

14        MS. MILLER:   The Port Authority has backup, but

15 it's my understanding that it's for saved files.   If I

16 create a litigation document and I save it in my computer in

17 the share drive, and my computer is destroyed, it's my

18 understanding that that document has been saved on backup

19 tapes because I intended to save it.

20        THE COURT:   Okay.

21        MS. MILLER:   So if I took an email out of the

22 regular email system and I saved that email in a folder, in

23 the share drive, I have a share drive as well as a U drive

24 on computer and I put it in the share drive and I saved it

1

2   as a document, that that email would be preserved, that it

3   would be backed up because I've now saved it as a regular

4   document just as a Word document.  That's my understanding,

5   but I'm not a technical person, and I don't know how long

6   those backup tapes are maintained.  My only experience with

7   it directly was after 9/11 when I was fortunate enough to

8   have most of my files saved on backup.

9           THE COURT:   All right, well, I mean with respect

10  to this item, what I'm inclined to do is direct – I'm not

11  trying to put you on the spot here, Miss Miller, or ask you

12  to describe things that you don't have a full understanding

13  of.  But what I'm inclined to do is direct the Port

14  Authority to describe to plaintiffs what backup tapes exist

15  and what information they capture.

16           Again, I hasten to add that I'm not ordering that

17  backup tapes be searched or restored at this time.  That's

18  an issue that involves a different analysis, and that's an

19  issue that if we come to that issue, if we come to that

20  matter, it would need to be briefed, but he's at least

21  entitled to know what exists and what kind of information is

22  captured on the backup tapes.  Okay?

23           The Port Authority should not be permitted to

24  redact non-privileged information from documents.  Mr.

25  Mulry, why are they not permitted to redact irrelevant

information?

MR. MULRY: Well, Your Honor, they're entitled to withhold or redact information on the basis of privilege, but as far as selecting information that they consider not relevant --

THE COURT: Let me pose the question differently. What entitles you to discovery of irrelevant information?

MR. MULRY: Well, if it is a document that's relevant to the case --

THE COURT: Well, sometimes part of a document's relevant and part of it's not.

MR. MULRY: But if a document's relevant, the only basis for redaction is privilege.

THE COURT: No, if a document deals with multiple topics and some topics are relevant and some topics are irrelevant, what entitles you to discovery of the irrelevant topics?

MR. MULRY: Well, the – Your Honor, we've looked as far as finding authority for redaction of documents on the basis of relevance, and that is nothing I have found any authority for. Typically --

THE COURT: No, but I think the answer may lie in Rule 26 which sets the general guidelines for discovery as being relevance and non – relevant to a claim or defense and

1  not privileged.

2

3        MR. MULRY:   Well, then if Port Authority is

4  entitled to redact information that they consider not

5  relevant, then we would have to have a log of all those

6  redactions --

7        THE COURT:   By what authority?

8        MR. MULRY:   So we would understand what's the

9  basis for a redaction --

10        THE COURT:   No, what requires a log of redactions

11  on the grounds of irrelevance?  The rules don't.

12        MR. MULRY:   How are we to know why a document is

13  redacted?  Is it redacted on the basis of privilege?

14        THE COURT:   You could ask.  I mean right now we

15  know they haven't redacted any - well, my understanding is

16  they haven't asserted the privilege with respect to

17  anything.  That was one of the prior topics.  But if you -

18  look, if you get a document that's redacted and you want to

19  know why it's redacted, pick up the phone and call Miss

20  Miller.  I mean if you ask, she's obligated to tell you at

21  least why it was redacted, whether it was relevance,

22  privilege, or something else.

23        MR. MULRY:   Because we have to be able to address

24  that if necessary to the court as to there's a redaction and

25  the reason for, and if we disagree with the redaction, then

1
2  --

3           THE COURT:   Well, I mean --

4           MR. MULRY:   -- we'd have to be able to realize

5  that.

6           THE COURT:   Part of the problem is that there's

7  nothing in the rules that requires a list of documents

8  withheld or redacted on the ground of privilege and carried

9  to its logical extreme, requiring a redaction log, requiring

10 a log of documents redacted on the grounds of irrelevance

11 could lead to the requirement that you got to prepare a list

12 of documents, that a party would need to prepare a list of

13 documents withheld on the grounds of relevance which would

14 mean that a party would need to log every document it hasn't

15 produced.

16           MR. MULRY:   No, I wouldn't suggest that.

17           THE COURT:   Which is obviously ridiculous.

18           MR. MULRY:   The issue is it's a document that is

19 relevant to the case.

20           THE COURT:   Well, sometimes – but, no, I mean

21 sometimes a document deals with multiple issues, and some of

22 the issues are relevant and some of them are irrelevant.  I

23 mean I suppose you could have a document, you know,

24 itinerary for, or agenda for a meeting and one of the topics

25 might be a toll hike, and topic number 10 may be where the

1                                                                    48

2   holiday party's going to be this year.  And the toll hike

3   topic might be relevant but the topic on where the holiday

4   party's going to be held clearly isn't.  I mean sometimes a

5   document deals with multiple issues, some of which are

6   relevant, some of which aren't.

7            MR. MULRY:   Your Honor, I would ask that we'd be

8   given the opportunity, if we decide to raise this again to

9   you with case authority, but we'll certainly defer to your -

10  -

11           THE COURT:   I'm not aware -

12           MR. MULRY:   -- view of the case right now.

13           THE COURT:   I'm not aware of anything that

14  requires a log of documents redacted on the grounds of

15  irrelevance.  And, again, as I said before, if you get a

16  redacted document and you want to know why it was redacted,

17  you're free to call Miss Miller, and she would have to tell

18  you what the basis for the redaction was, you know, whether

19  it's relevance or privilege or something else.  I mean do

20  you want to add anything on that, Miss Miller?

21           MS. MILLER:   No, Your Honor, in most cases -

22  there weren't a lot of redactions.  Exhibit H comes to mind

23  in the second document production, although I believe there

24  were some in the Rule 26 voluntary disclosure also, and what

25  I did was I redacted - exhibit H had to do with the

49

allocations from the consolidated bond fund, and I redacted

the financial information for aviation, the World Trade

Center, port commerce, and I left all of the information in

for the interstate transportation network.

          I didn't redact the terms World Trade Center or

aviation so that they could see that I was redacting --

          THE COURT:   Right, right, I understand.

          MS. MILLER:   -- because it was World Trade Center

--

          THE COURT:   You left the label but not the

content.

          MS. MILLER:   Right, but I believe I also did

that, I tried to do that if I could with respect to the rule

of voluntary disclosure so that they would see that I was

redacting because it wasn't related, it was financial data

not unrelated to the interstate transportation network.  If

I didn't in one case, I'd be happy to explain it.

          THE COURT:   No, that makes - what you're

describing makes perfect sense.  All right.

          The last area here is AAA's intention to make a

motion to compel with respect to disputed areas of

discovery.  Basically to revisit the May 7 order.  Mr.

Mulry, if you want to make a motion arguing that broader

discovery is appropriate, I'm happy to consider such a

1

2  motion.  I would only ask that I would the motion is going

3  to add, is going to be based new or different arguments than

4  were made in May.  If it's just a rehash of what was said in

5  May, it's going to get the same result.

6           MR. MULRY:  We understand that, Your Honor, and

7  we know that when you made that ruling, you did say you

8  would look – that was an initial ruling based – it was

9  actually at the first conference and there were no discovery

10 requests or responses in front of you.  So you had told us

11 at the time you would look at that on a full record.  So

12 we're just alerting you to the fact that we will do that.

13           On issues, for example, such as the bond reserve

14 fund and the general reserve fund, because Your Honor made t

15 ruling in the context of a discussion of whether the AAA

16 would get discovery with respect to funding sources for the

17 World Trade Center, and Your Honor's ruling was that we

18 would not get, he would limit it to the ITN.  But we had not

19 explored in that conference all the issues that were present

20 in the case.

21           And so we would want to make clear, particularly

22 if, as we go into depositions, as to what the parameters of

23 discovery are, because we argue that they do go beyond that

24 time period, but we would like to lay that out for you in a

25 written motion.

1

2          THE COURT:   Yeah, that's fine.  If you want to

3   make a renewed application for broader discovery, you're

4   free to do so.  I'll get your papers, I'll get the Port

5   Authority's response, I'll get your reply, and I'll hear you

6   on it.  That's – if you want to make such an application,

7   feel free.  Again, as long as you're going to make some new

8   arguments.  I just hope you're going to be asserting new

9   arguments and not merely repeating what was said in May.

10          MR. MULRY:   Would Your Honor want to set a

11   schedule or do you want me to set that with Miss Miller and

12   present that?

13          THE COURT:   Well, I mean when do you want to make

14   – when do you want to make it?  I'll set a schedule right

15   now; if you want to agree with Miss Miller on a schedule,

16   that's fine too.  Whatever way you want to do it.

17          MR. MULRY:   Judge, we'd ask for two weeks to July

18   3.

19          MS. MILLER:   Your Honor, I'm starting a trial on

20   Monday in front of Judge Laura Taylor Swain, as I told this

21   court.

22          THE COURT:   Well, they're not going to be making

23   it until July 3, so you're not going to have anything on

24   Monday.  So you don't have to do anything next week.

25          MS. MILLER:   Right, well, the week after, the

1
2  trial, it's not going to be over in a week.  There are four

3  plaintiffs, and it's going to take at least two weeks.  So

4  this trial is going to be going into July.

5         THE COURT:  Maybe.

6         MS. MILLER:  I'm pretty sure it's going into

7  July.  I can't see this trial even --

8         THE COURT:  Trials usually take less time than

9  you think they're gonna take.  You usually get surprised.

10        MS. MILLER:  If Judge Swain --

11        THE COURT:  What kind of case is it?

12        MS. MILLER:  It's a retaliation case.

13        THE COURT:  Employment Title 7 retaliation?

14        MS. MILLER:  Employment retaliation, there are

15 four separate plaintiffs.  So it will take a while because I

16 can tell you right away that Paul Weiss has subpoenaed 25

17 witnesses.

18        THE COURT:  I don't even think group they had 25

19 witnesses.

20        MS. MILLER:  That, you know, unless they're

21 prepared to cut their list, which they may be, but I don't

22 know if they're going to cut it enough, and there's a

23 holiday in the middle.

24        THE COURT:  Well, maybe a holiday at the end, we

25 don't know yet.  I'd just be surprised if you have a

1

2  retaliation trial that's going to take more than two weeks.

3  Anything's possible, but who knows.  Well, okay, so you'll

4  be getting the papers on the 3rd.

5          MS. MILLER:   Well, I won't be able to look at the

6  papers until this trial is over, Your Honor, whether that's

7  - you know, I'm sure it's not going to be over before the

8  end of the week of July 6 because I know that the witnesses

9  that they are putting on are going to take up all of June

10  and the beginning of July.

11          THE COURT:   It must have been some kind of

12  retaliation.

13          MS. MILLER:   Well, Paul Weiss is, if nothing, but

14  thorough.  They are putting in everybody.

15          THE COURT:   Well --

16          MS. MILLER:   I would ask that papers --

17          THE COURT:   Tell you what, why don't we do this?

18  Why don't we do two weeks from the conclusion of your trial?

19  Or two weeks from July 3 whichever comes later.

20          MS. MILLER:   Two weeks from July 3 is --

21          THE COURT:   Two weeks from July 3 is July 17, or

22  two weeks from the conclusion of your trial, whichever comes

23  later.  So if your trial ends on the 6th, your response

24  would be due the 20th.  If your trial folds, your response

25  would be due the 17th.  If your trial ends on the 3rd, your

                                                                54

1   response would be due the 17th.

2           MS. MILLER:   Well, can I ask for either the 17th

3   or the 24th, Your Honor, simply because I'm taking a couple

4   of days off in July that week.

5           THE COURT:   Which week are you taking time off?

6           MS. MILLER:   I'm taking the 18th, 19th, and 20th.

7   So I would ask that it either be the 17th, which assuming,

8   if Your Honor is correct and the trial is over by July 3,

9   that's two weeks, or July 24.

10          THE COURT:   Well, tell you what, why don't – all

11  right, so you're out the 18th through the 20th.  I'm happy to

12  accommodate your vacation.  Why don't we do this, why don't

13  you send me a letter, you can have your secretary do it or a

14  paralegal do it, just send me a one-sentence letter telling

15  me when the case, when your retaliation case has concluded,

16  and I'll set the date two weeks from that giving you the

17  18th, 19th, and 20th off.  Okay?

18          MS. MILLER:   Very good, Your Honor, we'll do

19  that.

20          THE COURT:   What's the docket number of the case,

21  do you have the docket number of the case before Judge Swain

22  by any chance?

23          MS. MILLER:   Well, there are four docket numbers.

24  I can send the Court the docket numbers.  I don't have it

```
 1                                                    55
 2  with me.  It's the first -
 3            THE COURT:   Do you have one of them?  I suspect
 4  they're going to be related on the ECF system.  Do you have
 5  any of the docket numbers?
 6            MS. MILLER:   No, not off the top of my head.  I
 7  can tell you that it's Eng v. the Port Authority, Young v.
 8  the Port Authority, Chin v. the Port Authority, and Chung v.
 9  the Port Authority, and I can call the court with the docket
10  numbers.  I can tell you --
11            THE COURT:   It's E-N-G is Eng?
12            MS. MILLER:   Eng, Christopher Eng.
13            THE COURT:   Christopher Eng is enough, I can find
14  it.  Okay.
15            MS. MILLER:   And they're consolidated for trial.
16            THE COURT:   Yeah, I can find it.
17            MS. MILLER:   So the four of them.  I don't know
18  if they're consolidated, because they're brought as four
19  separate actions, the judge consolidated them for discovery,
20  and then we decided just to consolidate them for trial.
21            THE COURT:   Just knowing the lead case is enough.
22  That's all I need to know.  All right, so send me a letter
23  when --
24            MS. MILLER:   Christian Eng, it's Christian Eng,
25  I'm sorry.
```

1

2          THE COURT:   Chris --

3          MS. MILLER:   Christian, yes, Christian Eng.

4          THE COURT:   Okay.  All right, we'll give you two

5   weeks, and if the two weeks bridges the 18th through r 20th,

6   we'll give you the two weeks and three days.  Okay?  You'll

7   do a reply a week after her opposition?

8          MR. MULRY:   Yes, Your Honor.

9          THE COURT:   Okay.  I think that was everything in

10   the letter.

11          MR. MULRY:   One last point was to advise, Your

12   Honor, that the parties anticipate that we will need to seek

13   a modified discovery schedule from Judge Eaton, and at this

14   point I don't know that the Port Authority knows when its

15   supplemental production will be made, but I think both

16   parties would be making that application to Judge Eaton.  We

17   can consult with you beforehand as to what schedule we would

18   ask.

19          THE COURT:   I'm not sure I'm involved in that in

20   terms of what schedule you want to ask for.

21          MR. MULRY:   We can then direct that to Judge

22   Eaton.

23          THE COURT:   Yeah, I don't have it for general

24   pre-trial.  I don't have it for scheduling.  And in terms of

25   what modification you want from Judge Eaton, I think that's

```
 1                                                    57
 2  something that's up to all counsel, not up to me.  All
 3  right?  All right, anything else from plaintiff's side we
 4  should be considering?
 5            MR. MULRY:   No, Your Honor.
 6            THE COURT:   Anything else from defendant's side?
 7            MS. MILLER:   No, Your Honor, thank you.
 8            THE COURT:   Okay, thank you all.
 9            (Whereupon the matter is adjourned.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
```

C E R T I F I C A T E

I, Carole Ludwig, certify that the foregoing transcript of proceedings in the United States District Court, Southern District of New York, Automobile Club of New York versus The Port Authority of New York and New Jersey, Docket #1:11-cv-06746-RKE-HBP, was prepared using digital electronic transcription equipment and is a true and accurate record of the proceedings.

Signature_____

Date:   June 27, 2012