UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

AUTOMOBILE CLUB OF NEW YORK, INC. :
d/b/a AAA NEW YORK and AAA NORTH :
JERSEY, INC., : 11 Civ. 6746
 : (RKE) (HBP)
       Plaintiffs, :
 :
   -against- :
 :
THE PORT AUTHORITY OF NEW YORK :
AND NEW JERSEY, :
 :
       Defendant. :

-------------------------------------------------------------X

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION
## TO MOTION TO QUASH SUBPOENAS

FARRELL FRITZ, P.C.
*Attorneys for Plaintiffs*
370 Lexington Avenue, Suite 800
New York, New York 10017
(212) 687-1230

*Of Counsel:*
  Michael F. Fitzgerald
  Kevin P. Mulry
  Franklin C. McRoberts

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................. iii

PRELIMINARY STATEMENT ............................................................................. 1

BACKGROUND ................................................................................................... 2

    The Information Given to the Commissioners – And the Information Not Given
    to the Commissioners – Are Relevant Areas of Inquiry ....................................... 2

    The Reasons for the Toll Increase are Relevant Areas of Inquiry ....................... 5

    The Press Release Statements from Chairman Samson and Commissioner Lynford
    After Approval of the Toll Increase Are Relevant Areas of Inquiry ................... 6

    The Port Authority Concedes That Under Governing Second Circuit Law ITN
    Revenues May Only Be Used for ITN Expenditures ........................................... 7

    Port Authority Deposition Testimony Has Established That The Port Authority
    Ignores Governing Second Circuit Law on the Use of ITN Revenues ................ 7

    The Commissioners are the Decision Makers On the Toll Increase .................... 9

ARGUMENT ........................................................................................................ 10

Point I

    AAA'S SUBPOENAS DO NOT IMPOSE AN UNDUE BURDEN .............................. 10

Point II

    THE MOVING COMMISSIONERS ARE NOT EXEMPT FROM DEPOSITIONS ..... 11

Point III

    AAA'S SUBPOENAS ARE NOT DEFECTIVE ............................................................ 15

Point IV

    AAA'S SUBPOENAS SEEK RELEVANT TESTIMONY ........................................... 15

Point V

      PRIVILEGE IS NOT A BASIS TO BAR AN ENTIRE DEPOSITION .......................... 17

Point VI

      PARTY DISCOVERY IS NOT REQUIRED BEFORE NON-PARTY DISCOVERY .. 18

Point VII

      AAA'S SUBPOENAS ARE NOT DESIGNED TO HARASS....................................... 19

CONCLUSION ...................................................................................................................... 20

## <u>TABLE OF AUTHORITIES</u>

<u>Page No.</u>

<u>Cases</u>

*Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Am.*,
  262 F.R.D. 293 (S.D.N.Y. 2009) ...................................................................................10, 14

*Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Am.*,
  262 F.R.D. 300 (S.D.N.Y. 2009) ...........................................................................................14

*Automobile Club of New York, Inc. v. Cox*,
  592 F.2d 658 (2d Cir. 1979)....................................................................................................16

*Automobile Club of New York, Inc. v. Port Auth. of New York and New Jersey*,
  887 F.2d 417 (2d Cir. 1989) ...............................................................................................7, 16

*Bey v. City of New York*,
  No. 99–cv–3873 (LMM) (RLE), 2007 WL 1893723 (S.D.N.Y. June 28, 2007) ..................12

*Bridgeport and Port Jefferson Steamboat Co. v. Bridgeport Port Auth.*,
  567 F.2d 79 (2d Cir. 2009)........................................................................................................7

*Innomed Labs, LLC v. Alza Corp.*,
  211 F.R.D. 237 (S.D.N.Y. 2002) ............................................................................................19

*Kingsley v. New York City Police Dept.*,
  No. 07 Civ. 7629(NRB), 2008 WL 5215648 (S.D.N.Y. Dec. 9, 2008)............................12, 14

*L.D. Leasing Corp., Inc. v. Crimaldi*,
  No. 91-CV-2430 (EHN), 1992 WL 373732 (S.D.N.Y. Dec. 1, 1992) ....................................13

*Maher v. Monahan*,
  No. 98 Civ. 2319 (JGK) (MHD), 2000 WL 648166 (S.D.N.Y. May 18, 2000).....................18

*Marisol A. v. Giuliani*,
  No. 95 Civ. 10533 (RJW), 1998 WL 132810 (S.D.N.Y. Mar. 23, 1998)...............................12

*Marisol A. v. Giuliani*,
  No. 95 Civ. 10533 (RJW), 1998 WL 159948 (S.D.N.Y. Apr. 1, 1998) .................................13

*Martin v. Valley Nat'l Bank of Ariz.*,
  140 F.R.D. 291, 314 (S.D.N.Y. 1991) ....................................................................................12

*New Look Party Ltd. v. Louise Paris Ltd.*,
  No. 11 Civ. 6433 (NRB), 2012 WL 251976 (S.D.N.Y. Jan. 11, 2012)...................................11

*Pegoraro v. Marrero*,
  No. 10 Civ. 00051 (AJN) (KNF), 2012 WL 1948887 (S.D.N.Y. May 29, 2012) .......11, 13, 15

*Reserve Solutions, Inc. v. Vernaglia*,
No. 05 Civ. 8622 (VM) (RLE), 2006 WL 1982780 (S.D.N.Y. July 7, 2006) ........................18

*Sanstrom v. Rosa*,
No. 93 Civ. 7146 (RLC), 1996 WL 469589 (S.D.N.Y. Aug. 16, 1996)..........11, 13, 14, 17, 18

*Scott v. Dime Savings Bank*,
No. 88 Civ. 5495, 1989 WL 140286 (S.D.N.Y. Nov. 16, 1989) .......................................18, 19

*State of Del. Dept. of Nat. Res. and Envtl. Control v. U.S. Army Corp of Engineers*,
722 F. Supp. 2d 535 (D. Del. 2010).........................................................................................16

*Universal Calvary Church v. City of New York*,
No. 96 Civ. 4606 (RPP), 1999 WL 350852 (S.D.N.Y. June 2, 1999) ....................................13

*Williams v. McCausland*,
Nos. 90 Civ. 7563 (RWS), 91 Civ. 7281 (RWS), 1994 WL 62937
(S.D.N.Y. Feb. 22, 1994) ........................................................................................................13

*Wolters Kluwer Fin. Svcs. Inc. v. Scivantage*,
No. 07 CV 2352 (HB), 2007 WL 1098714 (S.D.N.Y. Apr. 12, 2007)...................................11

STATUTES

33 U.S.C. § 508 ................................................................................................................1, 4, 7, 16

Fed. R. Civ. P. 26...................................................................................................................18

Fed. R. Civ. P. Rule 30 ...............................................................................................15, 18, 19

Fed. R. Civ. P. Rule 45 ...............................................................................................................15

This memorandum is respectfully submitted by plaintiffs Automobile Club of New York, Inc. d/b/a AAA New York and AAA New Jersey, Inc. ("AAA" or "plaintiffs") in opposition to the motion of Port Authority Chairman David Samson ("Chairman Samson") and Commissioner Jeffrey H. Lynford ("Commissioner Lynford") (collectively, the "Moving Commissioners") to quash subpoenas or, in the alternative, for a protective order.  For the reasons set forth below, the subpoenas properly seek relevant testimony, and the motion of Chairman Samson and Commissioner Lynford should be denied in its entirety.

## PRELIMINARY STATEMENT

In this action, AAA asserts that the toll increases approved by the Port Authority Board of Commissioners ("Commissioners") in August 2011, which include yearly toll increases through 2015, violate the 33 U.S.C. § 508 (the "Highway Act") and the Commerce Clause.

The Port Authority concedes that, under the Highway Act and the Commerce Clause, revenues of its interstate transportation network ("ITN") may not be used for expenses outside of the ITN.  Nevertheless, deposition testimony has confirmed that high-level Port Authority officials were unaware of this governing law, that the Port Authority does not consider this law in its financial forecasting and capital planning, and that it does not have a method to track whether it is following the law.  Moreover, the Port Authority's justification for the toll increase in August 2011 was not the expenses of the ITN, but the overall expenses of the entire Port Authority.

AAA seeks the deposition testimony of Chairman Samson and Commissioner Lynford. The Commissioners were the decisions makers with respect to the toll increase.  Although the Port Authority and the Moving Commissioners seek to downplay their role, they cannot seriously contest that the Commissioners made the decision to approve the toll increase.

1

Chairman Samson and Commissioner Lynford have first-hand knowledge relevant to the issues in this case.  Their testimony is relevant to the information that was presented – and not presented – to the Commissioners for consideration of the toll increase, as well as the reasons for the ultimate approval by the Commissioners of the toll increase.  In addition, Chairman Samson and Commissioner Lynford each made statements after the toll increase that were issued as press releases by the Port Authority, another subject of relevant deposition testimony.

As demonstrated below, Chairman Samson and Commissioner Lynford have failed to make any showing that depositions would pose an undue burden, and their testimony is relevant to the issues in this case.  The motion to quash should be denied.

## BACKGROUND

### The Information Given to the Commissioners – And the Information Not Given to the Commissioners – Are Relevant Areas of Inquiry

On August 5, 2011, the Port Authority announced a proposed toll increase on its bridge and tunnel facilities of $4 for E-ZPass holders, bringing the peak EZ-Pass toll to $12, to fund a $33 billion ten-year capital plan.  On August 18, 2011, the Governors of New York and New Jersey wrote to the Port Authority Chairman and Vice-Chairman, calling the proposed toll hike "unacceptable", and proposed an increase of $1.50 in September 2011 and 75 cents per year, every year thereafter, from 2012-2015 for E-ZPass holders, and an added $2 penalty on top of the increased toll for cash toll payers.  On August 19, 2011 the Commissioners met and announced in a press release the approval of a revised $25.1 billion ten-year capital plan and revised toll increases as proposed by the two Governors in their letter of August 18, 2011.  *See* Complaint, Dkt. No. 1, at ¶34-37.[1]

---

[1]     "Dkt. No." refers to the docket number of documents that have been publicly filed by ECF in this case.

It would appear as if the Port Authority had cut $8 billion from the $33 billion capital plan announced on August 5 to arrive at the $25.1 billion capital plan announced two weeks later, on August 19.  In discovery, however, plaintiffs have learned that the $33 billion ten-year capital plan was inflated and actually included the full cost of all projects in the ten-year plan, including costs that extended beyond ten years.  The revised $25.1 billion ten-year capital plan did drop some projects, but the majority of the "savings" occurred because this plan included only the costs to be spent in the ten-year period, and not the costs extending beyond the ten-year period.  The public was not told this, and it is unknown whether the Commissioners – the decision makers on the toll increase -- were told this.

In Port Authority CFO Michael Fabiano's presentation to the Commissioners on August 19, 2011, he stated that the bridge and tunnel toll increase was needed to fund a $25.1 billion capital plan, which included the World Trade Center:

> The historic economic recession has had a dramatic effect on the Port Authority, and we have lost 2.6 billion dollars in net revenue from what was projected when we last set the ten-year capital plan in 2007.  Since 9/11, our annual capital and security costs have nearly tripled, and we have spent approximately 6 billion dollars in security for our facilities.  Finally, we are investing over 11 billion dollars to rebuild the World Trade Center site.  At the same time, there's a need to overhaul our aging facilities, some of which are over a hundred years old and to build modern facilities for the future needs.
>
> . . .
>
> The toll and fare increase will allow the Port Authority to invest 25.1 billion dollars in critical infrastructure projects that will provide an efficient, safe, and secure transportation network for our customers who rely on this agency every day.  . . . I request your approval of these items.

Fabiano Affidavit, Dkt. No. 12, Ex. F, at pp. 5, 8-9, 13; see id. at ¶ 15 ("As the Chief Financial Officer, I presented the overall capital plan supporting the necessity of a toll and fare increase to provide for a ten-year agency-wide capital plan totaling $25.1 billion to the Board of Commissioners at its August 19, 2011 Meeting.").  Mr. Fabiano's presentation did not address a

separate interstate transportation network ("ITN") capital plan, and did not refer to the restrictions on the use of ITN revenues under governing law.

Mr. Fabiano's presentation, justifying the toll increase in large part by the $11 billion needed to rebuild the World Trade Center, was consistent with the public statements being made by the Port Authority at the time of the increase. *See* Declaration of Kevin P. Mulry dated October 17, 2012 ("Mulry Decl."), Exh. A (toll and fare increase will fund $33 billion ten-year capital plan including $11 billion for World Trade Center); Ex. B (toll increase will fund $25.1 billion capital plan including completion of the World Trade Center).

This is what the public was being told, and from document discovery to date, it appears that this is what the Commissioners – the decision makers on the toll increase – were being told about the justification for the toll increase.

After this action was commenced, however, the Port Authority developed a new justification for the toll increase.  Before this Court, the Port Authority asserted that the toll increase was not justified by the $25.1 billion capital plan, the justification that was presented to the Commissioners and the public, but instead is justified by a preliminary, unapproved $10.786 billion capital plan for the ITN.  Fabiano Affidavit, ¶ 15.

In discovery, plaintiffs have learned that the analysis presented to the Court in the Fabiano Affidavit and the annexed exhibits was developed only after the toll increase was approved and after this action was commenced.  The types of documents that were submitted as exhibits to the Fabiano Affidavit are not kept in the ordinary course of the Port Authority's business.  This post-approval, post-lawsuit justification for the toll increase was not presented to the Commissioners – the decision makers on the toll increase.  Instead, this justification presumably was presented to the Court because the Port Authority believed the justification

presented to the Commissioners would not be sufficient under the Highway Act and the Commerce Clause.

Plaintiffs seek to depose Chairman Samson and Commissioner Lynford on the information presented to the Board of Commissioner for it to consider in determining whether to approve the toll increase in August 2011.

### The Reasons for the Toll Increase are Relevant Areas of Inquiry

The most basic question in this case is whether the Port Authority is using ITN revenues, and particularly the revenues from the toll increase, only for expenditures within the ITN, as it is required to do under governing Second Circuit law. The reasons that the Port Authority management had for the proposed toll increase, the reasons that were presented to the Commissioners – the decision makers – and the reasons for the Commissioners' approval of the toll increase are all obviously relevant areas of inquiry to that question. The Port Authority has sought to block this inquiry throughout this case.

In its Opinion and Order dated October 9, 2012, the Court clarified that the reasons for the toll increase is a proper subject of discovery. Dkt. No. 69, at 16. The Court had previously ruled, at a conference on May 25, that the reasons for the toll increase were discoverable, *id.* at 16-17, Mulry Decl., Exh. C at 33-34, but clarification was necessary because the Port Authority had sought to ignore that clear ruling and asserted that the reasons for the toll increase were outside the scope of discovery. The Court's opinion also clarified that its May 7 Order must be read in the context of the discoverability of financial information, Dkt. No. 69, at 16, and therefore cannot be considered a limitation on all discovery.

Plaintiffs seek to depose Chairman Samson and Commissioner Lynford on the reasons for the approval of the toll increase by the Board of Commissioners.

**The Press Release Statements from Chairman Samson and Commissioner
Lynford After Approval of the Toll Increase Are Relevant Areas Of Inquiry**

Significantly, the Port Authority issued press releases on August 19, 2011 referencing

statements from both Chairman Samson and Commissioner Lynford.  *See* Mulry Decl., Exhs. D

and E.

Chairman Samson outlined the factors contributing to the Port Authority's financial

condition as including the severe impact of the world economic recession on agency revenues,

the size and makeup of the Port Authority's overall capital plan, a disproportionate investment in

non-revenue producing projects, the increased subsidization of deficit-run facilities, and past

dependence on one-shot revenue sources.  He included among the "several projects that must

continue" the $6 billion to complete the World Trade Center site and $3.3 billion in

transportation projects.  Mulry Decl., Exh. D.

Commissioner Lynford stated that "[t]he Authority has proposed significant increases in

order to address a potentially destabilizing debt capacity issue.  Without additional revenue to

support incremental borrowings, the Authority will be unable to complete current projects,

execute its long term Capital Plan, and maintain satisfying jobs for the people of New York and

New Jersey."  Mulry Decl., Exh. E.  He further stated that "these initiatives should ensure the

completion of the World Trade Center as well as hundreds of other capital projects."  *Id.*

In their public statements, neither Chairman Samson nor Commissioner Lynford make

any reference to a preliminary capital plan for the ITN or the governing law restricting the use of

ITN revenues, including toll increase revenues.

Plaintiffs seek to depose Chairman Samson and Commissioner Lynford on their public

statements concerning the toll increase and the reasons for the toll increase.

### The Port Authority Concedes That Under Governing Second Circuit Law ITN Revenues May Only be Used for ITN Expenditures

In their preliminary injunction application papers, plaintiffs demonstrated that under the Highway Act, bridge or tunnel tolls are not "just and reasonable" if the toll funds go to uses that are outside the ITN, which the Second Circuit described in *Automobile Club of New York, Inc. v. Port Authority of New York and New Jersey*, 887 F.2d 417 (2d Cir. 1989) ("*AAA v. PA*"), as an "integrated, interdependent transportation system."  *AAA v. PA*, 887 F.2d at 423; *see* AAA Mem., Dkt. No. 32, at 6-8.  The Port Authority accepts this standard as well, recognizing that ITN revenues may not pay for non-ITN uses such as the World Trade Center.  PA Mem., Dkt. No. 15, at 1, 14.

Plaintiffs also demonstrated that under "dormant" Commerce Clause jurisprudence, toll funds may not go to uses that do not bear a "functional relationship" to the facilities used by the toll payers.  *Bridgeport and Port Jefferson Steamboat Co. v. Bridgeport Port Auth.,* 567 F.2d 79, 87 (2d Cir. 2009); *see* AAA Mem., Dkt. No. 32, at 8-10.  The Port Authority accepts this standard, recognizing that ITN revenues may not pay for non-ITN uses such as the World Trade Center, because they do not bear a functional relationship to the facilities used by the toll payers, could not represent a fair approximation of the use of those facilities, and thus, would be excessive in relation to the benefits conferred.  PA Mem., Dkt. No. 15, at 15-18.

### Port Authority Deposition Testimony Has Established That the Port Authority Ignores Governing Second Circuit Law on the Use of ITN Revenues

Although the Port Authority acknowledges – as it must – that it may not use ITN revenues outside the ITN, and that this has been clear Second Circuit law for twenty five years, the Port Authority does not have any method to track its compliance with that Second Circuit law. Moreover, the Port Authority's high level management was not even aware of the existence

of the Second Circuit law which restricts the use of ITN revenues to ITN expenses. Consequently, the Port Authority in its financial forecasting, capital planning and the challenged 2011 toll increase, has done nothing to seek to comply with the governing law restricting the use of ITN revenues.

Nothing produced in discovery has indicated that the Commissioners – the decision makers on the toll increase – were advised of governing Second Circuit law or were even aware of governing Second Circuit law on the restricted use of ITN revenues.

On October 3, 2012, plaintiffs deposed Rosemary Chiricolo, the deputy director of the management and budget department for the Port Authority. Mulry Decl., Exh. F ("Chiricolo Tr.") at 8. She is responsible for the aggregation and assembly of the Port Authority budget, reporting on the budget compared to actual results, and coordinating capital planning and the long range financial forecast. *Id.* at 11. Ms. Chiricolo testified that:

- The ten year preliminary capital plan for the Port Authority for 2012-2020 has not been approved by the Board of Commissioners. Chiricolo Tr. at 21-22.

- The Port Authority does not have a separate capital plan for each line department within the Port Authority. Chiricolo Tr. at 29-30.

- In her experience and work at the Port Authority, there are no restrictions on the use of ITN revenues by the Port Authority. Chiricolo Tr. at 35, 38, 126.

- In financial forecasting, the Port Authority considers the revenues and expenses of the entire Port Authority. Chiricolo Tr. at 38-39.

- All revenues for the Port Authority are "pooled," meaning that the net revenues from all facilities can be used to service the debt of all Port Authority bonds in the aggregate. Chiricolo Tr. at 35-36, 39-42.

- After debt service is paid from the pooled Port Authority revenues, available remaining pooled funds are transferred to the reserves. Chiricolo Tr. at 46-47, 144.

- The Port Authority cannot track ITN revenues through its system to see how those ITN revenue dollars were spent. Chiricolo Tr. at 44-45, 137.

- In performing scenario analyses for CFO Fabiano, the Port Authority looked at financial projections of all revenue of the Port Authority, and not a separate analysis of the ITN revenues and expenditures. Chiricolo Tr. at 53.

- The $33 billion ten-year capital plan announced on August 5, 2011 included the full cost to complete projects, even going beyond ten years. Chiricolo Tr. at 70, 110-12.

- The $25 billion ten-year capital plan announced on August 19, 2011 included the spending only during the ten-year period. Chiricolo Tr. at 111-12.

- The $25 billion ten-year capital plan represented the amount for the entire Port Authority. Chiricolo Tr. at 122.

- The $10.786 billion ITN preliminary capital plan was extracted from the preliminary capital plan for the entire Port Authority in order to prepare the exhibits to the Fabiano Declaration. Chiricolo Tr. at 129-31.

- The exhibits to the Fabiano Declaration were prepared after the toll increase was approved. Chiricolo Tr. at 148-50.

### The Commissioners are the Decision Makers on the Toll Increase

The Commissioners are unquestionably the decision-makers on the toll increase, yet the Port Authority has constantly sought to minimize their role, and Chairman Samson and Commissioner Lynford again seek to minimize their roll in their motion to quash. At the Court conference on May 25, Port Authority counsel tried to portray the Commissioners as having a very limited role in approving the toll increase:

> [PORT AUTHORITY COUNSEL]:  Because the Commissioners, I mean they voted on something that was proposed by the Port Authority, they didn't – they weren't evaluating and deciding what the toll increase would be, they were just approving or disapproving the toll increase. That was their roll, very limited, vote it up or down, and they voted it up.

> . . .

> [PORT AUTHORITY COUNSEL]:  Well the Commissioners' role, they're coming in after the fact. They're coming in after the fact of the decision to raise the toll increase.

Mulry Decl., Exh. C ("May 25 Transcript") at 8-9.

As this Court recognized, however, the Commissioners are the decision makers. *Id.* at 10 ("So they're not coming in after the decision has been made, they're getting documents concerning the proposal and then voting on it, are they not?").

The attempt by Chairman Samson, Commissioner Lynford and the Port Authority to minimize the role of the Commissioners as decision makers in approving the toll increase should be rejected. Plaintiffs have been clear in stating that the deposition testimony from Chairman Samson and Commissioner Lynford is relevant to the information provided by the Port Authority to the Commissioners for their approval, the reasons for the ultimate approval of the toll increase, and their public statements concerning the toll increase. The Commissioners have been properly subpoenaed for relevant testimony as the decision makers on the toll increase.

## ARGUMENT

### Point I

### AAA'S SUBPOENAS DO NOT IMPOSE AN UNDUE BURDEN

Chairman Samson and Commissioner Lynford first argue that the Court should quash AAA's subpoenas because the subpoenas would impose an undue burden. (*See* PA Mem. of Law at 7-8) "A party objecting to a subpoena on the ground of undue burden generally must present an affidavit or other evidentiary proof of the time or expense involved in responding to the discovery request." *Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Am.*, 262 F.R.D. 293, 300 (S.D.N.Y. 2009). Thus, a motion to quash for undue burden is defective where it omits an affidavit "describing the burden that the . . . subpoenas impose." *Id.* The same rule applies to high-ranking government officials.[2] In *Sanstrom v. Rosa*, No. 93 Civ. 7146 (RLC), 1996 WL

---

[2]     Plaintiffs do not concede that the Moving Commissioners, who have no role in the day-to-day operations of the Port Authority, are "high-ranking government officials" under the cases cited. However, plaintiffs will assume that this standard applies for the purpose of this motion.

469589, at *4 (S.D.N.Y. Aug. 16, 1996), the Court held that the New York State Governor's motion to quash a subpoena on grounds of undue burden was "meritless" because "Governor Cuomo has not submitted an affidavit to the Court to substantiate the claim that he is too busy."

Here, the Moving Commissioners failed to submit affidavits to substantiate their claim that they are too busy or otherwise cannot appear for depositions.  Even in their Memorandum of Law, the Moving Commissioners failed to explain how a single day of depositions would burden them more than any typical non-party deponent.  (*See* PA Mem. of Law at 7-8)  Therefore, the Moving Commissioners have failed to satisfy their burden of showing undue burden.[3]

### Point II

### <u>THE MOVING COMMISSIONERS ARE NOT EXEMPT FROM DEPOSITIONS</u>

The Moving Commissioners argue that the Court should quash AAA's subpoenas because Chairman Samson and Commissioner Lynford are senior government officials.  (*See* PA Mem. of Law at 8-10)  While courts do "recognize higher scrutiny for deposing high-ranking government officials," it is well-settled that "'depositions of senior officials should be allowed if they possess particular information necessary to the development or maintenance of the party's case which would not otherwise be reasonably obtainable.'"  *Pegoraro v. Marrero*, No. 10 Civ. 00051 (AJN) (KNF), 2012 WL 1948887, at 5 (S.D.N.Y. May 29, 2012) (quoting *Martin v. Valley Nat'l Bank of Ariz.*, 140 F.R.D. 291, 314 (S.D.N.Y. 1991)).

---

[3]     The Moving Commissioners may not submit the missing affidavits for the first time on reply because such evidence "goes to the heart of [their] contention and should have been submitted with [their] opening brief in order to give [AAA] an appropriate opportunity to respond."  *New Look Party Ltd. v. Louise Paris Ltd.*, No. 11 Civ. 6433 (NRB), 2012 WL 251976, at *4 n.4 (S.D.N.Y. Jan. 11, 2012).  "[I]n such situations, the Court strikes the evidence presented for the first time in reply, and does not consider it for purposes of ruling on the motion."  *Wolters Kluwer Fin. Svcs. Inc. v. Scivantage*, No. 07 CV 2352 (HB), 2007 WL 1098714, at *1 (S.D.N.Y. Apr. 12, 2007).

There is a two-part test to depose high-ranking government officials.  "A deposition of a senior government official will be permitted if (1) the deposition is necessary in order to obtain relevant information that cannot be obtained from any other source and (2) the deposition would not significantly interfere with the ability of the official to perform his governmental duties." *Kingsley v. New York City Police Dept.*, No. 07 Civ. 7629(NRB), 2008 WL 5215648, at *2 (S.D.N.Y. Dec. 9, 2008) (quotations omitted).

Regarding the first factor, the Moving Commissioners have direct, personal knowledge concerning the information that was presented – and not presented – to the Commissioners for consideration of the toll increase, the reasons for the ultimate approval by the Commissioners of the toll increase, and their own statements issued by the Port Authority in press releases.  Port Authority management can testify as to the proposal for the toll increase.  The Commissioners, however, are the Port Authority's final decision makers.  Discovery from Port Authority managers is no substitute for the Moving Commissioners' own testimony about the actual reasons for the toll increases.

The direct, personal knowledge of Chairman Samson and Commissioner Lynford distinguishes this case from the many cases upon which they rely.  (*See* PA Mem. of Law at 8-9) Most of the Moving Commissioners' cases held that the government official at issue should not be deposed because he lacked direct personal knowledge of the underlying dispute.  (*See id.*)  In *Marisol A. v. Giuliani*, No. 95 Civ. 10533 (RJW), 1998 WL 132810, at *2 (S.D.N.Y. Mar. 23, 1998), Mayor Giuliani provided an "affidavit that he does not have first-hand knowledge of the factual affairs of [the Administration for Children's Services]."  In *Bey v. City of New* York, No. 99–cv–3873 (LMM) (RLE), 2007 WL 1893723, at *2 (S.D.N.Y. June 28, 2007), the court found that "Jacobson was not directly involved" in the dispute and "[t]here is no showing that he has

personal knowledge of the way in which the investigation and subsequent actions were carried out."  In *Universal Calvary Church v. City of New York*, No. 96 Civ. 4606 (RPP), 1999 WL 350852, at \*3 (S.D.N.Y. June 2, 1999), the court held that "plaintiffs have not shown that Giuliani has personal knowledge of the events in question which he did not receive from persons whom they have already deposed."  In *Williams v. McCausland*, Nos. 90 Civ. 7563 (RWS), 91 Civ. 7281 (RWS), 1994 WL 62937, at \*3 (S.D.N.Y. Feb. 22, 1994), there was no "evidence that either McCausland or Thomson had any involvement with the decisions to either suspend or terminate Williams'' employment."  In *L.D. Leasing Corp., Inc. v. Crimaldi*, No. 91-CV-2430 (EHN), 1992 WL 373732, at \*1 (S.D.N.Y. Dec. 1, 1992), the plaintiffs "concede[d] that the Mayor had no first-hand knowledge relating to the seizure of the buses at issue."

None of the cases cited apply here because the Moving Commissioners have direct, personal knowledge of the information presented for considering approval of the toll increase, the actual reasons for the toll increase, and their public statements.  Where a government official has direct personal knowledge of the events at issue, a deposition is appropriate.  *See, e.g., Pegoraro v. Marrero*, 2012 WL 1948887, at \*7 (denying motion to quash subpoena of the President of the New York City Health and Hospital Corporation because he "submitted no affidavit that he lacks unique personal knowledge of the issues concerning plaintiff's claims") (quotations omitted); *Marisol A. v. Giuliani*, No. 95 Civ. 10533 (RJW), 1998 WL 159948, at \*1 (S.D.N.Y. Apr. 1, 1998) (conditionally ordering Governor Pataki to testify about information of which he was made aware while in office); *Sanstrom v. Rosa*, No. 93 Civ. 7146 (RLC), 1996 WL 469589, at \*4-\*5 (S.D.N.Y. Aug. 16, 1996) (denying former Governor Cuomo's motion to quash because he possessed "particular information necessary to the development" of the plaintiffs' case) (quotations omitted).  Thus, AAA satisfied the first prong of the applicable standard.

13

Regarding the second factor, as explained Point I, the Moving Commissioners have failed to include the necessary affidavits "describing the burden that the . . . subpoenas impose." *Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Am.*, 262 F.R.D. at 300.  Even high ranking government officials must provide such an affidavit to quash a subpoena.  *See Sanstrom v. Rosa*, 1996 WL 469589, at *4 (denying Governor Como's motion to quash because "Governor Cuomo has not submitted an affidavit to the Court to substantiate the claim that he is too busy.").

In any event, a single day of testimony would not significantly interfere with the Commissioners' "governmental duties."  *Kingsley v. New York City Police Dept.*, 2008 WL 5215648, at *2.  By their own admission, the Moving Commissioners' governmental duties are quite limited.  Chairman Samson is a lawyer devoted to "full-time legal practice" at his own law firm, Wolff & Samson.  (Mem. of Law at 4)  Chairman Samson "volunteers his time" to the Port Authority.  (*Id*.)  Commissioner Lynford likewise "volunteers his time" to the Port Authority, but he devotes the majority of his time to managing his real estate firm, Wellsford Strategic Partners LLC.  (*Id*.)  Neither of the Moving Commissioners is a full-time government employee.  Each can appear for a single day of deposition without interfering with his "governmental duties."  *Kingsley v. New York City Police Dept.*, 2008 WL 5215648, at *2.  Thus, AAA has satisfied the second prong of the applicable standard.  There is no reason to quash AAA's subpoenas on this basis.

14

**Point III**

**AAA'S SUBPOENAS ARE NOT DEFECTIVE**

The Moving Commissioners argue that AAA's subpoenas are "facially inadequate" because they "identify *no* topics of testimony whatsoever." (*See* PA Mem. of Law at 11) However, AAA served non-party subpoenas under Rule 45, not notices of deposition under Rule 30(b)(6). "[W]here, as here, a notice of the deposition is not given pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, the notice of taking of a deposition is not required to state the subject matter concerning which the examination will be made." *Pegoraro v. Marrero*, 2012 WL 1948887, at *6 (quotations omitted). Therefore, AAA's subpoenas are adequate and enforceable in all respects.

**Point IV**

**AAA'S SUBPOENAS SEEK RELEVANT TESTIMONY**

Next, the Commissioners argue that the Court should quash AAA's subpoenas because they lack relevance to any issue in the case. (*See* PA Mem. of Law at 11-13) As stated above, the depositions of Chairman Samson and Commissioner Lynford are relevant to significant issues in the case, including the information presented to the Board of Commissioners, the reasons for the toll increase, and their public statements concerning the toll increase. Given the Port Authority's failure to take any steps to track its compliance with governing Second Circuit law on the use of ITN revenues, testimony on what the decision makers at the Port Authority were not told about the use of ITN revenues is also relevant.

The Port Authority has consistently sought to reduce this case to simple mathematical equation: whether revenue from the toll increase exceeds the amount needed to cover ITN expenses. (*See* PA Mem. of Law at 2) Significantly, the mathematical justification for the toll

increase that the Port Authority presented to this Court could not possibly have been presented to the Commissioners, because it was not even put together until after the toll increase was approved and after AAA filed this lawsuit.

Under the Highway Act, courts must consider whether a toll increase is "'just and reasonable.'"  *AAA v. PA*, 887 F.2d at 418 (quoting 33 U.S.C. § 508).  In approving the toll increase, the Commissioners, as the decision makers, had the ultimate responsibility to comply with the just and reasonable standard under the Highway Act.  To determine what is reasonable, the court should look to the "full record that was before the agency at the time of the decision at issue."  *State of Del. Dept. of Nat. Res. and Envtl. Control v. U.S. Army Corp of Engineers*, 722 F. Supp. 2d 535, 541 (D. Del. 2010) (quotations omitted).  This includes the "agency's *stated justifications* . . . that led to the final, articulated decision."  *Id*. at 543 (quotations omitted) (emphasis added).

This Court ruled both at the May 25 conference and in its recent Opinion and Order that AAA has a right to discovery "concerning the reasons for the toll increases."  (Dkt. No. 69 at 16, 17)  Thus, AAA should be permitted to depose the Commissioners "concerning the reasons for the toll increases," including the "stated justifications" that led to the final decision.  (Dkt. No. 69 at 16, 17; *State of Del.,* 722 F. Supp. 2d at 543)

The citations by Port Authority to prior cases involving the AAA is telling.  *See* PA Memo at 4 & n.4; 12 & n.8; 17.  In *AAA. v. PA*, 887 F.2d 417, and *Automobile Club of New York, Inc. v. Cox*, 592 F.2d 658, 672 (2d Cir. 1979), the Port Authority justified the toll increase on the basis of the expenses of the transportation network.  The Port Authority did not attempt to justify the toll increase on expenses outside the transportation network.  As with these prior toll

16

increases, the Port Authority's justification for the 2011 toll increase should have based on been the expenses of the transportation network.

In August 2011, however, the Port Authority did not base the toll increase on the expenses of the transportation network, but instead, based it on the expenses of the entire Port Authority.  In fact, the Port Authority deputy director of the management and budget department had no idea of the Second Circuit law placing restrictions on the use of transportation network revenues.  The Port Authority does not look to the ITN separately in any of its financial forecasting or capital planning.  It was only after this lawsuit was filed that the Port Authority constructed a post-approval analysis seeking to justify the toll increase based on the expenses of the transportation network.  As it was post-approval, it could not possibly have been an analysis that was provided to the Commissioners.

For all the reasons stated herein, AAA's subpoenas seek relevant discovery.

**Point V**

**<u>PRIVILEGE IS NOT A BASIS TO BAR AN ENTIRE DEPOSITION</u>**

The Moving Commissioners also argue that the Court should quash AAA's subpoenas because questioning at the depositions might invade the deliberative-process privilege.  (*See* PA Mem. of Law at 13)  However, even in the case of deliberative-process privilege, "the mere fact that a witness may be asked questions that seek to elicit privileged matter does not provide a colorable basis for precluding the entire deposition."  *Sanstrom v. Rosa*, 1996 WL 469589, at *5. A governmental privilege "is properly asserted, not to block an entire deposition, but to preclude specific questions if the resisting party adequately demonstrates that the harm to [government] interests from requiring an answer outweighs the discovering party's need for the information."

17

*Maher v. Monahan*, No. 98 Civ. 2319 (JGK) (MHD), 2000 WL 648166, at *4 (S.D.N.Y. May 18, 2000).

Therefore, "[t]o the extent there is an objection to a particular question on the grounds of privilege, that objection may be made at the deposition and [the Court can] rule on it accordingly." *Sanstrom v. Rosa*, 1996 WL 469589, at *5.

**Point VI**

**PARTY DISCOVERY IS NOT REQUIRED BEFORE NON-PARTY DISCOVERY**

The Moving Commissioners argue that the Court should quash AAA's subpoenas because AAA should pursue party discovery first.  (*See* PA Mem. of Law at 13-14)  There is no rule that party discovery must precede non-party discovery.  To the contrary, "methods of discovery may be used in any sequence," Fed. R. Civ. P. 26(d)(2)(A), and "depositions may be conducted in any order." *Reserve Solutions, Inc. v. Vernaglia*, No. 05 Civ. 8622 (VM) (RLE), 2006 WL 1982780, at *1 (S.D.N.Y. July 7, 2006).  In any event, the Commissioners are the only witnesses with direct, personal knowledge of the decision makers' reasons for the toll increase and their own published statements in support of the toll increase.  Therefore, there is no basis to require AAA to complete party discovery before it may depose the Moving Commissioners.

The cases upon which the Moving Commissioners rely for this point are distinguishable. (*See* Mem. of Law at 14)  In *Scott v. Dime Savings Bank*, No. 88 Civ. 5495, 1989 WL 140286, at *2 (S.D.N.Y. Nov. 16, 1989), the court issued a protective order vacating notices of deposition the plaintiff served upon two senior bank officials.  The reason the court issued a protective order was because the *pro se* plaintiff improperly sent a notice of deposition to a bank's CEO and President, both of whom were non-parties, rather than serve a Rule 30(b)(6) notice on the actual defendant, the bank.  *Id*.  In that case, the court held that the bank should "designate an official

18

who is the most familiar with the facts."  *Id.  Scott* did not involve a valid non-party subpoena.

Similarly, in *Innomed Labs, LLC v. Alza Corp.*, 211 F.R.D. 237, 239-40 (S.D.N.Y. 2002), the

issue was whether a litigant should be permitted to re-depose a party under Rule 30 without

seeking prior leave of the court.  Like *Scott*, *Innomed Labs* did not involve a valid non-party

subpoena.  AAA is not required to wait until the Port Authority finishes presenting witnesses of

its choosing before AAA may depose the Commissioners.

**Point VII**

**<u>AAA'S SUBPOENAS ARE NOT DESIGNED TO HARASS</u>**

Finally, the Moving Commissioners argue that the Court should quash AAA's subpoenas

because they are allegedly designed to harass.  (*See* PA Mem. of Law at 14-16)  There is nothing

harassing about AAA's subpoenas.  AAA's subpoenas are not the sort of subpoena

that demand exhaustive categories of documents or that threaten lengthy questioning on sensitive

or vast areas of subject matter.  All the subpoenas require is that the Moving Commissioners

appear for questioning on an area particularly within their province: the information presented to

them to consider in approving the toll increase, the reasons for the toll increase, and their public

statements on the toll increase.

Therefore, the Court should deny the motion to quash AAA's subpoenas.  Finally,

because the Moving Commissioners' motion for a protective order is grounded on the same

reasons as their motion to quash AAA's subpoenas, the Court should also deny the motion for a

protective order.  (*See* Mem. of Law at 16-18)

## <u>CONCLUSION</u>

For all of the foregoing reasons, the Court should: (i) deny the Moving Commissioners'

motion to quash AAA's subpoenas; (ii) deny the Moving Commissions' motion for a protective

order; and (iii) award such other and further relief as the Court deems just and proper.

Dated: New York, New York
   October 17, 2012

         Respectfully Submitted,

         FARRELL FRITZ, P.C.


     By:  ____s/ Kevin P. Mulry_____.
         Michael F. Fitzgerald
         Kevin P. Mulry
         Franklin C. McRoberts
         *Attorneys for Plaintiffs*
         370 Lexington Avenue, Suite 800
         New York, New York 10017
         (212) 687-1230