UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

AUTOMOBILE CLUB OF NEW YORK, INC.          : 11 Civ. 6746
d/b/a AAA NEW YORK and AAA NORTH           : (RKE) (HBP)
JERSEY, INC.,                              :
                                           :
                    Plaintiffs,            :
                                           :
              -against-                    :
                                           :
THE PORT AUTHORITY OF NEW YORK             :
AND NEW JERSEY,                            :
                                           :
                    Defendant.             :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x


## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT
## OF MOTION FOR A PRELIMINARY INJUNCTION

FARRELL FRITZ, P.C.
*Attorneys for Plaintiffs*
370 Lexington Avenue, Suite 800
New York, New York 10017
(212) 687-1230

*Of Counsel:*
    Michael F. Fitzgerald
    Kevin P. Mulry

**TABLE OF CONTENTS**

**PAGE**

TABLE OF AUTHORITIES ...................................................................................... iii

PRELIMINARY STATEMENT ................................................................................. 1

FACTUAL BACKGROUND ...................................................................................... 3

The Toll Increases were announced on August 5, 2011, and were justified by the capital needs of the entire Port Authority, not just the transportation network ................. 3

The Port Authority's reason for the Toll Increases as given to this Court differs from the reason presented to the Commissioners and the public....................................... 4

The post-approval rationale for the Toll Increases –a $10.786 billion ITN capital plan – includes $3.8 billion that is not authorized, not for transportation, or not connected to any transportation project ................................................................ 6

    A.    $1.8 billion of the ITN capital plan is for New Jersey state bridges and roads that the Port Authority is not permitted by statute of fund......... 7

    B.    $1 billion of the ITN capital plan is for raising the Bayonne Bridge roadway, which is not an ITN expense but is for navigation and Port Commerce ............................................................................................. 8

    C.    $1 billion of the ITN capital plan is a placeholder representing no ITN projects ......................................................................................... 9

    D.    Subtracting $3.8 billion from the "ITN capital plan" turns CFO Fabiano's cash flow analysis positive ........................................................ 10

PROCEDURAL BACKGROUND ............................................................................. 10

Judge Holwell's Preliminary Injunction Decision ........................................... 11

Only Limited Discovery Remains .................................................................... 12

ARGUMENT .......................................................................................................... 13

Point I

    AAA HAS ESTABLISHED IRREPARABLE INJURY ................................. 13

POINT II

    AS A MATTER OF LAW, THE PORT AUTHORITY IS NOT STATUTORILY AUTHORIZED TO FUND THE PULASKI SKYWAY AND NEW JERSEY STATE ROADS............................................................................................. 16

Point III

      THE TOLL INCREASES VIOLATE THE COMMERCE CLAUSE ............................ 19

          A.    The Toll Increases are not based on a fair approximation of the use
                 of the ITN facilities .................................................................................. 19

          B.    The Toll Increases are excessive in relation to the benefit conferred ....... 21

Point IV

      THE TOLL INCREASES VIOLATE THE HIGHWAY ACT ........................................ 22

          A.    The legal parameters for the Highway Act analysis were set by two
                 prior AAA challenges to Port Authority toll increases ............................. 22

          B.    The Toll Increases violate the Highway Act because they fund costs
                 outside the ITN and are therefore not "just and reasonable" ................... 23

          C.    There is a private right of action under the Highway Act ......................... 24

                 1.    The statutory scheme preceding the Highway Act afforded
                       administrative review and Court review ....................................... 25

                 2.    In amending the statute, Congress eliminated administrative
                       review but kept Court review ........................................................ 25

                 3.    The private right of action issue was before the Second
                       Circuit panel which decided *AAA v. PA* soon after passage
                       of section 508 ............................................................................. 27

                 4.    Congressional intent evidences a private right of action under
                       33 U.S.C. § 508 ....................................................................... 28

      CONCLUSION ........................................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*American Trucking Ass'n. v. Delaware River Joint Toll Bridge Comm'n,*
458 F.3d 291 (3d Cir 2006)................................................................................................29

*AAA v. Cox,*
592 F.2d 658 (2d Cir. 1979)...........................................................................................22, 23

*AAA v. PA,*
842 F. Supp. 2d 672 (S.D.N.Y. 2012)........................................................................ passim

*Automobile Club of New York, Inc. v. Port Authority of New York and New Jersey,*
887 F.2d 417 (2d Cir. 1989)........................................................................................ passim

*Beal v. Stearn,*
184 F.3d 117, 122 (2d Cir. 1999).....................................................................................13

*Bridgeport and Port Jefferson Steamboat Co. v. Bridgeport Port Authority,*
567 F.3d 79, 84 (2d Cir. 2009)......................................................................................19, 21

*Cort v. Ash,*
422 U.S. 66 (1975).............................................................................................................28

*Gonzaga University v. Doe,*
536 U.S. 273, 280 (2002)............................................................................................ passim

*Health Care Plan. Inc. v. Aetna Life Ins. Co.,*
966 F.2d 738 (2d Cir.1992)...............................................................................................28

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran,*
456 U.S. 353 (1982)..........................................................................................................28

*Molinari v. DiCarlo,*
838 F. Supp. 718 722 (E.D.N.Y. 1993) ...........................................................................25

*Northwest Airlines, Inc. v. County of Kent, Mich.,*
510 U.S. 355 (1994)..............................................................................................11, 12, 19

*Touche Ross & Co. v. Redington,*
442 U.S. 560 (1979)..........................................................................................................28

*Transamerica Mortgage Advisors. Inc. v. Lewis,*
444 U.S. 11 (1979)............................................................................................................28

**STATUTES**

5 U.S.C. § 701..................................................................................................................25

33 U.S.C. § 508.........................................................................................25, 26, 27, 28

**OTHER AUTHORITIES**

49 C.F.R. § 310.1 (1986) ...............................................................................................25

133 Cong. Rec. H1635-02 ..............................................................................................26

133 Cong. Rec. S778-02 .................................................................................................25

H.R. Conf. Rep. 100-27 (1987), *reprinted in* 1987 U.S.C.C.A.N. 121 ........................25

S. Rep. 100-4 (1987), *reprinted in* 1987 U.S.C.C.A.N. 66............................................25

Plaintiffs Automobile Club of New York, Inc. d/b/a AAA New York and AAA New Jersey, Inc. ("AAA" or "plaintiffs") respectfully submit this Memorandum of Law in Support of their motion, pursuant to Federal Rule of Civil Procedure 65, for a preliminary injunction in advance of toll increases scheduled for December 7, 2014.  For the reasons that follow, the Court should enjoin the December 2014 toll increases, pending the disposition of this action.

## PRELIMINARY STATEMENT

Plaintiffs commenced this action to challenge the multi-year toll increases approved by the Commissioners of the Port Authority of New York and New Jersey ("Port Authority") on August 19, 2011 for the bridges and tunnels that cross the Hudson River between New York and New Jersey (the "Toll Increases").  The gravamen of the claim is that the toll increases are unlawful because they violate the Commerce Clause of the U.S. Constitution and the mandate of the federal Highway Act that tolls on interstate facilitates must be "just and reasonable".  The evidence produced in discovery establishes that the Commissioners approved the challenged tolls based upon the capital needs of the entire Port Authority, including the rebuilding of World Trade Center, a pure real estate venture.  It is only after the commencement of this action that the Port Authority changed the capital plan and reasons for the toll increase, and these had never been presented to the Commissioner prior to the approval of the multi-year toll increases.[1]

Plaintiffs have previously challenged toll increases earmarked to fund capital improvements to the Port Authority's Interstate Transportation Network ("ITN").  A central issue in the prior challenges was whether the expenses of the Port Authority Trans-Hudson ("PATH") railway were properly included in the ITN rate base to determine whether the toll increases then under scrutiny were "just and reasonable" under the Highway Act.  Through

---

[1] The funding for the rebuilding of the World Trade Center and the inclusion of the costs involved in the ITN rate base to determine whether the challenged toll increases are just, reasonable and constitutional are not before the court on this motion.

1

December 2013, the challenged toll increases have yielded more than $800,000,000 in additional toll revenue.  It is anticipated that by December 7, 2014, the Port Authority will have realized more than $1 billion additional toll revenue directly related to the increases authorized in 2011.

On this motion, plaintiffs seek to enjoin the fourth of the five multi-year toll increases which will go into effect on December 7, 2014, and which will fund capital projects that reach far beyond the controversial inclusion of PATH in the ITN.  Decisional law in this Circuit has established that bridge and tunnel tolls may only fund the needs of the Port Authority's ITN.  In the case at bar, it cannot be disputed that approximately $1.8 billion of Port Authority bridge and tunnel toll revenue will be unlawfully spent on New Jersey infrastructure and roads (Pulaski Skway, New Jersey Route 1&9, New Jersey Route 7 and the Wittpen Bridge) that are not Port Authority assets.  This cost should not be unlawfully loaded onto users of the Port Authority bridges and tunnels.

It has also become apparent that unlawfully increased Port Authority bridge and tunnel tolls will fund the raising of the Bayonne Bridge.  This capital improvement enhances the navigation and passage of large vessels and to support New York and New Jersey port commerce.  This is an impermissible expenditure of ITN bridge and tunnel tolls.  Finally, plaintiffs bottom this application upon the creation and maintenance of an unspecified and unapplied "capital infrastructure fund" which inflates the ITN capital plan by $1 billion.

Defendants unlawful expenditure and misapplication of steadily increasing ITN bridge and tunnel toll revenue has resulted in irreparable harm to the bridge and tunnel users who pay tolls in cash.  Simply stated, it will be impossible to refund improper toll increases to cash users if plaintiffs succeed in this action.  As demonstrated infra, and based on Port Authority disclosures, more than 60,000,000 cash users crossed Port Authority bridges and tunnels since

the challenged toll increase of December 2011. The Port Authority cannot identify the cash

users. Any prospective attempt to refund through discounts will clearly miss the mark, with no

assurance that the discount will compensate those who were adversely affected. Under the

circumstances, monetary damages do not provide a remedy. An order enjoining the next toll

increase on December 7, 2014 is the only way to maintain the status quo and avoid irreparable

harm to cash users of the Port Authority's bridges and tunnels.

## **FACTUAL BACKGROUND**

**The Toll Increases were announced on August 5, 2011, and were justified by
the capital needs of the entire Port Authority, not just the transportation network.**

On August 5, 2011, the Port Authority recommended to its Commissioners "an

immediate toll and fare increase in order to prevent a devastating impact to the region's

transportation infrastructure and economic health." *See* Declaration of Kevin P. Mulry dated

August 6, 2013 ("Mulry Decl."), Ex. A. Without a toll and fare increase, "construction at the

World Trade Center site would be affected later this fall." *Id.* The memorandum supporting the

increases described the causes for the urgent need for a toll and fare increase: "The 2008

economic recession which caused a severe reduction in Port Authority income projections; the

cost of rebuilding the World Trade Center site, which is now more than $11 billion; and more

than $6 billion in security-related expenses since 9/11, which have nearly tripled from pre-9/11

annual budgets." *Id.*

The August 5 announcement initially proposed a $33 billion capital plan for the entire

Port Authority. *See* Mulry Decl., Ex. B. The Port Authority then "cut" the budget to $25 billion,

but this reduction was just a different way of presenting the budget. The initial ten-year $33

billion plan included the full cost to complete projects, including amounts extending beyond ten

years. *See* Mulry Decl., Ex. C at 70:18-25; 111:12-18; 114:6-17. The $25 billion plan was the

3

amount for all projects started during the ten year period, including only the cost during the ten year period.  *See id.* at 111:19 to 112:8.

The Toll Increases were approved by the Port Authority Board of Commissioners two weeks later, on August 19, 2011.  To justify the need for a toll increase, the Port Authority Chief Financial Officer presented to the Commissioners – and the public – a $25.1 billion capital plan for the <u>entire</u> Port Authority, including funding the World Trade Center.  *See* Mulry Decl., Ex. D at Ex. F, pp. 5, 8-9, 13; *see id.* at ¶ 15.  Neither the public nor the Commissioners were told that a separate " ITN capital plan" was the reason for the toll increase.

**The Port Authority's reason for the Toll Increases as given to this Court**
**differs from the reason presented to the Commissioners and the public.**

In *AAA v. PA,* 887 F.2d 417 (2d Cir. 1989), the toll increase supported a $1.5 billion capital improvement plan limited to the ITN.  *Id.* at 418-19.  In contrast, the 2011 Toll Increases were presented to the Commissioners and the public as supporting a $25.1 billion capital plan for the <u>entire</u> Port Authority, including the World Trade Center.  No evidence has been developed in discovery suggesting that the Commissioners – the decision makers – were voting to approve, disapprove or modify a toll increase solely for the benefit of the ITN as opposed to one benefitting the <u>entire</u> Port Authority.

After AAA sued, relying significantly on *AAA v. PA*, the Port Authority developed an entirely new reason for the toll increases.  Before this Court, the Port Authority asserted that the toll increases were not needed for the World Trade Center or the $25.1 billion capital plan, but instead were needed for a preliminary, unapproved $10.786 billion capital plan only for the

ITN. [2]   *See* Mulry Decl., Ex. D, ¶ 15.  The Commissioners, however, were never told that the toll increases were targeted solely to the ITN, and were never presented with a $10.786 billion ITN capital plan.

Discovery has confirmed that the "ITN capital plan" could not have been the Commissioners' reason for the toll increases.  The exhibits and financial analysis in CFO Fabiano's affidavit were not even prepared until after this lawsuit was filed, and were specifically created in response to the AAA litigation.  *See* Mulry Decl., Ex. E at 151:24 to 152:6.

The "$10.786 billion Preliminary Capital Plan for the ITN for 2011-2020" resulted from the management and budget department putting together what they believed was capacity and "taking the list of the various projects from all the departments."  *Id.* at 152:6 to 153:2; Ex. D at ¶ 5.  This "ITN capital plan" was not presented to the Commissioners, but instead was specifically developed in response to the AAA lawsuit.  Mulry Decl., Ex. E at 153:12-21.  The idea of a "preliminary capital plan for the ITN" did not even make any sense to the Port Authority's Management and Budget Department Director. *See* Mulry Decl., Ex. C at 94:21-24.

Exhibit B to the Fabiano Affidavit, which CFO Fabiano considered "the only schedule that really matters," *See* Mulry Decl., Ex. F at ¶ 2, purports to be an analysis of cash flow for the ITN.  *See* Mulry Decl., Ex. Mulry Decl., Ex. E at 44:19-22.  A cash flow analysis had not been presented in any way to the Commissioners, *See id.* at 159:5-12, even though CFO Fabiano believes it is "the only schedule that really matters."  A cash flow analysis for the ITN had never even been done at the Port Authority prior to the AAA lawsuit. *See id.* at 44:19 to 46:12.  A cash

---

[2]      The Interstate Transportation Network ("ITN") is comprised of four bridges, the George Washington Bridge, the Bayonne Bridge, the Goethals Bridge, and the Outerbridge Crossing; two tunnels, the Lincoln Tunnel and the Holland Tunnel; three bus terminals; and PATH. *AAA. v. PA*, 887 F.2d 417, 418 (2d Cir. 1989).

flow analysis differs from the reporting in the Port Authority's annual reports. For example, depreciation, which is used in income statements, was not used in Fabiano's cash flow statement. *See id*. at 47:23 to 48:4.

A review of presentation documents for the Commissioners at the time of the Toll Increases demonstrates that the "ITN capital plan," later presented to the Court by CFO Fabiano, was not and could not have been the basis for the Toll Increases. None of these presentation materials mention an "ITN capital plan," and none suggest that the Toll Increases were being proposed for anything other than the needs of the entire Port Authority, including the World Trade Center, Aviation and Port Commerce. *See* Mulry Decl., Exs. G, H, I, J.

In sum, the analysis presented to the Court by the Port Authority in opposition to the AAA lawsuit was developed only after the Toll Increases were approved and this action was commenced. Thus, that post-approval, post-lawsuit analysis could not possibly have been the rationale employed by the decision makers in approving the Toll Increases, as it was never presented to them. Presumably, this new rationale was presented to the Court because the Port Authority believed the reasons presented to the Commissioners would not be sufficient under the Commerce Clause and the Highway Act.

**The post-approval rationale for the Toll Increases –a $10.786 billion ITN capital plan – includes $3.8 billion that is not authorized, not for transportation, or not connected to any transportation project.**

As stated above, the Toll Increases were proposed to the Commissioners and the public based upon an approximation of the needs of the entire Port Authority, with a $25.1 billion capital plan that included the $11 billion reconstruction of the World Trade Center. The Toll Increases were then approved by the Commissioners on the same basis. At trial, AAA will advance the argument, *inter alia*, that the Toll Increases violate the Commerce Clause and the

Highway Act because the decision of the Commissioners to approve the Toll Increases must be analyzed by examining the information they had, and the reasons they had for approving them, and not based on a post-approval rationale that they never considered.

On this injunction application, however, AAA focuses on the post-approval, post-lawsuit rationale given by the Port Authority to the Court, the $10.786 billion "ITN capital plan." Even assuming this was the basis for approval of the Toll Increases – which it could not have been – over one-third of that total budget comprises projects the toll payers should not have to pay for. Some of these projects, totaling $1.8 billion, are for New Jersey state bridges and roads, and are outside the statutory funding ability of the Port Authority. One project, costing at least an additional $1 billion, is being undertaken for navigational rather than transportation purposes. And one project is not a project at all, but instead is a "placeholder" that inflates the "ITN capital plan" by an additional $1 billion.

### A. $1.8 billion of the ITN capital plan is for New Jersey state bridges and roads that the Port Authority is not permitted by statute to fund

The $10.786 billion "ITN capital plan" includes $1.8 billion for improvements to the Pulaski Skyway and New Jersey state roads. In the Fabiano Affidavit, these are called the "Lincoln Tunnel access roadway infrastructure projects." *See* Mulry Decl., Ex. D at ¶ 7(d). The connection to the Lincoln Tunnel, however, is illusory. The money is being spent not on the Lincoln Tunnel, but on New Jersey state bridge and road facilities: the Pulaski Skyway, N.J. Route 1 & 9, N.J. Route 7, and the WittPenn Bridge. *See* Mulry Decl., Ex. D at Ex. A, p. 6; Ex. E at 185:18 to 186:8. The Pulaski Skyway is more than eight miles from the Lincoln Tunnel,

and cannot in any way be considered an access roadway to the Lincoln Tunnel.[3]  *See* Mulry

Decl., Ex. K.

     As demonstrated at Point II below, the expenditures by the Port Authority for the Pulaski

Skyway and the New Jersey roads are completely unauthorized under New York and New Jersey

statutes.  Tollpayers should not be required to pay for $1.8 billion of unauthorized Port Authority

expenses.

### B.  $1 billion of the ITN capital plan is for raising the Bayonne Bridge roadway, which is not an ITN expense but is for navigation and Port Commerce

     The "ITN capital plan" also includes $1 billion for the raising of the Bayonne Bridge

roadway.  While this project involves construction at a bridge, the Bayonne Bridge roadway is

not being raised for transportation, but instead for navigation and the Port Commerce line of

business, because new larger container ships cannot pass under the current roadway.  As CFO

Fabiano stated to the Commissioners:

> [O]ne of the key projects supported by the tolls increase is the raising of the roadway at the Bayonne Bridge, which will accommodate the larger ships expected to call on the port with the opening of the expanded Panama Canal.  It is an investment in the competitiveness of our ports …"

*See* Mulry Decl., Ex. H at AAA211; *see also id.*, Ex. E at 143:21 to 145:4 (Bayonne Bridge must

be raised so larger container ships can pass under it); *id.*, Ex. C  at 152:23 to 153:12 (roadway

being raised to provide navigational clearance for larger ships).  Port Authority documents admit

that the Bayonne Bridge "Navigational Clearance" project is "Under [Tunnels, Bridges and

Terminals] but [is] a Port [Commerce] initiative."  *See* Mulry Decl., Ex. L.  Thus, although it is a

---

[3]    According to the Port Authority website, the driving distance between the Pulaski Skyway and the Lincoln Tunnel is 8.2 miles.  *See* http://www.panynj.gov/bridges-tunnels/driving-directions-map.html?sourceAddress=Lincoln+Tunnel&facilityAddress=Lincoln+Tunnel%2C+New+York%2C+NY+10001&destinationAddress=Pulaski+Skyway.

project expending funds at a bridge, the reason for the project is "to provide navigational

clearance for larger containerships as a result of the Panama Canal Expansion." *Id.*

Indeed, the current Port Authority capital plan summary acknowledges the purpose of the

Bayonne Bridge project is not interstate transportation, but navigation.

> The Board authorized $1.3 billion to raise the roadway of the Bayonne Bridge to 215 feet
> to accommodate larger more efficient ships anticipated post Panama Canal expansion.
> The current navigational clearance of 151 feet is an ongoing concern for the maritime
> industry.  In late 2015, much larger containerships are expected to call at east coast ports.
> Allowing these vessels access to our port facilities will provide a more sustainable and
> competitive Port of New York and New Jersey.

*See* Mulry Decl., Ex. M, at 9.

Toll payers should not be required to pay increased tolls to support the needs of

navigation and the maritime industry.

### C.  $1 billion of the ITN capital plan is a placeholder representing no ITN projects

The "ITN Capital Plan" also includes just under $1 billion for a "capital infrastructure

fund" ("CIF").  *See* Mulry Decl., Ex. D at Ex. A, p 10.  Access to the Region's Core ("ARC")

was a project for a mass transit tunnel the Port Authority was participating in, but ARC was

suspended and terminated by New Jersey Governor Christie.  *See* Mulry Decl., Ex. E at 184:8-

15; 185:7-17.  The CIF allocated the $2.7 billion balance of funds the Port Authority previously

committed to the ARC tunnel.  *See* Mulry Decl., Ex. C at 82:4-11; 95:17 to 96:8.  $1.8 billion

went to the New Jersey Bridges and Roads Project described above, and the remainder of close

to $1 billion has not yet been allocated.  *See id.* at 103:22 to 104:12; Ex. D at Ex. A, p. 10; Ex. E

at 188:17 to 189:4, 189:2 to 190:12.  This amount is simply a line item in the capital plan that is

not attributable to any transportation project.  *See* Mulry Decl., Ex. E at 190: 18-25.

In other words, it is a $1 billion cushion that inflates the "ITN capital plan" to $10.786

billion. | **REDACTED**

**REDACTED**

Toll payers should not be required to pay for a "placeholder," a $1 billion cushion in the

Port Authority's post-approval "ITN capital plan."

### D. Subtracting $3.8 billion from the "ITN capital plan" turns CFO Fabiano's cash flow analysis positive

CFO Fabiano's cash flow analysis, which he considered "the only schedule that really

matters," *see* Mulry Decl., Ex. F, at ¶ 2, uses a $10.786 billion "ITN capital plan," and concludes

with an ITN deficit at the end of ten years of only $55 million. If $3.8 billion is deducted from

the "ITN capital plan," the cash flow analysis yields a positive number in the billions. The

Commissioners were certainly never told this when they were asked to approve the Toll

Increases. The CFO Fabiano cash flow analysis, and its conclusion that the ITN would lose $55

million over a ten year period, are completely undercut when the billions of dollars for the

Pulaski Skyway and New Jersey roads project, the Bayonne Bridge projects and the billion dollar

"placeholder" are deducted from the "ITN capital plan."

## PROCEDURAL BACKGROUND

AAA commenced this action on September 26, 2011 by filing a complaint, and sought a

preliminary injunction enjoining the Port Authority from collecting toll increases that had been

approved in August 2011. AAA challenged the toll increases under both the Commerce Clause

and the Highway Act. Under the dormant Commerce Clause, a toll increase is unconstitutional

10

unless "it (1) is based on some fair approximation of the use of the facilities, (2) is not excessive is relation to the benefits conferred, and (3) does not discriminate against interstate commerce." *Northwest Airlines, Inc. v. County of Kent, Mich.*, 510 U.S. 355, 369 (1994).   Under the Highway Act, a toll increase is impermissible unless it is "just and reasonable."   *AAA v. PA*, 887 F.2d 417, 417 (2d Cir. 1989).   AAA argued that the toll increases violated both of these standards, because the toll increases were to be used for purposes outside the ITN.   The Port Authority opposed the injunction application, and moved to dismiss, relying upon matters outside the pleadings.

**Judge Holwell's Preliminary Injunction Decision**

After holding Oral Argument, Judge Holwell denied the AAA's application for an injunction, converted the Port Authority motion to dismiss into a motion for summary judgment, and referred the case to the Magistrate Judge for discovery.   *AAA v. PA*, 842 F. Supp. 2d 672 (S.D.N.Y. 2012).

Judge Holwell first addressed irreparable injury, and referenced the Port Authority's representation that 78.9% of bridge and toll motorists used E-Z Pass.   Regarding E-Z Pass users, the Port Authority stated that if Plaintiffs prevail, it could issue a refund by crediting the E-Z Pass users' accounts.   842 F. Supp. 2d at 676.   The Court and Port Authority seemed to accept the proposition that for the more than 20% of motorists who use cash, there could not be a refund.   Judge Holwell noted, however, that the Port Authority suggested a discount to cash users if Plaintiffs prevailed, and found that, on the record before him, "AAA [had] not shown that a substantial number of drivers would go unreimbursed."   *Id.* at 676-77.

The Court did not address "the fine points of the Port Authority's refund proposal" because he found that AAA had not shown a likelihood of success on the merits.   *Id.* at 677.   The Court first recognized a toll is only reasonable under the Commerce Clause "if it (1) is based on

some fair approximation of the use of the facilities, (2) is not excessive is relation to the benefits conferred, and (3) does not discriminate against interstate commerce." *Northwest Airlines, Inc. v. County of Kent, Mich.*, 510 U.S. 355, 369 (1994).  The Court found that AAA had not carried its burden on its injunction application because the Port Authority analysis submitted by CFO Fabiano, which had not been the subject of discovery, suggested that toll increase funds would not be used for the World Trade Center.  *Id.* at 678.  After suggesting without deciding that there is a private right of action under the Highway Act, *id.* at 679-80 & n. 5, the Court found for the same reason that AAA had not carried its burden under the Highway Act.  *Id.* at 680.

After denying the Port Authority motion to dismiss, Judge Holwell stated that "AAA's claim that the Port Authority's toll increases are earmarked for expenditures which do not reflect a 'fair approximation of use' or are 'excessive' in relation to the benefit conferred may be bolstered through discovery of financial documents or correspondence not yet provided for public review."  *Id.* at 681.

This application presents such evidence to the Court, including $1.8 billion for a New Jersey state bridge and road project the Port Authority may not statutorily fund; $1 billion for a project to benefit navigation and shipping rather than toll payers; and $1 billion for an empty "placeholder" in its budget.

**Only Limited Discovery Remains**

Discovery is substantially complete, with two items of discovery remaining.  First, AAA has filed objections to a ruling by Magistrate Judge Pitman concerning documents withheld by the Port Authority on the ground of the deliberative process privilege.  Those objections are fully briefed before the Court, and Oral Argument is scheduled for October 29.  Doc. Nos., 104, 109,

113.[4]   Once that issue has been determined, there is one remaining deposition, the deposition by

AAA of former Port Authority chairman David Samson.

## ARGUMENT

"[A] district court may grant a preliminary injunction only where the moving party

establishes: (i) that it is likely to suffer irreparable injury if the injunction is not granted, and (ii)

either (a) a likelihood of success on the merits of its claim, or (b) the existence of serious

questions going to the merits of its claim and a balance of hardships tipping decidedly in its

favor."  842 F. Supp. 2d at 676 (citing *Beal v. Stern*, 184 F.3d 117, 122 (2d Cir. 1999).

As set forth below, AAA has established irreparable injury, demonstrating in particular

that a substantial number of cash toll payers will go uncompensated if the December 2014 Toll

Increases go into effect.  Moreover, AAA has established a likelihood of success on the merits of

its Commerce Clause and Highway Act claims, even assuming the basis for the Toll Increases

was a $10.786 billion "ITN Capital Plan."

Most egregiously, one-sixth of the post-approval, post-lawsuit "ITN capital plan" is a

$1.8 billion payment for the Pulaski Skyway and New Jersey roads that is not statutorily

permitted.  Another $1 billion is for the raising of the Bayonne Bridge roadway for navigational

needs, not transportation, and another $1 billion is a "placeholder" untethered to any

transportation project.  These facts demonstrate a likelihood of success on the AAA Commerce

Clause and Highway Act claims.

### Point I

## AAA HAS ESTABLISHED IRREPARABLE INJURY

The Port Authority concedes that over twenty percent of motorists – more than one in

five -- pay the bridge tolls in cash.  *See* Mulry Decl., Ex. D at ¶ 16.  In addition, the Port

---

[4]       "Doc. No." refers to the number of documents electronically filed in this case.

Authority is well aware that it will not be able to refund the toll increases to those motorists in the event AAA prevails in this action, as its only suggestion for refunding was offering discounts to future cash users. *Id.* It is self-evident that the Port Authority could not refund the toll increases paid by a motorist in cash. The Port Authority does not know who cash users are, where they live, or how many times they have paid the tolls. Judge Holwell recognized that the Port Authority's proposal "would not be perfect," but he determined that on its initial application, "AAA has not shown that a substantial number of drivers would go unreimbursed." 842 F. Supp. 2d at 676-77.

AAA submits that Port Authority records from the last three years do show that a substantial number of cash users will go unreimbursed if it is successful in this action. The total annual bridge and tunnel crossings in the last three years for which full records are available are:

| | |
|------|-------------|
| 2011 | 119,150,000 |
| 2012 | 116,253,000 |
| 2013 | 115,688,000 |

*See* Mulry Decl., Exs. N, O, P, Q (Schedule G). For the first six months of 2014, the total bridge and tunnel crossings were 54,886,544. *See* Mulry Decl., Ex. R. During the period 2011 through 2014, the percentage of cash users has been between 17.9% and 23.1%. *Id.*

Even assuming an approximate twenty percent of cash users, that would mean that more than 60,000,000 cash users have crossed the Port Authority bridges and tunnels since the Toll Increases went into effect in December 2011. The Port Authority does not know who these people are, where they live, or how many times they have crossed the bridges and tunnels. AAA submits that this figure represents a substantial number of drivers that will go unreimbursed if it

is successful in this lawsuit. The Port Authority's suggestion that it could offer discounts in the future cannot refund the money these motorists have paid.

Money damages will not suffice in this case. Based on the Port Authority's own traffic statistics of bridge and tunnel usage, there are likely to be well over 100,000,000 bridge and tunnel crossings in the next year that will be subject to the tolls that are scheduled to increase on December 7, 2014. For cash users, likely to total more than 20,000,000 motorists, these amounts cannot be recouped in the event AAA is successful in this action. The Port Authority proposes that future motorists may get some benefit, but those who have already paid the increased tolls in the past are simply out of luck.

The dollars attributable to the Toll Increases are also significant. In the past four full years since the Toll Increases went into effect in September 2011, annual bridge and tunnel revenues have been:

| | |
|------|------------|
| 2010 | $  957,529 |
| 2011 | $ 1,043,441 |
| 2012 | $ 1,220,801 |
| 2013 | $ 1,330,494 |

*See* Mulry Decl., Exs. N, P, Q, R (Schedule E). Using the 2010 annual total as a baseline, the Toll Increases have gained the Port Authority more than $800,000,000 through December 2013. This does not count 2014, which included the third of the five toll increases. The Port Authority will have recouped over $1 billion from the Toll Increases by the time the fourth of the five toll increases goes into effect later this year.

In addition, the relief AAA seeks is limited, an injunction only against the fourth of five toll increases, which is scheduled to go into effect on December 7, 2014. The Port Authority has

already reaped the benefit of three prior toll increases and will continue to do so. Moreover, this case is at a much later stage than the filing of the complaint, which was the stage at which Judge Holwell first addressed the issue of an injunction. Only limited discovery remains, the pending objections to the Magistrate Judge's decision on withheld documents and the Samson Deposition. This case will then be ready for trial. An injunction against the fourth toll increase will maintain the *status quo* for the short period of time for this case to be ultimately resolved.

Judge Holwell found that in its initial injunction application, "AAA [had] not shown a substantial number of drivers would go unreimbursed." 842 F. Supp. 2d at 676-77. The record over the last three years establishes that a substantial number of motorists will go unreimbursed if AAA is successful, and more will go unreimbursed if the fourth toll increase goes into effect in December. AAA submits that the motoring public will continue to be irreparably injured by paying unlawful toll increases, with no practical way to refund them once the toll increases are held to be improper.

## POINT II

### AS A MATTER OF LAW, THE PORT AUTHORITY IS NOT STATUTORILY AUTHORIZED TO FUND THE PULASKI SKYWAY AND NEW JERSEY STATE ROADS

To receive Port Authority funding, projects must fall within the scope of the Port Authority's statutory authorization. Funding of projects outside the scope of such authority would be *ultra vires*, and therefore impermissible. The "ITN capital plan" includes $1.8 billion for the Pulaski Skyway and New Jersey roads, which are neither part of the Port Authority nor part of the ITN. The New York and New Jersey statutes governing the Port Authority, however, do not allow funding for such bridges and roads. Any such spending is impermissible and may not be passed on to toll payers.

16

The Port Authority has asserted that funding of the Pulaski Skyway and New Jersey roads is permitted because they are "access roads" to the Lincoln Tunnel. *See* Mulry Decl., Ex. D at ¶ 7(d); Ex. E at 185:18 to 186:8. These bridges and roads, however, are not owned by the Port Authority, are miles away from the Lincoln Tunnel, and are completely outside the Port Authority's statutory authorization for funding.

Regarding the Lincoln Tunnel, the Port Authority may "construct, own, maintain and operate [the Lincoln Tunnel], together with such approaches thereto and connections with highways." NY Unconsol. Laws § 6502; NJSA 32:1-119. These statutes were passed in 1931, after the Holland Tunnel had been constructed, but before the Lincoln Tunnel (and any approaches or connections to highways) had been constructed. Thus, the Port Authority was not authorized in the same statutes to construct approaches or connections to the Holland Tunnel, as they already existed. Instead, the state legislatures provided that "the control, operation, tolls and other revenues of the [Holland Tunnel] shall be vested in the port authority as hereinafter provided." NY Unconsol. Laws § 6502; NJSA 32:1-119.

As to the Lincoln Tunnel, the Port Authority may only fund "approaches thereto" and "connections with highways." The Pulaski Skyway and New Jersey roads are neither. New York and New Jersey statutes define the "entrances, exits and approaches" to the Lincoln Tunnel:

> The approaches to the [Lincoln Tunnel] on the New Jersey side shall be so located and constructed as to permit tunnel traffic to pass over or under the tracks of the New York, Susquehanna and Western Railroad Company and the Northern Railroad Company of New Jersey, immediately west of the Palisades, without crossing the said tracks at grade, and as to permit connections with New Jersey state highway routes in the vicinity of the said tracks.

NY Unconsol. Law § 6503; NJSA 32:1-120.

17

The Pulaski Skyway and New Jersey roads are miles away from the Lincoln Tunnel and cannot even remotely be considered within the statutory definition of "approaches." The Pulaski Skyway and New Jersey roads are also not "approaches" to the Lincoln Tunnel under the plain meaning of that term. An "approach" to a tunnel can only mean a contiguous road that leads directly into the tunnel. This meaning makes particular sense because, when the statutes were enacted, the Lincoln Tunnel had not yet been built, and the Port Authority had to build approaches to the tunnel, as well as connections to state highways on the New York and New Jersey sides. The Pulaski Skyway and New Jersey roads, miles away from the Lincoln Tunnel, cannot be considered "approaches," unless the Port Authority considers any road that eventually leads to the Lincoln Tunnel (such as Centre Street outside the Courthouse) to be an "approach" to the Lincoln Tunnel.

The only other Lincoln Tunnel authorization is for "connections with highways." This term, particularly considering the statute's enactment before construction of the Lincoln Tunnel, means the Port Authority may construct and pay for roads that connect the tunnel to the state highways. NY Unconsol. Law § 6511 discusses "Connections with state or municipal highways," and the Pulaski Skyway and New Jersey roads do not fall within the meaning of this statutory definition.

> The plans of the connections with state or municipal highways of any vehicular bridge or tunnel which the port authority may hereafter construct (including the plans of any additional connections of existing bridges or tunnels with state or municipal highways), shall be subject to the approval of the governor of the state in which such connections shall be located. Either state may require by appropriate legislation that such connections shall be subject to the approval of the municipality of that state in which they shall be located; and in such event, the approval of such municipality shall be given as provided in article twelve of the said compact of April thirty, nineteen hundred twenty-one. Except as limited herein, the port authority shall determine all matters pertaining to such bridges and tunnels.

NY Unconsol. Law § 6511.

The Pulaski Skyway and New Jersey roads are unquestionably not Port Authority facilities.  The authorization for the Port Authority to spend money comes from New York and New Jersey statutes, and those statutes do not authorize payment for the Pulaski Skyway and the New Jersey roads.  Such funding by the Port Authority is completely *ultra vires*, and that $1.8 billion payment should not be borne by toll payers.

**Point III**

**<u>THE TOLL INCREASES VIOLATE THE COMMERCE CLAUSE</u>**

Under the dormant Commerce Clause, a toll increase is unconstitutional unless "it (1) is based on some fair approximation of the use of the facilities, (2) is not excessive is relation to the benefits conferred, and (3) does not discriminate against interstate commerce." *Northwest Airlines, Inc. v. County of Kent, Mich.*, 510 U.S. 355, 369 (1994); *see Bridgeport and Port Jefferson Steamboat Co. v. Bridgeport Port Authority*, 567 F.3d 79, 84 (2d Cir. 2009).

**A.     The Toll Increases are not based on a fair**
            **<u>approximation of the use of the ITN facilities</u>**

The Toll Increases fail the first prong of the *Northwest Airlines* test, because they are not based on a fair approximation of the use of ITN facilities.  Even assuming a $10.786 billion ITN capital plan had been presented to the Commissioners, and assuming they approved a toll increase based on that plan, the Toll Increases are not a fair approximation of the use of ITN facilities because $3.8 billion of that amount comprises funding the Port Authority is not permitted to make, funding of projects benefitting navigation and Port Commerce rather than transportation, and funding of a massive "placeholder" that is unconnected to any transportation project.

19

First, funding of the Pulaski Skyway and New Jersey road project is completely unauthorized under New York and New Jersey statutes. *See supra* at Point II. The Port Authority has only limited authority to pay for approaches to the Lincoln Tunnel or connections with highways, and there is no authority to pay for New Jersey state roads and bridges that are miles away. The Pulaski Skyway and New Jersey roads are not Port Authority facilities, and raising tolls to pay for them cannot fairly approximate the use of ITN facilities. Raising tolls to pay for the $1.8 billion Pulaski Skyway and New Jersey roads project violates the Commerce Clause.

Second, the raising of the Bayonne Bridge roadway is a project undertaken – by the Port Authority's own admission – for the benefit of navigation and Port Commerce, not for the benefit of the ITN. The project involves a bridge, but the Port Authority's own documents establish that raising the roadway is a navigational rather than transportation need. Raising tolls for a $1 billion project needed to clear navigational paths does not fairly approximate the financial needs of the ITN, and raising tolls for this purpose violates the Commerce Clause.

Finally, the "ITN capital plan" includes a $1 billion "placeholder," through which the Port Authority has inflated its supposed ITN capital needs without explaining to its Commissioners or the public what those funds will be used for. The cost of the use of ITN facilities is not fairly approximated when that cost is inflated by a $1 billion "placeholder," representing almost ten percent of the total supposed "ITN capital plan." A fair approximation of use of ITN facilities cannot include an extra budget add-on of $1 billion. The Toll Increases violate the Commerce Clause for all of these reasons, and should therefore be enjoined.

B.     **The Toll Increases are excessive in relation to the benefit conferred**

The Toll Increases also fail the second prong of the *Northwest Airlines* test, because they are excessive in relation to the benefits conferred.  The benefit conferred on a toll payer is the ability to cross from New York to New Jersey over Port Authority bridges and tunnels.  The Toll Increases are excessive because they are based on expenses that do not have a relation to the ITN.

Again, even assuming the reason for the Toll Increases was the $10.786 billion "ITN capital plan," the Toll Increases are excessive because $3.8 billion of that capital plan is not for the ITN, so toll payers do not receive a benefit.  The toll payers do not receive a benefit from the unauthorized spending of  $1.8 billion for New Jersey state bridges and roads; the toll payers do not receive a benefit from the $1 billion raising of a bridge roadway so that ships can pass under it; and the toll payers do not receive a benefit from a $1 billion "placeholder" that  improperly inflates the supposed "ITN capital plan."  The $3.8 billion for these projects comprises at least thirty five percent of the $10.786 billion "ITN capital plan," the Port Authority's post-approval, post-lawsuit rationale for the Toll Increases.  The unauthorized and non-ITN projects in the "ITN capital plan" make the Toll Increases excessive for toll payers, in relation to the benefit conferred.  *See Bridgeport*, 567 F.3d at 87 ("limits of both a fair approximation of use and excessiveness are plainly exceeded when the fees support a BPA budget that includes, for example, a development project for reducing traffic on I-95").

For all of these reasons, the Toll Increases violate the Commerce Clause and should be enjoined.

### Point IV

### <u>THE TOLL INCREASES VIOLATE THE HIGHWAY ACT</u>

Under the Highway Act, a toll increase is impermissible unless it is "just and reasonable." *AAA v. PA*, 887 F.2d 417, 417 (2d Cir. 1989).

### A.    The legal parameters for the Highway Act analysis were set by two prior AAA challenges to Port Authority toll increases

AAA has challenged Port Authority toll increases in two prior cases, *AAA v. Cox*, 592 F.2d 658 (2d Cir. 1979), and *AAA v. PA*, 887 F.2d 417 (2d Cir. 1989).

In *AAA v. Cox*, AAA challenged the decision of the Federal Highway Administrator approving an increase in four bridge tolls[5] from $1.00 to $1.50.  AAA argued that the Highway Administrator should have only included the four bridges in the rate base for determining a fair return for tolls, and that he had improperly included the Holland and Lincoln Tunnels, Port Authority bus terminals, and the Port Authority Trans-Hudson Railroad ("PATH").  592 F.2d at 660.  The toll increase was justified by the Port Authority as necessary for four mass transit projects.  592 F.2d at 662.  Judge Friendly wrote for the Court that "the inclusion of PATH is still a giant leap from anything previously taken into account in determining appropriate rates under the 'reasonable and just' provision of the General Bridge Act of 1906."  592 F.2d at 672. Nevertheless, the Court could not find the Highway Administrator's decision to be arbitrary and capricious based on the record before it. 592 F.2d at 673. The Court noted that many of the issues it raised were not developed before the agency, and the AAA proceeded on an all or nothing argument resisting inclusion of anything other than the four bridges.  The Court affirmed, "but with the caveat that this shall not be deemed to constitute an approval or rejection of the Administrator's action or to preclude a new protest."  592 F.2d at 673.

---

[5]    The bridges at issue were the George Washington Bridge, the Bayonne Bridge, the Goethals Bridge, and the Outerbridge Crossing.

In *AAA v. PA*, AAA brought the new protest, challenging an increase of bridge tolls from $2.00 to $3.00. 887 F.2d at 419. AAA argued that PATH should not be included in the rate base for raising tolls. 887 F.2d at 417-18. The toll increase was justified by the Port Authority as necessary for capital improvements to transportation facilities. 887 F.2d at 419. The Second Circuit found that the district court's factual findings concerning the relatedness of the PATH to the Port Authority bridges and tunnels were not clearly erroneous, and affirmed the finding that PATH was part of an "integrated, interdependent transportation system." 887 F.2d at 423. Significantly, in *AAA v. PA*, as in *AAA v. Cox*, the toll increase was justified by the Port Authority as necessary for expenses of its transportation network.

**B.      The Toll Increases violate the Highway Act because they fund costs outside the ITN and are therefore not "just and reasonable"**

Even assuming the Commissioners had been presented with the $10.786 billion "ITN capital plan," and had approved the Toll Increases based on that plan, the Toll Increases would fail the "just and reasonable" test because they are supporting projects outside the ITN and its transportation mission. In the *AAA v. PA* case, the issue was whether PATH could be included in the rate base for a toll increase. Here, one of the primary issues on this injunction application can be stated as whether the Pulaski Skyway and New Jersey roads, the navigational raising of the Bayonne Bridge roadway, and a $1 billion "placeholder" can be included in the rate base for the 2011 Toll Increases. They cannot.

As stated above, the Pulaski Skyway and the New Jersey roads are not ITN facilities, and the $1.8 billion funding of those projects is not permitted under the statutes governing the Port Authority. Raising tolls for state road funding that is not authorized under the statutes governing the Port Authority cannot be "just and reasonable." If including PATH in the rate base for a

23

bridge toll increase was a "giant leap," *AAA v. Cox*, 592 F.2d at 672, including the Pulaski Skyway and the New Jersey roads in the rate base is an unauthorized and impermissible leap.

Similarly, the Port Authority concedes that Toll Increases can only be justified by ITN expenses. The Bayonne Bridge roadway is being raised – at a cost of $1 billion – so that ships can pass underneath it. Raising tolls to pay for a navigational project is not "just and reasonable" under the Highway Bridge Act.

Finally, it is not "just and reasonable" to include in the rate base a $1 billion "placeholder" into which the Port Authority can fill anything it would like. Essentially, the Port Authority argues it can inflate its budget by $1 billion and then tell the toll payers they should pay the Toll Increases and "trust us" concerning how the money should be spent. Raising tolls to pay for a budget inflated by $1 billion, unconnected to any ITN project, is not "just and reasonable."

### C.      There is a private right of action under the Highway Act

The Port Authority has argued that toll payers do not have a private right of action to challenge toll increases that are not "just and reasonable" under the Highway Act.  Its argument is wide of the mark because, for many years prior to the enactment of the Highway Act, toll payers had the right to file an administrative complaint, reviewable in federal court, to challenge an unjust and unreasonable toll increase. Defendant Port Authority disregards this history and asks this Court to focus solely on the stark language of the Highway Act of 1987 which is silent, as was the prior statute, regarding a remedy for an unjust and unreasonable toll increase.  Second Circuit precedent and the context, circumstances and purpose for which the Highway Act was enacted lead to the conclusion that there is a private right of action to challenge unjust and unreasonable toll increases under the Highway Act.

1. **The statutory scheme preceding the Highway**
   **Act afforded administrative review and Court review.**

Prior to the passage of the Highway Act in 1987, various statutes provided that the tolls

for certain bridges had to be just and reasonable, and provided for administrative and judicial

review of those tolls.  Under the prior statutory scheme, the Federal Highway Administrator

addressed issues such as the reasonableness and justness of toll schedules or amortization

periods.  49 C.F.R. § 310.1 (1986).  After the Administrator's factual investigation, the

Administrator or an administrative law judge would hold a formal hearing and render a decision.

Id. at §§ 310.3, 310.4, 310.5, 310.7, 310.13.  Thereafter, "[t]he decision . . . could be challenged

either in a district court, pursuant to the Administrative Procedure Act, or in the court of appeals

for the judicial circuit in which any portion of the bridge was located."  *Molinari v. DiCarlo*, 838

F. Supp. 718, 722 (E.D.N.Y. 1993) (*citing, inter alia*, 5 U.S.C. § 701 *et seq.* and 33 U.S.C.A. §

505 (1986)).

2. **In amending the statute, Congress eliminated**
   **administrative review but kept Court review.**

Congress found "[f]ederal oversight of the reasonableness of tolls ... to be

administratively burdensome [and] legally unproductive."  133 Cong. Rec. S778-02, 1987 WL

928634, at § 129.  Legislation removing the Administrator and the burdensome administrative

process initially would have repealed the sections of prior law providing that bridge tolls be just

and reasonable.  *Molinari v. DiCarlo*, 838 F. Supp. 718, 722-23 (E.D.N.Y. 1993).  To avoid the

result of having no standard for toll fares, however, Congress enacted 33 U.S.C. § 508 to ensure

that tolls remained just and reasonable.  "Toll increases on these deregulated facilities must be

just and reasonable but will not be subject to review by DOT."  H.R. Conf. Rep. 100-27, at 175

(1987), *reprinted in* 1987 U.S.C.C.A.N. 121, 159, 1987 WL 61451, at 159; S. Rep. 100-4, at 28

(1987), *reprinted in* 1987 U.S.C.C.A.N. 66, 92, 1987 WL 61450, at 92.

By maintaining the "just and reasonable" standard, Congress impliedly approved the

previous system for challenging tolls, but eliminated the Administrator and the administrative

process. In other words, Congress intended that parties aggrieved by unjust and unreasonable

tolls would continue to challenge such tolls, albeit without the burdensome administrative

procedure.

When the legislation was being discussed on the House floor, Mr. Molinari, a Republican

Representative from Staten Island, explained that "a number of questions have been raised as to

whether section 135, or the statement of managers accompanying section 135, changes in any

way the 'just and reasonable' standard as it has been applied under existing laws and existing

authorities." 133 Cong. Rec. H1635-02, 1987 WL 934316, at 4-5.  Mr. Howard, the Democratic

chairman of the Committee on Public Works and Transportation, addressed these concerns:

> Neither section 135 nor the statement of managers changes the
> standard to be applied in determining whether a toll increase is just
> and reasonable. The only thing that we have changed is the forum
> for making the determination. Toll increases will no longer be
> subject to review by the Department of Transportation; instead the
> decision will be left to the courts in the event of a challenge.

Id. *See also id.* (Mr. Hammerschmidt, ranking Republican on the Committee, concurred that

section 135 had "not changed the just and reasonable standard in any way.")  These statements

indicate that Congress did not intentionally preserve the "just and reasonable" standard only to

have it be an empty requirement nobody could enforce.

Thus, the reinsertion of the "just and reasonable" standard in section 508 indicates the

intent of Congress to preserve not only the "just and reasonable" standard, but also the

preexisting form of toll review not involving the Administrator, *i.e.,* review by the federal courts.

### 3. The private right of action issue was before the Second Circuit panel which decided *AAA v. PA* soon after passage of section 508.

The context and circumstances under which the *AAA v. PA* case was commenced, litigated and decided are extremely relevant to whether there is a private right of action under the Highway Act. Under the prior statutory scheme, AAA filed a complaint in March 1987 with the Federal Highway Administrator asserting that the Port Authority's 1987 toll increase violated the "just and reasonable" standard. Congress enacted the Highway Act while the administrative proceeding was pending, repealing the prior statutory scheme but maintaining the "just and reasonable" standard in Section 508. Consequently, in April 1987, AAA commenced an action in this Court challenging the 1987 toll increase because it violated the "just and reasonable" provision in Section 508 of the Highway Act.

In *AAA v. PA*, AAA argued in both the District Court and the Court of Appeals that there is a private right of action under Section 508. *See* Mulry Decl., Ex. S at 5-6 ("Recently, Congress has enacted the [Highway Act] and thereby transferred jurisdiction from the Federal Highway Administration to the federal courts in the first instance to access (sic) the just and reasonableness of bridge tolls."); Ex. T at 38 ("Before Congress passed the Highway Act, 33 U.S.C. § 508, which created subject matter jurisdiction in the 'courts' to determine the justness and reasonableness of tolls over bridges subject to the Bridge Act . . .").

Neither the parties, the District Court nor the Court of Appeals in *AAA v. PA*, which was litigated and decided contemporaneously with the passage of the Highway Act, questioned the fact that Congress intended a private right of action in Section 508. Significantly, in his dissenting opinion in *AAA v. PA*, Circuit Judge Van Graafeiland observed:

> When Congress transferred the exercise of these safeguards to the district
> court, it surely anticipated that the courts would not approve the
> Authority's claim of reasonableness without receiving and passing upon

27

facts and figures to support it.

*AAA v. PA*, 887 F.2d at 428 (Van Graafeiland, J., dissenting).  As Congress had anticipated, the

1987 action challenging the Port Authority toll increase was seamlessly transformed from an

administrative proceeding to a plenary action in the federal court.

### 4.  Congressional intent evidences a private right of action under 33 U.S.C. § 508.

In *Cort v. Ash*, 422 U.S. 66, 78 (1975), the Supreme Court set forth four factors to

consider in determining whether an implied right of action exists under a federal statute: (1)

whether plaintiff is a class member intended to benefit from the statute, (2) whether there is any

indication of legislative intent to create or deny a right of action, (3) whether a right of action is

consistent with the legislative scheme, and (4) whether the cause of action is one traditionally

relegated to state law.  *Id.* at 78.  Since *Cort*, however, the Supreme Court has emphasized that

congressional intent is the primary determinant.  *Touche Ross & Co. v. Redington*, 442 U.S. 560,

575-76 (1979); *Transamerica Mortgage Advisors. Inc. v. Lewis*, 444 U.S. 11, 24 (1979); *Health

Care Plan. Inc. v. Aetna Life Ins. Co.*, 966 F.2d 738, 740 (2d Cir.1992).

The Supreme Court has explained, "When Congress acts in a statutory context in which

an implied private remedy has already been recognized by the courts, ... Congress need not have

intended to create a new remedy, since one already existed; the question is whether Congress

intended to preserve the preexisting remedy." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v.

Curran*, 456 U.S. 353, 378-79 (1982).  Prior to the enactment of the Highway Act, aggrieved

parties had the right to challenge tolls first to the Administrator and then to the federal courts.

Congress eliminated the first step, but it did not eliminate the second level of review, the courts.

The legislative history and the contemporaneous decision addressing the merits of Section 508 in

*AAA v. PA* demonstrate that Congress intended to preserve the portion of the preexisting remedy

28

it did not explicitly eliminate. It would be illogical to conclude that Congress intended to preserve a standard that could not be enforced. This would have the same effect as having no "just and reasonable" standard, which Congress intentionally preserved.

While not deciding the private right of action issue, Judge Holwell questioned the statutory construction analysis of the Third Circuit in *American Trucking Ass'n. v. Delaware River Joint Toll Bridge Comm'n,* 458 F.3d 291 (3d Cir. 2006), which found no private right of action. Judge Holwell noted that in the Highway Act, Congress removed administrative review of tolls, but added a "just and reasonable" requirement. Without a means of enforcement, the "just and reasonable" language would be mere surplusage.

> [T]he Highway Act purposefully inserted a statutory requirement while removing all administrative mechanisms for its enforcement. The Supreme Court has found that such absence of administrative procedure is a "significant" indication of Congress's intent to create a private right of action. [*Gonzaga University v. Doe*, 536 U.S. 273, 280 (2002).]

*AAA v. PA*, 842 F. Supp. 2d at 679, n.5.

For these reasons, there is a private right of action under the Highway Act to enforce the statutory requirement that tolls be "just and reasonable."

## CONCLUSION

For all of the foregoing reasons, the Court should grant Plaintiffs' motion to enjoin the

Port Authority toll increases that are scheduled to be effective December 7, 2014, pending the

disposition of this action.

Dated: New York, New York
        October 24, 2014

                                        Respectfully Submitted,

                                        FARRELL FRITZ, P.C.

                          By:   _____
                                        Michael F. Fitzgerald
                                        Kevin P. Mulry
                                        *Attorneys for Plaintiffs*
                                        370 Lexington Avenue, Suite 800
                                        New York, New York 10017
                                        (212) 687-1230