# **Exhibit R**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
AUTOMOBILE CLUB OF NEW
YORK, INC. d/b/a AAA NEW YORK               :     11 Civ. 6746
and AAA NORTH JERSEY, INC.,                 :     (RJH)

                     Plaintiffs,  :     **AFFIDAVIT OF ROBERT**
                                                                 **WALTERS IN SUPPORT**
THE PORT AUTHORITY OF NEW YORK      :     **OF APPLICATION FOR**
AND NEW JERSEY,                             **ORDER TO SHOW CAUSE**
                                                  :     **AND IN OPPOSITION**
                      Defendant.     **MOTION TO DISMISS**
------------------------------------------------------------X

      ROBERT WALTERS, being duly sworn deposes and says:

      1.    I am the Treasurer and Chief Financial Officer of plaintiff Automobile Club of New York, Inc. d/b/a AAA New York ("AAA NY"). I submit this affidavit in support of plaintiffs' motion for a preliminary injunction and in opposition to defendant Port Authority's motion to dismiss.

      2.    The Port Authority's response to the AAA application for a preliminary injunction raises more questions than it answers. While much of the information in the affidavit of Port Authority CFO Michael Fabiano and the attached exhibits is not publicly available, a comparison of that information with the financial information provided to the public in the Port Authority 2011 Budget and its Financial Statements and Appended Notes, for the Year Ending December 31, 2010 ("the Financial Statements") provides some needed context. A copy of the 2011 Budget is attached as Exhibit K to the Affidavit of Marta Genovese dated September 26, 2011, and a copy of the Financial Statements is attached as Exhibit A hereto.

      3.    Initially, the Fabiano Affidavit paints a picture of the Port Authority's financial situation and the reasons for the toll increase that is in stark contrast to that

1

which the public saw when the increase was proposed. Rather than citing the need for jobs, economic growth and World Trade Center redevelopment, the affidavit shows an Authority pushing a wave of debt out in front of it with allocated debt service on bonds preventing the Integrated Transportation Network ("ITN") from positive cash flow until well into the future.

4. Yet it is clear from a review of Mr. Fabiano's multiple cash flow analyses and the document he refers to as the Preliminary Capital Plan, all of which appear to have been generated long after the toll increase was approved and instituted, that the picture they paint of the ITN financial health is an incomplete and misleading one. Generally speaking, the affidavit and its exhibits consolidate many years of projected data, *i.e.*, 2007-2020, into time periods which do not correspond to either the years of the 2011 Budget and Financial Statements, the five year period of the toll increase, or the ten year period of what he refers to as the Preliminary Capital Plan. Accordingly, it is difficult to reconcile the numbers they contain against any of the publicly available financial documents. In addition, the Cash Flow analyses in the Fabiano Affidavit rest on unaudited operating and allocated expenses and debt allocations with little or no explanation, a concern that will be addressed in greater detail later on in this affidavit.

5. A review of either the 2011 Budget or Financial Statements reveals that the Port Authority has two main sources of revenue, those from tolls and fares and those from the operation of the airports, which together account for approximately 87% of the Gross Operating Revenues. The 2011 Budget projected approximately $3.7 billion in Gross Operating Revenue, of which $1.1 billion were tolls and fares. (See Exhibit Ex. A, p. 13). Concomitantly, the vast majority of the Port Authority's capital spending -- $1.5

2

billion in 2010 -- was for the World Trade Center, while substantially less, $456 million is spent on the ITN. Thus, the larger question, which goes unanswered by the Fabiano Affidavit, is given that such a large portion of the Port Authority's Gross Operating Revenues are derived from tolls and fares, how is the Port Authority paying for the re-development of the World Trade Center without using tolls as the source?

5. It seems clear that contributions to the reserves are also key to understanding how toll revenue is used, yet the Fabiano Affidavit only shows funds going into the reserve fund and not how those funds are disbursed and what they are attributed to. The affidavit also discusses the statutory minimum requirement of 10% of the ITN revenues, but does not mention the Port Authority long-standing policy, as stated in Note E to the Financial Statements, to maintain reserve funds in "an amount equal to at least two years bonded debt service on outstanding debt secured by a pledge of the General Reserve Fund." It is my understanding that the Port Authority has continuously met this requirement and that it is one of the benchmarks the bond rating services use in evaluating the stability of the Authority. (*See* Exhibit A, p. 45). The 2011 Budget and Financial Statements estimate that the Reserve Fund will remain over $2 billion by the end of 2011. (*See* Genovese Aff., Ex. K, p. 71).

6. A review of the Cash Flow Analyses attached as Exhibits B, C and D to the Fabiano Affidavit raises substantial questions about the allocation of Operating Expense and Debt Service to the ITN. Typically, expense allocations are more of an art than a science, placing many of the "soft costs" of operations, such as administrative salaries and benefits, on the revenue generating lines of the business that can afford them. For example, a review of the allocated expenses listed in the 2011 Budget as Information

3

on Port Authority Operations By Facility reveals that approximately 50% of the $187 million in allocated expenses of the Port Authority are allocated to the ITN, while approximately 1% is allocated to the World Trade Center. (*See* Genovese Aff. Ex. K, p.70) This lack of transparency in accounting, particularly with respect to compensation issues is something the New York State Comptroller has addressed with the Port Authority in an audit report, and presumably is part of the reason the two governors required a full audit as a condition to their approval of the toll increase.

       7.      By comparing the Cash Flow analysis in Fabiano Affidavit Exhibits B, C and D to the relevant portion of the 2011 Budget entitled Revenues and Reserves for the entire Port Authority Operations, it becomes evident that in each case, Mr. Fabiano has computed the cash available for reserves by allocating debt service on bonds to the ITN but failed to allocate any share of Financial and Interest Income or Grants and Contributions. As a result, the financial picture is materially distorted by deducting an allocated share of payments out without accounting for any payments in. (*See* Genovese Aff., Ex. K, p.71). That omission is particularly significant because it is clear from the Financial Statements that declining financial and interest income, along with changes in the bond market, are a primary stress on the Port Authority's Net Revenues. (*See* Genovese Aff., Ex. K, pp. 12,13)

       8.      In addition, the allocation of the Debt Service that yields the unfavorable results in all three of the cash flow analyses is attributed to bonds allocated to the ITN that are not identified. Mr. Fabiano supports the allocation with the blanket statement in paragraph 10(h) that the Port Authority can identify which Consolidated Bonds are for the ITN because "these bonds are tax-exempt whereas the Consolidated Bonds for the

4

World Trade Center are federally taxable". Many of the WTC Liberty bonds, however, were tax-exempt, in contrast to those issued in the fall of this year. The change to taxable bonds is one which the Port Authority states in the 2011 Budget was due to the fact that "the bond market for speculative office space evaporated." (*See* Genovese Affidavit, Exhibit K, p.12).

    9.    In addition, a review of the Schedule E to the Financial Statements also reveals that in 2009 and 2010 the Authority included losses from the ill-fated Access to the Regions Core ("ARC") tunnel as part of the ITN financials.( *See* Exhibit A, p.80) The project was subsequently abandoned and in Note 9 to the Financial Statement the Port Authority discloses:

> During 2010, approximately $222 million in capital expenditures primarily associated with the redevelopment of the World Trade Center and the terminated ARC project, that were previously included as a component of "Facilities, Net" were determined to represent costs for projects that will not proceed forward to completion, or for preliminary engineering and design work that related to alternative analyses no longer considered viable for ongoing projects. As a result, these charges were written off to operating expense accounts in 2010. (*See* Exhibit A, p.62)

Thus, although Mr. Fabiano does not include the terminated ARC project it among the stated components of the ITN, it appears that the both the Operating Expenses and Debt Service numbers used in the cash flow analyses may include substantial expenses and debt service attributable to ARC. This may also explain why he chose to use consolidated financial data that reaches back to 2007 to evaluate the current and future cash flow. (*See* Exhibit A, p.4)

    10.    Finally, it should be noted that the Cash Flow Analyses provided in Fabiano Affidavit Exhibits B, C and D are very different from the rate of return analysis

5

proffered by the Port Authority and adopted by the Court in the 1987 *AAA v. PA* case. One principal difference is that the allocated Debt Service that yields the unprofitable results is irrelevant to a rate of return analysis. By way of illustration, annexed as Exhibit B is The Port Authority of New York and New Jersey's Rate of Return Analysis for 1991. While neither the Port Authority's publicly available financial documents nor the information contained in the Fabiano Affidavit provides the detailed Unamortized Investment In Use figures necessary to compute the Rate of Return, the Financial Statements does contain enough information to determine that the rate for 2010 would not be negative.

11. Specifically, review of the Financial Statements Schedule E – Information on Port Authority Operations the Income from Operations reveals the ITN to have Net Income of $115,156,000 for the Year ending December 31, 2010, while Exhibit B showed a projected loss of $80 million for 1991 and Unamortized Investments $1 billion. (*See* Exhibit A, p. 80). While we do not have sufficiently detailed information on unamortized investments in the ITN, we do know that those investments have been small by comparison to expenditures on the World Trade Center site, which have been about 50% of the total capital expenditures annually for the past several years as compared to 5% for the bridges and tunnels and 10% for PATH. (*See* Exhibit A, p. 4) Moreover, to the extent that the Port Authority's unaudited operating expenses contain inappropriate or misallocated expenses attributed to the ITN any rate of return obtained would appear artificially low.

12. In summary, while the Fabiano Affidavit raises many questions, it does not little to address the fundamental basis for the lawsuit – whether, directly or indirectly

6

through the reserve funds, the Port Authority toll increase has and will continue to be used to support the World Trade Center Redevelopment. More importantly, what did the Commissioners' believe when they approved the toll increase?

_____
Robert Walters

Sworn to before me this 18th
day of November, 2011

_____
Notary Public

# Exhibit A:

## Financial Statements and Appended Notes for the Year ended December 31, 2010

### The Port Authority of NY & NY

[To be filed in hard copy.]



# Comptroller's Department

# Financial Statements and Appended Notes for the Year ended December 31, 2010

**THE PORT AUTHORITY** OF NY & NJ

The Port Authority of New York and New Jersey
Interstate Transportation Network
1991 Projected Operating Results and
Rate of Return on Unamortized Investment in Use
($ in millions)

|  | Revenues from Operations (1) | Operating Expenses (2) | Depreciation & Amortization (3) | Income from Operations (4) | Unamortized Investment In Use (5) | Rate of Return on Unamortized Investment in Use (%) (6) |
|---|---|---|---|---|---|---|
| Holland Tunnel | $45.3 | $43.6 | $4.5 | ($2.8) | $123.9 | negative |
| Lincoln Tunnel | 65.4 | 53.9 | 5.4 | 6.1 | 189.2 | 3.2 |
| GWB & Bus Station | 181.1 | 75.7 | 7.7 | 97.7 | 212.3 | 46.0 |
| Bayonne Bridge | 7.6 | 11.2 | 0.5 | (4.1) | 18.8 | negative |
| Goethals Bridge | 44.6 | 17.5 | 0.7 | 26.4 | 17.5 | 150.9 |
| Outerbridge Crossing | 40.2 | 16.2 | 0.7 | 23.3 | 17.9 | 130.2 |
| P.A. Bus Terminal | 24.7 | 69.6 | 5.6 | (50.5) | 199.4 | negative |
| Subtotal—Tunnels, Bridges & Terminals | 408.9 | 287.7 | 25.1 | 96.1 | 779.0 | 12.3 |
| PATH | 72.4 | 178.4 | 27.7 | (133.7) | 531.1 | negative |
| Subtotal—Tunnels, Bridges, Terminals & PATH | 481.3 | 466.1 | 52.8 | (37.6) | 1,310.1 | negative |
| Ferry Service | (1.4) | 1.0 | 0.5 | (2.9) | 8.6 | negative |
| Subtotal—Tunnels, Bridges, Terminals, PATH & Ferry | 479.9 | 467.1 | 53.3 | (40.5) | 1,318.7 | negative |
| P.A. Bus Programs | 0.0 | 0.0 | 35.8 | (35.8) | 149.0 | negative |
| Regional Transp. Projects | 0.0 | 0.0 | 4.0 | (4.0) | 118.6 | negative |
| TOTAL—Interstate Transportation Network | $479.9 | $467.1 | $93.1 | ($80.3) | $1,586.3* | negative |

* Excludes work in progress totalling $610.8 million (average of beginning and end of year).

NOTES:
(1) Forecasted results include gross operating revenues but exclude interdepartmental revenues, which are not a component of the forecast. Interdepartmental revenues amount to less than 1% of total revenues from operations.
(2) Defined as operating and maintenance expenses plus allocated general administrative and development expenses. General administrative expenses are allocated on a labor base; development expenses are allocated on the basis of net operating revenues after fixed charges.
(3) Asset lives used in the calculation of depreciation are generally as follows:
  Tunnels and Bridges— 100 years
  Buildings— 25 to 50 years
  Machinery and Equipment— 5 to 35 years
(4) Defined as revenues from operations less operating expenses less depreciation and amortization.
(5) Average of beginning (1/1) and end (12/31) of year, net of accumulated depreciation. Net of cumulative federal aid amounts received of $6.4 million—Lincoln Tunnel; $14.0 million—GWB; and $44.3 million—PATH & JSTC; which have been adjusted for depreciation.
(6) Defined as income from operations divided by unamortized investment in use.