UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
AUTOMOBILE CLUB OF NEW           :
YORK, INC. d/b/a AAA NEW YORK
and AAA NORTH JERSEY, INC.,      :    11 CIV 6746
                                        (RKE) (HBP)
                                 :
             Plaintiffs,              **DECLARATION OF**
                                 :    **JONATHAN PETERS**
       -against-
                                 :
THE PORT AUTHORITY OF NEW YORK
AND NEW JERSEY,                  :

             Defendant.          :
------------------------------------------------------------X

       JONATHAN PETERS, declares under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following statements are true and correct to the best of his knowledge:

       1.     I am a Professor of Finance at the City University of New York. I submit this declaration in support of plaintiffs' opposition to defendant's motion for summary judgment.

       2.     I base the information and conclusions in this affidavit on an analysis of publicly available Port Authority of New York and New Jersey ("PANYNJ") financial statements, as well as documents presented to the court in this litigation and documents provided to me by counsel for Plaintiffs.

<u>Introduction, CV, Credentials</u>

       3.     I have an extensive background in economic research and have provided expert testimony to a number of federal and state agencies with regards to transportation finance, monopoly power, rate regulation and road pricing. My Curriculum Vitae is attached as Exhibit A, and includes publications and any prior testimony.

1

Rate of Return Analysis

Description of Rate of Return

4. Rate of return analysis is a long standing process that is used to establish reasonable rate changes for organizations that have no or minimal competition in a particular market and would thus be able to exert monopoly power and be open to charging excessive rates. To combat this problem, the U.S. Congress and other governmental bodies have enacted some form of price or rate control in these types of markets, particularly where, as here, the "just and reasonable" standard permeates the regulations. In many cases, a state or federal regulatory board will establish the appropriate rate of return that the investors in the firm need to achieve so that they will be willing to dedicate their funds to the particular enterprise that is subject to the rate regulation. So, a regulating entity such as the New Jersey Board of Public Utilities or the Federal Communications Commission would identify what level of profit is needed to compensate investors for their risk of investing in the regulated firm. Thus, the regulatory board examines the market conditions and then establishes prices or rates for the services provided that are sufficient to provide the owners of the firm with a fair rate of return on their investment.

5. I understand that in prior court cases involving PANYNJ toll increases, in 1975 and 1987, both the Court and the PANYNJ utilized a rate of return analysis to determine the appropriateness of toll increases.

6. Further, it is important to check the actual return on a regulated entity and tie its performance back to the actual capital invested and measures of reasonable profit for the investors into the firm – and not to just compare prices and price increases to

some other excessively priced entity such as the MTA Bridges and Tunnels – as was attempted by Mr. Mark Muriello in his declaration to the court. His testimony in no way attaches revenue and prices to capital investment and costs – but he merely attempts to provide rate justification that is pinned to the price levels and increases of another monopoly entity and thus distract from measures of reasonable rate of return.

7. I have examined the established practice in rate regulation as to the reasonable required rate of return and the necessary level of revenue required to meet that goal. This method is extensively used by public utility commissions across the United States to establish appropriate revenue levels and utility rates for the regulated public utility industry – including water, natural gas, sewer and power. In addition to being used in prior Court cases involving the PANYNJ, these methods have long standing acceptance in establishing fair and reasonable rates of return for utility firms as well as protecting consumers from excessive charges due to monopoly power.

Formula For The Rate of Return

8. To estimate the needed revenue and establish if the existing or proposed pricing and subsequent revenue stream is reasonable or excessive, one should apply a standard model of revenue requirement.

9. The formula for revenue requirement is as follows:

Revenue Requirement = (Rate Base * Allowable Rate of Return)

\+ Operating Expenses + Depreciation Expense + Taxes

The Rate Base

10. The rate base is the invested capital that is engaged in the production of revenue and income from the regulated entity. The rate base is carefully analyzed in rate

cases before Public Utility Commissions across the United States. Many utility firms have both regulated and unregulated portions of their operations and a considerable amount of effort is expended in rate filings to identify just those assets that are directly chargeable to the regulated rate payers. Thus, the question of what assets should be placed into the rate base is of considerable concern if one wants to obtain accurate estimates of capital costs for the regulated entity.

11. The PANYNJ reports on the capital assets by line department in Schedule F of their Annual Reports. I have used Schedule F to identify the reported assets that would be the subject of reasonable return regulation.

12. In examining assets that constitute the capital assets of the PANYNJ, I have not included non-ITN assets in the rate base. In particular, the Pulaski Skyway and other NJ DOT assets are not a part of the ITN or the Line Departments of the PANYNJ, and as such I have not included them in the rate base of the ITN. The inclusion of these assets into the rate base would increase the capital assets of the PANYNJ, with no corresponding additional revenue from the operations of the assets. Including such assets in the rate base would artificially increase the required revenue to pay for these unproductive capital assets.

The Allowable Rate of Return

13. From the perspective of the required rate of return, one must consider the mix of capital and the risk of the organization under consideration. The PANYNJ is an organization that has no shareholders and on that basis relies on bond funding to provide needed capital. Further, the PANYNJ issues tax-free municipal bonds for the ITN – and as such, the required rate of return for the purpose of rate of return evaluation is the long

term tax free bond rate for Aa3 rated bonds (the PANYNJ rating) which according to Moody's is 3.20% (February 16, 2015). As an additional validation of that rate, on August 14, 2014, the Port Authority had a consolidated bond issue of $830 Million in tax free bonds which had a blended rate of 3.63%. For these reasons, I believe the proper rate of return to use for this analysis in 3.63%, and I have therefore utilized a 3.63% rate of return as the required rate.

Operating Expenses

14. Operating expenses are available in the PANYNJ Annual Reports and are reported by facility and also on a line department basis. This information is reported in Schedule E of the PANYNJ Annual Reports.

15. There are significant limitations to the data reported and adjustments that are made to the financial reporting in the estimation of the rate of return, in that the PANYNJ has a long standing practice of allocating certain costs among its various line departments. Their method is reported to be based upon labor costs by line department. This method unfairly allocates costs towards the ITN, and as such, overstates the costs of running the ITN. This method artificially inflates the revenue requirement for a given rate base and allowable rate of return.

16. Nevertheless, for the rate of return analysis, I have used the operating expenses reported in Schedule E.

Depreciation Expense

17. Depreciation Expenses by facility and line department are presented in Schedule E of the PANYNJ Annual Reports. This represents the reported costs of depreciation by facility and it can also be summarized by line department. The PANYNJ

utilizes various methods of calculating depreciation and reports the total depreciation amount by facility in Schedule E of their Annual Reports.

18.     Depreciation represents a non-cash expense and by increasing the depreciation allowance on the financial statements, one undermines the reported financial performance of particular assets. Given the total amount of invested capital in a particular line department, the amount of depreciation reported should be linked to the invested capital and the expected economic life of the asset. In examining the financial statements of the PANYNJ, it appears that over the last 12 years, the ITN has been allocated a depreciation cost that reflected roughly a 25 year lifespan for the ITN assets. This is in sharp contrast to the WTC Site – where depreciation is apparently being taken at a rate of a roughly 325 year lifespan.

Taxes

19.     The ITN income and operations are generally not taxable, and as such I have not included a cost for taxes in the rate of return evaluation. In contrast, the evaluation of a private corporation under rate of return regulation would include a tax cost.

Calculating the rate of return

20.     Using the required rate and the other inputs as described above into the standard formula for the rate of return analysis, I estimated the revenue required at the time of the 2011 toll increases. I examined the financial statements of the PANYNJ to establish the appropriate rate base for the ITN, as well as the operating costs, depreciation and taxes on the ITN.

21. In order to make the rate of return calculation for the toll increases that were approved in August 2011, I utilized as the appropriate information for the rate base the information that would have been available to the Commissioners at the time of decision approving the toll increases. The 2010 financial reporting was completed in December 2010 and therefore would have been available for review in August 2011.

22. The rate base I analyzed was therefore the December 2010 capital assets for the ITN – and that is reported in Schedule F of the PANYNJ annual report. The revenue requirement is then calculated based on a reasonable return on the capital invested plus the operating expenses, depreciation expenses and taxes. The operating expenses and depreciation expenses are available from Schedule E in the 2010 PANYNJ annual report. Taxes are zero in this case – as the PANYNJ is a governmental entity. I utilized the end of period (December 31) capital assets – which in the case of the ITN is the largest capital asset for each year – and thus provides the highest estimate of allowable revenue.

23. Taking this model and applying it to the stated performance of the ITN that is reported in the annual reports of the PANYNJ, I then estimated the required revenue for the ITN and compared that to the realized revenue of the ITN. If the realized revenue is greater than the required revenue – then the toll and fare rates as a package are excessive – and thus not just or reasonable. If the realized revenue is less than the required revenue – then the shortfall in revenue is the amount that could be raised by higher tolls or fares. Table 1 below presents the results from the 2010 rate of return evaluation.

### Table 1 – Estimated Allowable Revenue – 2010

| PANYNJ Rate of Return Analysis | | Using 2010 Annual Report Data on Revenue & Expenses | | |
|---|---|---|---|---|
| 2010 Allowable Revenue | | | | |
| Interstate Transportation Network | | 2010 | 2010 | |
| Reported Net Capital | | Operating Expense | Depreciation | Taxes |
| December 2010 Rate Base | | | | |
| $ 6,808,824,000 | Operating Expense | $ 904,410,000 | $ 292,778,000 | $ - |
| | Grants | $ 279,359,000 | | |
| | 3.63% Net Expense | $ 625,051,000 | | |
| Allowable Return on Capital | | Net Oper + Grant | Depreciation | |
| $ 247,160,311 | | $ 625,051,000 | $ 292,778,000 | $ - |
| Total Allowable Revenue | | | | |
| $ 1,164,989,311 | | Allowable Total Costs and Return (Allowable Revenue) | | |
| $ 1,119,812,000 | | Observed Revenue | 2010 Revenue | |
| $ (45,177,311) | | Slight Shortfall | | |
| -3.9% | | Percent of Revenue that was Excessive Based on Existing Borrowing Rates | | |

24.     The rate of return analysis above shows a small shortfall ($45.2 million) in revenue in 2010 – with actual revenue reported at $1.120 billion and the allowable revenue of $1.165 billion. This shortfall is de minimus in scale, given the size of the revenue stream and the scope of operations of the ITN – and in sharp contrast to the 2009 results – where the ITN had a positive 190.7 million dollar overage. In the world of rate regulation, it is also suspicious to see such a pronounced deterioration in financial performance just prior to a proposed rate increase. Further, if cost allocation and non-ITN assets expenses were found to be misallocated toward the ITN - then clearly this shortfall would not meet the standard for approving a large scale rate increase. Finally, the rate base, if approved, would only allow a toll increase that was reflective of the shortfall –

8

and in this case that would only be a one-time 3.9% increase in tolls – not the roughly 12% average increase per year for 5 years as proposed and implemented by the PANYNJ commissioners in August 2011 (which resulted in roughly a compound 53% increase in PANYNJ tolls from 2010 to 2014).

25. Table 2 presents the same analysis rotated forward one year to the 2011 financial results. These would likely have been available to the Commissioners as a partial year pro-forma result – capturing the best estimate of end of year performance for 2011. Importantly, the enacted toll increases for 2011 only went in effect in September 2011, and as such they had a partial year impact on 2011 revenues. Still, in examining the 2011 results, the ITN collected $167.5 million in excess revenue in 2011. This figure does not provide support for a further toll increase. In fact, an entity in this financial situation could well be subject to a rate decrease instruction during a rate hearing at a state public utilities commission.

### Table 2 – Estimated Allowable Revenue – 2011

| PANYNJ Rate of Return Analysis 2011 Allowable Revenue | | Using 2011 Annual Report Data on Revenue & Expenses | | |
|---|---|---|---|---|
| Interstate Transportation Network | | 2011 | 2011 | |
| Reported Net Capital | | Oper Expense | Depreciation | Taxes |
| December 2011 Rate Base | | | | |
| $ 7,377,455,000 | Operating Expense | $ 785,784,000 | $ 327,055,000 | $ - |
| | Grants | $ 347,912,000 | | |
| 3.63% | Net Expense | $ 437,872,000 | | |
| Allowable Return on Capital | | Net Oper + Grant | Depreciation | |
| $ 267,801,616.50 | | $ 437,872,000 | $ 327,055,000 | $ - |
| Total Allowable Revenue | | | | |
| $ 1,032,728,617 | | Allowable Total Costs and Return (Allowable Revenue) | | |
| $ 1,200,246,000 | | Observed Revenue | 2011 Revenue | |
| $ 167,517,384 | | Overage | | |
| 16.2% | | Percent of Revenue that was Excessive Based on Existing Borrowing Rates | | |

26.  The 2012 financial performance demonstrates a massive required revenue surplus of $429.0 million in 2012. In 2012, fully 44.5% of the revenue collected is above the amount allowed as required revenue for the ITN. Table 3 provides these estimates.

10

## Table 3 – Estimated Allowable Revenue – 2012

| PANYNJ Rate of Return Analysis<br>December 2012 Rate Base Analysis | | | Using 2012 Annual Report Data on Revenue and Expenses | | |
|---|---|---|---|---|---|
| Interstate Transportation Network | | | 2012 | 2012 | |
| Reported Net Capital | | | Oper. Expense | Depreciation | Taxes |
| December 2012 Rate Base | | | | | |
| $ | 8,007,417,000 | Operating Expense | $ 798,960,000 | $ 337,264,000 | $ - |
| | | Grants | $ 463,271,000 | | |
| | | 3.63% Net Expense | $ 335,689,000 | | |
| Allowable Return on Capital | | | Net Oper + Grant | Depreciation | |
| $ | 290,669,237 | | $ 335,689,000 | $ 337,264,000 | $ - |
| Total Allowable Revenue | | | | | |
| $ | 963,622,237 | | Allowable Total Costs and Return (Allowable Revenue) | | |
| $ | 1,392,761,000 | | Observed Revenue | 2012 Revenue | |
| $ | 429,138,763 | | Overage | | |
| | 44.5% | | Percent of Revenue that was Excessive Based on Existing Borrowing Rates | | |

27. With respect to capital investment, the Rate of Return analysis allows the entity to charge the rate base for the net capital in place and as such, additional investment in capital infrastructure adds to the allowable revenue – in that the firm is entitled to receive additional revenue based on actual capital investment that is carried on the books of the agency – typically carried at purchased costs. Therefore, there is no allowance for interest and principle expense, as that is captured in the allowable return on the total capital invested. As such, this method of analysis values the new capital investments as they are implemented and placed onto the books of the agency.

28. Given this analysis, there was no allowable revenue justification for a toll increase indicated in the 2010 or 2011 financial statement reviews, let alone five increases in the tolls over a period of five years. In 2010, the rate of return analysis shows a very mild loss of 45.2 million dollars, which could have been covered by a small

11

increase in tolls, or some internal cost control or a more thorough examination of the cost allocations.

29.     I conclude that a rate of return analysis is the appropriate manner of determining if a toll increase is reasonable and justified, and I believe that based on the rate of return analysis described above, the ITN produced a significant positive cash flow with reasonable and appropriate capital funding methods and as such, the 2011 toll increases were not just and reasonable.

30.     Moreover, even if some small toll increase were justifiable, it would not have been reasonable based upon a rate of return analysis to increase tolls to the extent they were increased by the Commissioners in the 2011 toll increases.

31.     Finally, in a single approval decision in 2011, the Commissioners approved toll increases for the next five years. Multiple rate increases in one single rate setting action are inappropriate. It is highly unusual for an entity to allow a single rate setting session to authorize five rate increases without further analysis of the rate of return and appropriate tests of return as compared to the appropriate rate base. Further analysis would include appropriate adjustments to the rate base to reflect deprecation and capital investments, and testing of the revenue stream against the rate base to establish the fair and reasonable return on assets invested in this enterprise. Even assuming that some minor toll increase was warranted in 2011, it was not reasonable to raise tolls for multiple times over the succeeding five year period.

CFO Fabiano's Analysis

32.     In addressing the challenged multi-year toll increases, I have also reviewed the affidavit of Michael Fabiano, former Chief Financial Officer of the

PANYNJ, that was prepared and first submitted almost four years ago in opposition to plaintiffs' application to preliminarily enjoin the multi-year toll increases, and has not been changed in any respect. In substance, Mr. Fabiano's anomalous projection of the financial condition of the ITN is not reflective of sound and prudent financial practice. His analysis is presented on a post-litigation cash flow basis and his assumptions (e.g. 10 years repayment period) are not consistent with standard practice or, for that matter, the actual internal financial management of capital investments by the PANYNJ. The assumptions and views contained in the Fabiano projection are intended to create the impression of financial distress to justify the multiple year toll increases that were enacted in August 2011.

33. The observations that follow herein address defects in Mr. Fabiano's methodology and assumptions, which exhibit a bias that distorts the projected financial condition of the ITN for the period 2011-2020. A traditional rate base analysis which was utilized by the courts in two previous challenges to toll increases was the proper way for the PANYNJ to determine the financial condition of the PANYNJ and the financial need for a just and reasonable toll increase in 2011. Mr. Fabiano, however, stated in his reply affidavit at the time of the preliminary injunction hearing that a rate base analysis was irrelevant.

ITN Assets

34. Initially, I take issue with Mr. Fabiano's methodology of a cash flow analysis and projections to justify the challenged toll increase. A rate base analysis is the accepted methodology to determine whether the toll increase is reasonable and just under the Bridge Act. A rate base analysis is, in my experience, is commonly the methodology

used to determine whether requested rate increases for regulated, monopolistic utilities are just and reasonable.

35. Of key importance is the rate base used in any rate regulation case. Certain elements of the proposed capital plan used by Mr. Fabiano to justify the toll increases are clearly outside of the capital base of the ITN and should be excluded from any analysis regarding the ITN's financial condition. In particular, the funding of projects not within the ITN and/or owned by other entities with no direct revenue benefit to the PANYNJ should be excluded from any ITN financial analysis. This is especially the case with respect to the Pulaski Skyway, Wittpenn Bridge, Conrail Viaduct and Portway New Road, all of which are not PANYNJ owned assets and from which the PANYNJ derives no revenue.

Allocated Costs and Debt Service

36. Mr. Fabiano includes in his cash flow analysis both the allocated expenses that are assigned to the ITN by Port Authority Management as well as "debt service allocated to the Port Authority's Consolidated Bonds". Mr. Fabiano also includes "allocated costs that represent the cost of providing general and administrative services for the benefit of the entire agency." These allocations and cost reporting are subject to considerable management discretion.

37. In the PA's annual reports from 2002 to 2013, the ITN is charged $1.419 billion in interest and other costs over the 12 year period – while the WTC actually has a credit of $46.3 million over the same period. This is rather puzzling, as the WTC received $11.6 billion in net capital investment over the same period while the ITN had $5.9 billion in capital investments. Further, the ITN is charged $3.0 billion in

14

depreciation costs where the WTC is only charged $133 million in depreciation charges. One wonders why the ITN has such a massive burden of interest and depreciation reported and charged - while the WTC site was charged so little for the extensive capital investments it received.

38. Since the inception of the PANYNJ, the ITN has been charged 51% of the allocated costs and the WTC has been charged only 6%. Clearly, one has to question why the ITN is charged such a disproportionate share of these allocated costs and also why costs are not charged back to the line department that directly cause the cost. This heavy allocation distorts the financial condition of the ITN.

<u>Weakness of Fabiano's Cash Flow Analysis</u>

39. Mr. Fabiano presents two financial scenarios of the cash flow of the ITN in his Exhibit B and as he clearly states in subsequent testimony "the only schedule that really matters is Exhibit B to my Affidavit and the only information that is relevant is in the cash basis columns." The first cash flow scenario presented a payoff of the full amount of the projected $10.785 billion in new capital investments in the ITN through cash payments from the ITN revenue in the span of 10 years. The second scenario, purported to be a more conservative financial model has a 50% direct payment and 50% debt for the funding of the ITN capital improvements. Both of these presentations in my opinion improperly extract very large cash flows from the ITN in an unrealistically short repayment period. These assumptions are very aggressive and place an excessively large financial strain on the ITN revenue stream.

40. Regarding ITN assets, Mr. Fabiano states "Most of these facilities are over half-century old". These assets are expected have lifespans from 25 to 100 years. I find

it highly irregular that he would utilize a 10 year cash flow analysis to essentially expense out massive capital investments in a single 10 year period. A commonly applied method of financing term is to consider the useful lifespan of the asset and utilize a funding method that reflects that lifespan.

41. The scenario presented below as Tables 4 and 5 utilize the information provided by Mr. Fabiano with the exception of one single item - the capital spending plan. In my scenario in Table 5, I stretched the terms of repayment for the $10.875 billion in new capital investment out to reflect the general PANYNJ depreciation practices of capital assets for 25 to 100 years (I use 35 years as a proxy for the mix of assets). By changing that one dimension of the analysis and including the required 10% deposit to the Required Reserve Fund as indicated by Mr. Fabiano – we radically change the cash flow situation of the ITN. By correcting the analysis to reflect more standard capital funding practices, the cash flows of the ITN shift from a negative $51.2 million to a positive $2,018.4 million ($2.018 billion). This massive shift is solely due to the change in capital funding practice.

Table 4 – Fabiano 50% Cash / 50% Debt Model (in millions)

| **Fabiano Model**<br>**50% Cash**<br>**50% Debt** | 2011 to 2020 |
|---|---:|
| Revenues | 20,176.5 |
| Operating Expenses | 8,687.6 |
| Net Operating Revenues | 11,488.9 |
| | |
| Capital Paid in Cash | 5,392.8 |
| Less Grants | (99.1) |
| Net Capital Paid in Cash | 5,293.7 |
| | |
| Cash Balance | 6,195.2 |
| | |
| Debt Service | |
| Current Interest Payments | 2,322.1 |
| Current Principal Payments | 1,201.3 |
| Debt Service on New Debt | 2,050.8 |
| Goethals Bridge PPP Payment | 253.0 |
| | 5,827.2 |
| | |
| Reserve Requirement | 419.2 |
| | |
| ITN Cash Flows 50/50 | (51.2) |

Table 5 – Peters Revision to Fabiano to reflect 35 Year Funding (in millions)

| J. Peters Model of ITN Finance<br>All Debt for 35 Years | 2011 to 2020<br>Projected<br>PA Finance |
|---|---:|
| Revenues | $ 20,176.5 |
| Operating Expenses | $ 8,687.6 |
| Net Operating Revenues | $ 11,488.9 |
|  |  |
| Capital Paid in Cash | $ - |
| Less Grants | $ (99.1) |
| Net Capital Paid in Cash | $ (99.1) |
|  |  |
| Cash Balance | $ 11,588.0 |
|  |  |
| Debt Service |  |
| Current Interest Payments | $ 2,322.1 |
| Current Principal Payments | $ 1,201.3 |
| Debt Service on New Debt | $ 4,724.5 |
| Goethals Bridge PPP Payment | $ 253.0 |
|  | $ 8,500.9 |
|  |  |
| Reserve Requirement | $ 1,068.7 |
|  |  |
| ITN Cash Flows - All Debt | $ 2,018.4 |

42. Given these standards, I conclude that Mr. Fabiano's cash flow analysis does not accurately reflect the true financial condition of the ITN. Fundamentally, Mr. Fabiano presents an ITN that has no prior financial resources from prior operations and has to shoulder all of these massive capital investment costs in the very short run. Further, his presentation ignores the longer term future value of the ITN in terms of revenue – and attempts to artificially open and close the books of the ITN in a 10 year window.

Multiple Rate Increases in One Single Rate Setting Action

43. As stated above, it is highly irregular for an entity to allow a single rate setting session to authorize 5 annual rate increases without further analysis of the rate of return and appropriate tests of return as compared to the appropriate rate base. This is considered standard practice in these matters and Public Utilities Commissions will spend a considerable amount of effort to establish the correct rate base. This includes appropriate adjustments to the rate base to reflect deprecation and capital investments. Then the revenue stream is tested against the rate base to establish the fair and reasonable return on assets invested in this enterprise.

44. Further, a full rate setting case would involve considerably more outside review of the various aspects of the rate base and the components of costs to address the exact issues that I raised earlier with regards to allocated operating costs, non-ITN capital investment and allocated bond expenses. These costs as presented to the court have not been the subject of detailed objective analysis by an unbiased external commission or review board.

45. Taken as a whole, I find the financial analysis of Michael Fabiano as presented to the court to be lacking in significant details and to misrepresent the financial condition of the PANYNJ Interstate Transportation Network. His analysis overlooks significant matters of concern and applies non-standard methods of analysis. When examined with standard financial models and methods and reasonable assumptions, the arguments for the toll increases are unsubstantiated.

*/s/ Jonathan Peters*
JONATHAN PETERS