UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

AUTOMOBILE CLUB OF NEW YORK, INC.            :  11 Civ. 6746
d/b/a AAA NEW YORK and AAA NORTH             :  (RKE) (HBP)
JERSEY, INC.,                                :
                                             :  ORAL ARGUMENT
                          Plaintiffs,        :  REQUESTED
                                             :
            -against-                        :
                                             :
THE PORT AUTHORITY OF NEW YORK               :
AND NEW JERSEY,                              :
                                             :
                          Defendant.         :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION
## TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

FARRELL FRITZ, P.C.
*Attorneys for Plaintiffs*
370 Lexington Avenue, Suite 800
New York, New York 10017
(212) 687-1230

*Of Counsel:*
    Michael F. Fitzgerald
    Kevin P. Mulry

TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................ iv

PRELIMINARY STATEMENT ........................................................................... 1

FACTUAL BACKGROUND ............................................................................... 3

    Prior Port Authority toll increases were justified solely by the capital needs
    of the transportation network, and were based on a rate of return analysis. ...................... 3

    The toll increase planning process did not focus on the ITN, but instead
    looked to the needs of the entire Port Authority ......................................................... 3

    The Toll Increases announced on August 5, 2011 were justified by the capital
    needs of the entire Port Authority, not just the interstate transportation network. ............. 4

    The Port Authority's reason for the Toll Increases as given to this Court differs
    from  the reason presented to the Commissioners and the public ................................... 5

    The post-approval rationale for the Toll Increases –a $10.786 billion ITN capital
    plan – includes $3.8 billion that is not authorized, not for transportation, or not
    connected to any transportation project ...................................................................... 7

        A. $1.8 billion of the ITN capital plan is for New Jersey state bridges
           and roads that the Port Authority is not permitted by statute to fund .............. 8

        B. $1 billion of the ITN capital plan is for raising the Bayonne Bridge
           roadway, which is not an ITN expense but is for navigation and Port
           Commerce ........................................................................................... 9

        C. $1 billion of the ITN capital plan is a placeholder representing no
           ITN projects ....................................................................................... 10

        D. Subtracting $3.8 billion from the "ITN capital plan turns CFO
           Fabiano's cash flow analysis positive" ....................................................... 11

    The Toll Increases would not be just and reasonable under a rate of return analysis ....... 12

    The flawed Fabiano cash flow analysis and other Port Authority practices raise material
    issues of fact ...................................................................................................... 14

ARGUMENT ............................................................................................................ 15

POINT I

STANDARD FOR SUMMARY JUDGMENT .............................................................. 15

POINT II

AS A MATTER OF LAW, THE PORT AUTHORITY IS NOT
STATUTORILY AUTHORIZED TO FUND THE PULASKI SKYWAY AND
NEW JERSEY STATE ROADS ................................................................................ 16

    A. The Port Authority may not pay for projects when it does not have
      statutory authority to do so ............................................................................ 16

    B. The Port Authority is only authorized to pay for "approaches" and
      "connections with highways" with respect to the Lincoln Tunnel ................ 17

    C. The Port Authority is not authorized to pay for the Pulaski
      Skyway and New Jersey roads ...................................................................... 19

████████████████████████████████████████████████

POINT III

THERE ARE MATERIAL ISSUES OF FACT CONCERNING WHETHER THE
TOLL INCREASES VIOLATE THE COMMERCE CLAUSE ...................................... 22

    A. The Toll Increases are not based on a fair approximation of the use
      of the ITN facilities ........................................................................................ 23

        1. The toll increases were based an approximation of use
          of all Port Authority facilities, not those of the ITN .......................... 23

        2. The post-approval "ITN capital plan" justifying the toll
          increases includes billions of dollars that are not for ITN
          facilities ............................................................................................ 24

    B. The Toll Increases are excessive in relation to the benefit conferred ............ 26

        1. Tolls were increased to address the needs of the entire
          Port Authority .................................................................................... 26

        2. Tolls were increased to address the needs of bridges and
          roads not owned by the Port Authority, and expenses
          providing no ITN benefit .................................................................. 26

        3. The toll increases are excessive under a rate of return
          analysis .............................................................................................. 27

POINT IV

THERE ARE MATERIAL ISSUES OF FACT CONCERNING WHETHER
THE TOLL INCREASES VIOLATE THE HIGHWAY ACT ......................................... 28

    A.  The legal parameters for the Highway Act analysis were set by
        two prior AAA challenges to Port Authority toll increases ............................ 28

    B.  The Toll Increases violate the Highway Act as they were based on the
        needs of the entire Port Authority and are therefore not "just and
        reasonable" ................................................................................................ 29

    C.  The Toll Increases violate the Highway Act because they fund costs
        outside the ITN and are therefore not "just and reasonable" .......................... 31

    D.  A rate of return analysis, as used previously by the Second Circuit,
        shows that the toll increases are not just and reasonable ............................... 32

    E.  There is a private right of action under the Highway Act ............................... 33

        1.  The statutory scheme preceding the Highway Act afforded
            administrative review and Court review ............................................... 33

        2.  In amending the statute, Congress eliminated administrative
            review but kept Court review ............................................................... 34

        3.  The private right of action issue was before the Second
            Circuit panel which decided *AAA v. PA* soon after passage
            of section 508 ..................................................................................... 35

        4.  Congressional intent evidences a private right of action
            under 33 U.S.C. § 508 ......................................................................... 36

CONCLUSION ................................................................................................................. 38

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*AAA v. PA,*
  706 F. Supp. 2d 264 (S.D.N.Y. 1989)..................................................................................3, 4

*AAA v. PA,*
  842 F. Supp. 2d ..............................................................................................................7, 37

*AAA. v. PA,*
  887 F.2d 417 (2d Cir. 1989)........................................................................................ passim

*American Trucking Ass'n. v. Delaware River Joint Toll Bridge Comm'n,*
  458 F.3d 291 (3d Cir. 2006)..................................................................................................37

*Angus Partners LLC v. Walder,*
  2014 WL 4639552 (S.D.N.Y. Sept. 16, 2014)....................................................................27

*Automobile Club of New York v. Cox,*
  592 F.2d 658 (2d Cir. 1979)....................................................................3, 28, 29, 31

*Bridgeport and Port Jefferson Steamboat Co. v. Bridgeport Port Authority,*
  567 F.3d 79 (2d Cir. 2009)..............................................................................................22, 26

*Brod v. Omya, Inc.,*
  653 F.3d 156 (2d Cir. 2011)..................................................................................................15

*Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.,*
  444 F.3d 158 (2d Cir.2006)..................................................................................................15

*Conopco, Inc. v. Campbell Soup Co.,*
  95 F.3d 187 (2d Cir. 1996)....................................................................................................12

*Cooley v. Penguin Grp. (USA) Inc.,*
  31 F. Supp. 3d 599, 612 (S.D.N.Y. July 11, 2014)..............................................................12

*Corovic v. Mukasey,*
  519 F.3d 90 (2d Cir. 2008)....................................................................................................16

*Cort v. Ash,*
  422 U.S. 66 (1975)................................................................................................................36

*Gonzaga University v. Doe,*
  536 U.S. 273 (2002)..............................................................................................................37

*Health Care Plan. Inc. v. Aetna Life Ins. Co.*,
  966 F.2d 738 (2d Cir.1992)................................................................................36

*LiButti v. US*,
  107 F.3d 110 (2d Cir. 1997)..............................................................................21

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*,
  456 U.S. 353 (1982)...........................................................................................36

*Molinari v. DiCarlo*,
  838 F. Supp. 718 (E.D.N.Y. 1993) ....................................................................33

*Northwest Airlines, Inc. v. County of Kent, Mich.*,
  510 U.S. 355 (1994)...............................................................................22, 23, 25

*Port of New York Authority v. Weehawkeen Tp.*,
  14 N.J. 570 (1954) (Brennan, J.)..................................................................18, 19

*SEC v. Durante*,
  No. 01 Civ. 9056 (DAP)(AJP), 2013 WL 6800226 (S.D.N.Y. Dec. 19, 2013)......................21

*State v. Port Authority of New York and New Jersey*,
  151 N.J. Super. 127 (Super. Ct. 1977), *aff'd*, 159 N.J. Super. 102 (App. Div. 1978).......16, 17

*Swierkiewicz v. Sorema N. A.*,
  534 U.S. 506 (2002)..............................................................................................7

*Touche Ross & Co. v. Redington*,
  442 U.S. 560 (1979)...........................................................................................36

*Transamerica Mortgage Advisors. Inc. v. Lewis*,
  444 U.S. 11 (1979)..............................................................................................36

## OTHER AUTHORITIES

33 U.S.C. § 508.................................................................................33, 34, 35, 36

49 C.F.R. § 310.1 (1986) ....................................................................................33

133 Cong. Rec. H1635-02 .............................................................................34, 36

133 Cong. Rec. S778-02 ......................................................................................33

Fed. R. Civ. P. 8(a) ..............................................................................................7

Fed. R. Civ. P. 26(a)(2)(D)(i) .............................................................................13

Fed. R. Civ. P. 56(a) ............................................................................................15

General Bridge Act of 1906 ..................................................................................28

Highway Act of 1987 ............................................................................................32

H.R. Conf. Rep. 100-27 (1987), *reprinted in* 1987 U.S.C.C.A.N. 121 .........................33

NY Unconsol. Laws § 6502 ...........................................................................17, 18

NY Unconsol. Law § 6503 .........................................................................17, 18, 19

NY Unconsol. Law § 6511 ....................................................................................18

NJSA 32:1-120.............................................................................................17, 18, 19

5 USC § 701 .........................................................................................................33

33 USC § 505 .......................................................................................................33

33 USC § 508 ..................................................................................................32, 35

Rep. 100-4 (1987), *reprinted in* 1987 U.S.C.C.A.N. 66 ....................................34

Plaintiffs AAA Northeast (formerly Automobile Club of New York d/b/a AAA New York) and AAA New Jersey, Inc. ("AAA" or "plaintiffs") respectfully submit this Memorandum of Law in opposition to the motion of defendant Port Authority of New York and New Jersey ("Port Authority") for summary judgment.

## PRELIMINARY STATEMENT

Precedent in this Circuit, derived from cases challenging prior toll increases on the Port Authority's trans-Hudson crossings, provides this Court with procedural, evidentiary and substantive guidance to be applied to the case at bar. Specifically, the Second Circuit has limited the focus in Port Authority toll increase cases to the financial needs of the Port Authority's interstate transportation network ("ITN") [1] in analyzing whether prior toll increases were just and reasonable. To make that determination the parties and the Courts relied on a time-honored rate base analysis traditionally used to establish reasonable rate charges for utilities operating in markets with minimal competition. A critical part of that rate base analysis is the determination of the capital assets to be included in the rate base to determine a reasonable return. This is the procedure previously employed to determine whether the challenged toll increase was just and reasonable and/or met constitutional standards.

In the case at bar, the Port Authority Commissioners, when asked to approve an unprecedented five year toll increase, were presented with the estimated capital needs of the entire Port Authority, including the costs of rebuilding of the World Trade Center, admittedly not an ITN capital asset. In defending this lawsuit, despite prior precedent, the chief financial officer of the Port Authority has declared the rate base analysis to be irrelevant in determining whether the challenged toll increase is warranted. Indeed, the Port Authority's cornerstone

---

[1]      The ITN is comprised of four bridges, the George Washington Bridge, the Bayonne Bridge, the Goethals Bridge, and the Outerbridge Crossing; two tunnels, the Lincoln Tunnel and the Holland Tunnel; three bus terminals; and PATH. *AAA. v. PA*, 887 F.2d 417, 418 (2d Cir. 1989).

defense is that the ITN was "broke" even with the toll increases, and that for that reason toll payers could not be unlawfully burdened with expenses incurred outside of the ITN, including the reconstruction of the World Trade Center.

To illustrate his point, the CFO constructed a ten-year cash flow analysis premised upon proposed capital expenditures of $10.786 billion. The cash flow analysis is fatally flawed because (a) it is based on self-serving assumptions which defy standard financial practice and analysis and (b) it includes improper capital expenditures, such as (i) spending for repairs to New Jersey state bridges and roads which are not owned by the Port Authority and from which it does not derive revenue, *i.e.*, the Pulaski Skyway, NJ Route 1&9, NJ Route 7, and the Wittpenn Bridge, (ii) spending to raise a bridge roadway primarily for the benefit of navigation, and (iii) a $1 billion placeholder unconnected with any project.

If these unlawful capital expenditures are removed from the cash-flow analysis, the ITN would be cash positive at the end of the ten year period. If certain assumptions are changed such as extending the repayment period from an unrealistic ten years to the useful life of the capital asset, the ITN becomes cash positive, even profitable. Accordingly, an appropriate rate base analysis depicts a substantially profitable ITN and brings into question the need for a toll increase.

As will be demonstrated infra, there are myriad material factual issues concerning the legality of the challenged multi-year toll increases which undermine summary judgment. Accordingly, plaintiffs request that the motion for summary judgment of the Port Authority be in every respect denied.

2

## FACTUAL BACKGROUND

**Prior Port Authority toll increases were justified solely by the capital needs
of the transportation network, and were based on a rate of return analysis.**

The Second Circuit has addressed two prior Port Authority toll increases.  In 1975, the

Port Authority's rationale for bridge and tunnel toll increases was capital improvement for mass

transportation projects, not for the Port Authority as a whole.  The Port Authority and the Court

used a rate base analysis, and not a cash flow analysis, in the 1975 toll increase litigation.

*Automobile Club of New York v. Cox*, 592 F.2d 658, 662-64, 668-69 (2d Cir. 1979).

Similarly, the Port Authority's rationale for its 1987 bridge and tunnel toll increases was

a $1.5 billion capital improvement program for the ITN.  Again, the Port Authority and the Court

used a rate base analysis, not a cash flow analysis, in the 1987 litigation to determine the

reasonableness of the toll increase.[2]  *Automobile Club of New York, Inc. v. Port Authority of*

*New York and New Jersey ("AAA v. PA")*, 887 F.2d 417, 418-20 (2d Cir. 1989); *AAA. v. PA,* 706

F. Supp. 2d 264, 266, 267-68, 270, 274-77, 280-84 (S.D.N.Y. 1989).  In that case, the Second

Circuit decided that in order to be "just and reasonable" under the Highway Act, Port Authority

toll revenue must be used for the ITN.

**The toll increase planning process did not focus on the ITN,
but instead looked to the needs of the entire Port Authority**

In contrast, in determining whether a toll increase was needed in 2011, and how much it

could afford in capital spending, the Port Authority did not focus on the needs of the ITN, but

instead looked to the needs of the entire Port Authority.  Declaration of Kevin P. Mulry dated

August 21, 2015 ("Decl."), Ex. A at 11:16 to 12:14; 19:13-17.  In determining whether a toll

---

[2]     Judge Pollak received evidence and heard testimony during a two-day bench trial with respect to the 1987
bridge and tunnel toll increase. *AAA v. PA*, 887 F.2d 417, 419 (2d Cir. 1989); *AAA v. PA*, 706 F. Supp. 2d 264, 266
(S.D.N.Y. 1989).

increase was needed, CFO Fabiano was looking at the financial projections and data for the entire Port Authority, and not the line departments that comprise the ITN in isolation.  *Id.* at 19:24 to 20:22; 41:18 to 42:5.  Similarly, when Port Authority staff analyzed various scenarios that took into account a potential toll increase, they were looking at the financial projections of all Port Authority revenues.  Decl., Ex. B at 53:2-25.  In fact, the Port Authority does not prepare a financial forecast for the ITN separate from the forecast for the entire agency.  *Id.* at 157:20 to 158:3.  The analysis of the need for revenue enhancement through a toll increase included the cost of the World Trade Center, because the ratios are built on the entire Port Authority and not just on individual facilities or departments.  Decl., Ex. A at 84:22 to 85:11.

**The Toll Increases announced on August 5, 2011 were justified by the capital needs of the entire Port Authority, not just the interstate transportation network.**

On August 5, 2011, the Port Authority recommended to its Commissioners "an immediate toll and fare increase in order to prevent a devastating impact to the region's transportation infrastructure and economic health."  Decl., Ex. C.  Without a toll and fare increase, "construction at the World Trade Center site would be affected later this fall."  *Id.*  The memorandum supporting the increases described the causes for the urgent need for a toll and fare increase:  "The 2008 economic recession which caused a severe reduction in Port Authority income projections; the cost of rebuilding the World Trade Center site, which is now more than $11 billion; and more than $6 billion in security-related expenses since 9/11, which have nearly tripled from pre-9/11 annual budgets."  *Id.*

The August 5 announcement initially proposed a $33 billion capital plan for the entire Port Authority.  *See id.*  The Port Authority then "cut" the budget to $25 billion, but this reduction was just a different way of presenting the budget.  The initial ten-year $33 billion plan included the full cost to complete projects, including amounts extending beyond ten years.  *See*

Decl., Ex. B at 70:18-25; 111:12-18; 114:6-17. The $25 billion plan was the amount for all projects started during the ten year period, including only the cost during the ten year period. *See id.* at 111:19 to 112:8.

The Toll Increases were approved by the Port Authority's Board of Commissioners two weeks later, on August 19, 2011. To justify the need for a toll increase, the Port Authority Chief Financial Officer presented to the Commissioners – and the public – a $25.1 billion capital plan for the entire Port Authority, which included funding for the World Trade Center. Decl., Ex. E at Ex. F, pp. 5, 8-9, 13; *see id.* at ¶ 15. Neither the public nor the Commissioners were told that a separate "ITN capital plan" was the reason for the toll increase.

**The Port Authority's reason for the Toll Increases as given to this Court**
**differs from the reason presented to the Commissioners and the public**

In *AAA v. PA,* 887 F.2d 417 (2d Cir. 1989), as stated above, the Port Authority supported the need for the toll increase based upon a $1.5 billion capital improvement plan limited to the ITN. *Id.* at 418-19. In contrast, the need for the 2011 Toll Increases was supported by a $25.1 billion capital plan for the entire Port Authority, including the World Trade Center. No evidence has been developed in discovery suggesting that the Commissioners – the decision makers – were voting to approve, disapprove or modify a toll increase solely for the benefit of the ITN as opposed to one benefitting the entire Port Authority.

Subsequent to the commencement of this litigation, relying significantly on *AAA v. PA,* the Port Authority developed an entirely new reason for the toll increases. Before this Court, the Port Authority asserted that the toll increases were not needed for the World Trade Center or the $25.1 billion capital plan, but instead were needed for a preliminary, unapproved $10.786 billion capital plan only for the ITN. *See* Decl., Ex. E at ¶ 15. The Commissioners, however, were

5

never told that the toll increases were targeted solely to the ITN, and were never presented with a $10.786 billion ITN capital plan.

Discovery has confirmed that the "ITN capital plan" could not have been the Commissioners' reason for the toll increases. The exhibits and financial analysis in CFO Fabiano's affidavit were not even prepared until after this lawsuit was filed, and were specifically created in response to the AAA litigation. Decl., Ex. A at 151:24 to 152:6.

The "$10.786 billion Preliminary Capital Plan for the ITN for 2011-2020" resulted from the management and budget department putting together what they believed was capacity and "taking the list of the various projects from all the departments." Decl., Ex A at 152:6 to 153:2; Ex. E at ¶ 5. This "ITN capital plan" was not presented to the Commissioners, but instead was specifically developed in response to the AAA lawsuit. Decl., Ex. A at 153:12-21. The idea of a "preliminary capital plan for the ITN" did not even make any sense to the Port Authority's Management and Budget Department Director. Decl., Ex. B at 94:21-24.

Exhibit B to the Fabiano Affidavit, which CFO Fabiano considered "the only schedule that really matters," Decl., Ex. F at ¶ 2, purports to be an analysis of cash flow for the ITN. Decl., Ex. A at 44:19-22. A cash flow analysis had not been presented in any way to the Commissioners, see id. at 159:5-12, even though CFO Fabiano believes it is "the only schedule that really matters." A cash flow analysis for the ITN had never even been done at the Port Authority prior to the AAA lawsuit and differs from the financial measures in the Port Authority's annual reports. See id. at 44:19 to 46:12. For example, depreciation, which is used in income statements, was not used in Fabiano's cash flow statement. See id. at 47:23 to 48:4.

A review of the documents for presentation to the Commissioners at the time of the Toll Increases demonstrates that the "ITN capital plan," later presented to the Court by CFO Fabiano,

was not and could not have been the basis for the Toll Increases. None of these presentation materials mention an "ITN capital plan," and none suggest that the Toll Increases were being proposed for anything other than the needs of the <u>entire</u> Port Authority, including the World Trade Center, Aviation and Port Commerce. Decl., Exs. H, I, J, K.

In sum, the analysis presented to the Court by the Port Authority in opposition to the AAA lawsuit was developed only after the Toll Increases were approved and this action was commenced. Thus, that post-approval, post-lawsuit analysis could not possibly have been the rationale employed by the decision makers in approving the Toll Increases, as it was never presented to them. Presumably, this new rationale was presented to the Court because the Port Authority believed the reasons presented to the Commissioners would not be sufficient under the Commerce Clause and the Highway Act.

**The post-approval rationale for the Toll Increases – a $10.786 billion ITN capital plan – includes $3.8 billion that is not authorized, not <u>for transportation, or not connected to any transportation project</u>**

Even assuming the post-approval, post-lawsuit rationale given by the Port Authority to the Court, the $10.786 billion "ITN capital plan," was the basis for approval of the Toll Increases, there are issues of fact as to whether the 2011 Toll Increases are just and reasonable, since over one-third of that total capital budget comprises projects the toll payers should not have to pay for.[3]

---

[3]     The Port Authority's footnote argument that AAA should have amended its complaint, PA Mem. at 20 n. 15, should be rejected. Fed. R. Civ. P. 8(a) simply requires "a short and plain statement of the claim showing that the pleader is entitled to relief." *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 512 (2002). From the beginning of this case, AAA has argued that the toll increases violate the Commerce Clause and the Highway Act because toll revenues are being used for non-ITN purposes. The World Trade Center was the focus of the September 2011 application because the World Trade Center was the focus of the Port Authority's sales pitch for the toll increases. Once AAA filed its complaint and its preliminary injunction application, however, the Port Authority changed its theory, and developed the new "ITN capital plan" theory. Judge Holwell specifically provided for discovery for AAA to develop its claims that toll increases were designed to fund non-ITN expenses. *AAA v. PA*, 842 F. Supp. 2d at 681. The Port Authority is certainly not prejudiced by having to address issues that have been in the case throughout discovery.

In particular, $1.8 billion -- one dollar out of every six dollars -- in the "ITN capital plan" is for New Jersey state bridges and roads, which are outside the statutory funding ability of the Port Authority.  Issues of fact also arise because another project, costing at least an additional $1 billion, is being undertaken for primarily navigational rather than transportation purposes. And another project is not a project at all, but instead is a "placeholder" that inflates the "ITN capital plan" by an additional $1 billion.

### A.   $1.8 billion of the ITN capital plan is for New Jersey state bridges and roads that the Port Authority is not permitted by statute to fund

The $10.786 billion "ITN capital plan" includes $1.8 billion for improvements to the Pulaski Skyway and New Jersey state roads.  In the Fabiano Affidavit, these are misleadingly labeled "Lincoln Tunnel access roadway infrastructure projects."  Decl., Ex. E at ¶ 7(d).  The connection to the Lincoln Tunnel, however, is illusory.  The money is being spent not on the Lincoln Tunnel, but on New Jersey state bridge and road facilities:  the Pulaski Skyway, N.J. Route 1 & 9, N.J. Route 7, and the WittPenn Bridge.  Decl., Ex. E at Ex. A, p. 6; Decl., Ex. A at 185:18 to 186:8.  The Port Authority concedes that the Pulaski Skyway and New Jersey roads are not part of the Port Authority's ITN.  PA 56.1 Statement, Doc. No. 134, ¶ 24.  The Pulaski Skyway is more than eight miles from the Lincoln Tunnel, and cannot in any way be considered an access roadway to the Lincoln Tunnel.[4]  Decl., Ex. L.

As demonstrated at Point II below, the expenditures by the Port Authority for the Pulaski Skyway and the New Jersey roads are completely unauthorized under New York and New Jersey statutes.  This circumstance creates issues of fact concerning whether requiring toll payers to fund $1.8 billion of unauthorized Port Authority expenses is just and reasonable.

---

[4]      According to the Port Authority website, the driving distance between the Pulaski Skyway and the Lincoln Tunnel is 8.2 miles.  *See* http://www.panynj.gov/bridges-tunnels/driving-directions-map.html?sourceAddress=Lincoln+Tunnel&facilityAddress=Lincoln+Tunnel%2C+New+York%2C+NY+10001&destinationAddress=Pulaski+Skyway.

**B. $1 billion of the ITN capital plan is for raising the Bayonne Bridge roadway, <u>which is not an ITN expense but is for navigation and Port Commerce</u>**

The "ITN capital plan" also includes $1 billion for the raising of the Bayonne Bridge roadway. While this project involves construction at a bridge, the Bayonne Bridge roadway is not being raised primarily for transportation, but instead for navigation and the Port Commerce line of business, because new larger container ships cannot pass under the current roadway. As CFO Fabiano stated to the Commissioners:

> [O]ne of the key projects supported by the tolls increase is the raising of the roadway at the Bayonne Bridge, which will accommodate the larger ships expected to call on the port with the opening of the expanded Panama Canal. It is an investment in the competitiveness of our ports …"

Decl., Ex. I at AAA211; *see also* Ex. A at 143:21 to 145:4 (Bayonne Bridge must be raised so larger container ships can pass under it); Ex. B at 152:23 to 153:12 (roadway being raised to provide navigational clearance for larger ships). Port Authority documents admit that the Bayonne Bridge "Navigational Clearance" project is "Under [Tunnels, Bridges and Terminals] but [is] a Port [Commerce] initiative." Decl., Ex. M. Thus, although it is a project expending funds at a bridge, the reason for the project is "to provide navigational clearance for larger containerships as a result of the Panama Canal Expansion." *Id.*

Indeed, the current Port Authority capital plan summary acknowledges the purpose of the Bayonne Bridge project is not interstate transportation, but navigation.

> The Board authorized $1.3 billion to raise the roadway of the Bayonne Bridge to 215 feet to accommodate larger more efficient ships anticipated post Panama Canal expansion. The current navigational clearance of 151 feet is an ongoing concern for the maritime industry. In late 2015, much larger containerships are expected to call at east coast ports. Allowing these vessels access to our port facilities will provide a more sustainable and competitive Port of New York and New Jersey.

Decl., Ex. N.

Again, this circumstance creates issues of fact concerning whether requiring toll payers to fund $1 billion for a project that is primarily for navigation.  Toll payers should not be required to pay increased tolls to support the needs of navigation and the maritime industry.

### C. $1 billion of the ITN capital plan is a placeholder representing no ITN projects

The "ITN Capital Plan" also includes just under $1 billion for a "capital infrastructure fund" ("CIF").  Decl., Ex. E at Ex. A, p 10.  Access to the Region's Core ("ARC") was a project for a mass transit tunnel the Port Authority was participating in, but ARC was suspended and terminated by New Jersey Governor Christie.  *Id.*, Ex. A at 184:8-15; 185:7-17.  The CIF allocated the $2.7 billion balance of funds the Port Authority previously committed to the ARC tunnel.  *Id.*, Ex. B at 82:4-11; 95:17 to 96:8.  $1.8 billion went to the New Jersey Bridges and Roads Project described above, and the remainder of close to $1 billion was not yet allocated at the time of the 2011 Toll Increases.  *Id.* at 103:22 to 104:12; Decl., Ex. E at Ex. A, p. 10; Ex. A at 188:17 to 189:4, 189:2 to 190:12.  This amount admittedly was included as simply a line item in the capital plan that did not reflect any transportation project.  Decl., Ex. A at 190: 18-25.

In other words, it is a $1 billion cushion that inflates the "ITN capital plan" to $10.786 billion.  Tellingly, CFO Fabiano scoffed at reducing the "ITN Capital Plan" by $1 billion instead of having a $1 billion "placeholder."

> Why would I reduce the capital plan?  I did not set up a capital plan.  That's a place holder, once again.

Decl., Ex. A at 193:10-12.

This circumstance creates issues of fact concerning whether requiring toll payers to fund a "placeholder," a $1 billion cushion in the Port Authority's post-approval "ITN capital plan," is just and reasonable.

**D.  Subtracting $3.8 billion from the "ITN capital plan"
    turns CFO Fabiano's cash flow analysis positive**

CFO Fabiano's cash flow analysis, which he considered "the only schedule that really

matters," Decl., Ex. F at ¶ 2, uses a $10.786 billion "ITN capital plan," and concludes with an

ITN deficit at the end of ten years of only $55 million.  If $3.8 billion is deducted from the "ITN

capital plan," the cash flow analysis yields a positive number in the billions.  The Commissioners

were certainly never told this when they were asked to approve the Toll Increases.  The  CFO

Fabiano cash flow analysis, and its conclusion that the ITN would lose $55 million over a ten

year period (an average of only $5.5. million a year), are completely undercut when the billions

of dollars for the Pulaski Skyway and New Jersey roads project, the Bayonne Bridge projects and

the billion dollar "placeholder" are deducted from the "ITN capital plan."

Even the Port Authority admits that taking the $1.8 billion Pulaski Skyway and New

Jersey state road project out of the "ITN capital plan" would yield an ITN profit of $850 million

over ten years.  PA Mem., Doc. No. 133, at 20; PA PI Opp. Mem., Doc. No. 125, at 26 n.14.

The formula for this conclusion uses CFO Fabiano's 50/50 cash/bond theory of financing.

> $1.8 billion / 2 = $900,000,000;

> $900,000 - $50,000 = $850 million ITN profit

The same formula, after also subtracting the $1 billion placeholder, yields an ITN profit of $1.35

billion over ten years.

> $2.8 billion / 2 = $1,400,000,000;

> $1,400,000 - $50,000 = $1.350 million ITN profit

Also, after subtracting from the "ITN capital plan" the Pulaski Skyway and New Jersey state

roads, the raising of the Bayonne Bridge roadway and the $1 billion placeholder, the formula

yields an ITN profit of $1.85 billion over ten years.

$3.8 billion / 2 = $1,900,000,000;

$1,900,000,000 - $50,000,000 = $1.85 billion ITN profit

This alone should create an issue of fact.  There are issues of fact as to whether up to $3.8 billion in funding in the "ITN capital plan" should not be paid from ITN revenues.  When one deducts that sum from CFO Fabiano's figures, using the Port Authority's own analysis, the ITN turns a profit of almost $2 billion.  Significantly, the Port Authority concedes that removing just the Pulaski Skyway and New Jersey state roads from CFO Fabiano's analysis "yields a positive number."  PA Mem., Doc. No. 133, at 20.[5]

The inclusion of these inappropriate expenditures raises issues of fact concerning whether the 2011 Toll Increases were "just and reasonable," whether the Commissioners would have approved the toll increases if they were presented with these  facts, or if they would have approved the amount or the five year span of the toll increases if they had known these facts.

**The Toll Increases would not be just and reasonable under a rate of return analysis**

As stated above, a rate of return analysis was used by the Port Authority and the Court in both of the prior challenges to Port Authority toll increases.  The Port Authority did not conduct or submit to the Court a rate of return analysis in this case, instead offering a cash flow analysis, a type of analysis that was not presented to the Commissioners and one which had not been previously used at the Port Authority.

A rate of return analysis is used to establish reasonable rate changes for organizations that have no or minimal competition in a particular market and would be able to exert monopoly

---

[5]      Plaintiff's laches argument, PA Mem. at 22 n.17, should be rejected.  Laches requires delay in filing a lawsuit as well as prejudice to the defendant.  *See Cooley v. Penguin Grp. (USA) Inc.*, 31 F. Supp. 3d 599, 612 (S.D.N.Y. July 11, 2014); *Conopco, Inc. v. Campbell Soup Co.*, 95 F.3d 187, 192 (2d Cir. 1996).  Neither is present here.  Moreover, AAA is not seeking to enjoin any project, but is challenging the spending of toll revenue and the raising of tolls based on those non-Port Authority or non-ITN expenditures.  In any event, the Port Authority has stated that the remedy in this case could be money damages, with a credit to EZPass users and a discount to cash users.  Decl., Ex. E at ¶ 16.

power and thus be open to charging excessive rates, and where the regulations provide a just and reasonable . Declaration of Jonathan Peters dated August 21, 2015 ("Peters Decl")., at ¶ 4.[6] The formula for revenue requirement is: Revenue Requirement = (Rate Base * Allowable Rate of Return) + Operating Expenses + Depreciation Expense + Taxes. Peters Decl., at ¶ 9. The rate base is the invested capital that is engaged in the production of revenue and income from the regulated or monopoly entity. Peters Decl., at ¶ 10-12. As the Pulaski Skyway and New Jersey roads assets are not a part of the ITN, they for example would not be included in the ITN rate base. Peters Decl., at ¶ 12. If the realized revenue is greater than the required revenue – then the toll and fare rates as a package are excessive. If the realized revenue is less than the required revenue – then the shortfall in revenue is the amount that could be raised by higher tolls or fares. Peters Decl., at ¶ 23.

A rate of return analysis for 2010 shows a small shortfall ($45.2 million) – with actual revenue reported at $1.120 billion and the allowable revenue of $1.139 billion. Peters Decl., at ¶24. If costs and non-ITN asset expenses were misallocated toward the ITN, this shortfall would not meet the standard for approving a large scale rate increase, and would at most support a modest one time toll increase. Peters Decl., at ¶ 24.

An examination of the 2011 financial results shows that the ITN collects $188.2 million in excess revenue in 2011, a figure that does not provide support for a toll increase. Peters Decl., at ¶ 25. The 2012 financial results demonstrate a massive required revenue surplus of $452.0 million. Peters Decl., at ¶ 26.

---

[6]     Jonathan Peters, a Professor of Finance at the City University of New York, has submitted a declaration in support of AAA's opposition to the Port Authority's summary judgment motion and would be available to testify at any trial. Pursuant to Fed. R. Civ. P. 26(a)(2)(D)(i), expert disclosures with respect to this matter must be made at least 90 days before the date for trial or on which the case is to be ready for trial.

Based on a rate of return analysis, there was no allowable revenue justification for a toll increase indicated in the 2010 or 2011 financial statement reviews, let alone five increases in the tolls over a period of five years.  Peters Decl., at ¶ 28.  By the time of the decision to increase tolls in 2011, the rate of return analysis for the PANYNJ was demonstrating that no further toll increases were needed.  Peters Decl., at ¶ 27-30.  In addition, multiple rate increases in one single rate setting action are inappropriate.  Peters Decl., at ¶ 31.

**The flawed Fabiano cash flow analysis and other**
**Port Authority practices raise material issues of fact**

CFO Fabiano's cash flow analysis suffers from numerous other flaws that raise material issues of fact.  The model, using 50% cash and 50% debt, improperly extracts large cash flows from the ITN in an unrealistically short repayment period.  A more appropriate method of financing is to use the useful lifespan of the asset.  If that one change is made to the Fabiano cash flow analysis, the ITN cash flows change from a negative of a little over $50 million to a positive of over $2 billion.  Peters Decl. at ¶ 39-42.

The cash flow analysis also includes both allocated expenses as well as debt service allocated to the Port Authority's consolidated bonds, which are subject to considerable management discretion.  There is also a significant disparity between significant charges to the ITN compared to very minor charges to the World Trade Center.  This heavy allocation toward the ITN distorts the financial condition of the ITN.  Peters Decl. at ¶ 36-38.

In addition, for the years 2001 through 2012, Port Authority financial statements indicate that in excess of $10 billion has been transferred out of the Port Authority Reserve Funds.  Spending on the World Trade Center during from 2007 through 2012 was $9.1 billion, and spending on the ITN during that period was only $2.9 billion.  Also, during that period, in the years ended 2010, 2009 and 2008, Port Authority capital investment was funded by

14

approximately $900 million, $1.35 billion and $1.15 billion, respectively, from the Consolidated

Bond Reserve Fund and other sources. *See* Mulry Decl., Exh. Q. These public financial

statements raise substantial issues concerning whether ITN revenues transferred into the Reserve

Funds for many years have been paid out for non-ITN uses such as the World Trade Center.

Also, ITN revenues should be used only for ITN expenses. However, the bondholders

for any of the Port Authority consolidated bonds can look to the revenues of all Port Authority

line departments, equally and ratably, in the event of default. Mulry Decl., Ex. A at 275:4-13. In

that way, ITN revenues are put at risk for bonds financing non-ITN lines of Port Authority

business.

## ARGUMENT

### Point I

### STANDARD FOR SUMMARY JUDGMENT

Summary judgment is only appropriate where "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a). "In determining whether summary judgment is appropriate, [the] Court will

construe the facts in the light most favorable to the non-moving party and must resolve all

ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653

F.3d 156, 164 (2d Cir. 2011) (internal quotation marks and citations omitted). The role of the

Court is not "to weigh the evidence and determine the truth of the matter but to determine

whether there is a genuine issue for trial." *Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.*,

444 F.3d 158, 162 (2d Cir.2006).

## POINT II

## AS A MATTER OF LAW, THE PORT AUTHORITY IS NOT STATUTORILY AUTHORIZED TO FUND THE PULASKI SKYWAY AND NEW JERSEY STATE ROADS

The Port Authority has asserted that funding of the Pulaski Skyway and New Jersey roads is permitted because they are "approaches" to the Lincoln Tunnel. *See* Decl., Ex. E at ¶ 7(d); Ex. A at 185:18 to 186:8. These bridges and roads, however, are not owned by the Port Authority, are miles away from the Lincoln Tunnel, and are completely outside the Port Authority's statutory authorization for funding.

### A. The Port Authority may not pay for projects when it does not have statutory authority to do so

To receive Port Authority funding, projects must fall within the scope of the Port Authority's statutory authorization. Funding of projects outside the scope of such authority would be *ultra vires*, and therefore impermissible.[7] Facilities that the Port Authority does not own or operate are not candidates for inclusion in its rate base. *AAA v. PA*, 887 F.2d 417, 422 n. 5 (2d Cir. 1989).

In *State v. Port Authority of New York and New Jersey*, 151 N.J. Super. 127 (Super. Ct. 1977), *aff'd*, 159 N.J. Super. 102 (App. Div. 1978), the Court addressed whether the Port Authority was authorized under existing statutes to commit funds to a road project that would improve access to Newark Airport and Ports Elizabeth and Newark. The Port Authority argued that approval by New York and New Jersey legislatures was required because:

---

[7]     The Port Authority seems to be arguing in a footnote that it does not need statutory authority to spend Port Authority funds. PA Mem. at 21 n.16. AAA respectfully submits that the case law and statutory authority cited herein stand for the proposition that the Port Authority requires statutory or legislative authority to spend Port Authority funds. The Port Authority also argues that its interpretation of its governing statutes should be given deference, without explaining what that interpretation is or addressing the AAA arguments with respect to the Pulaski Skyway and New Jersey roads. *Id.* An agency cannot be given deference when it offers no interpretation of governing statutes. Moreover, an agency interpretation is not given deference when it clearly conflicts with the language of a statute. *See Corovic v. Mukasey*, 519 F.3d 90, 95 (2d Cir. 2008).

16

-   The project would not be part of a Port Authority facility or an exclusive connection to any facility;

-   The project would only incidentally benefit the marine and airport terminal; and

-   Similar access projects such as the Route 80 access road to the George Washington Bridge and construction of the third tube of the Lincoln Tunnel were of such magnitude as to require bi-state enabling legislation.

151 N.J. Super. at 131-32.

The Court held that bi-state enabling legislation was required because there was no statutory authority to construct the highways, expressly rejecting the argument that the Port Authority was authorized to fund a project without statutory authority or bi-state approval.

> The desires and goals of the Port Authority, or for that matter any agency, cannot run counter to the legislative mandate.  To grant the relief which plaintiffs seek would be, in effect, to sanction the Port Authority building, without bi-state approval, not merely the Route 81 project but as many highways as it deems beneficial to the public and in accord with the comprehensive plan.

151 N.J. Super. at 137-38 (citation omitted).

Neither the Pulaski Skyway nor the New Jersey state roads are Port Authority facilities, and thus they are outside the authority of the statutory enabling legislation.  The Port Authority may not fund these projects simply on the ground that it deems them to be beneficial to traffic flows.

## B.  The Port Authority is only authorized to pay for "approaches" and "connections with highways" with respect to the Lincoln Tunnel

Regarding the Lincoln Tunnel, the Port Authority may "construct, own, maintain and operate [the Lincoln Tunnel], together with such approaches thereto and connections with highways."  NY Unconsol. Laws § 6502; NJSA 32:1-119.  These statutes were passed in 1931, after the Holland Tunnel had been constructed, but before the Lincoln Tunnel (and any approaches or connections to highways) had been constructed.  Thus, the Port Authority was not

authorized in the same statutes to construct approaches or connections to the Holland Tunnel, as they already existed.  Instead, the state legislatures provided that "the  control,  operation,  tolls and  other  revenues  of the [Holland Tunnel] shall be vested in the port authority as hereinafter provided."   NY Unconsol. Laws § 6502; NJSA 32:1-119.

As to the Lincoln Tunnel, the Port Authority may only fund "approaches thereto" and "connections with highways."  The Pulaski Skyway and New Jersey roads are neither.  New York and New Jersey statutes define the "entrances, exits and approaches" to the Lincoln Tunnel:

> The approaches to the [Lincoln Tunnel] on the New Jersey side shall be so located and constructed as to permit tunnel traffic to pass over or under the tracks of the New York, Susquehanna and Western Railroad Company and the Northern Railroad Company of New Jersey, immediately west of the Palisades, without crossing the said tracks at grade, and as to permit connections with New Jersey state highway routes in the vicinity of the said tracks.

NY Unconsol. Law § 6503; NJSA 32:1-120.

The only other Lincoln Tunnel authorization is for "connections with highways."  This term, particularly considering the statute's enactment before construction of the Lincoln Tunnel, means the Port Authority may construct and pay for roads that connect the tunnel to the state highways.  NY Unconsol. Law § 6511 discusses "Connections with state or municipal highways," and the Pulaski Skyway and New Jersey roads do not fall within the meaning of this statutory definition.

> The plans of the connections with state or municipal highways of any vehicular bridge or tunnel which the port authority may hereafter construct (including the plans of any additional connections of existing bridges or tunnels with state or municipal highways), shall be subject to  the approval of the governor of the state in which such connections shall be located.  Either state may require by appropriate legislation that such connections shall be subject to the approval of the municipality of that state in which they shall be located; and in such event, the approval of such municipality shall be given as provided in article twelve of the said compact of April thirty, nineteen hundred twenty-one.

18

> Except as limited herein, the port authority shall determine all matters pertaining to such bridges and tunnels.

NY Unconsol. Law § 6511.

In 1931, when the enabling statutes were passed, the Lincoln Tunnel had not yet been built, and the building of approaches and connections to existing highways was therefore required. In *Port of New York Authority v. Weehawkeen Tp.*, 14 N.J. 570 (1954) (Brennan, J.), the Port Authority argued that the building of a third tube for the Lincoln Tunnel in 1954 did not require legislative approval, but was within the 1931 statutory authorization for construction of a midtown tunnel. The Court rejected this argument.

> We think that history demonstrates beyond question of doubt that the power to construct tunnels at that crossing related only to the construction of twin tunnels at the crossing and was exhausted when they were completed.

14 N.J. at 576. This decision demonstrates that Port Authority spending must fall within a statutory grant of authority. Moreover, it follows that if the statutory authority to construct the midtown tunnel tubes "was exhausted when they were completed," the power to construct "approaches" and "connections with highways" for the Lincoln Tunnel was similarly exhausted when the Lincoln Tunnel was completed.

### C. The Port Authority is not authorized to pay for the Pulaski Skyway and New Jersey roads

The Pulaski Skyway and New Jersey roads are admittedly not Port Authority facilities and not part of the ITN. PA Rule 56.1 Statement, Doc. No. 134 at ¶ 24. There is no statutory authority for the Port Authority to pay for bridges and roads that are not Port Authority facilities. The $1.8 billion expenditure for the Pulaski Skyway and New Jersey roads is therefore *ultra vires*.

19

The Port Authority assertion that it can fund the Pulaski Skyway and New Jersey roads because they are "approaches" to the Lincoln Tunnel should be rejected.  First, the statutory authority to fund "approaches" to the Lincoln Tunnel was exhausted when the tunnel was completed.  *Weehawken Tp.*, 14 N.J. at 576.  Second, the Pulaski Skyway and New Jersey roads are not even within the statutory definition of "entrances, exits and approaches" to the Lincoln Tunnel.  NY Unconsol. Law § 6503; NJSA 32:1-120.   Third, the Pulaski Skyway is eight miles from the Lincoln Tunnel and leads into the Holland Tunnel, for which the 1931 statutes did not authorize payment for "approaches."  Fourth, the Pulaski Skyway and New Jersey roads are not within the ordinary usage of the term "approach."  An "approach" to a tunnel is a contiguous road that leads directly into the tunnel.  This meaning makes particular sense because, when the statutes were enacted, the Lincoln Tunnel had not yet been built, and the Port Authority had to build approaches to the tunnel, as well as connections to state highways on the New York and New Jersey sides.  The Pulaski Skyway and New Jersey roads, miles away from the Lincoln Tunnel, cannot be considered "approaches," unless the Port Authority considers any road that eventually leads to the Lincoln Tunnel, such as the Kosciuszko Bridge, to be an "approach" to the Lincoln Tunnel.

The issue is not that AAA disagrees with Port Authority choices on capital projects it chooses to fund, nor is AAA asking the Court to substitute its judgment for that of the Port Authority.  PA Mem., Doc. No, 133, at 21-22.  AAA argues that there is no statutory authority for the Port Authority to spend one out of every six dollars in its "ITN capital plan" on New Jersey bridges and roads.  The Port Authority was aware of AAA's arguments and had all the statutory and case authority cited above, but it chose to completely ignore these arguments in its memorandum in support of summary judgment.

The $1.8 billion funding by the Port Authority of the Pulaski Skyway is completely *ultra vires*. It is not "just and reasonable" for that $1.8 billion payment to be borne by toll payers. At the very least, there are issues of fact concerning whether the Port Authority can raise tolls to pay $1.8 billion – one-sixth of the "ITN capital plan" – and spend it on New Jersey bridges and roads.





**Point III**

## THERE ARE MATERIAL ISSUES OF FACT CONCERNING WHETHER THE TOLL INCREASES VIOLATE THE COMMERCE CLAUSE

Under the dormant Commerce Clause, a toll increase is unconstitutional unless "it (1) is based on some fair approximation of the use of the facilities, (2) is not excessive is relation to the benefits conferred, and (3) does not discriminate against interstate commerce." *Northwest Airlines, Inc. v. County of Kent, Mich.*, 510 U.S. 355, 369 (1994); *see Bridgeport and Port Jefferson Steamboat Co. v. Bridgeport Port Authority*, 567 F.3d 79, 84 (2d Cir. 2009). The Second Circuit has held that under "dormant" Commerce Clause jurisprudence, toll funds may

not go to uses that do not bear a "functional relationship" to the facilities used by the toll payers. *See Bridgeport,* 567 F.2d at 87.

### A.    The Toll Increases are not based on a fair approximation of the use of the ITN facilities

The Toll Increases fail the first prong of the *Northwest Airlines* test, because they are not based on a fair approximation of the use of ITN facilities, but on the needs of the entire Port Authority.

### 1.    The toll increases were based an approximation of use of all Port Authority facilities, not those of the ITN

According to Port Authority witnesses, the toll increases were based on an approximation of use of the facilities of the entire Port Authority, a $25 billion Port Authority capital plan, and not an approximation of use of the ITN.  The analysis for the toll increase was the capital plan and needs of all Port Authority facilities, not a fair approximation of the use of the ITN facilities. In planning for the toll increase, the Port Authority did not even attempt to make an approximation of the cost of the use of ITN facilities.  This raises at least an issue of fact under the Commerce Clause as to whether the toll increases were a fair approximation of use of the ITN facilities.

The decision to raise tolls, and not just the ultimate spending of toll revenue, is relevant under both the Commerce Clause and the Highway Act.  In *Northwest Airlines, Inc. v. County of Kent,* 510 U.S. 355 (1994), (analyzing Commerce Clause based on Airport's decision to allocate costs a certain way).  In that case, the Court held that "[t]he Airport's *decision* to allocate costs" according to a certain formula, was "a fair, if imperfect, approximation of the use of facilities for whose benefit they are imposed." *Id.* at 369 (emphasis added).  Here, the decision to raise tolls was based not based on an approximation of the use of ITN facilities, as it should have been, but

23

instead an approximation of use of all Port Authority facilities, including the World Trade Center. That circumstance raises issues of fact under the Commerce Clause.

### 2. The post-approval "ITN capital plan" justifying the toll increases includes billions of dollars that are not for ITN facilities

Even assuming a $10.786 billion ITN capital plan had been presented to the Commissioners, and assuming they approved a toll increase based on that plan, the Toll Increases are not a fair approximation of the use of ITN facilities because there are issues of fact concerning whether $3.8 billion of that amount comprises funding the Port Authority is not permitted to make, funding of projects benefitting navigation and Port Commerce rather than transportation, and funding of a massive "placeholder" that is unconnected to any transportation project.

First, as stated above, funding of the Pulaski Skyway and New Jersey road project is completely unauthorized under New York and New Jersey statutes. *See supra* at Point II. The Port Authority has only limited statutory authority to pay for approaches to the Lincoln Tunnel or connections with highways, and there is no authority to pay for New Jersey state roads and bridges that are miles away. The Pulaski Skyway and New Jersey roads are not Port Authority facilities, and raising tolls to pay for them cannot fairly approximate the use of ITN facilities. Raising tolls to pay for the $1.8 billion Pulaski Skyway and New Jersey roads project violates the Commerce Clause.

Second, the raising of the Bayonne Bridge roadway is a project undertaken – by the Port Authority's own admission – primarily for the benefit of navigation and Port Commerce, not for the benefit of the ITN. The project involves a bridge, but the Port Authority's own documents establish that raising the roadway is a navigational rather than transportation need. The fact that there will be a new roadway is only incidental; the roadway is only being replaced because it has

to be raised for navigation.  This expenditure was not based on a fair approximation of

transportation needs, but was driven by port navigation needs.  Moreover, even if there were

some benefit to motorists, is would be excessive to require motorists to pay the entirety of a

project that is unnecessary but for the fact that large ships will not otherwise be able to pass

under the bridge.  Raising tolls for a $1 billion project needed to clear navigational paths does

not fairly approximate the financial needs of the ITN, and raising tolls for this purpose violates

the Commerce Clause.

Third, the "ITN capital plan" includes a $1 billion "placeholder," through which the Port

Authority has inflated its supposed ITN capital needs without explaining to its Commissioners or

the public what those funds will be used for.  The cost of the use of ITN facilities is not fairly

approximated when that cost is inflated by a $1 billion "placeholder," representing almost ten

percent of the total supposed "ITN capital plan."  At a minimum, the use of a $1 billion

"placeholder" in a capital plan that has a deficit of $55 million after ten years raises issues of

fact.  A fair approximation of use of ITN facilities cannot include an extra budget add-on of $1

billion, unattached to any project.  It is not a fair approximation of the use of ITN facilities to

tack on an extra billion dollars to the budget to try to sell a toll increase to Commissioners and

the public.  In addition, an artificially inflated capital plan is plainly excessive compared to the

ITN benefits it is being used to justify.

These capital spending expenditures – separately or in combination – would turn CFO

Fabiano's cash flow analysis positive and undercut the toll increases, or at least the amount of

the toll increases.  The Port Authority concedes that taking only the Pulaski Skyway and New

Jersey roads out of Fabiano's analysis "yields a positive number."  PA Mem., Doc. No. 133, at

20.  This alone creates an issue of fact.  Certainly, the Commissioners were never told any of this

25

when they approved the toll increases, and the Port Authority would be speculating if it tried to argue that the Commissioners would have still approved five years' worth of toll increases if they had known that significant projects funded by the increases are not ITN expenses.

For all these reasons, there are issues of fact concerning whether the Toll Increases were a fair approximation of use of the ITN facilities, and summary judgment should be denied.

### B. The Toll Increases are excessive in relation to the benefit conferred

The Toll Increases also fail the second prong of the *Northwest Airlines* test, because they are excessive in relation to the benefits conferred. The benefit conferred on a toll payer is the ability to cross from New York to New Jersey over Port Authority bridges and tunnels. The Toll Increases are excessive because they are based on expenses unrelated to the ITN.

#### 1. Tolls were increased to address the needs of the entire Port Authority

Based on Port Authority testimony and documents, tolls were increased to spend $25 billion on a capital plan for the entire Port Authority. There was admittedly never a consideration of what toll increase was necessary for the ITN. Toll payers should not have to pay tolls increased because of expenses that have no relation to the ITN benefits conferred. Commissioners were not presented with an ITN justification for the toll increases, and there are issues of fact concerning whether they would have approved such tolls at all or would have approved them only in part if only the ITN expenses were at issue.

#### 2. Tolls were increased to address the needs of bridges and roads not owned by the Port Authority, and expenses providing no ITN benefit

Again, even assuming the reason for the Toll Increases was the $10.786 billion "ITN capital plan," the Toll Increases are excessive because $3.8 billion of that capital plan is not for the ITN, so toll payers do not receive a benefit. The toll payers do not receive a benefit from the unauthorized spending of $1.8 billion for New Jersey state bridges and roads; the toll payers do

not receive a benefit from spending $1 billion to raise a bridge roadway so that ships can pass

under it; and the toll payers do not receive a benefit from a $1 billion "placeholder" that

improperly inflates the supposed "ITN capital plan." The $3.8 billion for these projects

comprises at least thirty five percent of the $10.786 billion "ITN capital plan," the Port

Authority's post-approval, post-lawsuit rationale for the Toll Increases.

Even under CFO Fabiano's analysis, the unauthorized and non-ITN projects in the "ITN

capital plan" make the Toll Increases excessive for toll payers, in relation to the benefit

conferred. *See Bridgeport*, 567 F.3d at 87 ("limits of both a fair approximation of use and

excessiveness are plainly exceeded when the fees support a BPA budget that includes, for

example, a development project for reducing traffic on I-95").

### 3.   The toll increases are excessive under a rate of return analysis

As described above, under a rate of return analysis, which was the method used by the

Port Authority and the Court in prior litigation concerning toll increases, a series of five, massive

multi-year toll increases were excessive. At a minimum, there is an issue of fact concerning

whether the 2011 toll increases were excessive. Significantly, the Port Authority did not perform

a rate of return analysis for the 2011 toll increases.

Interestingly, AAA has argued from the beginning of this case that a rate of return

analysis is the proper measure of a toll increase, Decl., Ex. R at ¶¶ 10-11. CFO Fabiano in

response argued that "a rate of return analysis is simply irrelevant." Fabiano Reply Aff. at ¶ 12.

Now that the Port Authority understands that the Fabiano analysis has been undercut by non-ITN

expenditures, the Port Authority argues that a bridge toll is permitted to generate a "fair profit or

rate of return." PA Mem., Doc. No. 133, at 22-23. This argument should be rejected.

AAA raised the rate of return issue at the beginning of the case, and has demonstrated that under a rate of return analysis, the tolls increases are excessive.  The Port Authority mis-cites *Angus Partners LLC v. Walder*, 2014 WL 4639552 (S.D.N.Y. Sept. 16, 2014).  That case examined whether surplus revenues could be used within the functionally-related facilities of the MTA, under MTA's enabling statutes, as *AAA v. PA* examined whether surplus revenues could be used within the ITN.  The present case involves surplus revenues being improperly used outside the ITN.

For all of these reasons, there are issues of fact concerning whether the Toll Increases violate the Commerce Clause.

Point IV

## THERE ARE MATERIAL ISSUES OF FACT CONCERNING WHETHER THE TOLL INCREASES VIOLATE THE HIGHWAY ACT

Under the Highway Act, a toll increase is impermissible unless it is "just and reasonable." *AAA v. PA*, 887 F.2d 417, 417 (2d Cir. 1989).

### A.     The legal parameters for the Highway Act analysis were set by two prior AAA challenges to Port Authority toll increases

AAA has challenged Port Authority toll increases in two prior cases, *AAA v. Cox*, 592 F.2d 658 (2d Cir. 1979), and *AAA v. PA*, 887 F.2d 417 (2d Cir. 1989).

In *AAA v. Cox*, AAA challenged the decision of the Federal Highway Administrator approving an increase in four bridge tolls[9] from $1.00 to $1.50.  AAA argued that the Highway Administrator should have only included the four bridges in the rate base for determining a fair return for tolls, and that he had improperly included the Holland and Lincoln Tunnels, Port Authority bus terminals, and the Port Authority Trans-Hudson Railroad ("PATH").  592 F.2d at

---

[9]     The bridges at issue were the George Washington Bridge, the Bayonne Bridge, the Goethals Bridge, and the Outerbridge Crossing.

660. The toll increase was justified by the Port Authority as necessary for four mass transit projects. 592 F.2d at 662. Judge Friendly wrote for the Court that "the inclusion of PATH is still a giant leap from anything previously taken into account in determining appropriate rates under the 'reasonable and just' provision of the General Bridge Act of 1906." 592 F.2d at 672. Nevertheless, the Court could not find the Highway Administrator's decision to be arbitrary and capricious based on the record before it. 592 F.2d at 673. The Court noted that many of the issues it raised were not developed before the agency, and the AAA proceeded on an all or nothing argument, resisting inclusion of anything other than the four bridges. The Court affirmed, "but with the caveat that this shall not be deemed to constitute an approval or rejection of the Administrator's action or to preclude a new protest." 592 F.2d at 673.

In *AAA v. PA*, AAA brought the new protest, challenging an increase of bridge tolls from $2.00 to $3.00. 887 F.2d at 419. AAA argued that PATH should not be included in the rate base for raising tolls. 887 F.2d at 417-18. The toll increase was justified by the Port Authority as necessary for capital improvements to transportation facilities. 887 F.2d at 419. The Second Circuit found that the district court's factual findings concerning the relatedness of the PATH to the Port Authority bridges and tunnels were not clearly erroneous, and affirmed the finding that PATH was part of an "integrated, interdependent transportation system." 887 F.2d at 423. Significantly, in *AAA v. PA*, as in *AAA v. Cox*, the toll increase was justified by the Port Authority as necessary for expenses of its transportation network.

**B. The Toll Increases violate the Highway Act as they were based on the needs of the entire Port Authority and are therefore not "just and reasonable"**

Here, there is no question based upon the testimony and documents from the Port Authority that the Commissioners approved a toll increase that was based on the needs of the entire Port Authority, not the needs of the ITN. At the very least, there is a material issue of fact

concerning whether the toll increase was for the needs of the entire Port Authority. The Commissioners may have come to a different conclusion with respect to approving a toll increase, or may have approved a smaller toll increase, if they had been presented with a toll increase that benefitted only the ITN. The toll increases cannot be just and reasonable where they are not based on the needs of the ITN.

The Port Authority argues that as long as, post-approval, it can make a case that there is a deficit in the ITN, a toll increase is allowable, regardless of what the Commissioners thought they were approving. The Port Authority's argument, by extension, would mean that the Commissioners could be presented with any reason – or no reason – to support a massive, multi-year toll increase. Then, once the toll increases were approved – even if by a rubber stamp from the Commissioners -- the Port Authority could come up with some other justification to satisfy the Commerce Clause and the Highway Act. And, that justification could include a cash flow analysis that had never been used by the agency to try to demonstrate a deficit projected out over ten years. Thus, as long as the Port Authority can come up with a ten year projected loss, it can justify a toll increase in any amount. This argument should be rejected as contrary to the "just and reasonable" requirement under the Bridge Act.

The Port Authority's argument that the decision to raise tolls is irrelevant, and the only thing that matters is whether they can justify the toll increase post-approval, should be rejected. The Port Authority does not cite any case for this proposition where the decision maker was given one reason for the approval and the Court was then presented with a substantially different reason. If the Commissioners had been asked to raise tolls based on a $10.786 billion ITN capital plan, and were advised that $3.8 billion of that plan was for New Jersey state bridges and roads, the raising of a bridge for navigation, and an empty $1 billion placeholder, the Port

Authority's argument might have some merit.  The Commissioners were clearly not advised of any of that, however, and a decision to raise tolls on that faulty premise is not just and reasonable.

**C.     The Toll Increases violate the Highway Act because they fund
        costs outside the ITN and are therefore not "just and reasonable"**

Even assuming the Commissioners had been presented with the $10.786 billion "ITN capital plan," and had approved the Toll Increases based on that plan, the Toll Increases would fail the "just and reasonable" test because there are issues of fact concerning whether they are supporting projects outside the ITN and its transportation mission.  In the *AAA v. PA* case, the issue was whether PATH could be included in the rate base for a toll increase.  Here, there is at least an issue of fact concerning whether the Pulaski Skyway and New Jersey roads, the navigational raising of the Bayonne Bridge roadway, and a $1 billion "placeholder" can be included in the rate base for the 2011 Toll Increases.

As stated above, the Pulaski Skyway and the New Jersey roads are not ITN facilities, and the $1.8 billion funding of those projects is not permitted under the statutes governing the Port Authority.  Raising tolls for state road funding that is not authorized under the statutes governing the Port Authority cannot be "just and reasonable."  If including PATH in the rate base for a bridge toll increase was a "giant leap," *AAA v. Cox*, 592 F.2d at 672, including the Pulaski Skyway and the New Jersey roads in the rate base is an unauthorized and impermissible leap.

Similarly, the Port Authority concedes that Toll Increases can only be justified by ITN expenses.  The Bayonne Bridge roadway is being raised – at a cost of $1 billion – so that ships can pass underneath it.  Raising tolls to pay for a navigational project is not "just and reasonable" under the Highway Bridge Act.

Finally, it is not "just and reasonable" to include in the rate base a $1 billion "placeholder" into which the Port Authority can fill anything it would like.  Essentially, the Port Authority argues it can inflate its budget by $1 billion and then tell the toll payers they should pay the Toll Increases and "trust us" concerning how the money should be spent.  Raising tolls to pay for a budget inflated by $1 billion, unconnected to any ITN project, is not "just and reasonable."

The Pulaski Skyway and New Jersey state roads are not ITN facilities, and are beyond the Port Authority's funding ability.  The raising of the Bayonne Bridge roadway is a navigation expense, not for the benefit of the ITN.  The $1 billion placeholder is not an expense at all, but is instead an artificial inflation of the "ITN capital plan."   These add at least $3.8 billion to the supposed "ITN capital plan."  Even assuming that an ITN capital plan were presented to the Commissioners – which it was not -- the toll increases based on that plan, inflated by almost $4 billion of non-ITN expense, is not "just and reasonable."

### D.  A rate of return analysis, as used previously by the Second Circuit, shows that the toll increases are not just and reasonable

As described above, a rate of return analysis is the proper way in which to analyze Port Authority toll increases.  That is the method that was used by both the Port Authority and the Court is prior toll increase litigation under the Highway Act.  The Port Authority did not even attempt to perform a rate of return analysis for the 2011 toll increases.  Tellingly, a rate of return analysis demonstrates that a toll increase was not just and reasonable, and certainly not a massive toll increase spanning five years into the future.  *See supra* at 12-14, 27-28.

At a minimum, the rate of return analysis, and the Port Authority's failure to even consider or perform a rate of return analysis, raises material issues of fact on whether the toll increases were just and reasonable.

32

**E.     There is a private right of action under the Highway Act**

The Port Authority argues that toll payers do not have a private right of action to

challenge toll increases that are not "just and reasonable" under the Highway Act.   PA Mem.,

Doc. No. 133, at 26-28.  Its argument is wide of the mark because, for many years prior to the

enactment of the Highway Act, toll payers had the right to file an administrative complaint,

reviewable in federal court, to challenge an unjust and unreasonable toll increase.  Defendant

Port Authority disregards this history and asks this Court to focus solely on the stark language of

the Highway Act of 1987 which is silent, as was the prior statute, regarding a remedy for an

unjust and unreasonable toll increase.  Second Circuit precedent and the context, circumstances

and purpose for which the Highway Act was enacted lead to the conclusion that there is a private

right of action to challenge unjust and unreasonable toll increases under the Highway Act.

     **1.   The statutory scheme preceding the Highway**
          **Act afforded administrative review and Court review**

Prior to the passage of the Highway Act in 1987, various statutes provided that the tolls

for certain bridges had to be just and reasonable, and provided for administrative and judicial

review of those tolls.  Under the prior statutory scheme, the Federal Highway Administrator

addressed issues such as the reasonableness and justness of toll schedules or amortization

periods. 49 C.F.R. § 310.1 (1986).  After the Administrator's factual investigation, the

Administrator or an administrative law judge would hold a formal hearing and render a decision.

Id. at §§ 310.3, 310.4, 310.5, 310.7, 310.13.  Thereafter, "[t]he decision . . . could be challenged

either in a district court, pursuant to the Administrative Procedure Act, or in the court of appeals

for the judicial circuit in which any portion of the bridge was located."  *Molinari v. DiCarlo*, 838

F. Supp. 718, 722 (E.D.N.Y. 1993) (*citing, inter alia,* 5 U.S.C. § 701 *et seq.* and 33 U.S.C.A. §

505 (1986)).

33

### 2. In amending the statute, Congress eliminated administrative review but kept Court review

Congress found "[f]ederal oversight of the reasonableness of tolls ... to be administratively burdensome [and] legally unproductive." 133 Cong. Rec. S778-02, 1987 WL 928634, at § 129. Legislation removing the Administrator and the burdensome administrative process initially would have repealed the sections of prior law providing that bridge tolls be just and reasonable. *Molinari v. DiCarlo*, 838 F. Supp. 718, 722-23 (E.D.N.Y. 1993). To avoid the result of having no standard for toll fares, however, Congress enacted 33 U.S.C. § 508 to ensure that tolls remained just and reasonable. "Toll increases on these deregulated facilities must be just and reasonable but will not be subject to review by DOT." H.R. Conf. Rep. 100-27, at 175 (1987), *reprinted in* 1987 U.S.C.C.A.N. 121, 159, 1987 WL 61451, at 159; S. Rep. 100-4, at 28 (1987), *reprinted in* 1987 U.S.C.C.A.N. 66, 92, 1987 WL 61450, at 92.

By maintaining the "just and reasonable" standard, Congress impliedly approved the previous system for challenging tolls, but eliminated the Administrator and the administrative process. In other words, Congress intended that parties aggrieved by unjust and unreasonable tolls would continue to challenge such tolls, albeit without the burdensome administrative procedure.

When the legislation was being discussed on the House floor, Mr. Molinari, a Republican Representative from Staten Island, explained that "a number of questions have been raised as to whether section 135, or the statement of managers accompanying section 135, changes in any way the 'just and reasonable' standard as it has been applied under existing laws and existing authorities." 133 Cong. Rec. H1635-02, 1987 WL 934316, at 4-5. Mr. Howard, the Democratic chairman of the Committee on Public Works and Transportation, addressed these concerns:

> Neither section 135 nor the statement of managers changes the
> standard to be applied in determining whether a toll increase is just
> and reasonable. The only thing that we have changed is the forum
> for making the determination. Toll increases will no longer be
> subject to review by the Department of Transportation; instead the
> decision will be left to the courts in the event of a challenge.

Id. *See also id.* (Mr. Hammerschmidt, ranking Republican on the Committee, concurred that section 135 had "not changed the just and reasonable standard in any way.")  These statements indicate that Congress did not intentionally preserve the "just and reasonable" standard only to have it be an empty requirement nobody could enforce.

Thus, the reinsertion of the "just and reasonable" standard in section 508 indicates the intent of Congress to preserve not only the "just and reasonable" standard, but also the preexisting form of toll review not involving the Administrator, *i.e.,* review by the federal courts.

### 3.  The private right of action issue was before the Second Circuit panel which decided *AAA v. PA* soon after passage of section 508

The context and circumstances under which the *AAA v. PA* case was commenced, litigated and decided are extremely relevant to whether there is a private right of action under the Highway Act.  Under the prior statutory scheme, AAA filed a complaint in March 1987 with the Federal Highway Administrator asserting that the Port Authority's 1987 toll increase violated the "just and reasonable" standard.  Congress enacted the Highway Act while the administrative proceeding was pending, repealing the prior statutory scheme but maintaining the "just and reasonable" standard in Section 508.  Consequently, in April 1987, AAA commenced an action in this Court challenging the 1987 toll increase because it violated the "just and reasonable" provision in Section 508 of the Highway Act.

In *AAA v. PA*, AAA argued in both the District Court and the Court of Appeals that there is a private right of action under Section 508.  *See* Decl., Ex. O at 5-6 ("Recently, Congress has

enacted the [Highway Act] and thereby transferred jurisdiction from the Federal Highway Administration to the federal courts in the first instance to access (sic) the just and reasonableness of bridge tolls."); Ex. P at 38 ("Before Congress passed the Highway Act, 33 U.S.C. § 508, which created subject matter jurisdiction in the 'courts' to determine the justness and reasonableness of tolls over bridges subject to the Bridge Act . . .").

Neither the parties, the District Court nor the Court of Appeals in *AAA v. PA*, which was litigated and decided contemporaneously with the passage of the Highway Act, questioned the fact that Congress intended a private right of action in Section 508. Significantly, in his dissenting opinion in *AAA v. PA*, Circuit Judge Van Graafeiland observed:

> When Congress transferred the exercise of these safeguards to the district court, it surely anticipated that the courts would not approve the Authority's claim of reasonableness without receiving and passing upon facts and figures to support it.

*AAA v. PA*, 887 F.2d at 428 (Van Graafeiland, J., dissenting). As Congress had anticipated, the 1987 action challenging the Port Authority toll increase was seamlessly transformed from an administrative proceeding to a plenary action in the federal court.

### 4. Congressional intent evidences a private right of action under 33 U.S.C. § 508

In *Cort v. Ash*, 422 U.S. 66, 78 (1975), the Supreme Court set forth four factors to consider in determining whether an implied right of action exists under a federal statute: (1) whether plaintiff is a class member intended to benefit from the statute, (2) whether there is any indication of legislative intent to create or deny a right of action, (3) whether a right of action is consistent with the legislative scheme, and (4) whether the cause of action is one traditionally relegated to state law. *Id.* at 78. Since *Cort*, however, the Supreme Court has emphasized that congressional intent is the primary determinant. *Touche Ross & Co. v. Redington*, 442 U.S. 560,

575-76 (1979); *Transamerica Mortgage Advisors. Inc. v. Lewis*, 444 U.S. 11, 24 (1979); *Health Care Plan. Inc. v. Aetna Life Ins. Co.*, 966 F.2d 738, 740 (2d Cir.1992).

The Supreme Court has explained, "When Congress acts in a statutory context in which an implied private remedy has already been recognized by the courts, ... Congress need not have intended to create a new remedy, since one already existed; the question is whether Congress intended to preserve the preexisting remedy." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 378-79 (1982). Prior to the enactment of the Highway Act, aggrieved parties had the right to challenge tolls first to the Administrator and then to the federal courts. Congress eliminated the first step, but it did not eliminate the second level of review, the courts. The legislative history and the contemporaneous decision addressing the merits of Section 508 in *AAA v. PA* demonstrate that Congress intended to preserve the portion of the preexisting remedy it did not explicitly eliminate. It would be illogical to conclude that Congress intended to preserve a standard that could not be enforced. This would have the same effect as having no "just and reasonable" standard, which Congress intentionally preserved.

While not deciding the private right of action issue, Judge Holwell questioned the statutory construction analysis of the Third Circuit in *American Trucking Ass'n. v. Delaware River Joint Toll Bridge Comm'n,* 458 F.3d 291 (3d Cir. 2006), which found no private right of action. Judge Holwell noted that in the Highway Act, Congress removed administrative review of tolls, but added a "just and reasonable" requirement. Without a means of enforcement, the "just and reasonable" language would be mere surplusage.

> [T]he Highway Act purposefully inserted a statutory requirement while removing all administrative mechanisms for its enforcement. The Supreme Court has found that such absence of administrative procedure is a "significant" indication of Congress's intent to create a private right of action. [*Gonzaga University v. Doe*, 536 U.S. 273, 280 (2002).]

*AAA v. PA*, 842 F. Supp. 2d at 679, n.5.

For these reasons, there is a private right of action under the Highway Act to enforce the statutory requirement that tolls be "just and reasonable."

## CONCLUSION

For all of the foregoing reasons, the Court should deny the Port Authority's motion for summary judgment.

Dated: New York, New York
       August 21, 2015

                             Respectfully Submitted,

                             FARRELL FRITZ, P.C.

By:    */s/ Kevin P. Mulry*
               Michael F. Fitzgerald
               Kevin P. Mulry
               *Attorneys for Plaintiffs*
               370 Lexington Avenue, Suite 800
               New York, New York 10017
               (212) 687-1230

Interwoven\4849978.1