UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------X

| | |
|---|---|
| AUTOMOBILE CLUB OF NEW YORK, INC. d/b/a AAA NEW YORK and AAA NORTH JERSEY, INC., | : : : 11 CIV 6746 (RKE) (HBP) : |
| Plaintiffs, | : **STATEMENT PURSUANT** : **TO LOCAL CIVIL RULE 56.1** |
| -against- | : |
| THE PORT AUTHORITY OF NEW YORK AND NEW JERSEY, | : : |
| Defendant. | : |

----------------------------------------------------------X

Pursuant to Rule 56.1 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York, and in opposition to the motion of defendant for summary judgment, plaintiffs AAA Northeast (formerly Automobile Club of New York d/b/a AAA New York) and AAA New Jersey, Inc., by their undersigned counsel, Farrell Fritz, P.C., respectfully submit the following response to the statement of defendant pursuant to Local Rule 56.1 and statement of additional material facts as to which there exist genuine issues to be tried.

## RESPONSE TO DEFENDANT'S LOCAL RULE 56.1 STATEMENT

1.      Plaintiff AAA Northeast is a not-for-profit corporation, organized under the laws of Delaware, having its principal place of business at 110 Royal Street, Providence, Rhode Island.

2.      Undisputed.

3.      Undisputed.

4.      AAA does not dispute that the quotation is the stated mission statement of the Port Authority; there is an issue of fact concerning whether the Port Authority has

1

carried out that mission and whether the Port Authority has exceeded the limits of that mission.  *See infra*.

5.      Undisputed.

6.      Undisputed.

7.      Undisputed.

8.      Undisputed.

9.      The factual statement is indefinite as to how bonds secure borrowed money and is therefore disputed.

10.      Undisputed.

11.      AAA does not dispute that the Port Authority is run as a pooled revenue agency; there are issues of fact concerning whether the pooling of revenue leads to the Commerce Clause and Highway Act violations at issue in this lawsuit.  *See infra*.

12.      Undisputed.

13.      Undisputed.

14.      Undisputed.

15.      Disputed.  Port Authority finances are not kept in a manner that allows it to track ITN revenues and follow those revenues to see how they are spent.  *See infra* ¶ 149-54.

16.      AAA does not dispute that the Port Authority is run as a pooled revenue agency, and draws on revenue from different Line Departments and revenue sources; there are issues of fact concerning whether the pooling of revenue and the use of ITN revenue for other Line Departments and expenses outside the Port Authority lead to the Commerce Clause and Highway Act violations at issue in this lawsuit.  *See infra*.

17.     AAA does not dispute that the Port Authority Line Departments share certain services; there are issues of fact concerning whether these expenses are properly allocated across the various Line Departments.  *See infra* ¶ 264-69.

18.     Disputed.  Bond proceeds sit in the capital fund, and those funds never flow into the either the general reserve fund or the consolidated bond reserve fund. Declaration of Kevin P. Mulry dated August 21, 2015 ("Decl."), Ex. A at 165:8 to 166:6.

19.     Undisputed.

20.     AAA does not dispute that pursuant to state statutes, the General Reserve Fund ("GRF") must be funded in an amount equal to 10% of the par value of all bonds and related undertakings issued and outstanding; there are issues of fact concerning whether that funding leads to the Commerce Clause and Highway Act violations at issue in this lawsuit, as state statutes may not require a manner of funding that is not permitted under the Constitution and federal law.

21.     AAA does not dispute that the Port Authority has defined "Surplus Revenues" in the manner described in paragraph 21.

22.     AAA does not dispute that the continued maintenance of the GRF is a factor relevant to Port Authority's credit rating.

23.     AAA does not dispute that the facilities of the TB&T Line Department, the PATH Line Department, and the ferries program together constitute the integrated transportation network ("ITN") as described in *Automobile Club of New York, Inc. v. Port Authority of New York and New Jersey*, 887 F.2d 417 (2d Cir. 1989).

24.     Undisputed.

25.     Undisputed.

26.     Undisputed.

27.     Undisputed.

28.     AAA does not dispute that the construction costs allocated for the Bayonne Bridge will in part cover the items described in paragraph 28; there are issues of fact concerning whether the primary reason for the raising of the Bayonne Bridge is for navigation, and the Port Commerce Line Department.  *See infra* Decl., Ex. A at 143:21 to 145:4; Ex. B at 152:23 to 153:12; Ex. M; Ex. N.

29.     Disputed.  The Fabiano Affidavit was not prepared until after the toll increases were approved.  The Fabiano Affidavit did not state that the toll increases would be used in part to fund the Pulaski Skyway and New Jersey state roads, but referred only to the "Lincoln Tunnel access roadway project," a term used to hide the fact that the Port Authority was paying for New Jersey state roads.  The only reference to the Pulaski Skyway and other New Jersey state roads was in the small print of a ten page listing of projects, which was not prepared until after the toll increases were approved and was specifically prepared to oppose the AAA lawsuit.  The Pulaski Skyway and New Jersey roads are not Port Authority facilities, are not within the statutory definition of approaches to the Lincoln Tunnel, and are outside the funding authority of the Port Authority.  *See infra* ¶ 157-81, 187-210.

30.     Disputed.  The exhibit in support is a bond offering and not a public notice.  The Pulaski Skyway and New Jersey roads are not Port Authority facilities, are not within the statutory definition of approaches to the Lincoln Tunnel, and are outside the funding authority of the Port Authority.  The Port Authority does not have statutory authority to fund New Jersey state roads on the ground that it promotes "efficient

4

transportation access and egress for goods and people" in the absence of statutory authority.  *See See infra* ¶ 157-81, 187-210.

31.     AAA does not dispute that the Port Authority allocated $1.8 billion to pay for the Pulaski Skyway and New Jersey state roads, and close to $1 billion to a Capital Infrastructure Fund ("CIF") reserve fund that CFO Fabiano called a "placeholder."  There are issues of fact concerning whether those allocation lead to the Commerce Clause and Highway Act violations at issue in this lawsuit.  The Pulaski Skyway and New Jersey roads are not Port Authority facilities, are not within the statutory definition of approaches to the Lincoln Tunnel, and are outside the funding authority of the Port Authority.  The Commissioners were not told about any of these expenditure when they were presented with a proposed toll increase for approval.  *See See infra* ¶ 187-224.

32.     Undisputed.

33.     Undisputed.

34.     Undisputed.

35.     AAA does not dispute that the ITN facilities are old and are not designed to handle the current volume and weight of traffic; there are issues of fact concerning whether this circumstance is due to the Port Authority deferral of capital spending on the ITN while it was spending billions of dollars on the World Trade Center.  *See* ¶ 128-47.

36.     AAA does not dispute that the ITN facilities require substantial capital expenditures in order to continue to be maintained in a state of good repair; there are issues of fact concerning whether this circumstance is due to the Port Authority deferral of capital spending on the ITN while it was spending billions of dollars on the World Trade Center.  *See* ¶ 128-47.

37.    Disputed.  Capital paid with cash is generally money that has gone through the consolidated bond reserve fund.  Decl., Ex. A at 164:16 to 165:7.

38.    AAA does not dispute that the method described in paragraph 38 was used by the Port Authority in preparing the Fabiano Affidavit and its attachments, after the toll increases were approved and solely in response to the AAA lawsuit.  It is undisputed (or there at least exist issues of fact) that this method was not used at the time of the approval of the 2011 toll increases; that this method had not been used at the Port Authority prior to the filing of this lawsuit; and that this method was developed specifically to construct an opposition to AAA's application for a preliminary injunction.  *See* ¶ 157-81.

39.    AAA does not dispute that the method described in paragraph 39 was used by the Port Authority in preparing the Fabiano Affidavit and its attachments, after the toll increases were approved and solely in response to the AAA lawsuit.  It is undisputed (or there at least exist issues of fact) that this method was not used at the time of the approval of the 2011 toll increases; that this method had not been used at the Port Authority prior to the filing of this lawsuit; and that this method was developed specifically to construct an opposition to AAA's application for a preliminary injunction.  *See* ¶ 157-81.

40.    AAA does not dispute that the method described in paragraph 40 was used by the Port Authority in preparing the Fabiano Affidavit and its attachments, after the toll increases were approved and solely in response to the AAA lawsuit.  It is undisputed (or there at least exist issues of fact) that this method was not used at the time of the approval of the 2011 toll increases; that this method had not been used at the Port Authority prior to the filing of this lawsuit; and that this method was developed specifically to construct an opposition to AAA's application for a preliminary injunction.  *See* ¶ 157-81.

41.     AAA does not dispute that the method described in paragraph 41 was used by the Port Authority in preparing the Fabiano Affidavit and its attachments, after the toll increases were approved and solely in response to the AAA lawsuit.  It is undisputed (or there at least exist issues of fact) that this method was not used at the time of the approval of the 2011 toll increases; that this method had not been used at the Port Authority prior to the filing of this lawsuit; and that this method was developed specifically to construct an opposition to AAA's application for a preliminary injunction.  *See* ¶ 157-81.

42.     AAA does not dispute that under the Port Authority's method of calculation, there was a deficit.

43.     AAA does not dispute that under the Port Authority's method of calculation, there was a deficit.

44.     AAA does not dispute the contribution amount under the Port Authority's method of calculation.

45.     AAA does not dispute that under the Port Authority's method of calculation, there was a deficit.

46.     AAA does not dispute that the Port Authority ITN preliminary capital plan, which was prepared after the toll increases were approved and solely in response to the AAA lawsuit, made certain projections and assumptions.   It is undisputed (or there at least exist issues of fact) that the Port Authority ITN preliminary capital plan was not presented to the Commissioners at the time of approval of the toll increases, was not a document prepared in the ordinary course of the Port Authority's business, was developed specifically to construct an opposition to AAA's application for a preliminary injunction, and includes as capital expenses billions of dollars that are not authorized Port

Authority or ITN expenditures, are primarily for navigation rather than the ITN, or are amounts unconnected to any ITN project that unnecessarily inflate the capital plan. *See* ¶ 157-224.

47.     AAA does not dispute that the Port Authority ITN preliminary capital plan, which was prepared after the toll increases were approved and solely in response to the AAA lawsuit, made certain projections and assumptions.   It is undisputed (or there at least exist issues of fact) that the Port Authority ITN preliminary capital plan was not presented to the Commissioners at the time of approval of the toll increases, was not a document prepared in the ordinary course of the Port Authority's business, was developed specifically to construct an opposition to AAA's application for a preliminary injunction, and includes as capital expenses billions of dollars that are not authorized Port Authority or ITN expenditures, are primarily for navigation rather than the ITN, or are amounts unconnected to any ITN project that unnecessarily inflate the capital plan. *See* ¶ 157-224.

48.     AAA does not dispute that the Port Authority ITN preliminary capital plan, which was prepared after the toll increases were approved and solely in response to the AAA lawsuit, made certain projections and assumptions.   It is undisputed (or there at least exist issues of fact) that the Port Authority ITN preliminary capital plan was not presented to the Commissioners at the time of approval of the toll increases, was not a document prepared in the ordinary course of the Port Authority's business, was developed specifically to construct an opposition to AAA's application for a preliminary injunction, and includes as capital expenses billions of dollars that are not authorized Port Authority or ITN expenditures, are primarily for navigation rather than the ITN, or are

amounts unconnected to any ITN project that unnecessarily inflate the capital plan. *See* ¶ 157-224.

49.     AAA does not dispute that the Port Authority ITN preliminary capital plan, which was prepared after the toll increases were approved and solely in response to the AAA lawsuit, made certain projections and assumptions.   It is undisputed (or there at least exist issues of fact) that the Port Authority ITN preliminary capital plan was not presented to the Commissioners at the time of approval of the toll increases, was not a document prepared in the ordinary course of the Port Authority's business, was developed specifically to construct an opposition to AAA's application for a preliminary injunction, and includes as capital expenses billions of dollars that are not authorized Port Authority or ITN expenditures, are primarily for navigation rather than the ITN, or are amounts unconnected to any ITN project that unnecessarily inflate the capital plan. *See* ¶ 157-224.

50.     AAA does not dispute that the Port Authority ITN preliminary capital plan, which was prepared after the toll increases were approved and solely in response to the AAA lawsuit, made certain projections and assumptions.   It is undisputed (or there at least exist issues of fact) that the Port Authority ITN preliminary capital plan was not presented to the Commissioners at the time of approval of the toll increases, was not a document prepared in the ordinary course of the Port Authority's business, was developed specifically to construct an opposition to AAA's application for a preliminary injunction, and includes as capital expenses billions of dollars that are not authorized Port Authority or ITN expenditures, are primarily for navigation rather than the ITN, or are

amounts unconnected to any ITN project that unnecessarily inflate the capital plan. *See* ¶ 157-224.

51.    AAA does not dispute that the Port Authority ITN preliminary capital plan, which was prepared after the toll increases were approved and solely in response to the AAA lawsuit, made certain projections and assumptions.   It is undisputed (or there at least exist issues of fact) that the Port Authority ITN preliminary capital plan was not presented to the Commissioners at the time of approval of the toll increases, was not a document prepared in the ordinary course of the Port Authority's business, was developed specifically to construct an opposition to AAA's application for a preliminary injunction, and includes as capital expenses billions of dollars that are not authorized Port Authority or ITN expenditures, are primarily for navigation rather than the ITN, or are amounts unconnected to any ITN project that unnecessarily inflate the capital plan. *See* ¶ 157-224.

52.    AAA does not dispute that the Port Authority ITN preliminary capital plan, which was prepared after the toll increases were approved and solely in response to the AAA lawsuit, made certain projections and assumptions.   It is undisputed (or there at least exist issues of fact) that the Port Authority ITN preliminary capital plan was not presented to the Commissioners at the time of approval of the toll increases, was not a document prepared in the ordinary course of the Port Authority's business, was developed specifically to construct an opposition to AAA's application for a preliminary injunction, and includes as capital expenses billions of dollars that are not authorized Port Authority or ITN expenditures, are primarily for navigation rather than the ITN, or are

amounts unconnected to any ITN project that unnecessarily inflate the capital plan. *See* ¶ 157-224.

53.     AAA does not dispute that the Port Authority ITN preliminary capital plan, which was prepared after the toll increases were approved and solely in response to the AAA lawsuit, made certain projections and assumptions.   It is undisputed (or there at least exist issues of fact) that the Port Authority ITN preliminary capital plan was not presented to the Commissioners at the time of approval of the toll increases, was not a document prepared in the ordinary course of the Port Authority's business, was developed specifically to construct an opposition to AAA's application for a preliminary injunction, and includes as capital expenses billions of dollars that are not authorized Port Authority or ITN expenditures, are primarily for navigation rather than the ITN, or are amounts unconnected to any ITN project that unnecessarily inflate the capital plan. *See* ¶ 157-224.

54.     AAA does not dispute that the Port Authority ITN preliminary capital plan, which was prepared after the toll increases were approved and solely in response to the AAA lawsuit, made certain projections and assumptions.   It is undisputed (or there at least exist issues of fact) that the Port Authority ITN preliminary capital plan was not presented to the Commissioners at the time of approval of the toll increases, was not a document prepared in the ordinary course of the Port Authority's business, was developed specifically to construct an opposition to AAA's application for a preliminary injunction, and includes as capital expenses billions of dollars that are not authorized Port Authority or ITN expenditures, are primarily for navigation rather than the ITN, or are amounts unconnected to any ITN project that unnecessarily inflate the capital plan.

*See* ¶ 157-224.

55.     AAA does not dispute that the Port Authority ITN preliminary capital plan, which was prepared after the toll increases were approved and solely in response to the AAA lawsuit, made certain projections and assumptions.   It is undisputed (or there at least exist issues of fact) that the Port Authority ITN preliminary capital plan was not presented to the Commissioners at the time of approval of the toll increases, was not a document prepared in the ordinary course of the Port Authority's business, was developed specifically to construct an opposition to AAA's application for a preliminary injunction, and includes as capital expenses billions of dollars that are not authorized Port Authority or ITN expenditures, are primarily for navigation rather than the ITN, or are amounts unconnected to any ITN project that unnecessarily inflate the capital plan. *See* ¶ 157-224.

56.     AAA does not dispute that the Port Authority ITN preliminary capital plan, which was prepared after the toll increases were approved and solely in response to the AAA lawsuit, made certain projections and assumptions.   AAA does not dispute that the Port Authority financial statements reported the net revenues referenced, but disputes that such information is material or relevant to the issues in this case. *See* ¶ 157-81.

57.     AAA does not dispute that the Port Authority ITN preliminary capital plan, which was prepared after the toll increases were approved and solely in response to the AAA lawsuit, made certain projections and assumptions.   AAA does not dispute that the Port Authority financial statements reported the net revenues referenced, but disputes that such information is material or relevant to the issues in this case. *See* ¶ 157-81.

58.     AAA does not dispute that the Port Authority ITN preliminary capital plan, which was prepared after the toll increases were approved and solely in response to the AAA lawsuit, made certain projections and assumptions.   AAA does not dispute that the Port Authority financial statements reported the net revenues referenced, but disputes that such information is material or relevant to the issues in this case.  *See* ¶ 157-81.

59.     Undisputed.

60.     AAA does not dispute that the Port Authority August 5, 2011 press release, in part, used the phrase "unprecedented challenges" and announced a two-phase toll and fare increase.

61.     AAA does not dispute that the Port Authority August 5, 2011 press release, in part, described the proposed toll and fare increase in the manner described in paragraph 61.

62.     Undisputed.

63.     AAA does not dispute that ten meetings were held with respect to the 2011 toll increases, all on the same day; there are issues of material fact as to whether the locations were convenient and whether the meetings afforded motorists with a fair opportunity to understand and question the toll increases.

64.     Undisputed.

65.     AAA does not dispute that on August 18, 2011, Governors Andrew Cuomo of New York and Chris Christie of New Jersey issued a joint letter (the "Joint Letter") in support of a toll and fair increase.  It is undisputed (or there at least exist issues of fact) that the Joint Letter did not state anything with respect to the ITN,

referenced the needs of the entire Port Authority, and specifically stated that "this proposal will allow for the completion of the World Trade Center."  Decl., Ex. G.

66.     AAA does not dispute that the Joint Letter, in part, described the proposed toll and fare increase in the manner described in paragraph 66.  Decl., Ex. G.

67.     Undisputed.

68.     AAA does not dispute that the August 19, 2011 presentations to the Commissioners included, in part, the statements in paragraph 68.  There are issues of fact concerning whether this circumstance is due to the Port Authority deferral of capital spending on the ITN while it was spending billions of dollars on the World Trade Center. *See* ¶ 128-47.

69.     Undisputed.

70.     Undisputed.

71.     AAA does not dispute that Governors Christie and Cuomo charged the Board of Commissioners to undertake a review of the Port Authority, but disputes that the reviews by Navigant and Rothschild were "audits."  Declaration of Richard W. Mark dated January 6, 2015 ("Mark Decl."), Ex. 10 at 51; Ex. 11 at 117; Ex. 12 at AAA0002145.

72.     AAA does not dispute that Governors Christie and Cuomo charged the Board of Commissioners to undertake a review of the Port Authority, but disputes that the reviews by Navigant and Rothschild were "audits."  Mark Decl., Ex. 10 at 51; Ex. 11 at 117; Ex. 12 at AAA0002145.

73.     Undisputed.

74.     Undisputed.

75.     Disputed.  The Navigant Phase II Report is inadmissible hearsay and may

not be relied upon as evidentiary support to provide conclusions based upon its

qualifications and disclaimers, including the following:

    a.   "Due to time and other limitations, this report has been prepared utilizing limited due diligence."

    b.   "[This report] is based on assumptions, forecasts and estimates made by Management of the Port Authority, information provided to Navigant by Port Authority personnel, information provided by industry sources, and, in some cases, assumptions made by Navigant, which may not have been reviewed with Port Authority Management."

    c.   "Any historical financial information or other information given to, and subsequently presented by Navigant may not be reliable."

    d.   "Any financial statements or other data contained herein, including any forecasts, are the financial statements and forecasts of Management, not Navigant."

    e.   "Navigant has not subjected the information contained herein to an examination in accordance with generally accepted auditing or attestation standards or the statements or standards for prospective financial information issued by the AICPA".

    f.   "Further, the work involved did not include a detailed review of any transactions, and cannot be expected to identify errors, irregularities or illegal acts, including fraud or defalcations that may exist."

    g.   "Accordingly, Navigant cannot and does not express an opinion or any other form of assurance on the financial information and does not assume the accuracy or correctness of the historical and forecasted financial data, information and assessments upon which this report is presented."

    h.   "The source of all financial information or other information relating to the Port Authority contained in the tables, figures and body of this report was information provided to Navigant by Port Authority personnel."

    i.   "Any projections of results or benefits set forth in the attached materials are necessarily, by their nature, inherently uncertain, and

15

no warranty or representations, express or implied, is given that the results or benefits set forth in such projections will be achieved or realized."

Mark Decl., Ex. 11 at 117.

76.    Disputed.  The Navigant Phase II Report is inadmissible hearsay and may not be relied upon as evidentiary support to provide conclusions based upon its qualifications and disclaimers, including the following:

a.    "Due to time and other limitations, this report has been prepared utilizing limited due diligence."

b.    "[This report] is based on assumptions, forecasts and estimates made by Management of the Port Authority, information provided to Navigant by Port Authority personnel, information provided by industry sources, and, in some cases, assumptions made by Navigant, which may not have been reviewed with Port Authority Management."

c.    "Any historical financial information or other information given to, and subsequently presented by Navigant may not be reliable."

d.    "Any financial statements or other data contained herein, including any forecasts, are the financial statements and forecasts of Management, not Navigant."

e.    "Navigant has not subjected the information contained herein to an examination in accordance with generally accepted auditing or attestation standards or the statements or standards for prospective financial information issued by the AICPA".

f.    "Further, the work involved did not include a detailed review of any transactions, and cannot be expected to identify errors, irregularities or illegal acts, including fraud or defalcations that may exist."

g.    "Accordingly, Navigant cannot and does not express an opinion or any other form of assurance on the financial information and does not assume the accuracy or correctness of the historical and forecasted financial data, information and assessments upon which this report is presented."

  h. "The source of all financial information or other information relating to the Port Authority contained in the tables, figures and body of this report was information provided to Navigant by Port Authority personnel."

  i. "Any projections of results or benefits set forth in the attached materials are necessarily, by their nature, inherently uncertain, and no warranty or representations, express or implied, is given that the results or benefits set forth in such projections will be achieved or realized."

Mark Decl., Ex. 11 at 117.

  77. Disputed.  The Navigant Phase II Report is inadmissible hearsay and may not be relied upon as evidentiary support to provide conclusions based upon its qualifications and disclaimers, including the following:

  a. "Due to time and other limitations, this report has been prepared utilizing limited due diligence."

  b. "[This report] is based on assumptions, forecasts and estimates made by Management of the Port Authority, information provided to Navigant by Port Authority personnel, information provided by industry sources, and, in some cases, assumptions made by Navigant, which may not have been reviewed with Port Authority Management."

  c. "Any historical financial information or other information given to, and subsequently presented by Navigant may not be reliable."

  d. "Any financial statements or other data contained herein, including any forecasts, are the financial statements and forecasts of Management, not Navigant."

  e. "Navigant has not subjected the information contained herein to an examination in accordance with generally accepted auditing or attestation standards or the statements or standards for prospective financial information issued by the AICPA".

  f. "Further, the work involved did not include a detailed review of any transactions, and cannot be expected to identify errors, irregularities or illegal acts, including fraud or defalcations that may exist."

17

g.   "Accordingly, Navigant cannot and does not express an opinion or any other form of assurance on the financial information and does not assume the accuracy or correctness of the historical and forecasted financial data, information and assessments upon which this report is presented."

h.   "The source of all financial information or other information relating to the Port Authority contained in the tables, figures and body of this report was information provided to Navigant by Port Authority personnel."

i.   "Any projections of results or benefits set forth in the attached materials are necessarily, by their nature, inherently uncertain, and no warranty or representations, express or implied, is given that the results or benefits set forth in such projections will be achieved or realized."

Mark Decl., Ex. 11 at 117.

78.   Undisputed.

79.   Disputed.  The Rothschild Report is inadmissible hearsay and may not be relied upon as evidentiary support to provide conclusions based upon its qualifications and disclaimers, including the following:

a.   "Rothschild has not assumed any responsibility for independent verification of any of the information contained herein including, but not limited to, any forecasts or projections set forth herein."

b.   "Rothschild assumes no obligation to update or to correct any inaccuracies which may become apparent in this material and the analyses contained herein are not and do not purport to be appraisals of the assets or business of the Company."

Mark Decl., Ex. 12 at AAA0002145.

18

80.     Disputed.  The Rothschild Report is inadmissible hearsay and may not be relied upon as evidentiary support to provide conclusions based upon its qualifications and disclaimers, including the following:

> a. "Rothschild has not assumed any responsibility for independent verification of any of the information contained herein including, but not limited to, any forecasts or projections set forth herein."
>
> b. "Rothschild assumes no obligation to update or to correct any inaccuracies which may become apparent in this material and the analyses contained herein are not and do not purport to be appraisals of the assets or business of the Company."

Mark Decl., Ex. 12 at AAA0002145.

81.     Undisputed, but AAA disputes that such information is material or relevant to the issues in this case.

82.     Undisputed, but AAA disputes that such information is material or relevant to the issues in this case.

## STATEMENT OF ADDITIONAL MATERIAL FACTS AS TO WHICH THERE EXIST GENUINE ISSUES TO BE TRIED

### The 1975 Bridge and Tunnel Toll Increases

83.     The Port's Authority's reason for the 1975 bridge and tunnel toll increases was the spending on capital improvement for mass transportation projects. *Automobile Club of New York v. Cox*, 592 F.2d 658, 662 (2d Cir. 1979).

84.     The Port's Authority did not request approval of the 1975 bridge and tunnel toll increases on the basis of spending for anything other than capital improvement

for mass transportation projects.  *Automobile Club of New York v. Cox*, 592 F.2d 658, 662 (2d Cir. 1979).

85.     The Port Authority and the Court used a rate base analysis in the litigation concerning 1975 bridge and tunnel toll increases.  *Automobile Club of New York v. Cox*, 592 F.2d 658, 663-64, 668-69 (2d Cir. 1979).

86.     The Port Authority and the Court did not use a cash flow analysis in the litigation concerning the 1975 bridge and tunnel toll increases.  *Automobile Club of New York v. Cox*, 592 F.2d 658, 663-64, 668-69 (2d Cir. 1979).

**The 1987 Bridge and Tunnel Toll Increases**

87.     The Port's Authority's reason for the 1987 bridge and tunnel toll increases was the spending of $1.5 billion for a capital improvement program for the ITN.  *Automobile Club of New York, Inc. v. Port Authority of New York and New Jersey*, 887 F.2d 417, 418-19 (2d Cir. 1989); *Automobile Club of New York, Inc. v. Port Authority of New York and New Jersey*, 706 F. Supp. 2d 264, 267-68, 281-82 (S.D.N.Y. 1989).

88.     The Port's Authority did not request approval of the 1987 bridge and tunnel toll increases on the basis of spending for anything other than the $1.5 billion capital improvement program for the ITN.  *Automobile Club of New York, Inc. v. Port Authority of New York and New Jersey*, 887 F.2d 417, 418-19 (2d Cir. 1989); *Automobile Club of New York, Inc. v. Port Authority of New York and New Jersey*, 706 F. Supp. 2d 264, 267-68, 281-82 (S.D.N.Y. 1989).

89.     Judge Pollak received evidence and heard testimony during a two-day bench trial with respect to the 1987 bridge and tunnel toll increase.  *Automobile Club of New York, Inc. v. Port Authority of New York and New Jersey*, 887 F.2d 417, 419 (2d Cir.

1989); *Automobile Club of New York, Inc. v. Port Authority of New York and New Jersey*, 706 F. Supp. 2d 264, 266 (S.D.N.Y. 1989).

90.     The Port Authority and the Court used a rate base analysis in the litigation concerning the 1987 bridge and tunnel toll increases. *Automobile Club of New York, Inc. v. Port Authority of New York and New Jersey*, 887 F.2d 417, 419-20 (2d Cir. 1989); *Automobile Club of New York, Inc. v. Port Authority of New York and New Jersey*, 706 F. Supp. 2d 264, 266, 270, 274-77, 280-81, 283-84 (S.D.N.Y. 1989).

91.     The Port Authority and the Court did not use a cash flow analysis in the litigation concerning the 1987 bridge and tunnel toll increases. *Automobile Club of New York, Inc. v. Port Authority of New York and New Jersey*, 887 F.2d 417, 419-20 (2d Cir. 1989); *Automobile Club of New York, Inc. v. Port Authority of New York and New Jersey*, 706 F. Supp. 2d 264, 266, 270, 274-77, 280-81, 283-84 (S.D.N.Y. 1989).

92.     Facilities that the Port Authority does not own or operate are not candidates for inclusion in its rate base. *Automobile Club of New York, Inc. v. Port Authority of New York and New Jersey*, 887 F.2d 417, 422 n. 5 (2d Cir. 1989).

**The Port Authority Did Not Have An Approved Capital Plan in 2011**

93.     Prior to 2011, there was a ten year capital plan that was prepared in 2006, and then it was updated in 2007. Declaration of Kevin P. Mulry dated August 21, 2015 ("Decl."), Ex. B at 17:12-17.

94.     From 2007 through 2011, the Port Authority was working off the 2007 capital plan. Decl., Ex. B at 17:18-21.

95.     The Port Authority did not formulate a new ten year capital plan between 2007 and 2011. Decl., Ex. B at 17:22 to 18:5.

96.     The Port Authority did not have an approved capital plan in 2011, as a Port Authority capital plan had not been approved by the Port Authority Board of Commissioners since 2007.  Decl., Ex. B at 20:2-14.

97.     In 2011, the 2007 Port Authority capital plan was the most current capital plan that had been approved by the Board of Commissioners.  Decl., Ex. B at 22:21 to 23:2.

98.     The 2011 preliminary capital plan covered the period from 2011 through 2020, but that plan had not been approved by the Board of Commissioners.  Decl., Ex. B at 21:20 to 22:5.

99.     CFO Fabiano stated that there was not an officially adopted  $25.1 billion capital plan for the Port Authority in August 2011.  Decl., Ex. A at 137:23 to 138:21; Ex. I at 6; Pl. Ex. J at 8.

**Facts Leading Up To The 2011 Toll Increases**

**The Toll Increase Planning Process Did Not Focus On The ITN,**
**But Instead Looked To The Needs Of The Entire Port Authority**

100.     "Capital capacity" is a term describing the Port Authority's decision on how much it can afford to spend on capital over a period of time and still meet bond covenants and maintain its credit rating.  Decl., Ex. A at 11:16 to 12:3.

101.     In looking at capital capacity, the Port Authority does not look at each of the line departments, because the Port Authority is consolidated.  Decl., Ex. A at 12:4-9.

102.     In determining capital capacity, the Port Authority looks at capital capacity for the entire agency, and not the separate line departments.  Decl., Ex. A at 12:10-14; 19:13-17.

103.   With respect to the 2011 toll and fare increases, the Port Authority looked at what additional revenues provided additional capacity across all business, in a corporate level.  Decl., Ex. A at 19:24 to 20:22.

104.   In determining whether a toll increase was needed, CFO Fabiano was looking at the financial projections and data for the entire Port Authority, and not the line departments that comprise the ITN in isolation. Decl., Ex. A at 41:18 to 42:5.

105.   When Ms. Chiricolo and her staff performed analyses on various scenarios that took into account a potential toll increase, they were looking at the financial projections of all revenues of the Port Authority.  Decl., Ex. B at 53:2-25.

106.   The Port Authority does not prepare a financial forecast for the ITN separate from the forecast for the entire agency.  Decl., Ex. B at 157:20 to 158:3.

107.   The analysis of the need for revenue enhancement included the cost of the World Trade Center, because the ratios are built on the entire Port Authority and not just on individual facilities or departments.  Decl., Ex. A at 84:22 to 85:11.

**The Toll Increases Were Announced On August 5, 2011, And Were
Presented for Approval Just Two Weeks Later, on August 19, 2011**

108.   On August 5, 2011, Executive Director Ward and Deputy Executive Director Baroni recommended to the Commissioners "an immediate toll and fare increase in order to prevent a devastating impact to the region's transportation infrastructure and economic health.  Decl., Ex. C.

109.   Ward and Baroni told the Commissioners that as a result of the agency's financial condition, "the [Port Authority] will not have the financial ability to access the capital markets in order to complete current projects in the capital plan."  Decl., Ex. C.

110.    Ward and Baroni told the Commissioners that "a lack of a toll and fare increase and inability to complete the capital plan would likely result in adverse rating agency actions that could lead to a downgrade of the agency's bond ratings."  Decl., Ex. C.

111.    Ward and Baroni advised the Commissioners that without a toll and fare increase, "construction at the World Trade Center site would be affected later this fall." Decl., Ex. C.

112.    The memorandum from Ward and Baroni described the causes for the urgent need for a toll and fare increase:  "The 2008 economic recession which causes a severe reduction in Port Authority income projections; the cost of rebuilding the World Trade Center site, which is now more than $11 billion; and more than $6 billion in security-related expenses since 9/11, which have nearly tripled from pre-9/11 annual budgets."  Decl., Ex. C.

113.    A press release on August 5, 2011 stated that the toll increases were necessary "to fully fund a new $33 billion ten-year capital plan, which will generate 167,000 jobs."  Decl., Ex. D.

114.    According to CFO Fabiano, the $33 billion capital plan referred to in the August 5 press release was not an actual plan.  That was the amount of capacity that would be present with a toll increase as proposed, without the specifics of the projects that make up the $33 billion.  Decl., Ex. A at 100:8 to 101:2.

115.    There was no official listing of projects to comprise a ten year plan in August 2011.  Decl., Ex. A at 101:3-18.

24

116.   $33 billion was the amount of capacity in the ten year window.  Decl., Ex. A at 102:11-24.

117.   The $33 billion capital plan would have taken into account the full cost to complete projects, which could have been beyond the ten year period.  Decl., Ex. B at 70:18-25.

118.   When the proposed toll increase was announced on August 5, 2011, the Port Authority also announced a $33 billion capital plan for the next ten years.  Decl., Ex. B at 110:21 to 111:5.

119.   The $33 billion in that August 5 ten year plan went beyond the ten year period.  Decl., Ex. B at 111:12-18.  The $33 billion was the total cost for the projects in the ten year plan, as well as the cost to complete those projects if they extended beyond the ten years.  Id. at 114:6-17.

120.   Ten meetings were held by the Port Authority with respect to the 2011 toll increases, all on the same day, August 16, 2011.  There are issues of material fact as to whether the locations were convenient and whether the meetings afforded motorists with a fair opportunity to understand and question the toll increases.

121.   On August 18, 2011, Governors Chris Christie of New Jersey and Andrew Cuomo of New York sent a Letter to Chairman Samson and Vice Chairman Grayson, proposing a revised toll increase.  Decl., Ex. G.

122.   The Governors' Letter stated that Commissioners had "identified $5 billion in savings that can be immediately achieved within the capital plan."  Decl., Ex. G.

123.    The Governors' Letter stated that, among other things, the toll increases would "allow for the completion of the World Trade Center."  Decl., Ex. G.

124.    Between the August 5 announcement and the August 19 vote on the proposed toll increase, the size of the ten year capital plan went from $33 billion to $25 billion.  Decl., Ex. B at 111:12-18.

125.    The $33 billion was the cost to complete the projects that were in the ten year plan, even if the costs extended beyond ten years.  The $25 billion was the spending during the ten year period.  Decl., Ex. B at 111:19 to 112:8.

126.    The reference to $25.1 billion in critical infrastructure projects is consistent with the number for the entire Port Authority.  Decl., Ex. B at 122:20-25.

127.    The proposed toll increases were presented to the Commissioners for approval on August 19, 2011, just two weeks after they were announced.

**The Reasons Given To The Commissioners For Approving The 2011 Toll Increases**

128.    CFO Fabiano made a presentation to the Board of Commissioners at their executive session and public session meetings on August 19, 2011.  Decl., Ex. A at 116:3-6.

129.    At the August 19, 2011 executive session and public hearing, CFO Fabiano was giving the Commissioners a financial justification for the toll and fare increase.  Decl., Ex. A at 123:6-9.

130.    CFO Fabiano was also presenting this financial justification at the public hearing so that the public would be aware of it.  Decl., Ex. A at 123:10-15.

131.     The August 19, 2011 presentation was an important one, and CFO Fabiano believed he gave the Commissioners the full story based on his perception of the necessity and the need for the toll and fare increase.  Decl., Ex. A at 123:16 to 124:14.

132.     In August 2011, the cost for rebuilding the World Trade Center was approximately $11 billion.  Decl., Ex. A at 126:5-10.

133.     In Pl. Ex. 11 and 12, the writing below the box on each page is CFO Fabiano's talking points for the slide.  Decl., Ex. A at 128:19 to 129:17.

134.     CFO Fabiano stated in executive and public sessions that the Port Authority is investing over $11 billion to rebuild the World Trade Center.  Decl., Exs. I & J.

135.     CFO Fabiano stated in executive and public sessions that the Port Authority had re-prioritized and deferred millions of dollars in program capital spending. Decl., Ex. I, Exs. I & J.

136.     Significant amounts of Port Authority funding were being spent on the World Trade Center when projects such as the George Washington Bridge, the Lincoln Tunnel and the Goethals Bridge were being deferred.  Decl., Ex. A at 52:14-17.

137.     If the funding necessary for the World Trade Center increased, the Port Authority would have to push out other projects in the capital plan to accommodate any additional increases to the World Trade Center budget.  Decl., Ex. A at 145:19 to 147:16; Ex. H at AAA 202.

138.     CFO Fabiano told the Commissioners in executive and public session that the capital plan would allow the Port Authority to invest $25.1 billion in critical infrastructure projects.  Decl., Ex. H at AAA201; Ex.  I at AAA210;  Ex. J at AAA224.

139.   As part of his presentation on the toll and fare increase and the capital plan, CFO Fabiano told the Commissioners that the Port Authority would complete the rebuilding of the World Trade Center.  Decl., Ex. I at AAA215; Ex. J at AAA230.

140.   The reference to $25.1 billion of capital capacity over the next ten years was a reference to the total agency capacity to spend in a ten year window.  Decl., Ex. A at 130:3-13; Ex. I at 6; Ex. J at 8.

141.   CFO Fabiano did not present the Commissioners with the amount of capital investment that would be expended within the ITN at the August 19 hearing. Decl., Ex. A at 136:13 to 137:2.

142.   When CFO Fabiano said that "This capital plan will also benefit the region by generating 131,000 jobs," he was referring to jobs generated by projects for the entire Port Authority.  Decl., Ex. A at 142:3-22; Ex. I at 6; Ex. J at 8.

143.   CFO Fabiano never gave the Commissioners an estimate of jobs that would be created by ITN projects.  Decl., Ex. A at 142:23 to 144:2.

144.   CFO Fabiano's reference to "$7.6 billion in wages and $30 billion in sale" was with respect to projects for the entire Port Authority, and he did not give an estimate of wages or sales to be generated by ITN projects.  Decl., Ex. A at 143:3-15; Ex. I at 6; Ex. J at 8.

145.   The Commissioners were told that in the event spending on the World Trade Center rose above the estimated $11.3 billion, the Port Authority "would need to push out other projects in the Capital plan to accommodate any additional increases to the WTC budget."  Decl., Ex. H at AAA 202.

146.    A consumer price index increase provision from the 2007 toll increase is still in effect.  Decl., Ex. A at 244:14 to 246:13.

147.    CFO Fabiano did not advise the Commissioners in August 2011 of a projected automatic toll increase in 2018 or 2019 based on the CPI.  Decl., Ex. A at 247:2-14.

**The 2011 Toll Increases Were Approved by the Commissioners on August 11, 2011**

148.    The Commissioners approved the toll increases on August 19, 2011.

**Port Authority Finances Are Not Kept In A Manner That Allows It To Track ITN Revenues And Follow Those Revenues To See How They Are Spent**

149.    The Port Authority does not budget or report in a manner that allows it to track ITN revenues and follow them to see how they are spent.  Decl., Ex. B at 43:23 to 45:2.

150.    The Port Authority does not record revenues in a manner that would enable it to determine if money transferred to the reserve funds could be traced to an ITN revenue.  Decl., Ex. B at 46:16-25.

151.    The Port Authority cannot take all revenues attributable to the ITN on an earned basis, and then follow those revenues to see how they were spent within the Port Authority.  Decl., Ex. A at 28:21 to 29:9.

152.    Revenues from all line departments of the Port Authority are rolled up eventually to one main bank account.  Decl., Ex. A at 29:10 to 30:18.

153.    The Port Authority could not direct 100 percent of PATH revenues into PATH.  Decl., Ex. A at 31:4-6.  The Port Authority does not have a way to direct revenue from PATH into PATH projects.  *Id*. at 104:2-17.

154.    While the August 5 press release states that "The Port Authority also plans to direct 100 percent of the revenue from the proposed PATH fare increase back into the PATH system," that is not a direct link of every dollar being tracked directly back into PATH.  Decl., Ex. A at 103:6-25.

**AAA Filed This Lawsuit, Challenging The 2011 Toll Increases
Under The Highway Act And The Dormant Commerce Clause**

155.    AAA filed this lawsuit on September 27, 2011.  Doc. No. 1.

156.    The AAA lawsuit challenged the 2011 toll increases as violative of the Commerce Clause and the Highway Act.  Doc. No. 1.

**After the AAA Lawsuit Was Filed, The Port Authority Came
Up With A New, Post-Approval Rationale For The Toll Increases**

157.    After the filing of the AAA lawsuit, and after the 2011 toll increases had been approved, Rosemary Chiricolo and her staff were requested to prepare the exhibits for the Michael Fabiano Affidavit dated November 4, 2011 ("Fabiano Affidavit").  Decl., Ex. B at 150:7-11.

158.    Rosemary Chiricolo's staff prepared exhibits A through E to the Fabiano Affidavit.  Decl., Ex. B at 129:21 to 130:19.

159.    Paragraph 5 of the Fabiano Affidavit refers to a $10.786 billion preliminary capital plan for the ITN.  Decl., Ex. E at  5.

160.    Rosemary's Chiricolo's staff extracted the information for the $10.786 billion ITN preliminary capital plan from the preliminary capital plan for the entire Port Authority.  Decl., Ex. B at 131:5-18.

161.    Exhibits A, B, C, D, and E to the Fabiano Affidavit were not presented to the Board of Commissioners.  Decl., Ex. A at 151:24 to 152:3.

162.    Exhibits A, B, C, D, and E to the Fabiano Affidavit were created specifically in response to the AAA litigation.  Decl., Ex. A at 152:4-6.

163.    Paragraph 5 of the Fabiano Affidavit refers to a "$10.786 billion Preliminary Capital Plan for the ITN for 2011-2020."  Decl., Ex. A at 152:6-12; Pl. Ex. 14 at  5.

164.    That referred to the management and budget department putting together what it believed was ITN capital capacity and taking the list of various projects from all the departments.  Decl., Ex. A at 152:13 to 153:2.

165.    Exhibit A to the Fabiano Affidavit purported to be the preliminary capital plan for the ITN.  Decl., Ex. A at 153:3-11.

166.    The term "preliminary capital plan for the ITN" did not make sense to Rosemary Chiricolo the Port Authority's deputy director, management and budget.  Decl., Ex. B at 94:21-24.

167.    Exhibit A was not presented to the Commissioners, but instead was specifically developed in response to the AAA lawsuit.  Decl., Ex. A at 153:12-21.

168.    CFO Fabiano had never seen a document like Exhibit A prepared within the Port Authority before it was developed in response to the AAA lawsuit.  Decl., Ex. A at 153:22-25.

169.    Exhibit B to the Fabiano represents cash flow for the ITN.  Decl., Ex. A at 44:19 to 22.

170.    A cash flow analysis for the ITN had never been done at the Port Authority prior to the AAA lawsuit.  Decl., Ex. A at 44:19 to 46:12.

171.    Depreciation would be used in income statements, and depreciation was not used in the cash flow statement in Exhibit B to the Fabiano Affidavit.  Decl., Ex. A at 47:23 to 48:4.

172.    Exhibit B to the Fabiano Affidavit was not presented to the Board of Commissioners, and it is not an analysis that in some way was presented to the Board of Commissioners.  Decl., Ex. A at 159:5-12

173.    Exhibit B had not been previously prepared in the ordinary course of the Port Authority's business, but was instead a response to the AAA lawsuit.  Decl., Ex. A at 159:13-25.

174.    Exhibit C to the Fabiano Affidavit represents the first column of Exhibit B broken down by facility.  Decl., Ex. A at 183:6-19.

175.    Exhibit C is not a document prepared in the ordinary course of the Port Authority's business, and it is not something that was presented to the Board of Commissioners.  Decl., Ex. A at 183:20 to 184:7.

176.    Exhibit D to the Fabiano Affidavit shows cash flows for the projected period.  Decl., Ex. A at 195:4-16.

177.    Exhibit D to the Fabiano Affidavit was not presented to the Board of Commissioners in August 2011, and was prepared specifically for the AAA lawsuit.  Decl., Ex. A at 195:17-22.

178.    Exhibit D to the Fabiano Affidavit is not a document prepared in the ordinary course of the Port Authority's business.  Decl., Ex. A at 195:23 to 196:2.

179.    Exhibit E to the Fabiano Affidavit shows the line item detail of the third column of Exhibit B.  Decl., Ex. A at 196:3-7.

180.    Exhibit E to the Fabiano Affidavit was not presented to the Board of Commissioners in August 2011, and was prepared specifically for the AAA lawsuit. Decl., Ex. A at 196:3-13.

181.    Exhibit E to the Fabiano Affidavit is not a document prepared in the ordinary course of the Port Authority's business.  Decl., Ex. A at 196:14-17.

**The $10.786 Billion "ITN Capital Plan" Contains At Least $2.8 Billion Of Non-ITN Projects And An Additional $1 Billion Placeholder For New Jersey Projects**

**The Capital Infrastructure Fund**

182.    Access to the Region's Core ("ARC") was the project for a mass transit tunnel that the Port Authority was participating in, and which was suspended and terminated by Governor Christie.  Decl., Ex. A at 184:8-15. 185:7-17.

183.    The Port Authority's commitment for ARC was $3 billion, which is the cost the Port Authority expected it would pay if the ARC project went to completion. Decl., Ex. A at 187:5-17.

184.    The capital infrastructure fund ("CIF") was a fund that was authorized by the Board of Commissioners, and which allocated the remaining Port Authority commitment to the ARC tunnel.  Decl., Ex. B at 82:4-11.

185.    The "capital infrastructure fund" was the residual balance of the Port Authority's commitment to the ARC tunnel.  The ARC tunnel would have been included within the ITN, so the Port Authority included the residual commitment within the ITN. Decl., Ex. B at 95:17 to 96:8.

186.    The ARC project is not an ongoing project.  Decl., Ex. B at 96:18-20.

**The Pulaski Skyway**

187.     The $10.786 billion "ITN capital plan" includes $1.8 billion for improvements to the Pulaski Skyway and New Jersey state roads.

188.     When the CIF was authorized, the balance remaining was $2.7 billion. $1.8 billion of that amount was authorized in conjunction with three listed projects. Decl., Ex. B at 103:22 to 104:12.

189.     This $1.8 billion was allocated to new projects that were not previously in the Port Authority capital plan.  Decl., Ex. B at 105:6-15; 105:21 to 106:3.

190.     These three projects were the capital infrastructure improvements on the Pulaski Skyway, the Whitpenn Bridge, and a new road on Route 1 and 9.  Decl., Ex. B at 108:12-21; Ex. A at 188:17 to 189:4.

191.     In the Fabiano Affidavit, these are called the "Lincoln Tunnel access roadway infrastructure projects."  Decl., Ex. E at ¶ 7(d).

192.     Despite the term "Lincoln Tunnel access roadway infrastructure projects," the $1.8 billion is not being spent on the Lincoln Tunnel, but is instead being spent on New Jersey state bridge and road facilities:  the Pulaski Skyway, N.J. Route 1 & 9, N.J. Route 7, and the WittPenn Bridge.  Decl., Ex. E at Ex. A, p. 6; Decl., Ex. A at 185:18 to 186:8.

193.     The Pulaski Skyway is not part of the Port Authority ITN.  Port Authority 56.1 Statement, Doc. No. 134, at ¶ 24.  .

194.     The Pulaski Skyway is not a Port Authority facility.  Port Authority 56.1 Statement, Doc. No, 134. at ¶ 24.

195.    N.J. Routes 1 & 9 are not part of the Port Authority ITN.  Port Authority 56.1 Statement, Doc. No. 134, at ¶ 24.

196.    N.J. Routes 1 & 9 are not Port Authority facilities.  Port Authority 56.1 Statement, Doc. No. 134, at ¶ 24.

197.    N.J. Route 7 is not part of the Port Authority ITN.  Port Authority 56.1 Statement, Doc. No. 134, at ¶ 24.

198.    N.J. Route 7 is not a Port Authority facility.  Port Authority 56.1 Statement, Doc. No. 134, at ¶ 24.

199.    The WittPenn Bridge is not part of the Port Authority ITN.  Port Authority 56.1 Statement, Doc. No. 134, at ¶ 24.

200.    The WittPenn Bridge is not a Port Authority facility.  Port Authority 56.1 Statement, Doc. No. 134, at ¶ 24.

201.    With respect to the Holland Tunnel, New York and New Jersey statutes provides that "the  control,  operation,  tolls  and  other  revenues  of the [Holland Tunnel] shall be vested in the port authority as hereinafter provided."   NY Unconsol. Laws § 6502; NJSA 32:1-119.

202.    These statutes were passed in 1931, after the Holland Tunnel had been constructed, but before the Lincoln Tunnel (and any approaches or connections to highways) had been constructed.

203.    As to the Lincoln Tunnel, the Port Authority may only fund "approaches thereto" and "connections with highways."  NY Unconsol. Laws § 6502; NJSA 32:1-119 (The Port Authority may "construct, own, maintain and operate [the Lincoln Tunnel], together with such approaches thereto and connections with highways").

35

204.    New York and New Jersey statutes define the "entrances, exits and approaches" to the Lincoln Tunnel:

> The approaches to the [Lincoln Tunnel] on the New Jersey side shall be so located and constructed as to permit tunnel traffic to pass over or under the tracks of the New York, Susquehanna and Western Railroad Company and the Northern Railroad Company of New Jersey, immediately west of the Palisades, without crossing the said tracks at grade, and as to permit connections with New Jersey state highway routes in the vicinity of the said tracks.

NY Unconsol. Law § 6503; NJSA 32:1-120.

205.    The only other Lincoln Tunnel authorization is for "connections with highways."  This term, particularly considering the statute's enactment before construction of the Lincoln Tunnel, means the Port Authority may construct and pay for roads that connect the tunnel to the state highways.  NY Unconsol. Law § 6511 discusses "Connections with state or municipal highways," and the Pulaski Skyway and New Jersey roads do not fall within the meaning of this statutory definition.

> The plans of the connections with state or municipal highways of any vehicular bridge or tunnel which the port authority may hereafter construct (including the plans of any additional connections of existing bridges or tunnels with state or municipal highways), shall be subject to  the approval of the governor of the state in which such connections shall be located.  Either state may require by appropriate legislation that such connections shall be subject to the approval of the municipality of that state in which they shall be located; and in such event, the approval of such municipality shall be given as provided in article twelve of the said compact of April thirty, nineteen hundred twenty-one.  Except as limited herein, the port authority shall determine all matters pertaining to such bridges and tunnels.

NY Unconsol. Law § 6511.

206.    According to the Port Authority website, the driving distance between the Pulaski Skyway and the Lincoln Tunnel is 8.2 miles.  *See* http://www.panynj.gov/bridges-tunnels/driving-directions-

map.html?sourceAddress=Lincoln+Tunnel&facilityAddress=Lincoln+Tunnel%2C+New +York%2C+NY+10001&destinationAddress=Pulaski+Skyway.

207.    The Pulaski Skyway and New Jersey roads are not "approaches" to the Lincoln Tunnel under the statutory definition of "approaches."

208.    The Pulaski Skyway and New Jersey roads are not "approaches" to the Lincoln Tunnel under the plain meaning of that term.

209.    The Pulaski Skyway and New Jersey roads are not "approaches" to the Lincoln Tunnel under the statutory definition of "connections with highways."

210.    The Pulaski Skyway and New Jersey roads are not "connections with highways" for the Lincoln Tunnel under the plain meaning of that term.

### The Bayonne Bridge

211.    The "ITN capital plan" also includes $1 billion for the raising of the Bayonne Bridge roadway.  While this project involves construction at a bridge, the Bayonne Bridge roadway is not being raised for transportation, but instead for navigation and the Port Commerce line of business, because new larger container ships cannot fit under the current roadway.  Decl., Ex. A at 143:21 to 145:4.

212.    There was a navigational clearance issue at the Bayonne Bridge for anticipated larger container ships using the waterways in the future.  The alternative to deal with that problem which was selected was to raise the roadway deck in order to provide sufficient navigational clearance for the larger ships.  Decl., Ex. B at 152:23 to 153:12.

213.    The Navigant Report noted that the raising of the Bayonne Bridge is for the benefit of Port Commerce.  Mark Decl., Ex. 11 at 43.

214.    Port Commerce is not part of the ITN.  Decl., Ex. B at 153:19-21.

215.    CFO Fabiano stated to the Commissioners:

[O]ne of the key projects supported by the tolls increase is the raising of the roadway at the Bayonne Bridge, which will accommodate the larger ships expected to call on the port with the opening of the expanded Panama Canal.  It is an investment in the competitiveness of our ports …"

Decl., Ex. I at AAA211; *see also* Decl., Ex. A at 143:21 to 145:4 (Bayonne Bridge must

be raised so larger container ships can pass under it); Decl., Ex. B at 152:23 to 153:12

(roadway being raised to provide navigational clearance for larger ships).

216.    Port Authority documents admit that the Bayonne Bridge "Navigational

Clearance" project is "Under [Tunnels, Bridges and Terminals] but [is] a Port

[Commerce] initiative."  Decl., Ex. M.

217.    These documents state that the reason for the project is "to provide

navigational clearance for larger containerships as a result of the Panama Canal

Expansion."  Decl., Ex. M.

218.    The current Port Authority capital plan provides:

The Board authorized $1.3 billion to raise the roadway of the Bayonne Bridge to 215 feet to accommodate larger more efficient ships anticipated post Panama Canal expansion.  The current navigational clearance of 151 feet is an ongoing concern for the maritime industry.  In late 2015, much larger containerships are expected to call at east coast ports.  Allowing these vessels access to our port facilities will provide a more sustainable and competitive Port of New York and New Jersey.

Decl., Ex. N at 9.

## The Remainder of the CIF Is A $1 Billion "Placeholder"

219.    The "ITN Capital Plan" also includes just under $1 billion for a "capital

infrastructure fund" ("CIF").  Decl., Ex. E at Ex. A, p 10.

220.     As stated above, when the CIF was authorized, the balance remaining was $2.7 billion.  A balance of $995,000,000 was the amount that had not yet been allocated to a specific project.  Decl., Ex. B at 103:22 to 104:12.

221.     With respect to the $995 million remaining in the CIF, the Port Authority carried the remaining authorized commitment, awaiting the projects that those amounts will be authorized for.  Chiricolo Dep. Tr. at 106:4-19.

222.     The balance of what would have been spent on ARC is a reserve subject to being identified for a specific project, and amounts to approximately $976 million.  Fabiano Dep. Tr. at 189:2 to 190:12.

223.     This amount is simply a line item in the ITN capital plan of dollars in the capital plan to be expended in the future, but it is not attributable to any transportation project.  Fabiano Dep. Tr. at 190:9-25.

224.     CFO Fabiano said he would not reduce the "ITN Capital Plan" by $1 billion instead of having a $1 billion "placeholder."

> Why would I reduce the capital plan?  I did not set up a capital plan.  That's a place holder, once again.

*See* Mulry Decl., Ex. E at 193:10-12.

**A Rate Base Analysis Is The Proper Analysis To**
**Determine If The Toll Increase Is Just And Reasonable**

### Description of Rate of Return

225.     Rate of return analysis is used to establish reasonable rate changes for organizations that (a) have no or minimal competition in a particular market and would be able to exert monopoly power and thus be open to charging excessive rates, or (b) are

subject to a just and reasonable standard.  Declaration of Jonathan Peters dated August 21, 2015 ("Peters Decl.") at ¶ 4.

226.    This method is extensively used by the Public Utility Commissions across the United States to establish appropriate revenue levels and utility rates for the regulated public utility industry – including water, natural gas, sewer and power.  In addition to being used in prior Court cases involving the PANYNJ, these methods have long standing acceptance in establishing fair and reasonable rates of return for utility firms as well as protecting consumers from excessive charges due to monopoly power.  Peters Decl., at ¶ 7.

**Formula For The Rate of Return**

227.    To estimate the needed revenue and establish if the existing or proposed pricing and subsequent revenue stream is reasonable or excessive, one should apply a standard model of revenue requirement. Peters Decl., at ¶ 8.

228.    The formula for revenue requirement is as follows:

Revenue Requirement = (Rate Base * Allowable Rate of Return)

+ Operating Expenses + Depreciation Expense + Taxes

Peters Decl., at ¶ 9.

**The Rate Base**

229.    The rate base is the invested capital that is engaged in the production of revenue and income from the regulated entity.  Peters Decl., at ¶ 10.

230.    The PANYNJ reports on the capital assets by line department in Schedule F of their Annual Reports.  Peters Decl., at ¶ 11.

231.    In particular, the Pulaski Skyway and other NJ DOT assets are not a part of the ITN or the Line Departments of the PANYNJ, and as such should not be included in the rate base of the ITN. Peters Decl., at ¶ 12.

232.    The inclusion of these assets into the rate base would increase the capital stock of the PANYNJ, with no corresponding additional revenue from the operations of the assets. Including such assets in the rate base would artificially increase the required revenue to pay for these unproductive capital assets.  Peters Decl., at ¶ 12.

**The Allowable Rate of Return**

233.    On August 14, 2014, the Port Authority had a consolidated bond issue of $830 Million in tax free bonds which had a blended rate of 3.63%. Peters Decl., at ¶ 13.

234.    A proper rate of return to use for PANYNJ bridge tolls is 3.63%.  Peters Decl., at ¶ 13.

**Operating Expenses**

235.    Operating expenses are available in the PANYNJ Annual Reports and are reported by facility and also on a line department basis. This information is reported in Schedule E of the PANYNJ Annual Reports.  Peters Decl., at ¶ 14.

236.    There are significant limitations to the data reported and adjustments that are made to the financial reporting in the estimation of the rate of return, in that the PANYNJ has a long standing practice of allocating certain costs among its various line departments. Their method allocating based upon labor costs by line department unfairly allocates costs towards the ITN, and as such, it overstates the costs of running the ITN. Peters Decl., at ¶ 15.

**Depreciation Expense**

237.    Depreciation Expenses by facility and line department are presented in Schedule E of the PANYNJ Annual Reports. Peters Decl., at ¶ 17.

238.    Depreciation represents a non-cash expense and by increasing the depreciation allowance on the financial statements, one undermines the reported financial performance of particular assets. Peters Decl., at ¶ 18.

239.    Given the total amount of invested capital in a particular line department, the amount of depreciation reported should be linked to the invested capital and the expected economic life of the asset. Peters Decl., at ¶ 18.

240.    In examining the financial statements of the PANYNJ, it appears that over the last 12 years, the ITN has been allocated a depreciation cost that reflected roughly a 25 year lifespan for the ITN assets, in sharp contrast to the WTC Site, where depreciation is apparently being taken at a rate of a roughly 325 year lifespan.  Peters Decl., at ¶ 18.

**Taxes**

241.    The ITN income and operations are generally not taxable, and as such there is not a cost for taxes in the rate of return evaluation.  Peters Decl., at ¶ 19.

**Calculating the rate of return**

242.    If the realized revenue is greater than the required revenue – then the toll and fare rates as a package are excessive. If the realized revenue is less than the required revenue – then the shortfall in revenue is the amount that could be raised by higher tolls or fares. Peters Decl., at ¶ 23.

243.    A rate of return analysis shows a small shortfall ($45.2 million) in revenue in 2010 – with actual revenue reported at $1.120 billion and the allowable revenue of

$1.139 billion. This shortfall is de minimus in scale, given the size of the revenue stream and the scope of operations of the ITN.  Peters Decl., at ¶ 24.

244.    If costs and non-ITN assets expenses were misallocated toward the ITN, this shortfall would not meet the standard for approving a large scale rate increase. Also, the rate base would only allow a toll increase that was reflective of the shortfall, in this case a one- time 2% increase in tolls, not the roughly 12% average increase per year for five years as proposed and implemented by the PANYNJ commissioners in August 2011 (roughly a compound 53% increase in PANYNJ tolls from 2010 to 2014).  Peters Decl., at ¶ 24.

245.    In examining the 2011 financial results, the ITN collects $167.5 million in excess revenue in 2011.  This figure does not provide support for a toll increase.  Peters Decl., at ¶ 25.

246.    In fact, an entity in this financial situation could well be subject to a rate decrease instruction during a rate hearing at a state public utilities commission.  Peters Decl., at ¶ 25.

247.    The 2012 financial performance demonstrates a massive required revenue surplus of $429.0 million.  In 2012, fully 48% of the revenue collected is above the amount allowed as required revenue for the ITN. Peters Decl., at ¶ 26.

248.    With respect to capital investment, the Rate of Return analysis allows the entity to charge the rate base for the net capital in place and as such, additional investment in capital infrastructure adds to the allowable revenue – in that the firm is entitled to receive additional revenue based on actual capital investment that is carried on the books of the agency – typically carried at purchased costs.  Peters Decl., at ¶ 27.

249.   Therefore, there is no allowance for interest and principle expense, as that is captured in the allowable return on the total capital invested.  As such, this method of analysis values the new capital investments as they are implemented and placed onto the books of the agency.  Peters Decl., at ¶ 28.

250.   Based on a rate of return analysis, there was no allowable revenue justification for a toll increase indicated in the 2010 or 2011 financial statement reviews, let alone five increases in the tolls over a period of five years.  Peters Decl., at ¶ 28.

251.   In 2010, the rate of return analysis shows a very mild loss of $45.2 million dollars, which could have been covered by a small increase in tolls, or some internal cost control or a more thorough examination of the cost allocations.  Peters Decl., at ¶ 28.

252.   By the time of the decision to increase tolls in 2011, the rate of return analysis for the PANYNJ was demonstrating that no further toll increases were needed. Peters Decl., at ¶ 28.

253.   Multiple rate increases in one single rate setting action are inappropriate. Peters Decl., at ¶ 31.

254.   It is highly unusual for an entity to allow a single rate setting session to authorize five rate increases without further analysis of the rate of return and appropriate tests of return as compared to the appropriate rate base.  Peters Decl., at ¶ 31.

255.   Further analysis would include appropriate adjustments to the rate base to reflect deprecation and capital investments, and testing of the revenue stream against the rate base to establish the fair and reasonable return on assets invested in this enterprise. Peters Decl., at ¶ 31.

256.     Rosemary Chiricolo, the Port Authority deputy director, management and budget, was unfamiliar with the term rate base being used at the Port Authority in connection with capital planning.  Decl., Ex. B at 31:15 to 32:15.

**The Fabiano cash flow analysis is flawed in
other ways that raise material issues of fact**

**Non-ITN Assets**

257.     The funding of projects not within the ITN and/or owned by other entities with no direct revenue benefit to the PANYNJ should be excluded from any ITN financial analysis.  Peters Decl., at ¶ 35.

258.     The Pulaski Skyway, Wittpenn Bridge, Conrail Viaduct and Portway New Road are not PANYNJ owned assets, and PANYNJ does not derive any revenue from them.  Peters Decl., at ¶ 35.

259.     The Pulaski Skyway, Wittpenn Bridge, Conrail Viaduct and Portway New Road should be excluded from any rate based analysis or cash flow analysis. Peters Decl., at ¶ 35.

**Allocated Costs and Debt Service**

260.     Fabiano includes in his cash flow analysis both the allocated expenses that are assigned to the ITN by Port Authority Management as well as "debt service allocated to the Port Authority's Consolidated Bonds".  Peters Decl., at ¶ 36.

261.     Fabiano also includes "allocated costs that represent the cost of providing general and administrative services for the benefit of the entire agency."  Peters Decl., at ¶ 36.

262.     Allocations and cost reporting are subject to considerable management discretion.  Peters Decl., at ¶ 36.

263.    In the PA's annual reports from 2002 to 2013, the ITN is charged $1.419 billion in interest and other costs over the 12 year period – while the WTC actually has a credit of $46.3 million over the same period. Peters Decl., at ¶ 37.

264.    During this same time period, the WTC received $11.6 billion in net capital investment while the ITN had 5.9 billion in capital investments. Peters Decl., at ¶ 37.

265.    Further, the ITN is charged $3.0 billion in depreciation costs while the WTC is only charged $133 million in depreciation charges during this period. Peters Decl., at ¶ 37.

**Financing of capital projects should be over normal lifetime of the asset**

266.    Fabiano presents two financial scenarios of the cash flow of the ITN in his Exhibit B.  Peters Decl., at ¶ 39.

267.    The first cash flow scenario presented a payoff of the full amount of the projected $10.785 billion in new capital investments in the ITN through cash payments from the ITN revenue in the span of 10 years.  Peters Decl., at ¶ 39.

268.    The second scenario, purported to be a more conservative financial model has a 50% direct payment and 50% debt for the funding of the ITN capital improvements. Peters Decl., at ¶ 39.

269.    Regarding ITN assets, Mr. Fabiano states "Most of these facilities are over half-century old".  These assets are expected have lifespans from 25 to 100 years.  Peters Decl., at ¶ 40.

270.     A commonly applied method of financing term is to consider the useful lifespan of the asset and utilize a funding method that reflects that lifespan.  Peters Decl., at ¶ 40.

271.     By stretching the terms of repayment for the $10.875 billion in new capital investment out to reflect the general PANYNJ depreciation practices of capital assets for 25 to 100 years (using 35 years as a proxy for the mix of assets), and including the 10% deposit to the Required Reserve Fund used by Fabiano, the cash flows of the ITN shift from a negative $51.2 million to a positive $2,018.4 million ($2.018 billion).  Peters Decl., at ¶ 41.

**Multiple Rate Increases in One Single Rate Setting Action**

272.     It is highly irregular for an entity to allow a single rate setting session to authorize 5 annual rate increases without further analysis of the rate of return and appropriate tests of return as compared to the appropriate rate base. Peters Decl., at ¶ 43.

273.     Further, a full rate setting case would involve considerably more outside review of the various aspects of the rate base and the components of costs to address the exact issues regarding allocated operating costs, non-ITN capital investment and allocated bond expenses.  Peters Decl., at ¶ 44.

**The Port Authority's Public Financial Statements Show
Massive Sums Being Paid Through The Reserve Funds**

274.     According to the Port Authority financial statements, for the years 2001 through 2012, the Port Authority reserve balances have been steadily increasing, from $1.6 billion in 2001 to $2.8 billion in 2012, a net increase of $1.2 billion.  Decl., Ex. Q.

275.    In that period, according to the Port Authority financial statements, over $12 billion has been transferred into the Reserve Funds, such that in excess of $10 billion has come out of the Reserve Funds.  Decl., Ex. Q.

276.    Spending on the World Trade Center during from 2007 through 2012 has been $9.1 billion, and spending on the ITN during that period has been only $2.9 billion. Decl., Ex. Q.

277.    The Port Authority financial records also reflect that in the years ended 2010, 2009 and 2008, Port Authority capital investment was funded by approximately $900 million, $1.35 billion and $1.15 billion, respectively, from the Consolidated Bond Reserve Fund and other sources.  Decl., Ex. Q.

**ITN Revenue Is At Risk For All Port Authority Bonds, Including Those Used To Pay For The World Trade Center And Other Line Department Capital Expenses**

278.    In order for the Port Authority to be able to finance facilities and projects and take on new facilities and projects, they need the revenue of the combined existing facilities to convince bondholders that there is value and they will be paid.  Decl., Ex. A at 268:20 to 269:9.

279.    The bondholders for any of the Port Authority consolidated bonds can look to the revenues of all Port Authority line departments, equally and ratably, in the event of default.  Decl., Ex. A at 275:4-13.

280.    Bondholders can look to the revenues of all the line departments in the

Port Authority.  Decl., Ex. A at 275:14-17.


Dated:  New York, New York
            August 21, 2015

                                                        Respectfully Submitted,

                                                        FARRELL FRITZ, P.C.

                                                          *s/ Kevin P. Mulry*

                                              By:   _____
                                                        Michael F. Fitzgerald  (MF2954)
                                                        Kevin P. Mulry
                                                        Attorneys for Plaintiffs
                                                        370 Lexington Avenue, Suite 800
                                                        New York, New York 10017
                                                        (212) 687-1230


TO:    Richard W. Mark, Esq.
            GIBSON DUNN & CRUTCHER LLP
            200 Park Avenue
            New York, New York  10166-0193
            (212) 351-3818
            Fax:  (212) 351-5338

            Kathleen Gill Miller, Esq.
            JAMES M. BEGLY, ESQ.
            4 World Trade Center, 24th Floor
            150 Greenwich Street
            New York, New York  10007
            (212) 435-3834