UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------x
                                                           :
AUTOMOBILE CLUB OF NEW YORK,                               :
INC. d/b/a AAA NEW YORK and AAA                            :
NORTH JERSEY, INC.,                                        :
                                                           :
                    Plaintiffs,                            :
                                                           :
        -against-                                          :   No. 11 Civ. 6746 (RKE) (HBP)
                                                           :
THE PORT AUTHORITY OF NEW YORK                             :
AND NEW JERSEY,                                            :
                                                           :
                    Defendant.                             :
                                                           :
-----------------------------------------------------------x


**DEFENDANT PORT AUTHORITY'S REPLY MEMORANDUM OF LAW IN
FURTHER SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT DISMISSING
PLAINTIFFS' COMPLAINT**


GIBSON, DUNN & CRUTCHER LLP
RICHARD W. MARK
NANCY HART
200 Park Avenue
New York, NY 10166-0193
Telephone:    212.351.4000
Facsimile:    212.351.4035

*Attorneys for Defendant Port Authority*

**TABLE OF CONTENTS**

Page(s)

PRELIMINARY STATEMENT ..................................................................................................1

ARGUMENT ...........................................................................................................................2

    A.   The AAA's Dormant Commerce Clause Claim Fails as a Matter of Law ...........................2

       1.   AAA's Attempt to Constrain the Court to a "Rate of Return" Analysis Is
           Contrary to Established Law .......................................................................................3

       2.   The Port Authority's Cash-Flow Analysis Establishes the Tolls Are a "Fair
           Approximation of the Use of the ITN Facilities" and "Not Excessive" .....................7

          a.   The Port Authority Properly Considered the ITN's Allocated Costs
             and Reserve Fund Payments .......................................................................... 7

          b.   The Challenged ITN Projects Were Properly Included in the Capital
             Plan .............................................................................................................. 9

             i.   The Lincoln Tunnel Access Project ...................................................... 10

             ii.  The Bayonne Bridge ............................................................................. 12

             iii. The "CIF" ............................................................................................. 13

       3.   The Tolls Are "Not Excessive" and Are a "Fair Approximation of Use" Based
           on the Undisputed Needs of the ITN ........................................................................14

    B.   The AAA's Highway Act Claim Fails as a Matter of Law ...............................................16

    C.   AAA Cannot Use an Expert Report to Create Issues of Fact ...........................................17

CONCLUSION ........................................................................................................................20

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*AAA v. Cox,*
    592 F.2d 658 (2d Cir. 1979) .................................................................................... 3

*AAA v. Port Auth. of N.Y. & N.J.,*
    887 F.2d 417 (2d Cir. 1989) .................................................................................... 4

*AAA v. The Port Auth. of N.Y. & N.J.,*
    706 F. Supp. 264 (S.D.N.Y. 1989) ........................................................................ 12

*Alamo Rent-A-Car v. Sarasota-Manatee Airport Auth.,*
    906 F.2d 516 (11th Cir. 1990) ............................................................................ 4, 9

*Am. Trucking Ass'n, Inc. v. Del. River Joint Toll Bridge Comm'n,*
    458 F.3d 291 (3d Cir. 2006) ............................................................................ 16, 17

*Angus Partners LLC v. Walder,*
    52 F. Supp. 3d 546 (S.D.N.Y. 2014) ............................................................... 4, 6, 8

*Auto Club of N.Y. Inc. v. Port Auth. of N.Y & N.J.,*
    842 F. Supp. 672 (S.D.N.Y. 2012) ....................................................................... 17

*Banks v. Yokemic,*
    144 F. Supp. 2d 272 (S.D.N.Y. 2001) .................................................................. 11

*Bridgeport & Port Jefferson Steamboat Co. v. Bridgeport Port Auth.,*
    567 F.3d 79 (2d Cir. 2009) ................................................................................... 10

*Daubert v. Merrell Dow Pharm., Inc.,*
    509 U.S. 579 (1993) .............................................................................................. 20

*Doran v. Mass. Turnpike Auth.,*
    256 F. Supp. 2d 48 (D. Mass. 2003) ................................................................... 5, 9

*Evansville Airport v. Delta Airlines, Inc.,*
    405 U.S. 707 (1972).................................................................................. 2, 5, 9, 15

*Highlight Capital Mgmt., L.P. v. Schneider,*
    379 F. Supp. 2d 461 (S.D.N.Y. 2005) .................................................................. 19

*Industria y Distribucion de Alimentos v. Trailer Bridge,*
    2015 WL 4880997 (1st Cir. Aug. 17, 2015)..................................................... 3, 18

## TABLE OF AUTHORITIES
### (continued)

Page(s)

*Janes v. Triborough Bridge & Tunnel Auth. ("Janes II")*,
    774 F.3d 1052, 1055 & n.6 (2d Cir. 2014) ........................................................ 7

*Janes v. Triborough Bridge & Tunnel Auth. ("Janes I")*,
    977 F. Supp. 2d 320 (S.D.N.Y. 2013) .................................... 4, 5, 10, 12

*Jorling v. U.S. Dep't of Energy*,
    218 F.3d 96 (2d Cir. 2000) ........................................................ 16

*LiButti v. United States*,
    107 F.3d 110 (2d Cir. 1997) ........................................................ 11

*LinkCo, Inc. v. Fujitsu Ltd.*,
    2002 WL 1585551 (S.D.N.Y. July 16, 2002) ........................................ 19

*Malletier v. Dooney & Bourke, Inc.*,
    525 F. Supp. 2d 558 (S.D.N.Y. 2007) ................................................ 19

*Molinari v. N.Y. Triborough Bridge & Tunnel Auth.*,
    838 F. Supp. 718 (E.D.N.Y. 1993) .............................................. 8, 17

*N.H. Motor Transp. Ass'n v. Flynn*,
    751 F.2d 43 (1st Cir. 1984) ...................................................... 3, 15

*Nw. Airlines, Inc. v. Cnty. of Kent*,
    510 U.S. 355 (1994) .............................................................. 2, 3

*Port Authority v. Weehawken Twp.*,
    103 A.2d 603 (N.J. 1954) ........................................................ 11

*Reach Music Pub., Inc. v. Warner Chappell Music, Inc.*,
    988 F. Supp. 2d 395 (S.D.N.Y. 2013) .............................................. 20

*Selevan v. N.Y. Thruway Auth. ("Selevan III")*,
    711 F.3d 253 (2d Cir. 2009) ...................................................... 4, 6

*State v. Port Auth.*,
    376 A.2d 591 (N.J. Super. Ct. 1977) ................................................ 10

*Ullmo v. Ohio Turnpike & Infrastructure Comm'n*,
    2015 WL 5055867 (N.D. Ohio Aug. 25, 2015) ........................................ 4

*United States v. Williams*,
    506 F.3d 151 (2d Cir. 2007) ...................................................... 20

## TABLE OF AUTHORITIES
### (continued)

Page(s)

**Statutes**

33 U.S.C. § 508 (1988) ............................................................................................ 16

N.J. Stat. Ann. § 32:1-118 ....................................................................................... 12

N.J. Stat. Ann. § 32:1-119 ................................................................................. 10, 11

N.J. Stat. Ann. § 32:1–142 ................................................................................... 5, 8

N.Y. Unconsol. Laws § 6501 ................................................................................... 12

N.Y. Unconsol. Laws § 6502 ............................................................................. 10, 11

N.Y. Unconsol. Laws § 7002 ................................................................................. 5, 8

**Rules**

Fed. R. Evid. 702 .................................................................................................... 19

**Other Authorities**

H.R. Conf. Rep. No. 27, 100th Cong., 1st. Sess. 175, *reprinted in* 1987 U.S.C.C.A.N.
   66 .......................................................................................................................... 8

Zernike, Kate, *"Port Authority Official Is Out Amid Scandal Over Shut Lanes,"*
   *available at* http://www.nytimes.com/2014/03/29/nyregion/christie-press-
   conference-on-bridge-scandal.html .................................................................... 11

The Port Authority of New York and New Jersey (the "Port Authority") respectfully submits this reply in further support of its motion for summary judgment dismissing Plaintiffs Automobile Club of New York, Inc. and AAA North Jersey, Inc.'s (collectively, "AAA") complaint with prejudice.

## PRELIMINARY STATEMENT

AAA does not dispute the Port Authority's financial information and cash flow analyses in the case record showing that the Port Authority's Interstate Transportation Network (the "ITN") operated at a deficit before the 2011 toll increase and will, even with the toll increase, operate at a deficit for nearly a decade thereafter.  *See* D.I. 154 ¶¶ 42, 43, 45 ("AAA SOF") ("AAA does not dispute that under the Port Authority's method of calculation, there was a deficit.").  On that undisputed record, the Court should enter summary judgment in favor of the Port Authority on all claims.

The AAA avoids any real factual challenge to the motion and instead offers mainly legal argument in opposition.  ***First,*** AAA argues that the law requires using an investor-owned, single purpose utility-type rate of return analysis to assess whether the tolls at issue are just and reasonable, and further contends that such an analysis would show the tolls are excessive.  But the law nowhere requires the Port Authority to use the utility rate of return method.  Indeed, dormant Commerce Clause and Highway Act cases within the Second Circuit with claims similar to this case have upheld tolls based on the sort of cash-flow analysis the Port Authority presents here.[1]

***Second,*** having abandoned its initial theory that ITN funds were being diverted to the World Trade Center, AAA contends that the Port Authority overstated the ITN's expenses because

---

[1]   As explained in Section C, *infra,* the declaration of Jonathan Peters, which presents a utility-style rate of return analysis, should be excluded as a matter of law because it is based on incorrect legal premises and improperly attempts to create facts resting on those flawed premises.

the Lincoln Tunnel Access Project ("LTAP"), the capital improvements to the Bayonne Bridge, and a sum for the Capital Infrastructure Fund ("CIF"), are not proper ITN costs as a matter of law. These arguments failed on AAA's Second Preliminary Injunction motion, and they have not improved with age. Nothing in the relevant statutes or case law provides a basis to exclude these projects from the ITN capital plan.

AAA did submit a lengthy Local Rule 56.1 statement advancing as facts statements regarding prior AAA litigations, procedural aspects of the toll increase decision, and other irrelevancies. *See, e.g.*, PA Resp. to AAA SOF at 2 (collecting examples of inappropriate statements). None of these items (some of which are speculative or simply wrong) are at all material to this case and the Court should disregard them. *See, e.g.*, D.I. 154 ("AAA SOF") ¶¶ 234, 236, 238, 239 (citing speculative opinion or legal argument as material fact); ¶¶ 149, 240 (mischaracterizing testimony and/or financial statements). AAA cannot avoid summary judgment by attempting to invoke factual disputes regarding immaterial points.

The undisputed financial picture presented by the Port Authority demonstrates that there is no genuine issue of material fact that the 2011 increase does not even cover the ITN's significant deficit. As the Port Authority's cash flow analysis shows the ITN to operate at a loss (even with the toll increase), the 2011 increase is incontrovertibly reasonable. Accordingly, the Court should grant the Port Authority's motion.

## ARGUMENT

### A.    The AAA's Dormant Commerce Clause Claim Fails as a Matter of Law

Under the Supreme Court's *Evansville* and *Northwest Airlines* test, agencies have wide latitude in setting tolls. *Evansville Airport v. Delta Airlines, Inc.*, 405 U.S. 707 (1972); *Nw. Airlines, Inc. v. Cnty. of Kent*, 510 U.S. 355, 368–69 (1994). A user fee will be allowed under the Commerce Clause if it: "(1) is based on some fair approximation of use of the facilities, (2) is not

excessive in relation to the benefits conferred, and (3) does not discriminate against interstate commerce." *Nw. Airlines, Inc.* 510 U.S. at 368–69.  Those challenging the government action must carry a heavy burden of persuasion.  *Industria y Distribution de Alimentos v. Trailer Bridge*, 2015 WL 4880997, at *2 (1st Cir. Aug. 17, 2015) (citing *N.H. Motor Transp. Ass'n v. Flynn*, 751 F.2d 43, 47 (1st Cir. 1984)).

AAA argues that the toll increase fails the first two prongs of the *Northwest Airlines* test that focus on the relationship between a challenged toll and the benefits received by the toll payer. Conceding that a toll charged to users may appropriately be used to support other portions of an integrated transportation system, AAA alleged that the tolls were being secretly diverted to pay for building the World Trade Center.  Compl. ¶¶ 2, 17, 39, 42–45.  It has since abandoned that theory (there is not a shred of supporting evidence) and now attempts to survive summary judgment with new, legal arguments:  (1) mischaracterizing the controlling law in an effort to change the applicable legal test for such tolls; (2) attacking capital projects that have long been disclosed as part and parcel of the ITN; and (3) incorrectly asserting the toll increase was based on the use of all Port Authority facilities.  These arguments provide no basis to deny summary judgment.

1.    **AAA's Attempt to Constrain the Court to a "Rate of Return" Analysis Is Contrary to Established Law**

AAA's core argument is that the law requires using a "rate of return" analysis to decide dormant Commerce Clause and Highway Act challenges to a toll increase and that such an analysis would show the increase to be excessive.  D.I. 153 ("Opp.") at 12–14.  AAA argues that because reported decisions indicate that the Port Authority presented a rate base analysis to defend toll increases against AAA challenges brought nearly thirty and forty years ago, the Port Authority must use only that methodology.  *Id.* at 28–29 (citing *AAA v. Cox*, 592 F.2d 658 (2d Cir. 1979);

*AAA v. Port Auth. of N.Y. & N.J.*, 887 F.2d 417 (2d Cir. 1989)).  That argument is contrary to the relevant case law.

These two prior AAA cases may have accepted the rate of return analysis presented, but nothing in those rulings makes that methodology the exclusive method for evaluating toll rates under the dormant Commerce Clause.  Indeed, the case law rejecting dormant Commerce Clause claims like this case not only did not require (much less mention) such a "rate of return" analysis, but dismissed the claims on the basis of a wide range of approaches, including a financial analysis. *See, e.g.*, *Angus Partners LLC v. Walder*, 52 F. Supp. 3d 546 (S.D.N.Y. 2014) (granting summary judgment dismissing dormant Commerce Clause challenge to toll increase where tolls generated a revenue surplus of nearly a billion dollars, inclusive of capital investments, the operating budget, debt payments, and investment income payments); *Janes v. Triborough Bridge & Tunnel Auth*. *("Janes I")*, 977 F. Supp. 2d 320, 340 (S.D.N.Y. 2013) (granting summary judgment on challenge to toll increase noting that no "analysis was undertaken at the time the current toll policies were adopted to justify setting the specific amounts" of the challenged toll discounts); *Selevan v. N.Y. Thruway Auth. ("Selevan III")*, 711 F.3d 253, 260 (2d Cir. 2013) (affirming dismissal of dormant Commerce Clause claim and holding that "there need not be a perfect fit between the use of [the facilities] and the support of [the facilities] by the toll"); *Alamo Rent-A-Car v. Sarasota-Manatee Airport Auth.*, 906 F.2d 516, 520 (11th Cir. 1990) (rejecting Commerce Clause claim because, while "imperfect" and "imprecise," the Authority's estimate of costs was "not irrational"); *Ullmo v. Ohio Turnpike & Infrastructure Comm'n*, 2015 WL 5055867, *1 (N.D. Ohio Aug. 25, 2015) (dismissing dormant Commerce Clause claim challenging toll increase despite allegation that $930 million was being spent outside of turnpike-related endeavors).

Thus, AAA's claim that the Port Authority must employ a utility-type rate of return analysis to justify a toll increase has no basis in law.  On the contrary, the analysis of a "fair approximation of use" and "excessiveness" requires only "reasonableness and broad proportionality," not "precise tailoring, or a pre-enactment administrative record, for toll amounts to be justified."  *Janes I*, 977 F. Supp. 2d at 340.[2]

The Port Authority's cash flow analysis here was plainly a reasonable depiction of ITN finances, and nothing more is required.[3]  *See Evansville*, 405 U.S. at 717 (noting a state's fee allocation "will pass constitutional muster, even though some other formula might reflect more exactly the relative use of the state facilities by individual users"); *Doran v. Mass. Turnpike Auth.*, 256 F. Supp. 2d 48, 56 (D. Mass. 2003) (finding that "courts are not to give exacting scrutiny to the assessments of tolls that maintain [interstate commerce]").  AAA does not point to any *facts* in the record that contradict the Port Authority's financials or the uniform testimony that before the toll increase, the revenues collected from the ITN were grossly insufficient to fund the ITN operations

---

[2]  The Commerce Clause does not require a specific administrative procedure to adopt tolls or fees. AAA effectively concedes this point:  after using much of its Opposition fact statement to highlight the process by which the 2011 Toll Increase was adopted, AAA makes no legal argument based on those facts.  *Compare* Opp. at 3–7 (AAA fact statement regarding 2011 toll increase process), *with* Opp. at 15–38 (no argument that a Commerce Clause "reasonableness" claim requires justification by substantial evidence in an administrative record).  This concession is understandable because the Court already effectively rejected this argument when it denied AAA's attack on the Port Authority's privilege claim.  D.I. 143 at 17 ("[I]n other words, Magistrate Judge Pitman found, and the court agrees, that evidence of the reasons why the Port Authority raised the tolls are not relevant to a case that rests upon how the money raised by the tolls was and is spent.").

[3]  In any event, as the Port Authority's CFO, Michael Fabiano, explained in both his declarations and deposition, a rate of return analysis would make no sense here given the substantial historical and future projected deficit of the ITN.  D.I. 134 ("PA SOF") ¶¶ 42–55.  A backward-looking methodology like Peters' rate of return analysis, as opposed to Fabiano's forward-looking cash-flow model, is a particularly poor fit to this case given the known massive capital needs of the ITN over the course of a ten-year period (the Port Authority's normal planning cycle), and beyond.  Moreover, as described *infra*, AAA's expert Peters' purported rate of return analysis does not take into consideration that, by statute, the Port Authority is a pooled revenue agency—meaning that a deficit in the ITN pulls revenue from the remaining line departments and revenue sources of the Port Authority to cover the ITN shortfall.  N.Y. Unconsol. Laws § 7002; N.J. Stat. Ann. § 32:1-142.

and capital needs on a cash-flow basis.  Nor is there a factual dispute that under the Port

Authority's cash flow analysis the increased revenues narrowed, but did not eliminate, the ITN

deficit and drag on the rest of the Port Authority.  AAA SOF ¶¶ 42–43, 45; *see also* D.I. 23

("Fabiano Reply") ¶ 4 ("The tolls and fare increases are intended to assure that the ITN is better

able to support its operating expenses, capital needs, debt service and reserve requirements, thereby

minimizing the support needed from other sources of revenue within the Port Authority.").[4]

In any event, there is no requirement that there be a deficit in order for tolls to be

constitutionally reasonable—far from it.[5]  The dormant Commerce Clause does not require a

perfect balance of revenue and expense:  tolls are permitted to include "proper margins when

taking into consideration the benefits conferred."  *Angus Partners*, 52 F. Supp. 3d at 568–69.  For

example, in *Angus Partners*, the court rejected a dormant Commerce Clause challenge to tolls that

generated almost $1 billion in surpluses *annually*, finding that the tolls were based on a fair

approximation of use and not excessive.  *Id.* at 568.  In comparison, even using the flawed

methodology of AAA's expert, the ITN would apparently yield revenue of only approximately

$198.3 million *annually* over the 2010 to 2012 time period according to AAA.  That does not

exceed any standard of "excessive" or "unreasonable" in the case law.  It is an order of magnitude

less than the $1 billion figure accepted in *Angus Partners*.  *See id.*; *see also Selevan III*, 711 F.3d at

260 (holding Thruway Authority charges were not excessive because they "did not exceed proper

---

[4]  Each of the Fabiano scenarios for the ITN's capital demands over the next decade—all cash, 50%
cash/50% debt—show the ITN with a deficit.  *See* D.I. 133 ("PA Op.") at 11–16, 21–25; PA SOF
¶¶ 42–55.  AAA does not contest Fabiano's arithmetic; its only response is to attempt to impose a rate
of return methodology on the Port Authority.

[5]  Notably, even under the flawed rate of return analysis that the AAA sponsors, the ITN would show a
deficit in 2010 leading up to the toll increase—and that deficit exists after improperly eliminating the
expense of contested ITN projects, and the ITN's payments of allocated costs and payment to the general
reserve fund.  *See* Opp. at 13.

margins, given the NYTA's public safety responsibilities and its expenses for construction and

maintenance"); *Janes v. Triborough Bridge & Tunnel Auth.* *("Janes II")*, 774 F.3d 1052, 1055 &

n.6 (2d Cir. 2014) (affirming dismissal of dormant Commerce Clause claim on summary judgment

in part because tolls at issue on three bridges provided "crucial revenue that supports the larger

[MTA] system").

> ## 2. The Port Authority's Cash-Flow Analysis Establishes the Tolls Are a "Fair Approximation of the Use of the ITN Facilities" and "Not Excessive"

The AAA *does not challenge* the numbers underlying Fabiano's cash flow analysis.

Instead, it attempts to substitute its own judgment for that of the Port Authority, by claiming that:

(1) Fabiano incorrectly took into consideration as ITN expenses certain allocated costs for general

fund requirements and operations; and (2) Fabiano incorrectly included certain projects in the

ITN's capital expenditures.  Neither argument has merit.

> ### a. The Port Authority Properly Considered the ITN's Allocated Costs and Reserve Fund Payments

*First,* regarding allocated expenses and reserve fund allocations, AAA recycles the same

meritless arguments it made in its 2011 affidavit from the AAA's Treasurer and CFO attacking

Fabiano's analysis.  *See* D.I. 17.  AAA does *not* challenge that such costs are in fact charged to the

ITN, nor does it explain *why* such costs should not be included as a legal matter.  Instead, AAA

speculates—without citation—that these costs are "subject to considerable management

discretion."  Opp. at 14.  It bases this throwaway comment on the fact that the World Trade

Center's allocated costs and depreciation costs are less than those charged to the ITN.  *See* AAA

SOF ¶ 240.  This argument only serves to show AAA's ignorance of basic GAAP principles, as a

facility that is still under construction, and not in service, is necessarily subject to modest, or even

no, depreciation.   Fabiano Reply ¶ 8.

More fundamentally, however, AAA's argument reveals its continued misapprehension of the Port Authority's structure. *By statute*, the Port Authority is a pooled revenue agency—meaning it is required to allocate costs and reserve fund payments among the line departments and revenue sources of the Port Authority. N.Y. Unconsol. Laws § 7002; N.J. Stat. Ann. § 32:1-142. As Fabiano explained, the ITN contributes, as all other Port Authority line departments do, into the Port Authority's General Reserve Fund pursuant to statutory mandate that the Port Authority reserve 10% of the par value of the Consolidated Bonds issued for the Port Authority. Fabiano Reply ¶¶ 5–6. It is this pooled nature that allows the Port Authority superior access to the capital markets and permits the ITN to issue debt to finance the ITN capital infrastructure on beneficial terms. PA SOF ¶ 11.

Plaintiffs contend that the agency structure contributes to the dormant Commerce Clause violation, Opp. at 7–8, because ITN revenue, pooled with other Port Authority monies, makes reserve fund payments that benefit non-ITN operations. Nonsense. The case law is clear that such a legal structure, required by state law, does not render tolls excessive under the dormant Commerce Clause.[6] *See Angus Partners*, 52 F. Supp. 3d at 555 (taking into consideration capital investments, the operating budget, debt payments and investment income payments made by transit authority in analysis of dormant Commerce Clause challenge to increased tolls). Indeed, in *Evansville* the Supreme Court expressly approved consideration of bond costs in analyzing the fees

---

[6] Indeed, in the related test for assessing violations of the Highway Act, Congress was explicit that it did not intend the Act to disrupt this principle:

> The just and reasonable requirement is not intended to interfere with or in any way restrict existing authority granted to multi-modal transportation agencies, such as the Port Authority of New York and New Jersey, that operate bridges along with other facilities to use bridge toll revenues for non-bridge purposes or the pooling or combination of the revenues from all of their facilities.

*Molinari v. N.Y. Triborough Bridge & Tunnel Auth.*, 838 F. Supp. 718, 725–26 (E.D.N.Y. 1993) (quoting H.R. Conf. Rep. No. 27, 100th Cong., 1st. Sess. 175, *reprinted in* 1987 U.S.C.C.A.N. 66, 159).

at issue.  *See* 405 U.S. at 719–21.  And in *Alamo Rent-a-Car*, "given the long term nature of maintaining and developing [the facility], it was appropriate for the Authority to factor in future development plans when setting user fees.  To ignore the future expense of developing and expanding the [facility] to meet increased demands[] would increase rather than mitigate burdens on interstate commerce."  906 F.2d at 51.  Such costs were appropriately included in Fabiano's cash flow analysis.

### b.     The Challenged ITN Projects Were Properly Included in the Capital Plan

*Second,* AAA challenges the Port Authority's judgment to include in the ITN capital projects list the LTAP, the Bayonne Bridge, and a since-allocated CIF reserve fund.  AAA raised these arguments, almost verbatim, in its failed Second PI Motion.  AAA does not address *any* of the evidence the Port Authority submitted in its moving brief regarding these long-disclosed ITN projects, preferring to literally cut-and-paste its prior arguments without regard for the Court's prior rejection of these points.

AAA's argument misapprehends the deference courts have shown to an agency's considered policy judgment regarding expenditures.[7]  *See, e.g.*, *Doran*, 256 F. Supp. 2d at 56 (stating that if "the roads themselves facilitate interstate commerce, courts are not to give exacting scrutiny to the assessments of tolls to maintain them").  Indeed, courts have routinely held that because of the integrated nature of roads and bridges, "everyone benefits from each part of the system," and thus only a "functional relationship" between a fee or toll and those who pay it is

---

[7]  AAA's assertion that the Port Authority has not interpreted its own governing statutes is plainly wrong.  Opp. at 16 n.7.  There is no mystery here:  the Port Authority's policy choices and interpretation of authority are reflected in the Board of Commissioners' approval of the capital budget project allocations.  PA SOF ¶¶ 25–32.  Accordingly, the cases the Port Authority cites in its opening brief, which were ignored by the AAA in its Opposition, apply here and dictate that the Port Authority be given deference in its interpretation of its own governing statutes.  *See* Op. at 21 n.16.

required.  *Janes I*, 977 F. Supp. 2d at 341.  Only revenue diversion that serves no benefit at all to ITN users would contravene the Commerce Clause.  *See Bridgeport & Port Jefferson Steamboat Co. v. Bridgeport Port Auth.*, 567 F.3d 79, 88 (2d Cir. 2009) (using passenger ferry fees to support activities with no functional relationship to ferry service violated Commerce Clause).

### i.        The Lincoln Tunnel Access Project

AAA spends a substantial portion of its opposition brief rehashing its previous argument that the Port Authority is not permitted to undertake projects in connection with the Pulaski Skyway and N.J. routes 1& 9, N.J. Route 7, and the Wittpenn Bridge (the "LTAP").

*First,* AAA claims that the Port Authority may not fund projects that it "does not own or operate."  Opp. at 16.  AAA claims this would be "*ultra vires*," pointing to a single, inapposite 1977 case:  *State v. Port Auth.*, 376 A.2d 591 (N.J. Super. Ct. 1977).  At issue in that case was the construction of an entirely new highway interchange that had no connection to any facility and had only "incidental[] benefit" to the marine and airport terminals.  *Id.* at 593.  And it was the *Port Authority* that argued that the project required legislative approval, based on the Port Authority's Board of Commissioners' resolution making the project contingent on receiving "appropriate legislative authorization for Port Authority participation."  *Id.*

*Second,* AAA argues that the various enabling statutes do not permit the Port Authority to fund the LTAP.  It purports to cite the statutory language providing the Port Authority with express authority to "construct, own, maintain and operate [the Lincoln Tunnel], together with such approaches thereto and connections with highways" and urges a very narrow reading of "highways" and "approaches."  Opp. at 17–21 (citing N.Y. Unconsol. Laws § 6502; NJSA 32:1-119)).

AAA's quote, however, *omits* key language that precludes the proffered narrow reading:

> [T]he Port Authority is hereby authorized and empowered to construct, own, maintain and operate [the Lincoln Tunnel], together with such approaches thereto and connections with highways *as the Port Authority may deem necessary or desirable*.

N.Y. Unconsol. Laws § 6502; NJSA 32:1-119 (emphasis added). The emphasized language, which AAA cut from its quote, shows a clear intent to give deference to Port Authority judgments in this area.

Case law does not help AAA's argument. Once again, AAA cites to a single case, *Port Authority v. Weehawken Twp.*, 103 A.2d 603 (N.J. 1954), that stands for the unremarkable proposition that legislative approval would be required for the Port Authority to undertake the building of an *entirely new third tunnel under the Hudson River*. *Id.* at 580. This argument fails: after review of these statutes and the *Weekawkeen* case, this Court previously held that "AAA cites no law indicating that these projects [including LTAP] do not fall within the definitions of the statutes to which it cites."[8] D.I. 129 at 13.

---

[8]

The existing law is contrary to AAA's view that the Port Authority must operate in a narrow scope.  The Port Authority's governing statutes in New York and New Jersey actually show the Legislature's intent to allow the Port Authority discretion to address "the vehicular traffic moving across the interstate waters . . . [as] a general movement of traffic which follows the most accessible and practicable routes."  N.J. Stat. Ann. § 32:1-118; *see also* N.Y. Unconsol. Laws § 6501 ("[T]he users of each bridge or tunnel over or under the said waters benefit by the existence of every other bridge or tunnel since all such bridges and tunnels as a group facilitate the movement of such traffic and relieve congestion at each of the several bridges and tunnels.").

AAA does not challenge the record establishing that the purpose of the LTAP is to help serve the overall transportation network of the Port Authority, as the affected roads serve as critical access points to the tunnel and would "improve traffic flows."  PA SOF ¶¶ 29–30; *see also AAA v. The Port Auth. of N.Y. & N.J.*, 706 F. Supp. 264, 276 (S.D.N.Y. 1989) (finding that "the Lincoln Tunnel provides an alternative for users of the Holland Tunnel").  Nor does AAA dispute the record reflecting that repair of these heavily used roads was critical to help address "efficient transportation access and egress for goods and people."  PA SOF ¶30; *see also Janes I*, 977 F. Supp. 2d at 341 (finding it "fair to consider the benefits that flow from the tolls charged on . . . bridges on the entire transportation system within the New York City area").  AAA's preference for what the Port Authority should undertake and prioritize as ITN capital projects has no impact on the constitutionality of the tolls here.

### ii.    The Bayonne Bridge

For the Bayonne Bridge, AAA presents the same failed conclusions and conjectures it raised in its rejected Second PI Motion.  Opp. at 24–25 ("[E]ven if there were some benefit to motorists, is [sic] would be excessive to require motorists to pay the entirety of a project that is unnecessary but for the fact that large ships will not otherwise be able to pass under the bridge.").

AAA cannot dispute that *bridge tolls* are used for *bridge work*, and simply ignores the undisputed record in this regard about the Bayonne Bridge work.  *See* AAA SOF ¶¶ 211–12.  As explained in Fabiano's 2011 Affidavit:

> The Bayonne Bridge over the Kill Van Kull will be rehabilitated to increase its vertical clearance to accommodate shipping and ***to meet modern highway and structural design standards***. . . . This is necessary to maintain the competitiveness of the metropolitan region's marine terminals and ports and ***simultaneously permits modernization of the structure***.

D.I. 12 ¶ 7(b) (emphasis added).[9]  AAA fails to establish that the Port Authority's judgment to carry out the $1 billion (now $1.3 billion through 2023) capital improvement of the Bayonne Bridge as an ITN capital project is flawed as a matter of law.

### iii.   The "CIF"

Finally, AAA's conjecture and conclusions regarding the capital infrastructure fund or "CIF" avail it nothing.  The record shows that the approximately $996 million freed up in the budget due to the cancellation of ARC was reserved for "specific project[s]" "within the [ITN] infrastructure," subject to the Board of Commissioners' approval.  Fabiano Dep. 189:16–190:25, 191:2–19.

Fabiano's 2011 Preliminary Capital Plan was, by its very nature, an estimate of future costs for projects selected from a long queue of capital projects:

> [T]hese major projects were competing with that state of good repair work. . . . So it's a balancing act . . . we provide the envelope and the window of capacity, how much, and it's up to capital people to determine which projects can get into the mix and which don't; engineering assessments are done on the criticality and timeliness of it and whether or not it can be delayed without impacting life safety and operational efficiencies, and those decisions have to be made.

---

[9]   The Capital Plan Summary 2014–2023, submitted by AAA in its injunction papers, explains that this work will include "the replacement of the existing main span deck and the NY and NJ approach structure and access ramps" and will "provide standard 12-foot lanes, median safety barrier and shoulders, a bikeway and a future transit corridor."  D.I. 117-13 ("Mulry Decl., Ex. M") at 9.

Fabiano Dep. 50:18–51:11.  AAA's suggestion that the CIF reserve is an illusory inflation is incorrect.  AAA's own submission in previous papers shows that the Port Authority's final ten-year capital plan lists ITN capital needs between 2014–2023 exceeding $11.3 billion in specifically enumerated critical projects.  AAA SOF ¶ 32.  The CIF money was allocated to specific ITN capital projects as each was approved, and there is no CIF reserve line item in the final capital plan (as opposed to Fabiano's 2011 Preliminary Capital Plan).  *Id*. ¶ 31.

> **3.  The Tolls Are "Not Excessive" and Are a "Fair Approximation of Use" Based on the Undisputed Needs of the ITN**

Finally, again playing fast and loose with the undisputed record, AAA wrongly claims that the toll increase was "based" on the $25 billion Port Authority preliminary capital plan for 2011–2021 and, therefore, does not reflect a "fair approximation of use" of the ITN alone and is therefore "excessive in relation to benefit conferred" under the *Northwest Airlines* test.  Opp. at 22–28.  This misrepresents the record:  toll increase revenues do not approach covering a $10.8 billion ITN plan, much less a $25 billion capital plan.  Fabiano Reply ¶¶ 3, 6.

The Port Authority has five principal line departments:  Tunnels, Bridges and Terminals ("TB&T"); the Port Authority Trans-Hudson rail system ("PATH"); Aviation; Port Commerce; and Real Estate & Development.  The ITN is made up of TB&T, PATH, and the Trans-Hudson Ferry Service.  By statute, the Port Authority is a pooled revenue agency, but it also tracks (and reports) the financials, as well as proposed capital expenditures, by facility.  PA SOF ¶ 15; *see also* Mulry Decl., Ex. N (2014–2023 Capital Plan Summary); Mark Suppl. Decl., Ex. A at Schedules E, F (2011 audited financial report).

Because the Port Authority operates on a pooled basis, the $25.1 billion preliminary capital plan that was presented to the Board of Commissioners on August 19, 2011 included the proposed

capital projects for the entire Port Authority.  AAA SOF ¶ 126.  The $10.786 billion in ITN-specific capital projects were part of this total plan.   AAA SOF ¶ 160; PA SOF ¶ 47.

The total amount of the preliminary capital plan, however, is a red herring.  Fabian's ITN cash flow analysis includes only the ITN's own allocated $10.786 billion of capital expense, so the demonstrated ITN deficit does *not* reflect funding required for the Port Authority's entire $25 billion preliminary capital plan.  On a cash-flow basis, the ITN had run a $636 million deficit from 2007 through 2010 and was projecting another deficit in 2011.  AAA SOF ¶¶ 42, 43, 45.  The record and testimony amply show that the Port Authority's non-ITN lines subsidized the ITN and that the subsidy had reached critical levels in the face of the ITN's pressing capital infrastructure needs for bridges and tunnels.  The tolls approved do not erase the ITN's deficit or pay for the whole Port Authority capital program.  They merely reduce the ITN deficit's "drag" on the rest of the Port Authority.  PA SOF ¶¶ 51–52,75–77.  These fees pass the broad constitutional test of *Northwest Airlines*.

At bottom, AAA's argument turns on its unsupported contention that ITN financials should be wholly segregated from the rest of the Port Authority.  Opp. at 14–15.  But nothing requires the Port Authority to operate and account for the ITN as a standalone entity.  Commerce Clause cases make clear that it is "immaterial whether . . . funds are expressly earmarked for [facility] use," as the issue is whether the *amount* of the funds received is "shown to exceed . . . [facility] costs." *Evansville*, 405 U.S. at 720.  Summarizing *Evansville's* "explicit" guidance, then-Judge Breyer wrote:  "what the fees themselves are *actually* spent on is irrelevant.  The question is the relationship between the *amount* the fees raise and the *amount* the state likely spends. *The Commerce Clause does not require states or courts to trace individual dollars*." *N.H. Motor Transp. Ass'n*, 751 F.2d at 49 (emphasis added).  This statement describes the type of cash-flow

15

analysis the Port Authority presented, the arithmetic of which AAA does not dispute.

The ITN need not secede from the Port Authority to comply with the Commerce Clause, and the Port Authority's statutorily-mandated status as a pooled revenue agency does not put the ITN in violation of the Commerce Clause. *See Jorling v. U.S. Dep't of Energy*, 218 F.3d 96, 105 (2d Cir. 2000) (holding that "as long as charges fairly approximate use and thereby fairly approximate costs of available services, it does not matter whether or how a government entity segregates the money it collects").

**B.      The AAA's Highway Act Claim Fails as a Matter of Law**

**1.      The Highway Act Creates No Private Right of Action**

Section 508 of the Highway Act is modest. It states only that "[t]olls for passage or transit over [certain] bridge[s] . . . shall be just and reasonable." 33 U.S.C. § 508 (1988). From this single sentence, AAA attempts to manufacture a private cause of action.

While AAA purports to focus its arguments on the text of the statute, its argument actually focuses on the administrative remedy Congress *eliminated* when it amended the Highway Act in 1987. Opp. at 33–35. The AAA's own papers recognize that the argument is non-textual, as the strongest statement they can make is that "Congress *impliedly* approved the previous system for challenging tolls, but *eliminated* the Administrator and the administrative process." Opp. at 34 (emphasis added).

There is no clear and manifest mandate in the actual text or structure of the Highway Act to overcome the presumption against the creation of an implied private right of action. The statute consists of a simple statement "that is notable mainly for its brevity." *Am. Trucking Ass'n, Inc. v. Del. River Joint Toll Bridge Comm'n*, 458 F.3d 291, 296 (3d Cir. 2006). The congressional insertion of the just and reasonable baseline was done simultaneously with the congressional removal of the administrative oversight mechanism. If Congress intended to create a private right

16

of action to bring a "just and reasonable" claim, it could have done so with a brief textual addition. It did not.

AAA's Opposition wholly ignores the Port Authority's opening explanation that remedies other than administrative action and private rights of action exist.  As *American Trucking* explains, state political processes provide a forum for "the airing of toll grievances."  *Id.* at 303.  This point stands unrebutted by Plaintiffs.[10]

### 2.       The Toll Increase Is Just and Reasonable

If the Court reaches AAA's Highway Act claim, the merits analysis is no different from the dormant Commerce Clause claim.  Case law treats the Highway Act test as equivalent to the Commerce Clause test.  *See Auto Club of N.Y. Inc. v. Port Auth. of N.Y & N.J.*, 842 F. Supp. 672, 679–80 (S.D.N.Y. 2012); *Molinari*, 838 F. Supp. at 724–25.  This point is aptly illustrated in AAA's Opposition Brief, which raises the same issues on its Highway Act claim as those raised on its Commerce Clause claim.  *Compare* Opp. at 23–28, *with* Opp. at 29–32.  Accordingly, AAA's Highway Act claim warrants the same treatment as its Commerce Clause claim—dismissal.

### C.       AAA Cannot Use an Expert Report to Create Issues of Fact

AAA's use of purported expert testimony to create facts where none exist should be summarily rejected.

---

[10]    If resort to legislative history were at all warranted, it would only confirm that no implied private right of action exists.  *See Am. Trucking*, 458 F.3d at 303 ("[L]egislative history is clear [that] . . . Congress intended to remove the federal government from toll oversight because it viewed the regulation of tolls as a matter better left to local officials[;] . . . it does not readily follow that Congress would have intended to subject local toll authorities to suit in federal court as a means of enforcing § 508."); *accord Molinari*, 838 F. Supp. at 724 ("Implying [private cause of action] is not only inconsistent with the congressional purpose of 'removing Federal regulation and review of increases on certain toll bridges,' but would occupy an area traditionally the concern of state law—the regulation of tolls on intrastate bridges constructed without federal aid.")).

*First,* the declaration of Jonathan Peters (the "Peters Declaration") employs an improper methodology and is rife with mistakes.  The core problem with the Peters Declaration is its attempt to argue a legal proposition:  that the Port Authority must use a specific form of rate of return analysis to evaluate toll rates.  *See, e.g.*, Peters Decl. ¶ 4 (Under a rate of return analysis, "a regulating entity such as the New Jersey Board of Public Utilities or the Federal Communications Commission would identify *what level of profit is needed to compensate investors for their risk of investing in the regulated firm*.") (emphasis added).  Peters' premise is that rate of return analysis is proper where (1) there is a single utility, (2) that is investor-owned, (3) is subject to a rate regulating entity, and (4) has a specific requirement of compensating investors with a reasonable level of profit for their risk in funding the regulated utility.

Utility-type rate of return methodology does not apply to Port Authority toll rates and the reason is obvious:  the Port Authority is not a regulated entity like an investor-owned utility or a regulatory body like a utility commission.  The Port Authority's organic law does not require it to make a "rate case" to any governing body, as is typical of investor-owned and heavily regulated public utilities such as electric or water utilities.  Further, the Peters Declaration similarly ignores the statutory mandate to operate the Port Authority on a pooled revenue basis.  Peters Decl. ¶¶ 36–38.  Peters' dismissal of actual debt and reserve obligations of the agency as inconsistent with his rate of return approach is simply a denial of statutory requirements.  PA SOF ¶¶ 18–22.  Once the major premise that the law mandates a rate of return analysis is denied, the rest of Peters' analysis fails.

But even if Peters' views as to how the Port Authority *should* operate had a shred of merit, they would still create no issue of fact, because they are policy arguments that have no place in any Commerce Clause analysis.  *See Industria y Distribucion de Alimentos*, 2015 WL 4880997, at *5

("Over a dormant Commerce Clause challenge, we . . . emphatically rejected the idea that 'customer judgments of benefits received' form any part of the constitutional analysis.  Instead, the service must merely be 'relevant to the operation of the [entity].'") (citations omitted).

 **Second,** Rule 702 of the Federal Rules of Evidence is plain in its text that expert testimony, in order to be admissible, *must* "help the trier of fact to *understand the evidence* or to *determine a fact in issue*."  Fed. R. Evid. 702 (emphasis added); *Highlight Capital Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 468 (S.D.N.Y. 2005).  On this threshold issue, AAA falls woefully short.  Rather than assist the trier of fact in "understand[ing] the evidence," AAA uses its purported expert to attempt to create evidence out of his speculation in the hopes of generating some facts to put "in issue."  Fed. R. Evid. 702.  AAA's statements of fact in paragraphs 225 to 255 and 257 to 273 cite to the "Peters Declaration" as the sole source of "evidence" in support of the given proposition.  That is not a permissible use of expert testimony.  *Highlight Capital*, 379 F. Supp. 2d at 469 (permitting experts to look to the existing facts to formulate an opinion but rejecting testimony submitted "solely for the purpose of constructing a factual narrative based upon record evidence"); *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 677 (S.D.N.Y. 2007) (recognizing that facts, including those in an expert report, "should of course be proved by admissible evidence and not expert assertion").  AAA's use of the Peters Declaration is nothing more than an impermissible attempt to *literally* conjure issues of fact.

 **Third,** the Peters Declaration warrants exclusion because AAA has failed to carry its burden of demonstrating that Peters has the "specialized knowledge" necessary to opine competently on the Port Authority's financial structure.  *LinkCo, Inc. v. Fujitsu Ltd.*, 2002 WL 1585551, at *4 (S.D.N.Y. July 16, 2002) (noting it is permissible in limited situations for experts to testify apart from scientific or technical knowledge through reliance on other "specialized

19

knowledge" but not "[w]ithout good explanations" as to the basis of the expert's conclusions). "The burden of proving the admissibility of expert evidence, as with all evidence, rests with the proponent." *Reach Music Pub., Inc. v. Warner Chappell Music, Inc.*, 988 F. Supp. 2d 395, 401 (S.D.N.Y. 2013).[11]  AAA has not provided anything to suggest that Peters has any expertise in how the Port Authority—a joint compact organization with a highly unique structure—operates. Indeed, Peters' failure to consider or appreciate the significance of the Port Authority's pooled agency status (instead trying to impose a methodology derived from investor-owned utilities that report to a regulatory board) shows that his general finance expertise is simply inapt for the Port Authority's particular structure.

## CONCLUSION

For the above reasons the Port Authority respectfully requests that this Court grant its motion and dismiss Plaintiffs' Complaint with prejudice.

Dated:   October 9, 2015
         New York, New York

                                        GIBSON, DUNN & CRUTCHER LLP


                                        By:   /s/ Richard W. Mark
                                        Richard W. Mark (RM-6884)
                                        Nancy E. Hart (NH-1789)

                                        200 Park Avenue
                                        New York, NY  10166-0193
                                        Telephone: 212.351.4000
                                        Facsimile:  212.351.4035

                                        *Attorneys for Defendant Port Authority*

---

[11]   *See also United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007); *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 584–85 (1993).