UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____x

AMERICAN TRUCKING ASSOCIATIONS,
INC., WADHAMS ENTERPRISES, INC.,
LIGHTNING EXPRESS DELIVERY SERVICE INC.,
and WARD TRANSPORT & LOGISTICS CORP.,

Plaintiffs,

-against-

13 Civ. 8123 (CM)

NEW YORK STATE THRUWAY AUTHORITY,
NEW YORK STATE CANAL CORP.,
THOMAS J. MADISON, JR., HOWARD MILSTEIN,
DONNA J. LUH, E. VIRGIL CONWAY,
RICHARD N. SIMBERG, BRANDON R. SALL,
J. RICE DONALD, JR., and JOSE HOLGUIN-VERAS

Defendants.

_____x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:____8__10__16__

## DECISION AND ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING DEFENDANTS' CROSS MOTION FOR SUMMARY JUDGMENT

McMahon, C.J.:

The complaint in this case challenges the constitutionality of the New York State

Thruway Authority's use of New York Thruway toll revenue to maintain the New York State

Canal System, which an anachronistic provision of the New York State Constitution obligates

the State to maintain in perpetuity.

Plaintiffs, commercial trucking companies that use the Thruway while engaging in

interstate commerce and their national trade association,[1] contend that the Thruway's toll rates

_____

[1] The four named plaintiffs ("Plaintiffs") are a trucking industry trade association (the American Trucking
Association) and three commercial shipping and warehousing conpanies (Wadhams Enterprises, Inc., Lightning
Express Delivery Service Inc., and Ward Transport & Logistics Corp.). They bring suit on behalf of themselves and

1

violate the so-called Dormant Commerce Clause, because they are inflated to cover the cost of improving and maintaining a canal system that Plaintiffs do not use and that affords them no benefit.

This Court originally granted the Defendants' motion to dismiss the case without prejudice because the State of New York was a necessary party; its joinder would have required the case to be litigated in the New York Court of Claims, rather than in a federal court. (*See* Dkt. No. 28.) However, the United States Court of Appeals for the Second Circuit overturned that decision, with two members of the panel concluding that the State was not a necessary party, and all three agreeing that the Attorney General, who appears here as counsel for the Thruway Authority, will adequately protect the interests of the State. *See Am. Trucking Ass'n, Inc. v. New York State Thruway Auth.*, 795 F.3d 351, 360, 362 (2d Cir. 2015); *id.* at 362 (Newman, J., concurring). The case was remanded for a decision on the merits. *Id.* at 360.

Plaintiffs have moved for partial summary judgment on the issue of liability and seek a trial on the issue of damages. Defendants have cross-moved for summary judgment dismissing the complaint.

The motions raise two issues for decision.

The first is whether the claims herein asserted are barred by limitations or by laches.

They are not.

The second is which side is correct on the merits.

The answer is: Plaintiffs. To the extent that toll revenues collected from interstate truckers are used to maintain the Canal System — which has great economic, historic and

---

a class of "all individuals and motor carriers who, since November 14, 2010, have paid tolls to the Thruway Authority for trucks that were traveling in interstate commerce on Thruway Authority roads." (*See* Class Action Complaint (Dkt. No. 1) ("Compl.") ¶ 136.)

2

recreational value for the State of New York and many of its constituent communities, but no transportation or other associated value to Plaintiffs — the incorporation of those expenses into the Thruway's toll rates, and their collection from the Plaintiffs, violates the Dormant Commerce Clause.

## BACKGROUND

The extensive history that underlies this lawsuit is recited by the Second Circuit in Judge Jacobs's majority opinion. *See Am. Trucking*, 795 F.3d at 354-56.

Briefly, the New York State Thruway Authority (the "Thruway Authority") is a public benefit corporation created by the New York State Legislature in 1950. Its stated purpose was to "finance, construct, reconstruct, improve, develop, maintain or operate" something called "the thruway system" (the "Thruway") together with incidental facilities. Pub. Auth. L. § 352, 353.

The Thruway Authority is authorized to charge fees for the use of the Thruway "or any part thereof necessary . . . to produce sufficient revenue to meet the expense of maintenance and operation and to fulfill the terms of any agreements made with the holders of its notes or bonds." Pub. Auth. L. § 354(8).

In 1992, the New York Public Authority Law redefined the term "thruway system" to include the State's historic barge canals and their adjacent lands (hereinafter, the "Canal System"). Pub. Auth. L. § 351(12). To facilitate the incorporation of the Canal System into the "thruway system," the New York State Legislature transferred jurisdiction over canal lands and all assets, equipment, and property associated therewith (the historic Erie Canal, which runs between Albany and Buffalo, being the principal such asset) to the Thruway Authority. Canal L. § 6. A brand new New York State Canal Corporation ("Canal Corporation") — which is named as a defendant in this action, along with the Thruway Authority and several of its officers and

3

directors (collectively, "Defendants") — was created as a subsidiary of the Thruway Authority. Pub. Auth. L. § 382(3). Finally, although the Thruway Authority is an autonomous public corporation independent of the State of New York, *see Mancuso v. NY State Thruway Authority*, 86 F. 3d 289, 296 (2d Cir. 1996), it was deemed to be the "state for purposes of such management and control [of the Canal System] but for no other purpose," Canal L. § 6(1).

All this was done to remove the expense of maintaining the Canal System and its assets from the backs of New York State taxpayers. They were saddled with this obligation by virtue of a well-intentioned but short-sighted provision of the New York State Constitution, adopted in the 19th century, which provides:

> The legislature shall not sell, abandon or otherwise dispose of the now existing or future improved barge canal, the divisions of which are the Erie canal, the Oswego canal, the Champlain canal, and the Cayuga and Seneca canals, or of the terminals constructed as part of the barge canal system; nor shall it sell, abandon or otherwise dispose of any portion of the canal system existing prior to the barge canal improvement which portion forms a part of, or functions as a part of, the present barge canal system; but such canals and terminals shall remain the property of the state and under its management and control forever.

N.Y. Const. art. XI, § 1. As admitted by the Thruway Authority, the 1992 Canal Law amendments "resulted in the State of New York['s] no longer having to provide for the operation and maintenance of the Canal System with money from the state's General Fund." (Defs.' Counterstatement of Material Facts in Opp'n to Pls.' Mot. for Partial Summ. J. (Dkt. No. 49) ("Defs.' Rule 56.1 Counterstatement") at ¶ 20.) The law thus effectively insulated the Canal System and its operations from the whims of the taxpayers or from more pressing demands for public funds.

The canals and adjacent lands are presently used for many purposes, most of them recreational, some of them educational, but very few of them related to transportation.

And therein lies the rub.

4

## MATERIAL AND UNDISPUTED FACTS

The parties spar with each other over numerous issues that are not, in the end, material to

the decision on the instant motions. For present purposes, a number of relevant facts are

undisputed. I list them here.

1. The Thruway Authority collected the following amounts in toll revenue from

motorists between the years 2010 and 2014:[2]

> 2010: $641.2 million
> 2011: $634.1 million
> 2012: $637.7 million
> 2013: $637.7 million
> 2014: $664.1 million.

2. The total operating expenses (excluding depreciation and amortization) for the

Thruway Authority for non-canal expenses in those same years was:[3]

> 2010: $402.3 million
> 2011: $414.1 million
> 2012: $407.7 million
> 2013: $351.1 million
> 2014: $358.7 million.

---

[2] I apologize to the reader in advance for the extensive footnotes. I do not like footnotes — indeed, I required the Defendants to file new briefs because their original briefs were more than 50% footnotes. (*See* Dkt. No. 65.) However, because the parties both (1) assert statistics in their respective Statements of Material Facts, and (2) admit statistics compiled by the other side in their respective Counterstatements of Material Fact (in Plaintiffs' case, those admissions are made solely for the limited purposes of deciding these motions), even if the numbers are different, it can seem that two seemingly inconsistent sets of numbers for the same proposition are "admitted." I thus find that I have to explain at great length why the facts are undisputed. Undisputed Fact 1 illustrates the problem facing the Court. Plaintiffs assert in their Statement of Material Facts that the Thruway Authority collected $641.2 million in toll revenues in 2010. Defendants admit that assertion of fact in their Response to Plaintiffs' Statement of Material Facts. (*See* Defs.' Rule 56.1 Counterstatement ¶ 44.) But in their own Statement of Undisputed Facts, Defendants assert that Thruway "revenue" (other than canal revenues) for 2010 was $672.5 million. (*See* Defs.' Statement of Material Facts ISO Cross-Mot. for Summ. J. (Dkt. No. 50) ("Defs.' Rule 56.1 Statement") ¶ 2.) There is a 5% discrepancy between those numbers. But since this case is about tolls, I used the numbers for toll revenues that was asserted by Plaintiffs and admitted by Defendants. Recognizing that "toll revenue" and "revenue" are likely different, I feel no need to reconcile any seeming disparity.

[3] Plaintiffs assert that this amount may include certain administrative and general charges that should rightly be attribute to Canal System operations, but disclaim the need to confirm that assertion for purposes of this motion. I accept the disclaimer.

3. By the Thruway Authority's own reckoning (*see* Defs.' Rule 56.1 Statement ¶ 2,

Fig. 1 (hereinafter "Figure 1")) and admission (*see* Defs. Rule 56.1 Counterstatement ¶¶ 63-64),

the Thruway Authority has spent over $1.1 billion on the Canal System since 1992 — $1.06

billion of which came from tolls collected from motorists on the Thruway.

4. In the years 2010-2015, the Thruway Authority contributed the following

amounts for operating expense of the Canal System:[4]

> 2010: between $61.6 million and $66.3 million
> 2011: between $67.7 million and $81.3 million
> 2012: between $65.8 million and $74.7 million
> 2013: between $68.1 million and $70.1 million
> 2014: between $65.9 million and $92.9 million.

5. Revenues derived from commercial users of the barge canals themselves cover an

infinitesimal portion of the cost of running the Canal System. Between 1994 and 2014 actual

canal revenues totaled just $41.18 million — less than the cost of running the Canal System in

any single year since the Thruway Authority took it over (*see* Undisputed Fact 4) — and

averaged $1.96 million per year. (*See* Figure 1.) In its most "profitable" year, 2012, revenues

from canal users generated no more than $3.94 million. (*See* Figure 1; Pls.' Counterstatement of

Material Facts in Opp'n to Defs.' Cross-Mot. for Summ. J. (Dkt. No. 57) ("Pls.' Rule 56.1

Counterstatement") at ¶ 2.)

---

[4] In each case, the lower number was asserted in the Plaintiffs' Statement of Undisputed Material Facts and admitted by Defendants in their Counterstatement, while the higher number was asserted in the Defendants' Statement of Undisputed Material Facts (though identified as "canal costs net of canal revenues and federal/other aid") and admitted (albeit solely for the purposes of deciding the motions) by Plaintiffs in their Counterstatement. (*Compare* Defs.' Rule 56.1 Counterstatement ¶¶ 67-70, 77, 84, 90, 96, 102 *with* Figure 1.) I gather from statements made by Defendants in their Counterstatement of Material Facts that the difference may be attributable to accounting for unfunded pension liabilities — a perennial sore spot where public pensions are concerned. In any event, what is undisputed is that a whole lot of money collected from drivers went to support the Canal System; the range, which is undisputed, demonstrates that, and is all that is material for purposes of this opinion.

6

6. By contrast, since 1994, per the Authority's figures, total Canal System costs were $1.5 billion. (*See* Figure 1.)

7. Simple mathematics reveals that revenues from canal users covered, on average, just over one fifth of one percent of Canal System costs. (*See* Undisputed Facts 5 and 6; *see also* Figure 1.)

8. There are sources of revenue available to the Thruway Authority other than highway tolls and canal user fees, and at least theoretically some or even all of those funds could be used to fund the Canal System's operating costs.[5] Total non-toll revenues for the years 2010-2014 were as follows:[6]

> 2010: $33.1 million
> 2011: $33.4 million
> 2012: $35.3 million
> 2013: $33.9 million
> 2014: $34.7 million.

(*See* Defs.' Rule 56.1 Counterstatement ¶¶ 78, 82, 88, 94, 100.)

9. These "other revenue sources," however, do not begin to cover the shortfall between annual revenues from canal user fees and the annual cost of operating and maintaining the Canal System. (*See, e.g., id* ¶¶ 48, 50.)

---

[5] The record contains almost no information about those sources of revenue (federal grants apparently being one) other than to say that they exist. The record also contains no information about any restrictions on the expenditure of funds obtained from the federal government or from sources other than canal user fees (which, presumably, are available for any canal-related purpose). I imagine that at least some of these aid monies are restricted to highway use, which would make them unavailable for canal-related purposes. However, the record at present contains no information that would either corroborate or contradict my conjecture, which certainly cannot be treated an undisputed fact.

[6] In Figure 1, Defendants appear to show negative numbers for "federal/other aid" in every year (I was taught that a number in a financial statement that appeared inside parentheses was a negative number; conventions may have changed, for I went to school many years ago). But they also admit the listed numbers as asserted by Plaintiffs in their Statement of Material Facts. Since the larger number is more favorable to the Thruway Authority, I consider this to be undisputed for purposes of deciding these motions.

7

10. In papers filed in this lawsuit, the Thruway Authority has made the following statements, both to this Court and to the Second Circuit: "highway tolls . . . cover the lion's share of its responsibilities for the canals" and toll revenues are "the principal mean" by which the Authority has funded the Canal System. (*See id.* ¶¶ 54-55.) The Court rejects as idiotic Defendants' assertion that the phrase "lion's share" or the word "principal" are "vague, unverifiable and legally irrelevant." (*See id.*) The phrase "lion's share" means "most," while "principal" means "foremost, main." I will assume that Mr. Schneiderman and his Associate Attorneys General are sufficiently literate to have known the meaning of the words they used in their own briefs. I thus deem it undisputed that Thruway tolls provide most of the financial support for the Canal System and its operations.

11. Viewing Undisputed Fact 10 through another lens makes clear how significant the Thruway tolls are to the operations of the Canal System. In both Figure 1 and their Memorandum of Law in Support of their Cross Motion, Defendants admit that somewhere between 9 and 14% of Thruway toll revenues are used to fund Canal System expenses not otherwise covered by other sources each year. (*See* Figure 1; Corrected Mem. of Law in Opp'n to Pls.' Mot. for Partial Summ. J. and ISO Defs.' Mot. for Summ. J. (Dkt. No. 66) ("Defs.' Br.") at 25.) They also admit, as shown in Figure 1, that this percentage has remained constant since the Authority became responsible for the Canal System in 1992. (*See* Figure 1.) That is consistent with the Complaint's allegation that between 10-12% of toll revenues are used to fund the Canal System, rather than to maintain the highways. (*See* Compl. ¶¶ 73-103.) Again, simple mathematics — that is, dividing the annual operating expense of the Canal System (*see* Undisputed Fact 5) by the annual toll revenue collected from motorists (*see* Figure 1; Undisputed Fact 1) — yields a similar result. It is

8

thus undisputed that somewhere between 9-14% of the toll revenues collected from motorists on the Thruway are used each year to fund Canal System expenses.

12. A significant percentage of those toll revenues are collected from commercial truckers — far in excess of their contribution to the traffic on the New York State Thruway. In the years 2011-2013, commercial truck traffic has made up approximately 10% of the annual traffic on the Thruway. Defendants admit that commercial trucks made up 10% of the annual traffic on the Thruway in 2011 — a fact supported by a 2012 report prepared by Jacobs Civil Consultants, Inc. (Defs.' Rule 56.1 Counterstatement ¶ 35; Decl. or Thomas R. Wolf ISO Mots. for Partial Summ. J of Pls. Am. Trucking Assoc., Inc., Wadhams Enterprises, Inc., Lightning Express Delivery Serv. Inc., and Ward Transport & Logistics Corp. (Dkt. No. 36) ("Wolf Decl.") Exh. D ("Jacobs Report") at IV-3.). The Thruway Authority's own published statistics for 2013 reveal that commercial truck traffic amounted to just over 10% of total Thruway traffic in both 2012 and 2013. (*See* Wolf Decl. Exh. V at 2-3 (N.Y. Thruway Authority, Vehicle Trips, Miles and E-ZPass Statistics: December (2013).) While Defendants decline to admit these numbers, they are admissions. Furthermore, Defendants do not offer any evidence (all of which would be in the Thruway Authority's control) to contradict the published figures. Therefore, Defendants fail to raise any genuine issue of material fact.

13. Because commercial trucks are larger, heavier vehicles, they are required to pay higher tolls, and as a result, account for a larger percentage of the Thruway's toll revenue. For example, commercial truckers accounted for approximately 37% of the Thruway's toll revenue in 2011 — a fact that Defendants admit. (*See* Defs.' 56.1 Rule Counterstatement at ¶ 36.) As it is undisputed that commercial truck traffic remained at the same level in 2012 and 2013, and there

9

was no change to the toll rates, it is fair to infer that the truckers paid around one-third, or a little bit more, of the tolls collected along the Thruway during those two years as well.[7]

14. The Canal System is important to the economic well-being of the State of New York[8] — particularly to the villages, hamlets, and towns that line its 524 miles of waterways. (*Id.* ¶¶ 27-31.)

15. One benefit of the Thruway Authority's expenditure of highway toll receipts (and other funds) for the maintenance and operation of the Canal System is that it promotes economic development in Upstate New York. (*See id.*)

16. The Canal System is a tourist attraction, offering visitors recreational activities, including hiking trails, as well as educational activities about the barge canals and the history of Upstate New York. (*See* Wolf Decl. Exh. T.) It generates nearly $400 million in tourism revenues annually for those who live and do business along the canals. (*See* Defs.' Rule 56.1 Counterstatement ¶ 31.) The tourist revenue generated by the Canal System is thus approximately 200 times the average annual revenue generated from commercial users of the barge canals.

17. Another benefit of the Authority's expenditures of highway toll receipts (and other funds) for the maintenance and operation of the Canal System is to maintain its status as a "tourist attraction." (*See id.*)

18. Notwithstanding the importance of the Canal System to the State of New York, the record contains not a scintilla of evidence that long distance truckers, in their capacity as

---

[7] Defendants admit that commercial trucks accounted for 37% of the Thruway's 2011 toll revenues, but deny that this percentage would be the same in other years. I will, therefore, assume that this number fluctuates from year to year. But given the undisputed fact in the preceding paragraph, it does not appear to fluctuate very much.

[8] This fact is not actually material to the decision on the motion, but it is most certainly undisputed.

10

commercial drivers on the toll roads known as the New York State Thruway, derive any benefit whatever from the Canal System's waterways, its museums and educational attractions, and the parks and recreational areas adjacent to the historic barge canals. The record reveals only *de minimis* use of the canals for commercial haulage, and contains an admission from the Canal Corporation that the canals are not, at present, "a viable transportation system for moving cargo." (Wolf Decl. Exh. R at 35 (N.Y. State Canal Corp., Report on Econ. Benefits of Non-Tourism Use of the NYS Canal Syst. (2014)).) Therefore, no reasonable trier of fact could conclude that commercial use of the canals results in an appreciable diminution of truck traffic on the Thruway itself — which would afford some benefit to the plaintiff truckers. No other actual or potential benefit to truckers from the Canal System to Thruway drivers is either identified or apparent; while the canals run largely parallel to the Thruway, very little of the Canal System (including its facilities) is either immediately adjacent to or directly accessible from the Thruway. (*See* Wolf Decl. Exh. D at II-2, II-7.)

## DISCUSSION

### I.     Standard for Summary Judgment

A party is entitled to summary judgment when there is no "genuine issue of material fact" and the undisputed facts warrant judgment for the moving party as a matter of law. Fed. R. Civ. P. 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). On a motion for summary judgment, the Court must view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Whether any disputed issue of fact exists is for the Court to determine. *Balderman v. U.S. Veterans Admin.*, 870 F.2d 57, 60 (2d Cir. 1989). The moving party has the initial burden of

11

demonstrating the absence of a disputed issue of material fact. *Celotex v. Catrett*, 477 U.S. 317, 323 (1986).

Once the motion for summary judgment is properly made, the burden shifts to the non-moving party, which "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250. The nonmovant "may not rely on conclusory allegations or unsubstantiated speculation," *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998), but must support the existence of an alleged dispute with specific citation to the record materials. Fed. R. Civ. P. 56(c).

While the Court must view the record "in the light most favorable to the nonmoving party," *Leberman v. John Blair & Co.*, 880 F.2d 1555, 1559 (2d Cir.1989) (citations omitted), and "resolve all ambiguities and draw all reasonable inferences in favor of the party against whom summary judgment is sought," *Heyman v. Commerce and Indus. Ins. Co.*, 524 F.2d 1317, 1320 (2d Cir. 1975) (citations omitted), the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec.*, 475 U.S. at 586 (citations omitted). Not every disputed factual issue is material in light of the substantive law that governs the case. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.

When summary judgment motions precede discovery, a party may oppose the motion by establishing that discovery would be needed to respond. Fed. R. Civ. P. 56(d). However, the fact that discovery has not yet been taken in this case is of no moment. Defendants, not Plaintiffs, are the custodians of every single fact and figure and bit of data concerning the Thruway and the Canal System operations needed to decide the issues raised by Plaintiffs' partial summary

12

judgment motion. They do not need discovery in order to controvert any of the evidence that has
been supplied to the Court by Plaintiffs in support of their motion, because they already have in
their possession every bit of evidence that could controvert any of the facts and figures asserted
by Plaintiffs in their Rule 56.1 Statement. (This is no doubt why Defendants have not submitted
an affidavit or declaration pursuant to Rule 56(d) attesting to an inability to oppose the motion.)

The fact that Plaintiffs have refused to admit the validity of some of those facts and
figures does not in and of itself raise any genuine issue of fact. Only evidence can contradict
evidence, and there can be no question about where contradictory evidence, if any existed, would
be found. To the extent that Defendants have declined to present contradictory evidence of facts
they refuse to admit, those facts are nonetheless undisputed. Fed. R. Civ. P. 56(e)(2).

With these principles in mind, we turn to the questions presented.

## II.    Plaintiffs' Claims Are Not Barred by the Statute of Limitations Or Laches

In their Complaint, Plaintiffs assert claims under the Dormant Commerce Clause and the
Privileges and Immunity Clauses of Article IV and the Fourteenth Amendment, both pursuant to
42 U.S.C. § 1983. (*See* Compl. ¶¶ 148-62.)

Plaintiffs seek two types of relief. First, they ask for damages, in the amount of tolls paid
in violation of the Dormant Commerce Clause since November 14, 2010 — exactly three years
prior to the filing of the Complaint. (*See* Compl. ¶ 153.) Second, they ask for equitable relief, in
the form of a declaratory judgment and a permanent injunction to prevent the future expenditure
of highway tolls collected by the Thruway Authority in a manner that violates the Dormant
Commerce Clause. (*Id.* ¶ 154.)

13

In their brief opposing Defendants' earlier motion to dismiss, Plaintiffs withdrew their Privileges-and-Immunities claim. (*See* Opp's to Defs.' Mot. to Dismiss (Dkt. No. 22) at 25.) We are, therefore, left to consider only their Dormant Commerce Clause challenge.

Defendants assert that Plaintiffs' Dormant Commerce Claim is barred, whether by the statute of limitations or by laches, because the Plaintiffs or their privies have known about the allegedly unconstitutional toll collections since either 1992 (when the canals and their assets were spun off to the Thruway Authority), or at the latest 2008 (when the current toll structure was adopted). Yet they failed to sue until 2013. (*See* Defs.' Br. at 7-18.)

Defendants are incorrect as a matter of law.

A. <u>A Claim for Damages is Not Barred by Limitations or Laches</u>

Congress did not provide a statute of limitations for claims brought pursuant to 42 U.S.C. § 1983, so the Supreme Court has directed courts to "borrow the general or residual statute for personal injury actions" from the state in which the claim was brought. *Owens v. Okure*, 488 U.S. 235, 250 (1989). In this district, the applicable statute of limitations on a claim brought under 42 U.S.C. §1983 is three years from the date on which suit is commenced. *Pearl v. City of Long Beach*, 296 F.3d 76, 79 (2d Cir. 2009); *see also* N.Y.C.P.L.R. § 214(5). Where, as here, the alleged violation of law has been going on for longer than three years, a plaintiff is limited to damages that accrue no more than three years from the date on which he commenced suit — in this case, November 14, 2010. *See Stone v. Williams*, 970 F.2d 1043, 1051 (2d Cir. 1992).

Defendants suggest that the statute of limitations on damages expired in 1995, three years after the Thruway took over the management and operation of the Canal System. They argue that truckers and their trade associations were on notice, as of the date of the passage of the statutes that set up the new funding scheme, that highway tolls would be used to fund the Canal System;

14

if there was a viable challenge to the constitutionality of that arrangement, it had to be brought during that three year period. (*See* Defs.' Br. at 7-8.)

Alternatively, Defendants suggest that the statute of limitations expired in April 2011, three years after the Thruway Authority adopted the current schedule of road tolls — the details of which were publicly known prior to its adoption, and which was opposed (albeit not by any of the named plaintiffs is this case), on the ground, *inter alia*, that the tolls were inflated by an amount equal to their use for Canal System funding. (*Id.* at 8-10.)

Plaintiffs, on the other hand, assert that each time the Thruway Authority collected an unconstitutionally excessive toll, it committed a separate and affirmative unlawful act that carried its own three year statute of limitations, "regardless of plaintiff's knowledge of the alleged illegality at much earlier times," citing *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997). In *Klehr,* a civil RICO case, the Supreme Court noted that, under the analogous Clayton Act, each overt act "starts the statutory period running again." *Id.* Plaintiffs also cite the Supreme Court's most recent pronouncement on the statute of limitations in "separate accrual" cases, *Petrella v. Metro-Goldwyn-Mayer, Inc*, -- U.S. --, 134 S. Ct. 1962, 1969 (2014) — a copyright case in which the Court stated that when a defendant commits successive acts of infringement, "the statute of limitations runs separately from each violation" because, "Each wrong gives rise to a discrete 'claim' that 'accrue[s]' at the time the wrong occurs." Plaintiffs further note that among its proposed class members are plenty of drivers who were not engaged in commercial trucking between 1992 and 1995 — and some who did not begin driving until the last two or three years — whose claims could not possibly be time barred.

Plaintiffs are correct.

15

In this case, the alleged wrong suffered by the plaintiff class is the collection of unconstitutionally inflated tolls — something that occurs every day as class members pass through toll booths. The wrong complained of by the class is not the adoption of the toll schedule (an act that did not cause any injury to individual truckers until it hit them in their pocketbooks), and it is certainly not the decision to turn the canals over to the Thruway Authority. It is true that those legislative and administrative acts laid the foundation for the pocketbook injury ultimately suffered by the members of the plaintiff class; but the actual injury was worked by the toll collections themselves. So the fact that those foundational acts took place more than three years before November 2013 is irrelevant. "A law that works an ongoing violation of constitutional rights does not become immunized from legal challenge for all time merely because no one challenged it within [three] years of its enactment." *Kuhnle Bros. v. Cnty of Geauga*, 103 F. 3d 516, 522 (6th Cir. 1997).

Defendants insist that Plaintiffs' complaint attacks the constitutionality of the rate structure, and does not complain about the collection of tolls from individual truckers. They are in error. Of course the complaint criticizes the rate structure; Plaintiffs assert that the tolls are too high because they were deliberately set at a level that would comfortably fund both the operation of the Thruway (with its adjacent facilities) and the operation of the Canal System. And Plaintiffs specifically seek, as equitable relief, adjustment of the tolls to exclude those costs from the rate base. But the Complaint specifically alleges a claim for damages by member of a plaintiff class, in the form of a refund of so much of the tolls as were collected for the purpose of funding the Canal System (which is to say, the pro rata share of the tolls that were used for that allegedly improper purpose). (*See* Compl. ¶¶ 153, 161.)

16

Defendants' invocation of the "continuing violation" doctrine — which they (wrongly) identify as the basis for Plaintiffs' timeliness argument — is puzzling, if only because it appears that they do not understand how it works. The continuing violation doctrine allows a plaintiff to collect all damages resulting from a single ongoing violation of his rights that commenced outside the relevant limitations period, as long as some act giving rise to the violation occurred during the limitations period. The classic example is a hostile work environment claim in employment discrimination litigation. As long as some act furthering a hostile work environment took place within 300 days of a plaintiff's filing an Equal Employment Opportunity Commission charge complaining about a hostile work environment, the plaintiff can recover for wrongs perpetrated to maintain that environment even if they took place more than 300 days before the filing of the charge. *See Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 907 (2d Cir. 1997).

When it applies, the continuing violation doctrine effectively extends the period within which damages are recoverable. That said, the doctrine rarely applies. It is much disfavored, even in employment litigation. *See Curtis v. Airborne Freight Corp.*, 87 F.Supp.2d 234, 244 (S.D.N.Y. 2000). That is why Lilly Ledbetter was unable to recover damages for paychecks that were unequal due to her status as a woman (a continuing course of conduct if ever there was one), but that were paid to her outside the relevant statute of limitations. *Ledbetter v. Goodyear Tire & Rubber Co.*, 550 U.S. 618, 629-30 (2007), *abrogated by* Lilly Ledbetter Fair Pay Act, Pub. L. No. 111-2 (Jan. 29, 2009).

Here, the Plaintiffs are not trying to extend the period within which damages are recoverable. They have not asked to recover excessive toll payments made prior to November 14, 2010, on the ground that collections since that date are part of an ongoing wrong that commenced back in 1992, or in 2008. Rather, Plaintiffs limit themselves to asking for damages

17

that accrued within the three years immediately prior to the filing of this lawsuit. The continuing violations doctrine has no applicability to such a situation.

Defendants cannot get around this by resorting to the doctrine of laches. The Second Circuit ruled, in *Ivani Contracting Corp. v. City of New York*, 103 F.3d 257, 262 (2d Cir. 1997), that laches cannot bar a claim for damages that is timely under the applicable three year limitations period. As the Court of Appeals said, "laches within the term of the statute of limitations is no defense at law." *Id.* (quoting *United States v. Mack*, 295 U.S. 480, 489 (1935)).

Contrary to Defendants' argument, the Supreme Court in *Petrella*, 134 S. Ct. at 1972-74, did not overrule *Ivani* on this point. *Petrella* addressed cases where Congress expressly set a statute of limitations; the Court did not, either expressly or impliedly, overrule case law holding that laches is inapplicable within a statute of limitations not expressly set by Congress. *See id.*

The Plaintiffs' damages claim is, therefore, not time-barred.

B.  Equitable Relief is Not Barred by Laches

Plaintiffs also seek an equitable remedy in the form of declaratory relief and an injunction against future violations of the Dormant Commerce Clause. Although Plaintiffs' Dormant Commerce Clause claim presents thorny questions about the form that equitable relief should take, it is not barred by laches.

Laches is an equitable doctrine. It is invoked in circumstances when it would be inequitable to permit a lawsuit because a party has slept on his rights. *See Stone v. Williams*, 873 F.2d 620, 623 (2d Cir. 1989), *vacated on other grounds*, 891 F.2d 401 (2d Cir. 1989). A plaintiff's claim for equitable relief may be barred by laches where "(1) the plaintiff knew of the defendant's misconduct; (2) the plaintiff inexcusably delayed in taking action; and (3) the

18

defendant was prejudiced by the delay." *Ikelionwu v. United States*, 150 F.3d 233, 237 (2d Cir. 1998).

Because the application of laches extinguishes a party's right to sue, a federal district court must consider whether a less drastic form of equitable relief is a more appropriate remedy for delay than complete dismissal of the action — even if the elements of laches are proven. *See Waddell v. Small Tube Products, Inc.*, 799 F.2d 69 (3d Cir. 1986). Ultimately, "The determination of whether laches bars a plaintiff from equitable relief is entirely within the discretion of the trial court." *Tri–Star Pictures, Inc. v. Leisure Time Prods., B.V.*, 17 F.3d 38, 44 (2d Cir. 1994).

The question of whether laches bars a timely filed claim for injunctive relief has caused headaches for district courts in this circuit for years. *See, e.g., Price v. Fox Entm't Grp., Inc.*, No. 05 CIV 5259 SAS, 2007 WL 241387, at *2 (S.D.N.Y. Jan. 26, 2007). As discussed above, in *Ivani*, 103 F.3d at 260, the Second Circuit noted that the "prevailing rule" is that laches would not bar a timely-made claim seeking legal relief (*i.e.*, damages). However, the Second Circuit has never expressly extended *Ivani* to claims for equitable relief.

Other courts have, however. In *Lyons Partnership, L.P. v. Morris Costumes, Inc.*, 243 F.3d 789, 797 (4th Cir. 2001), the Fourth Circuit considered whether the owner of the intellectual property rights to Barney, the children's television character, could seek an injunction against continued infringement of its copyrights and trademarks. Relying in part on *Ivani*, the Fourth Circuit held that a federal statutory claim brought within the statutory limitations period could not be barred by laches, regardless of the type of remedy sought by the claimant. The Fourth Circuit reasoned:

> [W]hen considering the timeliness of a cause of action brought pursuant to a statute for which Congress has provided a limitations period, a court should not apply laches to

19

overrule the legislature's judgment as to the appropriate time limit to apply for actions brought under the statute. Separation of powers principles thus preclude us from applying the judicially created doctrine of laches to bar a federal statutory claim that has been timely filed under an express statute of limitations. And this principle is equally relevant when Congress creates a cause of action for traditional equitable remedies, such as injunctions, and specifies a statute of limitations for that action. *Thus, when Congress creates a cause of action and provides both legal and equitable remedies, its statute of limitations for that cause of action should govern, regardless of the remedy sought.*

*Id.* (emphasis added). Addressing specifically the plaintiff's request for injunctive relief, the Fourth Circuit also explained that ongoing conduct that threatens future harm "cannot be so remote in time as to justify the application of the doctrine of laches." *Lyons*, 243 F.3d at 797.

As my former colleague, Judge Scheindlin, concluded, "Under the reasoning of *Ivani* and *Lyons*, the inevitable conclusion is that the express statute of limitations in the Copyright Act precludes the use of the laches defense *in toto*, regardless of the relief sought." *Price*, 2007 WL 241387, at *3. Nonetheless, several decisions issued by courts in this district have declined to follow *Ivani*'s "prevailing rule." *See Legislator 1357 Ltd. v. Metro-Goldwyn-Mayer, Inc.*, 452 F. Supp. 2d 382, 392-93. (S.D.N.Y. 2006) (collecting cases).

In 2014, the Supreme Court provided some much-needed clarity. In *Petrella*, the Court held that, as long as a claim was brought within the limitations period established by Congress, laches could not be invoked to bar a claim for legal relief, and could only be invoked to bar a claim for equitable relief in "extraordinary circumstances." 134 S. Ct. 1972-74. The plaintiff in the case inherited the copyright renewal rights to a screenplay on which the blockbuster movie "Raging Bull" was based. Twenty nine years after the movie was released, sixteen years after the plaintiff renewed the copyright to the screenplay, and nine years after she first threatened to take legal action, the plaintiff sued the studio that produced the film for copyright infringement. As in this case, she sought damages for acts of infringement that fell within the statutory three-year

20

statute of limitations and injunctive relief to redress the possibility of future violations. *Id.* at 1971.

The Ninth Circuit had dismissed her infringement claims on the grounds of laches; the Supreme Court reversed, reasoning that Congress had expressly provided a three-year statute of limitations for copyright infringement and "courts are not at liberty to jettison Congress' judgment on the timeliness of suit." *Id.* at 1967.

Unlike *Ivani*, *Petrella* expressly applied to equitable as well as legal remedies, although the Court reserved the possibility that laches could bar a timely-filed claim for equitable relief in "extraordinary circumstances" where the "consequences of a delay in commencing suit" is of "sufficient magnitude to warrant . . . curtailment of the relief equitably awardable." *Id.* at 1977. As an example of such an extraordinary circumstance, the Court looked to *Chirco v. Crosswinds Communities, Inc.*, 474 F.3d 227 (6th Cir. 2007), in which housing developers were alleged to have used the plaintiffs' copyrighted architectural designs, without permission, when planning and building a housing development. *Id.* at 1978. Because the plaintiffs had been long aware of the defendants' project, but took no steps to halt it until more than 168 units were built and 109 occupied, laches rightfully barred destruction of the housing project, even though the infringement claim was filed within the applicable statute of limitation. As the Sixth Circuit held, "the plaintiffs knew of the defendants' construction plans before the defendants broke ground, yet failed to take readily available measures to stop the project[,]" and the requested relief would "work an unjust hardship" upon the defendants and innocent third parties." *Id.*

As Defendants note, the Court in *Petrella* distinguishes between statutes of limitations expressly established by Congress and those borrowed from state statutes — which is, of course, the case here. (*See* Corrected Reply Mem. of Law in Further Support of Defs.' Cross-Mot. for

21

Summ. J. (Dkt. No. 67) ("Defs.' Reply Br.") at 11.) *See, e.g., Petrella*, 134 S. Ct. at 1967; *id.* at 1973 n.15 (noting that the Lanham Act does not have an express statute of limitations, unlike the Copyright Act). Because the Court based its reasoning in *Petrella*, in part, on the separation of powers — specifically the impermissibility of the judiciary's *shortening* of a limitations period expressly set by Congress — it is open to question whether *Petrella* applies with the same force where Congress did not establish an applicable statute of limitations, since the Supreme Court was silent on this point in *Petrella.* However, there is reason to believe that it does.

First of all, it is not technically accurate to say that Congress did not provide the statute of limitations for a suit under 42 U.S.C. § 1983, like this one. While Congress did not set a specific statute of limitations for Section 1983 claims, it has directed courts to borrow a closely applicable state statute of limitations in such situations. That is itself a judgment by the First Branch, one that is entitled to deference from the Third.[9]

Second, *Petrella* did not rely only on the separation of powers argument. In deciding that laches did not apply to the plaintiff's claim for damages, for instance, the Court reasoned that the Ninth Circuit had erred by ignoring the fact that the Copyright Act "itself takes account of delay" by limiting recovery of damages to three years from the filing of the complaint. *Id.* at 1973. It also noted that the Copyright Act permits the court to offset damages and limit recovery. *Id.* Both of these facts limit the need for the doctrine of laches for claims filed within a statute of

---

[9] Congress expressly specified that where federal laws are "deficient in the provisions necessary to furnish suitable remedies . . . the common law, as modified and changed by the constitutions and statutes of the State wherein the court [resides]" applies, unless it is "inconsistent with the Constitution and the laws of the United States." 42 U.S.C. § 1988. That provision — which gives claims brought pursuant to 42 U.S.C. § 1983 their statute of limitations, *see Owens v. Okure*, 488 U.S. 235, 249–50 (1989) — can also be said to reflect "Congress' judgment on the timeliness of suit," *see Petrella*, 134 S. Ct. at 1967. This reflection of Congressional intent was not discussed in *Petrella*, but it should not be casually tossed aside.

22

limitations. This reasoning applies whether a statute of limitations was created by Congress or was, at Congress' direction, borrowed from a state.

Finally, when laches is claimed but the court does not believe it equitable to bar Plaintiffs' claims outright, it has the power to fashion an equitable remedy that addresses any prejudice suffered by Defendants as a result of Plaintiffs' delay. This also effectively reduces the need for a doctrine of laches where claims are timely filed. *See Waddell*, 799 F.2d 69. *See also Kamberos v. GTE Automatic Electric, Inc.*, 603 F.2d 598, 603 (7th Cir. 1979). In *Petrella*, after denying the defendants' laches defense, the Court specifically stated that "adjustments may be in order in awarding injunctive relief" to "take account" of the Defendant MGM's conduct prior to suit. *Id.* at 1978. The Court noted that any injunction might have to take account of MGM's early knowledge of the plaintiff's claim, "the protection MGM might have achieved through pursuit of a declaratory judgment, the extent to which MGM's investment was protected by the separate-accrual rule," and "any other considerations that would justify adjusting injunctive relief or profits." *Id.* at 1978-79. Such adjustments allowed the court to fashion a remedy that addresses any prejudice suffered by the defendants, without resorting to the draconian remedy of laches.

Not surprisingly, then, courts outside this circuit have described *Petrella*'s legal reasoning as "categorical" and applied its holding to equitable claims filed within an applicable statute of limitations, whether or not that statute of limitations was enacted by Congress. In *Operating Engineers Local 324 Health Care Plan v. G & W Const. Co.*, 783 F.3d 1045, 1055 (6th Cir. 2015), a case particularly pertinent to this one, the Sixth Circuit held that, after *Petrella*, laches did not bar an ERISA collection action, even though ERISA does not provide a statute of limitations for such claims and federal courts rely on the statute of limitations from an analogous state cause of action. *Id.* at 1054. Courts have also suggested that *Petrella* prevents a laches

defense from barring claims brought under the Endangered Species Act, which takes its statute of limitations in civil actions from 28 U.S.C. § 2401(a),[10] *see Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 781 F.3d 1271, 1286 (11th Cir. 2015), and the National Environmental Protection Act and the Federal Aid Highway Act, which take their statutes of limitations from the Administrative Procedure Act, *see RB Jai Alai, LLC v. Sec'y of Florida Dep't of Transp.*, 112 F. Supp. 3d 1301, 1316 (M.D. Fla. 2015), *vacated on other grounds*, No. 13-cv-1167, 2016 WL 3369259 (M.D. Fla. Feb. 2, 2016).[11]

In this case, the Court's remedial powers may well have to be used flexibly. Defendants' claim that Plaintiffs' delay could trigger defaults under existing indentures and other contracts is certainly plausible, and the Court is rightly concerned about such matters. However, Plaintiffs in this case, unlike the plaintiffs in *Chirco*, have not called for some extreme remedy, like the dismantling of the Canal System and all the facilities that have been built and maintained with allegedly unconstitutional funding. Instead, they seek forward-looking relief. As it is unquestionably the case that the trade association plaintiff and at least some members of the plaintiff class could have brought suit on this claim years ago, *Petrella* gives this Court wide discretion to "take account of [Plaintiffs'] delay in commencing suit" when determining the appropriate equitably remedy; one thing this Court can do is ensure that obligations already incurred are honored. *See Petrella*, 134 S. Ct. at 1977-78.

As a result, the Court does not believe it appropriate to rely on laches to dismiss the claims in suit. There is nothing equitable about tolerating an ongoing constitutional violation. As the Fourth Circuit noted in *Virginia Hospitals Association v. Baliles*, 868 F. 2d 653, 663 (4th

---

[10] 28 U.S.C. § 2401(a) mandates a six-year statute of limitations for suits brought against the United States.

[11] I recognize that those statutes of limitations are "borrowed" from other Congressionally-set statutes of limitations, rather than from state statutes used at the behest of Congress.

Cir. 1989), *aff'd in part on other grounds sub nom. Wilder v. Va. Hospital Ass'n,* 496 U.S. 498 (1990), if a rule like the one suggested by the Thruway Authority had been adopted, *Brown v. Board of Education* would have been thrown out of court, on the ground that the Kansas statute authorizing Topeka to maintain segregated public schools had been on the books since 1879, and everyone knew about it. In this case, as in *Brown,* the alleged constitutional violation impacts individuals who were not truckers in 1992, or even 2008, and so had no opportunity to bring suit on these claims at some earlier date.[12] Given the court's broad power over fashioning appropriate equitable remedies, "there is no evident basis for immunizing" the Defendants from "present and future" violations of the Dormant Commerce Clause, if such are shown. *Petrella,* 134 S. Ct. at 1979.

## III.     To the Extent That They Are Used To Maintain and Operate the Canal System, The Thruway Tolls are Unconstitutionally Excessive

And so we come to the main event: is it constitutional for the Thruway Authority to use highway tolls paid by long-distance truckers (who in recent years have paid approximately one-third of the Thruway Authority's toll revenues) in order to maintain the Canal System?

Plaintiffs argue that, because they receive no benefit from the Canal System in their capacity as truckers, the collection of tolls used to maintain the Canal System violates the Dormant Commerce Clause of the United States Constitution.

One looks in vain in the text of the Constitution for something called the "Dormant Commerce Clause." Article I, Section 8 of that hallowed document provides Congress with the

---

[12] Defendants insist that discovery, and perhaps a trial, is needed on the issue of whether Plaintiffs knew the facts underlying their Dormant Commerce Clause claim more than three years before filing their Complaint. (Defs.' Br. at 17-18.) For the reasons stated, additional discovery on this issue is not warranted, because Plaintiffs' claims are not barred by the statute of limitations or laches, regardless of when Plaintiffs first became aware of the facts necessary to bring their claims.

25

power to, "regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." That affirmative grant of power has, however, long been held to carry an implied negative corollary: the states may not pass legislation that improperly burdens or discriminates against interstate commerce. Put otherwise, the Commerce Clause is "a self-executing limitation on the power of the States to enact laws imposing substantial burdens on [interstate] commerce." *USA Recycling, Inc., v. Town of Babylon,* 66 F. 3d 1272, 1281 (2d Cir. 1995). The so-called "Dormant Commerce Clause doctrine" does not prohibit states or municipalities from passing laws or regulations affecting commerce, but it does prohibit them from either discriminating against or unduly burdening interstate commerce. Congress alone has the right, under the Commerce Clause, to pass laws or authorize regulations that do either.

In *C&A Carbone, Inc. v. Town of Clarkstown, N.Y.,* 511 U.S. 383, 390 (1994), Justice Kennedy announced, "The central rationale for the rule against discrimination is to prohibit state or municipal laws whose object is local economic protectionism, laws that would excite those jealousies and retaliatory measures the Constitution was designed to prevent." Therefore, in determining whether a law violates the Dormant Commerce Clause, the court first asks whether it treats in-state and out-of-state economic interests differently, in ways that benefit the former and burden the latter. If a state law facially discriminates against out-of-state actors or has the effect of favoring in-state economic interests over out-of-state interests, it is subject to a "virtually per se rule of invalidity," *City of Philadelphia v. New Jersey*, 437 U.S. 617, 624 (1978), one that can only be overcome by a showing that the State has no other means to advance some legitimate local purpose, *Maine v. Taylor*, 477 U.S. 131, 138 (1986).

On the other hand, if a state or local ordinance is not facially discriminatory or protectionist, but still has some impact on interstate commerce, the court will evaluate its

26

constitutionality using a balancing test. *City of Philadelphia*, 437 U.S. at 624. The parties agree that, for the purposes of this case, the test to be applied was set out in the case of *Northwest Airlines, Inc. v. Cnty of Kent*, 510 U.S. 355 (1994). The Second Circuit has consistently invoked *Northwest Airlines* where, as here, the challenge is to the constitutionality of a fee imposed by a government to defray the cost of facilities used by those engaged in interstate commerce — of which a highway toll is perhaps the quintessential example. Indeed, the Second Circuit has squarely held that the *Northwest Airlines* test is "the applicable test" for evaluating the constitutionality of a highway toll. *Selevan v. N.Y. State Thruway Auth.*, 584 F.3d 82, 98 (2d Cir. 2009) (hereinafter *Selevan I*).

Under *Northwest Airlines*, a user fee or toll imposed by a transportation authority is constitutionally permissible only if it: (1) is based on some "fair approximation" of the use of the facilities for which it is paid; (2) is not excessive in relation to the benefits conferred from the use of those facilities; and (3) does not discriminate against interstate commerce. The failure to meet any single prong of the test makes the fee unconstitutional. *Id.* at 96.

The parties have directed the Court's attention to two Second Circuit cases that as controlling precedent, set the parameters for discussion in this case. I begin by discussing those two decisions in some detail.

    *A. Bridgeport and Port Jefferson Steamboat Company v. Bridgeport Port Authority*

The case that Plaintiffs find to be dispositive here is *Bridgeport and Port Jefferson Steamboat Company v. Bridgeport Port Authority,* 567 F.3d 79 (2d Cir. 2009).

The Bridgeport Port Authority ("BPA") was created "to foster and stimulate the shipment of freight and commerce through the ports," "to develop and promote port facilities with the district in order to create jobs, increase the city's tax base and provide special revenues to the

city," and "to develop strategies and initiatives to promote and create port facilities within the district, [and] participate in the economic development of the harbor and waterfront area." *Id.* at 81.

To fund its mission, the BPA imposed a surcharge, known as the passenger fee, on all persons and vehicles embarking on or disembarking from plaintiff's ferries, which run between Bridgeport, Connecticut and Port Jefferson, New York. *Id.* at 82. The fee at the time the lawsuit was filed was $1.00 for an adult foot passenger and $2.00 for a vehicle and driver; it was half that during the first decade it was imposed. The fee was added onto the ticket price, which for a vehicle with passengers was $51.25, and for an individual foot traveler was $2.75. *Id.* at 83. The fee thus represented a relatively modest portion (about 3.5%) of the total cost of traveling across Long Island Sound with a car, and slightly more than 25% of the total cost of hopping the ferry on foot. *Id.*

Between 1993 and 2004, BPA collected a total of about $9.5 million in passenger fees. *Id.* That money, together with $1 million in rental revenues from lease agreements with the company that ran the ferry service and its food concession subsidiary, represented almost the entirety of the BPA's operating revenue. Indeed, as the District Court found, those collections approximated (and in most years exceeded) the total operating expenses of the BPA for all purposes, just as the Thruway tolls in this case exceed the total operating expenses of the Canal System and fund virtually its entire budget. *See id.*

Some of the money collected in passenger fees went toward projects that were of direct and obvious benefit to the ferry passengers, including the maintenance of a newly-constructed ferry terminal and of the Water Street dock, where the ferry docked and loaded while in Bridgeport. Some went toward projects that were of more attenuated but at least arguable benefit

28

to cross-Sound ferry travelers, such as dredging Bridgeport Harbor and operating a pump out service for pleasure craft that used the same waters as the ferries. And some of that money was spent on projects more closely related to the economic development of the Bridgeport harbor and waterfront area, including local waterfront development projects and automobile traffic projects — projects of economic value to the economically depressed City of Bridgeport, but of no interest or value to ferry users. *Id.* at 84.

After conducting "particularized inquiries" into the uses to which the BPA put the passenger fee, the district court held, insofar as is relevant here, that the fee violated both the first and second prongs of the *Northwest Airlines* test, but did not violate the third prong. [13] *See id.* at 86. Specifically Judge Droney (then a district judge; now a member of the Second Circuit) ruled that the fee:

1. Was not based on a fair approximation of the ferry passengers' use of the BPA's port facilities, because it was "calculated according to a method which ensures the Passenger Fee revenue will cover all of the Port Authority's operating costs and development projects throughout the Port District" many of which "are not even available to the ferry passengers;"

2. Was excessive in comparison with the government benefit conferred and in relation to the costs incurred by the taxing authority, because "the Port District . . . includes many projects beyond the Dock that are not functionally related to the ferry operation, and are not intended to benefit the travelers on ferries, or to facilitate their boat travel from Connecticut to Long Island;" but

3. Did not discriminate between interstate and intrastate interests, because the same fee was charged to every passenger and vehicle, with no favorable rate for local (Bridgeport, Connecticut) residents.

*Id.* at 84.

---

[13] The district court applied a variant of what ultimately became the *Northwest Airlines* test, which was announced in *Evansville-Vanderburgh Airport Authority District v. Delta Airlines, Inc.*, 405 U.S. 707 (1972). On review, the Second Circuit used the reformulation of that test announced in *Northwest Airlines*. The result was the same. I thus refer only to the *Northwest Airlines* test.

On appeal, the Second Circuit affirmed the district court's conclusion that "the existing fee violated the Commerce Clause and required an adjustment." *Id.* at 88.

As the parties did not dispute the "non-discrimination" point, the Second Circuit simply accepted Judge Droney's conclusion without further discussion. It then affirmed his other conclusions. The rule it applied was simple and straightforward: "If, as the district court ruled, *some of the BPA's expenses confer no benefit on the ferry passengers, either enjoyed or available to be enjoyed,* then to that extent the fee, imposed solely on ferry passengers, is not a fair approximation of the use of the facilities supported by the fee and is also excessive in relation to the benefits enjoyed or available to be enjoyed by the passengers." *Id.* at 86 (emphasis added). Because "the passenger fee supports virtually the entirety of the BPA's operating budget," the same facts supported a finding that both the first and second *Northwest Airlines* prongs were violated. *See id.*

The Second Circuit accepted the BPA's contention that there did not need to be a "perfect fit" between the passengers' use of the facilities and the use of passenger fees for their support; but it sustained the district court's finding that the discrepancy "exceeds permissible bounds," in that eight specifically identified projects funded by the BPA bore no "functional relationship" to the operation of a ferry service between Bridgeport and Port Jefferson, and so were of no actual or potential benefit to ferry passengers. *Id.* at 86-87. The Second Circuit contrasted the situation in *Bridgeport* with one that the Court had faced earlier. In *Automobile Club of New York, Inc. v. Port Authority*, 887 F. 2d 417, 421 (2d Cir. 1989), the Court of Appeals held that Port Authority of New York and New Jersey could include PATH train operating costs in the rate base for tolls charged on its bridges and tunnels, but only because there was a "functional relationship"

30

between commutation over the same route (New Jersey to New York City) by car and by train. *Id.*

In *Bridgeport*, the Court of Appeals applied a fairly rigorous reading of the "functional relationship" test. For example, it acknowledged that some ferry passengers — those who drove to and from the ferry terminal via I-95 before or after a cross-Sound boat trip — might be delighted by BPA projects that were designed to reduce traffic on that heavily trafficked road. But it held that this use of the money did not meet *Automobile Club*'s "functional relationship" test because, "quality of life improvements cannot be said to confer an actual or potential benefit to the ferry passengers *as users of the ferries*, and thus exceed the bounds of what may reasonably serve as the basis for the BPA fee." *Id.* (emphasis added). In other words, what constituted a permissible expenditure was one that benefitted the payor of the fee in his capacity as a user of the service for which the fee was paid; benefits to ferry passengers in their capacity as drivers to and from the terminal were not "functionally equivalent" to benefits those individuals received as ferry passengers. The panel contrasted this with *Automobile Club*, where the drivers who paid the tolls unquestionably benefitted *as drivers* from the reduction in motor vehicle traffic that resulted when people commuted by train. *Compare id.* at 87-88 *with Automobile Club*, 887 F. 2d at 424.

The Second Circuit acknowledged that the portion of the BPA passenger fees supporting two other activities — the dredging of the harbor and the complimentary pump-out service for pleasure boats — conferred some benefit to ferry passengers (although it did not have a direct impact on ferry service), and did not appear to be "excessive" in relation to those benefits. However, it concluded that so much of the passenger fee as funded those services ran afoul of the first prong, because the record contained no evidence that would have allowed a trier of fact to

31

determine whether the fees collected from ferry passengers "fairly approximated" their share of those costs, which were of benefit to others as well. *Bridgeport*, 567 F.3d at 88.

    *B. Selevan v. New York State Thruway Authority*

    Defendants rely principally on the *Selevan* cases — especially *Selevan v. New York State Thruway Authority*, 711 F. 3d 253 (2d Cir. 2013) (hereinafter *Selevan II*) — in which the Second Circuit held that a toll on a portion of the New York State Thruway, one that actually discriminated between local residents and other users, did not violate the Dormant Commerce Clause.

    The Grand Island Bridge ("GIB") connects an island in the middle of the Niagara River and its approximately 20,374 residents to the rest of the world. *Selevan II*, 711 F.3d at 261, 261 n.3. The GIB is maintained by the Thruway Authority as part of Interstate 190, a portion of the Thruway System. Each non-commercial vehicle crossing the bridge must pay a toll at one of three rates: (1) $1.00 per trip for a general passenger rate; (2) $0.28 per trip for a commuter; or (3) $0.09 per trip for a Grand Island resident. *Id.* at 255-56. Any motorist can qualify for the commuter rate by purchasing a "bundle" of at least 20 trips. Only Grand Island residents, however, can get the lowest rate. *Id.* at 256.

    The first named plaintiff in the case, Robert Selevan, was a resident of Nassau County on Long Island. Mr. Selevan wanted to go to New Jersey to shop. *Id.* He eschewed several obvious routes to get from Long Island to New Jersey. He did not take the Long Island Expressway to the Midtown Tunnel, and then drive across Manhattan and drive through the Lincoln Tunnel. He did not take the Fifty-Ninth Street Bridge to the FDR Drive, cross the Willets Avenue Bridge and go north on the Major Deegan Expressway until he reached the George Washington Bridge. He did not even drive up the Cross Island or Clearview Expressways, over the Whitestone Bridge, and

then north on the Hutchinson River Parkway until he reached the Cross Westchester Expressway (I-287), where he could turn west, go over the Tappan Zee Bridge, and get to New Jersey via either Exit 13 (Palisades Parkway) or Exit 15 (I-287 south). No, he drove from Long Island to Niagara Falls, crossed the Grand Island Bridge, crossed back, and drove back south and east until he reached New Jersey — a distance of approximately 850 miles. Then he filed a lawsuit complaining about the fact that he had to pay $1.00 to cross the GIB, rather than $0.09.[14] He insisted, among other things, that the toll rates were discriminatory and so violated the Dormant Commerce Clause.[15] *Id.*

In *Selevan I*, 584 F.3d at 102, the Second Circuit concluded that Selevan had standing to bring his wholly concocted lawsuit. However, on remand, the district court — applying the *Northwest Airlines* three-part test and following the detailed instructions given it by the *Selevan I* court — concluded that the toll differential for residents worked no unconstitutional restriction on interstate commerce. And in *Selevan II*, that conclusion was affirmed. *Selevan II*, 711 F.3d at 256, 261.

When discussing the first prong of the test in *Selevan I* (fair approximation), the Court of Appeals instructed the District Court to consider "whether the [Thruway Authority] policy at issue [*i.e.*, the toll differential] reflects rational distinctions among different classes of motorists using the Bridge, so that each user, on the whole pays some approximation of his or her fair share of the state's cost for maintaining the Bridge." *Id.* at 259 (internal quotations omitted). The district court followed that injunction, and in *Selevan II*, the Circuit affirmed its finding that the

---

[14] He was not, apparently, bothered by the unnecessary road tolls that he paid.

[15] Selavan and his co-plaintiff, a Mr. Rubin from Ontario, also contended that the toll differential burdened their right to travel interstate, a contention that the Second Circuit rejected in *Selevan I* because the toll differential constituted only a "minor restriction" on their right to travel. *See Selevan I*, 584 F.3d at 101.

33

geographic isolation of the Grand Island residents and the burden of non-residents passing

through their town was "'not [a] wholly unreasonable' basis upon which to draw a distinction"

between Grand Island residents (who might need to use the bridge multiple times each day) and

other motorists. *Id.* Noting that the discount was meant to alleviate both the severe geographic

isolation faced by Grand Island residents and the outsized impact on their tiny community of

nearly 25 million non-resident motorists who drove over the island each year to visit Niagara

Falls, the Circuit concluded that each class of motorist — residents, commuters and occasional

visitors — paid "some approximation" (if an admittedly imperfect approximation) of his "fair

share" of the use of the bridge: residents using it repeatedly, commuters regularly, and occasional

visitors rarely. *Id.* 259-260. This "fairness" was underscored by what the Circuit described as the

"very small difference" between the tolls paid by residents and non-residents.[16] *Id.*

Turning to the second *Northwest Airlines* prong (excessive in relation to benefits

conferred), the *Selevan II* court again affirmed the District Court's finding that the Thruway

Authority "had not been collecting excess revenues from its Grand Island tolls" because "any

revenues collected did not exceed proper margins, given the Thruway Authority's public safety

responsibilities and its expenses for construction and maintenance." *Id.* at 260. The specific

benefit to motorists like Selevan that the court identified was "access to a well maintained,

trooper-patrolled highway which either enables or expedites passengers' travels." *Id.*

Finally, because the plaintiffs had not identified an in-state interest that was being

favored at the expense of competing out-of-state interests, the Circuit concluded that District

---

[16] As between the occasional visitor (like Selevan) and the resident, I assume the "very small difference" is measured in absolute dollar terms — a $0.91 differential — because in percentage terms the latter pay approximately 90% more than the former. As between the commuter and the resident, the miniscule difference is clear viewed in either absolute or percentage terms.

Court had no obligation to consider the "discriminates against interstate commerce" prong of the *Northwest Airlines* test. *Id.* at 260-261.

For our purposes, *Selevan II* is just as important for what it did not decide as for what it did decide. Contrary to Defendants' argument, the *Selevan II* court did not reject a challenge to the fact that Thruway tolls were used to fund the canals; neither did it "bless" a rate structure that included money for that purpose. It held only that the three-tiered GIB toll rates did not violate the Dormant Commerce Clause. *See id.* at 261. To the extent that the Canal System was mentioned at all (in a single footnote), the court noted Selevan's contention that they were "used to subsidize the canal system, a largely recreational facility," but gave that argument the back of its hand because the record contained no evidence suggesting that *tolls collected on the Grand Island Bridge* were "diverted for other, unrelated uses in a manner that would make them excessive." *Id.* at 260 n.6.[17]

By the same token, neither did the Court of Appeal squarely hold that the use of Thruway toll monies for Canal System maintenance qualified as a "diversion . . . for unrelated uses." *Id.* at 260.

The issue was simply left for another day.

That day has arrived.

C. *Discussion*

In light of these two binding precedents, it is clear that Plaintiffs' motion for partial summary judgment on liability should be granted, and Defendants' motion for summary judgment dismissing this lawsuit denied.

---

[17] Apparently no effort was made in *Selevan I* or *Selevan II*, as has been made here, to calculate the percentage of GIB toll revenues, if any, that was being applied to Canal System operating costs. That oversight on *Selevan I* and *Selevan II*'s part has been more than redressed by the parties in this case.

a. Fair Approximation

Turning to the first prong of the *Northwest Airlines* test: Plaintiffs argue that the truck tolls, to the extent that they are used to fund the Canal System, do not "fairly approximate" the truckers' use of the facilities "for which [the toll] is paid." (Mem. of Law ISO Pls.' Mot. for Partial Summ. J. (Dkt. No. 34) ("Pls.' Br.") at 14-15.)

Plaintiffs are plainly correct.

Applying the "fair approximation" prong of the *Northwest Airlines* test requires the Court to look at one thing only: the toll payers' use (or potential for use) of the facilities for which the toll is paid. A "fair approximation" does not "require that a governmental entity adopt a formula that results in a 1:1 relationship between the actual use of the services by a particular entity and the cost of providing those services to that entity." *Jorling v. U.S. Dept. of Energy*, 850 F. Supp. 132, 142-43 (N.D.N.Y. 1994), *aff'd*, 218 F.3d 96 (2d Cir. 2000). But there must be a "rational relationship" between the method used to calculate the fees and the benefits that are realistically available to those who pay them. *Id.* at 143.

Here, the Thruway tolls are challenged to the extent that they are set and used to cover the operating and maintenance cost of the barge canals, the parks, the recreational facilities and the museum — all the things that make up the Canal System. It is the Plaintiffs' use of and benefit from *those* facilities, not their use and benefit from the toll road that runs from New York City to Buffalo, that must fairly approximate the amount that Plaintiffs are paying for their upkeep. *See Bridgeport*, 567 F.3d at 87-88. Put otherwise, to the extent that Thruway tolls are set with reference to the needs of the Canal System, there must be a rational relationship between the setting of those tolls and interstate truckers' use of or benefit from Canal System facilities. *Id.* at 87.

Plaintiffs pay a very great deal toward the upkeep of the Canal System, and 9-14% of Plaintiffs' highway tolls are being applied toward facilities they do not use and from which they derive no benefit. Obviously commercial truckers do not use the barge canals; they haul freight on the highway. Nor do they avail themselves of the System's recreational and educational facilities *in their capacity as truck drivers*; while they are working, Plaintiffs are not engaged in recreational activities. The truckers may wish to enjoy bike paths, hiking trails, and museums on a vacation, but they are irrelevant while sitting in the cab of an eighteen wheeler. Commercial truckers have no interest, *in their capacity as long-haul truckers,* in the availability of such amenities. Frankly, Defendants do not suggest otherwise.

Defendants cannot avoid this conclusion by arguing that *only* 9-14% of the Thruway toll revenue is used to fund the Canal System. (Defs.' Br. at 24-25.) Under the first prong of the *Northwest Airlines* test, what must be "fairly approximated" is the use made or benefit derived by the toll-payers of the non-Thruway assets for which they are paying — the canals and their associated facilities. *See Bridgeport*, 567 at 87. Since the subclass of tollpayers who are engaged in commercial trucking along the New York State Thruway derive no benefit from either the barge canals or their associated recreational facilities, the 9-14% of their toll payments that fund canal operations cannot possibly "fairly approximate" Plaintiffs' "use" of the facilities for which that 9-14% of their tolls pay.

### b. Excessiveness

Turning to the second prong of the *Northwest Airlines* test, it becomes clear beyond peradventure that Plaintiffs are correct.

The "excessiveness" prong compares the amount paid by the payer to the benefits conferred on him *in his capacity as a consumer of those benefits* (the benefits, in this case, being

37

the barge canals and the associated facilities, not the New York State Thruway). A long-haul truckers wants for his toll money the benefit that the Second Circuit identified in *Selevan II*: "access to a well maintained, trooper-patrolled highway which either enables or expedites passengers' travels." *Selevan II*, 711 F.3d at 260. There can, therefore, be absolutely no question that the tolls paid by the plaintiff class are "excessive" in relation to the benefits that the truckers are receiving in their capacity as truckers, because between 9-14 % of what the truckers pay in tolls is used for a purpose other than giving them and other motorists access to well maintained and trooper-patrolled highway that will enable and expedited their trips. To that extent, the tolls are unconstitutionally high.

It is true that there need not be a one-to-one correspondence between toll revenues collected and expenditures on projects that benefit the facilities "for which [the toll] is paid." *See, e.g., Selevan I*, 584 F. 3d at 98; *Bridgeport*, 567 F. 3d at 86 (citing *United States v. Sperry Corp.*, 493 U.S. 52, 60 (1989). Defendants, relying on *Selevan II*, argue that if 86-91% of a toll is used for actual Thruway expenses — that is, for the *actual cost* of the Authority's "*public safety responsibilities* and its *expenses for construction and maintenance*," 711 F. 3d at 260 (emphasis added) — then the relationship between the tolls and the facilities that confer a benefit is reasonable. (*See* Defs.' Br. at 29.) In essence, their argument is that a 9-14% diversion of toll revenues to uses that are not enjoyed or enjoyable by the Plaintiffs does not exceed "permissible bounds." (*Id.*)

Defendants' reliance on *Selevan II* to support this argument — indeed, their argument that *Selevan II* disposes of the point — is entirely misplaced. In *Selevan II*, the Court of Appeals dodged the issue that is squarely presented by this case. There was literally no evidence in the record that GIB tolls were being used for anything unrelated to those "public safety" or

38

"construction and maintenance" expenses — the two types of expenses that are required to offer motorists "access to a well maintained, trooper-patrolled highway which either enables or expedites passengers' travels." *Id.* at 260 n.6. The reasonableness of the relationship between the tolls collected from non-resident motorists and the benefits they obtained was, therefore, easily established.

The same can hardly be said here. The record is replete with evidence that millions of toll dollars are being used each year — *over a billion dollars in the last two decades* — in order to maintain the Canal System and its park and recreation lands. 9-14% of every dollar of toll revenue collected from Plaintiffs is "diverted" to the Canal System. While maintaining the Canal System is highly salutary and of great value to the people of the State of New York, it has absolutely nothing to do with either public safety on the Thruway or the construction and maintenance of the roads, bridges and rest stops — things that are of benefit to commercial haulers.

Admittedly, in *Automobile Club of New York,* the Second Circuit held that the benefits available to commuting drivers who paid tolls at the Port Authority's bridges and tunnels included things like the reduction in traffic resulting from the maintenance of a parallel commuting system that reduced automobile traffic (PATH commuter trains, which cover the same New Jersey to New York City commutation route). 887 F.2d at 421. Those two methods of commutation were held to have a "functional relationship" to each other. *Id.* In *Bridgeport*, the Second Circuit acknowledged the *Automobile Club* rule, and said that a toll/user fee "may reasonably support the budget of a governmental unit that operates facilities that bear at least a 'functional relationship' to facilities used by the fee payers." 567 F. 3d at 87. The Thruway Authority argues that truckers derive a similar benefit — truck traffic reduction — from haulers

39

who use the canal to move freight, which bears some "functional relationship" to, the haulage of freight on the Thruway itself. (*See, e.g.,* Defs.' Br. at 29.) That, it claims, makes the diversion of 9-14% of toll revenues to the Canal System "not excessive" within the meaning of the second prong of the *Northwest Airlines* test.

It is hard to believe that the Defendants make this argument with a straight face. Their own statements acknowledge that the canals are not "a viable transportation system for moving cargo." (*See* Wolf Decl. Exh. R at 35.) The data bears out the Defendants' admission. Over the two decades that Thruway tolls have funded the Canal System, revenue from barge haulage has averaged less than \$2 million per year. In the year when the barge canals generated their *greatest* revenue from commercial usage (2012), revenue from canal users was less than \$4 million. *See* Figure 1. Relying solely on reports from the Thruway Authority and its subsidiary the Canal Corporation — which reports constitute admissions for purposes of this litigation — the total tons of cargo shipped on the canal system during the entire year 2013 was equivalent to only five full fifteen-barge tows. By comparison, there were 2,017,533 documented commercial trips on the Thruway *in December 2013 alone*. (*See* Defs.' Rule 56.1 Counterstatement at ¶¶ 107-113.) No reduction in traffic analogous to the reduction at issue in *Automobile Club* could possibly result from such miniscule use of the canals for haulage.

If the canals are not a viable transportation system for moving cargo, and if they move almost no cargo, then they do not bear any "functional relationship" to the Thruway simply because both driving and barging are modes of transportation. If all that were required for a "functional relationship" to exist were a similarity of purpose, the Second Circuit in *Bridgeport* would have concluded that the money used to fund improvements on I-95 bore a "functional relationship" to ferry passage — since, after all, both the road and the water could be used to

40

transport people from Connecticut to Long Island! But the Court of Appeals held exactly the opposite. This alone renders *Automobile Club* and its "functional relationship" doctrine inapplicable here.[18]

I recognize that the "diverted" tolls in this case are proportionally far less that the percentage of the passenger fee in *Bridgeport* that was diverted to pay for development projects of no benefit to ferry passengers — although the amount of money at issue here massively exceeds the amount of money at issue in *Bridgeport*. If just 9-14% of Thruway tolls are used to cover canal costs, then 86-91% — the bulk of the tolls — are used for actual Thruway costs that are of benefit to Plaintiffs. By contrast, around 50% of the BPA passenger fees went to non-ferry related projects. *See Bridgeport and Port Jefferson Steamboat Co. v. Bridgeport Port Authority*, 566 F. Supp. 2d 81, 87-88 (D. Conn. 2008).

Because there need be no 1:1 correspondence between the "use of the facilities and the support of those facilities by [a] fee," I accept that some *de minimis* variance between total toll revenue collected and expenditures on projects that benefit the toll payers must be constitutionally tolerable. *See id.* at 86. Indeed, in *Bridgeport* itself, the Circuit acknowledged that there did not need to be a "perfect fit" between available benefits and expenditures in order for tolls to pass constitutional muster. *Id.* at 86 (citing *United States v. Sperry Corp.*, 493 U.S. 52, 60 (1989) ("This Court has never held that the amount of a user fee must be precisely calibrated to the use that a party makes of Government services.")).

But in *Bridgeport*, the Court of Appeals also held that, to be constitutional, a user fee had to be "reasonable." And while no court of appeals ever has or ever will define the precise

---

[18] There is considerable irony in Defendants' argument, because (with apologies to Jane Austen), it is a truth universally acknowledged that the only "functional relationship" between the Thruway and the canals is that the former rendered the latter obsolete.

boundary between reasonableness and unreasonableness, the *Bridgeport* court specifically related reasonableness to the existence of a functional relationship. It stated that to the extent a user fee that was spent for services of no "actual or potential benefit" to fee payers, it would "exceed the bounds of what may *reasonably* serve as the basis for the . . . fee" — *unless* the governmental unit were using that fee to supporting facilities that bore "at least a 'functional relationship' to facilities used by fee payers." *Bridgeport*, 567 F. 3d at 86-87. It is that "functional relationship" that renders the use of funds for seemingly unrelated purposes "reasonable." *Id.*; *see also Evansville-Vanderburgh Airport Auth. Dist. v. Delta Airlines, Inc.*, 405 U.S. 707 (1972) ("functional relationship" between the use of airport facilities and commercial airline passengers justified imposing a $1 user fee per commercial airline passenger to support airport construction and maintenance).

In *Bridgeport*, the lack of any functional relationship between passenger ferry transport and expenditures for things like road improvements on I-95, or urban renewal projects in the dock area, rendered the passenger fee "unreasonable" to the extent of those expenditures. *Bridgeport*, 567 F.3d at 84. So too here: the lack of any functional relationship between the Canal System facilities (including the barge canals themselves, which are virtually useless for commercial transport) and interstate commercial transport on the New York State Thruway means that the use of even 9-14% of Thruway tolls to fund the Canal System exceeds "permissible bounds," and so is "unreasonable" as a matter of law.

### c. *Discriminatory as Between In State and Out of State Interests*

Plaintiffs expend a great deal of argument on the proposition that interstate commercial truckers are subjected to discrimination *vis a vis* New York toll payers — even though it is undisputed that every driver of a vehicle of a particular weight and axel structure, regardless of

his state of licensure or where his journey originates or ends, pays exactly the same toll to drive the Thruway. (*See, e.g.,* Defs.' Rule 56.1 Counterstatement at ¶ 33; Wolf Decl. Exhs. D at II-1, P.) Plaintiffs' argument is that New Yorkers who drive on the Thruway derive a benefit in the form of reduced taxes — in violation of what they describe as the "well established" rule that the Commerce Clause forbids charging out-of-staters and those engaged in interstate commerce a fee in order to provide benefits to in-state interests alone, even if some in-staters also pay the fee. (*See* Pls.' Br. at 24.)

In *Bridgeport*, 566 F. Supp. 2d at 96, Judge Droney held that there was no unconstitutional discrimination against interstate travel or commerce where, as here, in-state and out-of-state rate payers paid exactly the same fees. Because the parties did not dispute his conclusion, the Second Circuit simply passed over it. And indeed, in this case the "tax" — the toll — is non-discriminatory in the *Bridgeport* sense.

But Plaintiffs argue that, by placing the cost of the Canal System on interstate motorists, New York State and its taxpayers, who would otherwise be charged with the cost of maintaining the barge canals in perpetuity, are receiving an unconstitutional "subsidy" in the form of tax relief. They contend that this subsidy violates the Dormant Commerce Clause in the same way that a rebate paid by the state to in-state payers of a non-discriminatory tax would. (*See* Pls.' Br. at 24.)

Plaintiffs rely on *West Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 190-9, 1961 (1994), a case in which the Supreme Court struck down a Massachusetts dairy support program. Both in-state and out-of-state milk dealers paid a monthly "premium payment," the proceeds of which were redistributed to Massachusetts producers based on how much milk they produced. The Court held that the program was discriminatory because "its effect on Massachusetts producers is

43

entirely (indeed more than) offset by the subsidy provided exclusively to Massachusetts dairy farmers." *Id.* at 194. Plaintiffs argue that this case is no different, because the toll money is used to fund a local interest (the Canal System) that the taxpayers would otherwise have to support our of tax dollars.

If Plaintiffs had shown that the revenue from out-of-state commercial truckers was, in fact, "redistributed" to New York residents, *West Lynn* might well be applicable here, especially as it is undeniable that the purpose of "spinning off" the canals to the Thruway Authority was to get the obligation off the books of the State and out of the public fisc. But no payment is made to New York taxpayers by using Thruway tolls to fund the Canal System; and it is mere conjecture to say that revenue collected from out-of-state truckers replaces state spending that otherwise would have been paid for by taxpayers. The Canal Corporation could assess higher user fees, or raise money through bonds, grants, or donations, to maintain itself without raising taxes of New Yorkers. The Thruway Authority could raise the tolls for drivers who are not engaged in interstate commerce. The People of the State of New York and their legislature could even amend the Constitution to rid themselves of their anachronistic burden. The availability of alternative funding models means that inflated toll rates on the Thruway do not necessarily function as a subsidy for New York State taxpayers.

Having failed to show that the Thruway tolls discriminate against out-of-state truckers, Plaintiffs have not shown that the Thruway tolls violate the third prong of the *Northwest Airlines* test. However, the rule is that if a toll violates any prong of the test, it violates the Dormant Commerce Clause. So this conclusion is, in the end, irrelevant to the decision on the motion.

## CONCLUSION

Nothing in this opinion should be taken to suggest, in any way, that the Canal System is not of great benefit to the State of New York and its residents — upstate and down. The Canal System is a jewel in the crown of the Empire State, and some combination of New York taxpayers, local businesses benefiting from tourism revenue, and the actual users of the Canal System's many facilities should want to pay for its upkeep. But for the reasons stated above, the State of New York cannot insulate the Canal System from the vagaries of the political process and taxpayer preferences by imposing the cost of its upkeep on those who drive the New York Thruway in interstate commerce.

Because the Thruway Authority's diversion of toll revenue collected from interstate commercial truckers to maintain the Canal System violates the Dormant Commerce Clause, the Court grants Plaintiffs' motion for partial summary judgment, and denies Defendants' motion for summary judgment. The Clerk of Court is directed to remove the motions at Docket Numbers 33 and 47 from the Court's list of open motions.

Dated: August 10, 2016

U.S.D.J.

BY ECF TO ALL COUNSEL