UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

AAA NORTHEAST and AAA NORTH JERSEY,
INC.,

                              *Plaintiffs*,

              -against-

THE PORT AUTHORITY OF NEW YORK
AND NEW JERSEY,

                              *Defendant*.

-------------------------------------------------------------x

```
┌─────────────────────────────────────┐
│ USDC SDNY                            │
│ DOCUMENT                             │
│ ELECTRONICALLY FILED                 │
│ DOC #:_____                  │
│ DATE FILED:__11-18-16__              │
└─────────────────────────────────────┘
```

Before: Richard K. Eaton, Judge[*]

11 Civ. 6746 (RKE) (HBP)

## OPINION

Before the court is the motion for summary judgment of defendant the Port Authority of New York and New Jersey ("defendant" or "the Port Authority"). *See* Def.'s Mem. of Law in Supp. of its Mot. for Summ. J. (ECF Dkt. No. 133) ("Def.'s Br."). Plaintiffs AAA Northeast and AAA North Jersey, Inc. ("plaintiffs" or "AAA") oppose the motion. *See* Pls.' Mem. of Law in Opp'n to Def.'s Mot. for Summ. J. (ECF Dkt. No. 153) ("Pls.' Br."). By its motion, defendant seeks to dispose of AAA's claims that certain toll and fare increases imposed by the Port Authority violate: (1) the Commerce Clause of the United States Constitution, U.S. Const. art. I, § 8, cl. 3, and (2) the Surface Transportation and Uniform Relocation Assistance Act of 1987 (the "Highway Act"), 33 U.S.C. § 508 (2006). For the following reasons, defendant's motion is GRANTED.

---

[*]      Judge Richard K. Eaton, of the United States Court of International Trade, sitting by designation.

# BACKGROUND

## I.  FACTS[1]

AAA is a not-for-profit corporation that claims to represent the interests of nearly two million member-drivers.  Def.'s Rule 56.1 Statement in Supp. of its Mot. for Summ. J. ¶¶ 1–2 (ECF Dkt. No. 134) ("Def.'s 56.1"); Compl. ¶ 5 (ECF Dkt. No. 1).  The Port Authority is a bi-state governmental agency created by an interstate compact between the States of New York and New Jersey, which was approved by the U.S. Congress in 1921.  Def.'s 56.1 ¶ 3; *see* N.Y. Unconsol. Law §§ 6401, 6404 (McKinney 2011); N.J. Stat. Ann. §§ 32:1-1, 32:1-4 (West 2011).

The Port Authority operates facilities in and around New York City, including: four interstate bridges (the Outerbridge Crossing, Bayonne, George Washington, and Goethals Bridges); two interstate tunnels (the Holland and Lincoln Tunnels); the interstate Port Authority Trans-Hudson ("PATH") Rail System; three bus terminals (the Port Authority Bus Terminal, George Washington Bridge Bus Station, and Journal Square Transportation Center); two truck terminals; seven marine terminals; four airports; two heliports; and the sixteen-acre World Trade Center site.  Def.'s 56.1 ¶¶ 12–13.  These facilities are organized into five "line departments" within the Authority: (1) Tunnels, Bridges & Terminals consisting of the four interstate bridges, the two tunnels, and the three bus terminals; (2) the PATH Rail System; (3) Aviation; (4) Port Commerce; and (5) Real Estate & Development (including the World Trade Center site).  *See* Def.'s 56.1 ¶¶ 13, 17.  The Port Authority also operates a facility on Staten Island called the

---

[1]     The court has taken the facts from the parties' Rule 56.1 statements.  *See* Def.'s Rule 56.1 Statement in Supp. of its Mot. for Summ. J. (ECF Dkt. No. 134) ("Def.'s 56.1"); Pls.' Statement Pursuant to Rule 56.1 (ECF Dkt. No. 154) ("Pls.' 56.1").  Where only one party's Rule 56.1 statement is cited, the opposing party does not dispute that fact or has offered no admissible evidence to controvert it, and it is otherwise supported by evidence on the record. Where no Rule 56.1 statement deals directly with a fact, a citation to an uncontroverted portion of the record is provided.

Teleport, the Newark Legal & Communication Center, a ferries program, and has some activity at the waterfronts of Hoboken and Queens.  Def.'s 56.1 ¶ 14.

The Tunnels, Bridges & Terminals Line Department, the PATH Rail System Line Department, and the ferries program collectively comprise what has been termed the "Interstate Transportation Network" ("ITN").  *See* Def.'s 56.1 ¶ 23.  While the concept of the ITN is rooted in the state laws implementing the compact that created the Port Authority, the term was first used in Judge Pollack's opinion in *Automobile Club of New York, Inc. v. Port Authority of New York & New Jersey* (*AAA 1989 I*), 706 F. Supp. 264 (S.D.N.Y. 1989), which was affirmed by Chief Judge Oakes' opinion in *Automobile Club of New York, Inc. v. Port Authority of New York & New Jersey* (*AAA 1989 II*), 887 F.2d 417 (2d Cir. 1989).  In that case, AAA argued the "PATH [Rail] operations should not form a part of the Port Authority rate base in the absence of statutory authorization therefor."  *AAA 1989 I*, 706 F. Supp. at 266.  In his findings of facts and conclusions of law, Judge Pollack wrote:

> At the present time, pursuant to its Compact powers, and subsequent amendments and supplements thereto, the Port Authority owns and/or operates various facilities within the boundaries of the Port of New York District including the following facilities *comprising its Interstate Transportation Network*: four interstate bridges, the George Washington Bridge (including the George Washington Bridge Bus Station), the Bayonne Bridge, the Goethals Bridge and the Outerbridge Crossing; two interstate tunnels, the Lincoln Tunnel and the Holland Tunnel; one bus terminal, located at 40th Street and 8th Avenue in Manhattan; the [PATH Rail System]; and the Port Authority Bus Programs.

*Id.* at 278 ¶ 7 (emphasis added).  On appeal, Chief Judge Oakes agreed: "Judge Milton Pollack found that the Port Authority's bridges, tunnels, bus terminal, bus programs *and* PATH [Rail System] form an 'integrated, interdependent transportation system.'  Accordingly, [Judge Pollack] decided, it is proper to include [the] PATH [Rail System] in the rate base, from which it follows that the tolls are just and reasonable.  We agree and affirm the decision below." *AAA*

*1989 II*, 887 F.2d at 418 (citations omitted) (quoting *AAA 1989 I*, 706 F. Supp. at 276–77, 280). Although the concept of the ITN is a fixture in case law and the Port Authority may take it into account in its capital plan, it does not otherwise account for it separately on its books and records. *See* Def.'s 56.1 ¶¶ 10–11, 16.

The Port Authority has statutory authority to collect tolls on its bridges and tunnels. Def.'s 56.1 ¶ 9; *see* N.Y. Unconsol. Law § 6501; N.J. Stat. Ann. §§ 32:1-118. On August 19, 2011, after public hearings and review by the governors of New York and New Jersey, the Port Authority's Board of Commissioners met and approved a toll and fare increase schedule for the ITN's bridges and tunnels, as well as phased fare increases for the PATH Rail System. Def.'s 56.1 ¶¶ 59–69. The proposed five-year schedule specified:

> Tolls on EZPass will increase $1.50 in September 2011 and then 75 cents in December of each year from 2012–2015; Tolls on cars paying with cash will have the same increase but will be subject to an additional $2 penalty (rounded up to the nearest whole dollar); Tolls on trucks using EZPass will pay an additional $2 per axle in September 2011, and then an additional $2 per axle in December of each year from 2012–2015; Tolls on trucks paying cash will have the same increase but will be subject to an additional $3 per axle cash penalty; and Fares on the PATH train will increase 25 cents a year for four years.

Def.'s 56.1 ¶ 66. Thereafter, "[o]n September 18, 2011, the Port Authority implemented the first step of the approved increases in ITN tolls. The ITN tolls have increased annually in 2012, 2013, and 2014," with the final increase in 2015. Def.'s 56.1 ¶ 70.

## II.   PROCEEDINGS

On September 27, 2011, AAA filed this action, seeking a preliminary injunction to reverse the toll and fare increases and a declaratory judgment that the toll and fare increases violate the Dormant Commerce Clause and the Highway Act. *See* Compl. ¶ 1. AAA alleged that, since the revenue from the toll and fare increases was "earmarked to fund cost overruns in

the Port Authority's speculative real estate development at the World Trade Center," the increases were illegal because they were "not functionally related to the Port Authority's integrated, interdependent transportation network."  Compl. ¶¶ 2, 42 ("The revenues resulting from the 2011 toll increase are to be used by the Port Authority to unlawfully provide funding for the reconstruction of the World Trade Center which is totally unrelated to the Port Authority's integrated, interdependent transportation network.").

AAA further alleged that the increases were "unreasonable" under the Dormant Commerce Clause because the "inclusion of the World Trade Center . . . improperly distorts [the Port Authority's] rate of return, creating the illusion that a toll increase is justified when in fact the Port Authority's integrated, interdependent transportation system is providing a significant surplus."  Compl. ¶ 43–44.  Thus, the Complaint contains the single claim that the toll and fare increases were unlawful because a portion of the proceeds would be diverted for reconstruction of the World Trade Center site which, would cause an apparent, but sham, deficit for the ITN.

This claim stemmed from a press release distributed by the Port Authority in August 2011.  *See* Compl. ¶ 34 ("The Port Authority has revealed in a public statement that $11 billion of the toll increase will be used to rebuild the World Trade Center and fund significant cost overruns which the Port Authority has encountered because of delays in construction."); Decl. of Kevin P. Mulry in Opp'n to Mot. for Summ. J. Ex. D, at 1 (Aug. 21, 2015) (ECF Dkt. No. 151-4) ("Mulry Decl.") (Press Release, Port Auth. of N.Y. & N.J., Faced with Constrained Capacity due to Historic Economic Recession, Coupled with Billions in WTC and Post 9-11 Security Costs, and Unprecedented Need for Infrastructure Overhaul, Port Authority Proposes Toll and Fare Increase (Aug. 05, 2011)) ("Faced with three unprecedented challenges at once—(1) a historic economic recession that has sharply decreased revenue below projections, (2) steep increases in

post-9/11 security costs, which have nearly tripled, and the overall cost of the [World Trade

Center] rebuilding, and (3) the need for the largest overhaul of facilities in the agency's 90-year

history—the Port Authority of New York and New Jersey today proposed a two-phase toll and

fare increase to fully fund a new $33 billion ten-year capital plan, which will generate 167,000

jobs."); *see also id.* ("The factors leading to the agency's financial position include . . . [m]ore

than $11 billion in funding necessary to rebuild the [World Trade Center] site.").

On November 4, 2011, the Port Authority moved to dismiss the action for failure to state

a claim under the Commerce Clause or the Highway Act.  On February 6, 2012, the court denied

AAA's motion for a preliminary injunction and converted the Port Authority's motion to dismiss

into a motion for summary judgment, but reserved ruling on the motion pending discovery.[2]  *See*

*Auto. Club of N.Y., Inc. v. Port Auth. of N.Y. & N.J.* ("*AAA I*"), 842 F. Supp. 2d 672, 681

(S.D.N.Y. 2012).[3]  In doing so, the court found AAA had not demonstrated irreparable injury or

likelihood of success on the merits, as required for a preliminary injunction.  *See id.* at 676–78,

680.  The court noted, however, that "AAA's claim that the Port Authority's toll increases are

earmarked for expenditures which do not reflect a 'fair approximation of use' or are 'excessive'

in relation to the benefit conferred may be bolstered through discovery of financial documents or

correspondence not yet provided for public review."  *Id.* at 681.  The case was then referred to

---

[2]    In a prior opinion, the court also granted the motion for leave to file an amicus curiae brief in support of AAA's motion for a preliminary injunction of then-Representative Michael G. Grimm, 13th Congressional District of New York, and then-Assemblywoman Nicole Malliotakis, New York State 60th Assembly District.  *See Auto. Club of N.Y., Inc. v. Port Auth. of N.Y. & N.J.*, No. 11 Civ. 6746, 2011 WL 5865296 (S.D.N.Y. Nov. 22, 2011).

[3]    Following Judge Holwell's opinion denying AAA's motion for a preliminary injunction and converting the Port Authority's motion to dismiss into a motion for summary judgment, the case was reassigned to the undersigned, while discovery matters were referred to Magistrate Judge Pitman.

Magistrate Judge Pitman to supervise discovery in connection with the Port Authority's motion for summary judgment. *See Auto. Club of N.Y., Inc. v. Port Auth. of N.Y. & N.J.*, No. 11 Civ. 6746, 2012 WL 4791804, at *2 (S.D.N.Y. Oct. 9, 2012).

Throughout discovery, Judge Pitman issued a number of opinions and orders resolving the parties' discovery disputes. For example, on May 7, 2012, after a conference with the parties, he issued an order stating: "In the absence of a further order of the Court, the scope of discovery is limited to [ITN] revenues and expenses for the years 2007 forward," thereby limiting the time period for which discovery with respect to financial matters could be sought. Ct. Order of May 7, 2012 (ECF Dkt. No. 41); *see also Auto. Club of N.Y.*, No. 11 Civ. 6746, 2012 WL 4791804, at *2 ("I think right now the relevant inquiry is income from the tolls, 2007 forward, and the actual expenses of the ITN and the projected expenses of the ITN. If the toll revenue is equal to or less than the ITN expenses and by ITN expenses I'm referring to all the categories of expenses that [the Port Authority] described—capital, operating, debt service—it really doesn't matter how the World Trade Center site development is being funded. If, on the other hand, the tolls exceed the ITN expenses, then maybe we have a different situation." (quoting Tr. of Proceedings at 49 (May 4, 2012) (ECF Dkt. No. 58-3))).

On July 3, 2012, AAA moved to expand the scope of discovery "to include the accounting of ITN revenues within the Port Authority's Consolidated Bond Reserve Fund and General Reserve Fund." *Auto. Club of N.Y.*, No. 11 Civ. 6746, 2012 WL 4791804, at *3. Plaintiffs also asked that discovery be expanded so that it could "ask questions of Port Authority witnesses with respect to areas of inquiry that could lead to further discovery." *Id.* The Port Authority opposed the motion, arguing that "since the [AAA's] underlying claims are based on objective analyses, discovery 'relating to the subjective intent of Port Authority decision makers'

7

should be prohibited" because "such discovery would have the effect of infringing upon the Port

Authority's deliberative process." *Id.* at *4.

On October 8, 2012, Judge Pitman found that, although AAA's request was titled a

"Motion to Compel Discovery," it made "little attempt to identify specific, allegedly problematic

discovery responses by defendant, instead focusing on broader discovery issues." *Id.* at *5–6

("Rather than identifying specific deficient responses by defendant, plaintiffs' motion is

comprised mainly of broad, conceptual arguments relating to the current scope of discovery,

many of which were raised and addressed at the conference on May 4."). Judge Pitman denied

the motion, concluding AAA "failed to provide a sufficient factual or legal basis for modifying

[the Court's] May 7 Order." *Id.* at *6. Judge Pitman took care to clarify, however, that his May

7 discovery order "was issued in connection with a discussion of the scope of discoverable

*financial information*, and must be read in that context. It was not intended to preclude

discovery concerning the *reasons* for the toll increases." *Id.* at *7 (emphases added). Therefore,

Judge Pitman concluded, "subject to the deliberative process privilege and any other objections

defendant might raise, the May 7 Order does not preclude discovery concerning the reasons for

the toll increases." *Id.*

Subsequently, by letter dated February 27, 2013, AAA claimed the privilege log

submitted by the Port Authority pursuant to Federal Rule of Civil Procedure 26 and Local Civil

Rule 26.2(c) was deficient, and sought an order requiring the Port Authority to amend the log

and provide more information about the withheld documents. *See Auto. Club of N.Y., Inc. v.

Port Auth. of N.Y. & N.J.*, No. 11 Civ. 6746, 297 F.R.D. 55, 56–57 (S.D.N.Y. May 8, 2013).

Specifically, the Port Authority's privilege log identified categories of withheld documents,

rather than identifying each individual document that was withheld. While AAA did not object

to the Port Authority's use of a categorical privilege log, it argued that eight of the categories did

not contain the substantive information required by Rule 26.  Judge Pitman agreed and ordered

the Port Authority to supplement its privilege log "by providing the number of individuals that

comprise the 'Authors' and 'Recipients' of each of the eight challenged categories," as well as

"the number of documents encompassed within each of the eight challenged categories," and by

specifically identifying, by name and title, certain individuals within each category.  *Id.* at 63–64.

The Port Authority subsequently submitted a revised privilege log providing this information.

On August 6, 2013, AAA moved to compel the production of 339 documents withheld by

the Port Authority pursuant to the deliberative process privilege, and asked Judge Pitman to

review the documents in camera "[i]f there is any question as to the applicability of the privilege

or the balancing of factors."  Pls.' Mem. of Law in Supp. of Mot. to Compel Produc. of Docs.

Withheld Pursuant to the Deliberative Process Privilege 3 (ECF Dkt. No. 93) ("Mot. to Compel

Mem."); *see Auto. Club of N.Y., Inc. v. Port Auth. of N.Y. & N.J.*, No. 11 Civ. 6746, 2014 WL

2518959 (S.D.N.Y. June 4, 2014).  In his opinion of June 4, 2014, Judge Pitman denied AAA's

motion to compel in its entirety.  *See Auto. Club of N.Y.*, No. 11 Civ. 6746, 2014 WL 2518959 at

*11.  While acknowledging that "'[t]he deliberative process privilege does not provide a blanket

basis upon which to withhold documents that an agency has created during its decision-making

process,'" he found that "AAA's claims under the dormant Commerce Clause and the Highway

Act do not turn on the Port Authority Commissioners' internal deliberations or motivations and

that AAA's interests do not, therefore, outweigh the interests protected by the deliberative

process privilege."  *Id.* at *9.  In other words, Judge Pitman found that preliminary discussions,

concerning the use of the revenue from the toll and fare increases might be used for, were not

central to resolution of this case; rather, the dispositive question was how the revenue was actually committed or spent.

On June 20, 2014, AAA objected to Judge Pitman's decision. *See* Pls.' Objs. to the Mag. J.'s Op. & Order of June 4, 2014 (ECF Dkt. No. 104). The court considered AAA's objections, but found them to be without merit, and therefore affirmed Judge Pitman's opinion of June 4, 2014. *See Auto. Club of N.Y., Inc. v. Port Auth. of N.Y. & N.J.*, No. 11 Civ. 6746, 2015 WL 3404111, at *8 (S.D.N.Y. May 27, 2015).[4]

While discovery was proceeding, and after the scheduled 2012 and 2013 phased toll and fare increases went into effect, AAA filed a second motion for a preliminary injunction, seeking to enjoin the Port Authority from implementing the scheduled December 7, 2014 toll and fare increases. *See Auto. Club of N.Y., Inc. v. Port Auth. of N.Y. & N.J.* (*AAA II*), No. 11 Civ. 6746, 2014 WL 6772058, at *1 (S.D.N.Y. Dec. 2, 2014). These were the penultimate increases on the challenged schedule. In arguing for a preliminary injunction, AAA claimed, for the first time, that "[t]he post-approval rationale for the [t]oll [i]ncreases . . . includes $3.8 billion that is not authorized, not for transportation, or not connected to any transportation project," and that information it acquired through discovery, following the court's denial of its first preliminary injunction motion, provided new grounds for its second motion to be granted. *See id.* at *2

---

[4]     In another opinion, this court denied the motion of Yoel Weisshaus, proceeding pro se, for permissive intervention in this case pursuant to Federal Rule of Civil Procedure 24(b) in support of AAA's objections to the court's denial of AAA's motion to compel. *See Auto. Club of N.Y., Inc. v. Port Auth. of N.Y. & N.J.*, No. 11 Civ. 6746, 2014 WL 5315097, at *2 (S.D.N.Y. Oct. 17, 2014) (stating "Mr. Weisshaus has simply waited too long. . . . [T]he Magistrate Judge's order is on appeal. According to Mr. Weisshaus, he wishes to argue new legal theories for why the discovery he seeks should be granted. . . . To allow him to intervene now and to make arguments not considered by the Magistrate Judge in the first instance, would necessarily delay the process and potentially prejudice the Port Authority by requiring it to litigate matters not heard by [the Magistrate Judge]").

(alteration in original) (citation omitted).  The court disagreed, finding AAA failed to show (1)

that it was likely to prevail on the merits of its claims and (2) that should the December 7, 2014

toll increases go forward there would be irreparable injury.  *Id.* at *7 ("While it may be that a

second motion for a preliminary injunction may be granted when there are new facts on the

record, here, there are few new facts and those that have been presented to the court do not serve

as the basis for a preliminary injunction.").

Discovery having concluded, the Port Authority filed its second[5] motion for summary

judgment now before the court.

## STANDARD OF REVIEW

Summary judgment is appropriate if "there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party

moving for summary judgment carries the burden of establishing that no genuine dispute exists.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  "'A fact is material if it might affect

the outcome of the suit under the governing law, and an issue of fact is genuine if the evidence is

such that a reasonable jury could return a verdict for the nonmoving party.'"  *Ramos v. Baldor*

*Specialty Foods, Inc.*, 687 F.3d 554, 558 (2d Cir. 2012) (quoting *Niagara Mohawk Power Corp.*

*v. Hudson River-Black River Regulating Dist.*, 673 F.3d 84, 94 (2d Cir. 2012)).  In assessing

whether summary judgment is proper, the court must construe "the evidence in the light most

favorable to the nonmoving party and draw[ ] all reasonable inferences in [the non-movant's]

favor."  *Sledge v. Kooi*, 564 F.3d 105, 108 (2d Cir. 2009).

---

[5]     There are, in fact, two motions for summary judgment.  The first dated November
4, 2011, that was converted from a motion to dismiss, and a second dated January 6, 2015.

"When the moving party has carried its burden under Rule 56[(a)], its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (footnote omitted). Indeed, to defeat a motion for summary judgment, the non-movant must identify probative evidence on the record from which a reasonable factfinder could find in its favor. *Liberty Lobby*, 477 U.S. at 256–57.

**DISCUSSION**

**I.     AAA's Dormant Commerce Clause Claim**

The Commerce Clause gives Congress the power "[t]o regulate Commerce with foreign Nations, and among the several States." U.S. Const. art. I, § 8, cl. 3. From this federal grant of regulatory power flows "'[t]he negative or dormant implication of the Commerce Clause[, which] prohibits state taxation or regulation that discriminates against or unduly burdens interstate commerce and thereby impedes free private trade in the national marketplace.'" *Selevan v. N.Y. Thruway Auth.*, 584 F.3d 82, 90 (2d Cir. 2009) (quoting *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 287 (1997)). The three-prong test of *Northwest Airlines, Inc. v. County of Kent* is used to determine whether the imposition of fees, for the use of state-provided facilities, violates the Dormant Commerce Clause. Under this test, a fee is reasonable, and thus constitutionally permissible, "if it (1) is based on some fair approximation of use of the facilities, (2) is not excessive in relation to the benefits conferred, and (3) does not discriminate against interstate commerce." *Nw. Airlines, Inc. v. Cty. of Kent*, 510 U.S. 355, 369 (1994) (citation omitted); *Evansville-Vanderburgh Airport Auth. Dist. v. Delta Airlines, Inc.*, 405 U.S. 707, 716–17 (1972) ("At least so long as the toll is based on some fair approximation of use or privilege

for use . . . and is neither discriminatory against interstate commerce nor excessive in comparison with the governmental benefit conferred, it will pass constitutional muster, even though some other formula might reflect more exactly the relative use of the state facilities by individual users.").

As to AAA's claims under the Dormant Commerce Clause, the Port Authority argues "the record establishes beyond genuine dispute that the ITN's costs exceed the ITN's revenues," and "[t]hat fact disposes of Plaintiffs' claims" because there were no surplus funds that could be used for projects such as the reconstruction of the World Trade Center site. Def.'s Br. 15. That is, the Port Authority contends that "AAA's discovery into the ITN's financials simply confirm[s] the facts presented by the Port Authority in opposing AAA's [second] preliminary injunction motion . . . : the ITN's costs outpaced revenues before the 2011 toll increases and the deficit continues even with the toll increases in effect"; "therefore the tolls, even with the increases, are necessarily reasonable." Def.'s Br. 15, 17. Accordingly, defendant argues, "[t]here is no excess ITN revenue that could be diverted to non-ITN work such as reconstruction of the [World Trade Center]." Def.'s Br. 15. Thus, for the Port Authority, because the amounts raised by the tolls were devoted exclusively to ITN projects, the toll and fare increases are necessarily reasonable under *Northwest Airlines* because they were "based on some fair approximation of use of the facilities," were "not excessive in relation to the benefits conferred," and were not discriminatory "against interstate commerce." *See Nw. Airlines*, 510 U.S. at 369.

In support of its contentions, the Port Authority relies on testimony relating to the cash flow of the ITN, including "operating revenues and expenses," "capital costs, the costs of financing capital improvements, and statutory reserve requirements." *See* Def.'s Br. 17. The figures referred to in this testimony, defendant contends, show that the ITN has historically

13

operated with a negative cash flow (or deficit) and is projected to do so into the future.  Def.'s

Br. 17; *see also* Def.'s Br. 6 ("'[T]he ITN does not generate excess cash that is supporting the

World Trade Center redevelopment.  In fact, as the schedules annexed hereto show, the ITN

operates at a deficit and will continue to operate at a deficit even with the toll and fare increases.

The Port Authority must consequently find revenue from other sources to support the ITN.'"

(quoting Mulry Decl. Ex. E ¶ 22 (ECF Dkt. No. 151-5) (affidavit of Michael Fabiano, Chief

Financial Officer, Port Authority, Nov. 4, 2011) ("Fabiano Aff."))); Def.'s Br. 8 ("'The toll

revenue from the George Washington Bridge, the toll revenue from the Lincoln and Holland

Tunnel and the three Staten Island crossings, that total revenue, with revenue that comes from

PATH, with revenue that comes through the bus stations, bus terminal, bus station, *that revenue

is not enough to cover the expenses of those very facilities*; the operating expense of those

facilities, the expenses for keeping those facilities in what the engineers say is a state of good

repair, and the longer term, long-term capital investment needs.'" (quoting Decl. of Richard W.

Mark in Supp. of Def.'s Mot. for Summ. J. Ex. 9, at 36:16–37:4 (Jan. 6, 2015) (ECF Dkt. No.

135-9) ("Mark Decl.") (deposition of William Baroni, Deputy Executive Director, Port

Authority, Nov. 30, 2012) ("Baroni Dep."))).

Defendant also cites two reports, prepared by independent third parties charged with

completing a comprehensive review of the Port Authority, Navigant Consulting, Inc. and

Rothschild Inc., neither of which was prepared for purposes of litigation.  *See* Mark Decl. Ex. 11

(ECF Dkt. No. 135-11) (report of Navigant Consulting, Inc.) ("Navigant Report"); Mark Decl.

Ex. 12 (ECF Dkt. No. 135-12) (report of Rothschild Inc.) ("Rothschild Report").  The Navigant

Report concludes that the ITN's "operating cash flow is insufficient to cover its own capital

expenditure needs" and that "the proceeds of [toll] increases are vital to fund Port Authority

14

infrastructure projects." Navigant Report at 5, 47. The Report also states that, "[a]bsent the recent and scheduled toll increases, the Port Authority would need to significantly reduce its Preliminary 2011–2020 Capital Plan, compromising the ability to maintain infrastructure assets in a 'State-of-Good-Repair.'" *Id.* at 6. The Rothschild Report reached similar conclusions. *See* Rothschild Report at 1 ("Without the schedule[d] toll and fare increase (or other financial underperformance versus the forecast), the analysis indicates a shortfall versus target credit metrics and thereby risk to the stability of the credit rating and financing terms.").

In response, AAA does not attempt to counter the Port Authority's record evidence by citing to evidence of its own; rather, it first challenges the Port Authority's use of a cash flow analysis, insisting that the proper analysis is a rate of return analysis,[6] which, if used, "depicts a

---

[6] A "rate of return" refers to the "annual percentage return . . . that actually occurs or is anticipated on an investment." Joel G. Siegel & Jae K. Shim, Dictionary of Accounting Terms 334 (2d ed. 1995). Thus, using a rate of return analysis, a company is able to formulate a reasonable rate change that both reflects its costs and achieves some monetary return on a project or investment. Here, for example, a rate of return analysis could be used to calculate a percentage return on the 2011 Preliminary Capital Plan for the ITN facilities if the plan was expected to produce such a return. By contrast, "cash flow" refers to "cash receipts minus cash disbursements from a given operation or asset for a given period." *Id.* at 63. Here, a cash flow analysis could be used to determine whether the toll and fare increases, combined with the Port Authority's other revenue generated by the facilities making up the ITN, are less than, equal to, or greater than its total capital costs, operating expenses and debt service.

Based on the testimony of its officers, the Port Authority claims that its version of a cash flow analysis shows there was no surplus resulting from the toll and fare increases, and therefore no funds are available to be used on projects outside of the ITN. *See* Def.'s Br. 8. For example, William Baroni, the Port Authority's Deputy Executive Director, testified that "it was made clear repeatedly that the revenue that was being raised at the crossings, the PATH, the bus terminals, bus stations, that revenue number was growing a deficit when compared to the growing expenditure need of those very facilities. So we had a deficit of those facilities upon my arrival, we had a deficit prior to the August 5th memorandum [concerning the toll and fare increases], we have a deficit after the toll and fare increase went into effect, and we have a deficit today. I'm very aware of that." Baroni Dep. 90:5–90:16.

It is important to note that the cash flow and rate of return analyses are not mutually exclusive. Indeed, a cash flow analysis can be used to calculate a rate of return on a project if the revenue generated exceeds the operating costs (i.e., a return is realized). Here, however, the Port

substantially profitable ITN and brings into question the need for a toll increase." Pls.' Br. 2. In support of its argument, AAA maintains that "[a] cash flow analysis for the ITN had never even been done at the Port Authority prior to the AAA lawsuit and differs from the financial measures in the Port Authority's annual reports." Pls.' Br. 6; *see also* Pls.' Br. 12 ("[A] rate of return analysis was used by the Port Authority and the Court in both of the prior challenges to Port Authority toll increases. The Port Authority did not conduct or submit to the Court a rate of return analysis in this case, instead offering a cash flow analysis, a type of analysis that was not presented to the Commissioners and one which had not been previously used at the Port Authority."). Although AAA insists that a rate of return analysis must be used in this case, as shall be seen, it never clarifies precisely how the analysis would be applied for the 2011 Preliminary Capital Plan for the ITN facilities ("2011 ITN Capital Plan").

As to AAA's contention that a cash flow analysis is inappropriate, and a rate of return analysis must be employed, the Port Authority responds that "the deficit figures undermine AAA's criticism that the Port Authority failed to evaluate the toll increase on the basis of the 'rate of return' for the ITN from this revenue." Def.'s Br. 19. That is, the Port Authority argues that because the "cash flow analysis proves the ITN operates at a loss, and there is nothing in the record that gives rise to a genuine dispute concerning that analysis," a rate of return analysis would not aid plaintiffs because it would not generate a positive percentage. Def.'s Br. 20.

---

Authority insists a rate of return analysis is of no consequence in light of the negative cash flow scenario presented by the ITN. That is, as Michael Fabiano, the Port's Chief Financial Officer, testified, AAA's "reference to a rate of return analysis overlooks the fact that the cash flow analysis demonstrates that even taking into account the tolls and fare increases, the ITN will still operate at a deficit, and therefore, a rate of return analysis is simply irrelevant." Mulry Decl. Ex. F ¶ 12 (ECF Dkt. No. 151-6) (reply affidavit of Michael Fabiano, Chief Financial Officer, Port Authority, Nov. 29, 2011). In other words, for the Port Authority, because the cash flow analysis shows a deficit, the rate of return analysis would result in a negative percentage.

While AAA maintains that a rate of return analysis is required here, the real substance of its argument is that three individual expenditures included in the 2011 ITN Capital Plan are not properly part of the ITN.  *See* Pls.' Br. 24–25.  AAA contends that if these expenditures are removed from the ITN, the toll and fare increases will be shown to generate revenue in excess of that required by it, and that the Port Authority will be shown to be diverting toll revenue to the reconstruction of the World Trade Center site, and possibly for other purposes.

With respect to these three expenditures, AAA first alleges that $1.8 billion was set aside in the 2011 ITN Capital Plan for bridges and roads owned by the state of New Jersey.  Pls.' Br. 8.  Specifically, AAA claims that the costs related to the Lincoln Tunnel Access Project are not being spent on the Lincoln Tunnel itself, but, rather, for New Jersey state bridge and road facilities.  Pls.' Br. 8; *see also* Pls.' Br. 16 ("These bridges and roads . . . are not owned by the Port Authority, are miles from the Lincoln Tunnel, and are completely outside the Port Authority's statutory authorization for funding.").

Second, AAA claims that $1 billion of the 2011 ITN Capital Plan is being used for the "raising of the Bayonne Bridge roadway," and the roadway "is not being raised primarily for transportation, but instead for navigation . . . because new larger container ships cannot pass under the current roadway."  Pls.' Br. 9.  Although this project also involves the construction of a new roadway, AAA maintains that "[t]he fact that there will be a new roadway is only incidental; the roadway is only being replaced because it has to be raised for navigation."  Pls.' Br. 24–25.

Third, AAA challenges the $1 billion allocated to a "capital infrastructure fund" ("CIF").  Pls.' Br. 10.  AAA claims that "close to $1 billion was not yet allocated at the time of the 2011 Toll Increases," and this "$1 billion cushion . . . inflates the 'ITN capital plan' to $10.786 billion."  Pls.' Br. 10.  Based on these three areas of expenditure, AAA thus argues there are

genuine factual disputes as to whether the toll and fare increases were a fair approximation of use of the ITN facilities under *Northwest Airlines*, and that "the unauthorized and non-ITN projects in the 'ITN capital plan' make the Toll Increases excessive for toll payers, in relation to the benefit conferred."  Pls.' Br. 26–27.

The Port Authority responds there is no basis to exclude the challenged items from the ITN.  Def.'s Br. 20–21.  For the Port Authority, although AAA claims in its brief[7] that these projects are not part of the ITN, it has provided no evidence to support this contention.  Thus, the Port Authority argues that AAA has waived any argument that these expenditures are not part of the ITN and that even if the court should entertain arguments with respect to these costs, AAA has not supported its arguments with record evidence.  *See* Def.'s Br. 20–21 n.15 ("The three items raised in AAA's Second PI Motion as purported non-ITN matters . . . were all explicitly referenced as ITN projects in the Fabiano 11/4/11 Affidavit and supporting exhibits, and were the subject of inquiry at depositions of Port Authority officials in 2012. . . . Despite that, AAA has never sought leave to amend its Complaint . . . and its attempt to inject new issues at the time of the Second PI Motion is improper. . . . Accordingly, AAA is barred from seeking any relief based on its new theory that these disclosed ITN expense items should now be excluded from the ITN.") (citations omitted).

With respect to AAA's substantive arguments, the Port Authority quotes the court's opinion in *AAA II* that "'there is not on the record before the court any evidence other than AAA's assertions that these items are not part of the ITN . . . [and] AAA presents nothing but

---

[7]   AAA makes the claim that these expenditures are not part of the ITN for the first time in its papers in support of its second motion for a preliminary injunction and not in its Complaint.  *Compare* Compl. *with* Pls.' Mem. in Supp. of Mot. for Prelim. Inj. 6–9 (Oct. 24, 2014) (ECF Dkt. No. 118).

conjecture to bolster its claim that it has found new evidence, as a result of discovery." *AAA II*, No. 11 Civ. 6746, 2014 WL 6772058, at *6. Thus, to the Port Authority, the record in support of AAA's claims has not strengthened with time. Further, the defendant contends that AAA's argument fails even if the three challenged items are excluded from the ITN cash flow analysis "because there is no showing that a positive cash flow resulting from their exclusion would render the toll increase unreasonable." Def.'s Br. 22. In other words, defendant maintains that "[t]he law does not require public facilities to lose money in order for a toll to pass constitutional muster." Def.'s Br. 22.

As an initial matter, the court is unpersuaded by AAA's claim that a rate of return analysis, rather than a cash flow analysis, must be used in this case; the law does not require the use of any specific financial analysis for purposes of the Dormant Commerce Clause. *See Evansville*, 405 U.S. at 717 (noting a state's fee allocation "will pass constitutional muster, even though some other formula might reflect more exactly the relative use of the state facilities by individual users"). Moreover, as noted, the cash flow and rate of return analyses are not in tension, and AAA's insistence on a rate of return analysis is a bit of a puzzlement. A cash flow analysis can be used to calculate a rate of return, if any, on a project. If the revenue generated by a project or investment is less than its costs of construction, operation, and maintenance, however, there is no return on the invested funds. When, as here, AAA cites to no record evidence that the increased toll revenues would generate a surplus, a rate of return analysis would not affect the outcome of a case.[8]

---

[8]    In AAA's two prior challenges to the Port Authority's toll increases, a rate of return was discussed in the context of determining whether certain projects or facilities should be included in the rate base. *See AAA 1989 II*, 887 F.2d at 419 ("[T]he rate of return is reasonable, regardless of the method of accounting used, if PATH is properly included in the rate base.");

Next, it is apparent that AAA's other arguments are without merit.  First, as the Port Authority points out, and as revealed by the Navigant and Rothschild Reports, "even under the flawed rate of return analysis that the AAA sponsors, the ITN would show a deficit in 2010 leading up to the toll increase—and that deficit exists after improperly eliminating the expense of [the three] contested ITN projects."  *See* Def.'s Reply Mem. in Supp. of Mot. for Summ. J. 6 n.5 (ECF Dkt. No. 159); *see also* Baroni Dep. 90:5–90:16 ("[I]t was made clear repeatedly that the revenue that was being raised at the crossings, the PATH, the bus terminals, bus stations, that revenue number was growing a deficit when compared to the growing expenditure need of those very facilities.  So we had a deficit of those facilities upon my arrival, we had a deficit prior to the August 5th memorandum [concerning the toll and fare increases], we have a deficit after the toll and fare increase went into effect, and we have a deficit today."); Mark Decl. Ex. 7, at 141:16–141:21 (ECF Dkt. No. 135-7) (declaration of Rosemary Chiricolo, Deputy Director for Management & Budget, Port Authority, Oct. 3, 2012) ("[T]here would have been negative cash flows from the ITN during the period [from 2007–2010], which means that there would not have been sufficient cash to maintain the general reserve fund at its required level.").  In the absence of evidence that the tolls have or will produce a surplus in the ITN, AAA's rate of return arguments fail.

---

*Auto. Club of N.Y., Inc. v. Cox*, 592 F.2d 658, 670 (2d Cir. 1979) ("The serious question . . . is the inclusion of PATH. . . .  [I]f PATH were excluded, the projected 1976 rate of return would be 14.32%.").  In both cases, because the PATH Rail System was properly included in the ITN, a positive return on toll increases was anticipated, so a rate of return analysis resulted in a positive percentage.  It is worth mentioning that the earlier case from 1979 did not involve a Dormant Commerce Clause claim; rather, the claims were brought under the General Bridge Act of 1946, 33 U.S.C. § 529, and a former version of the Highway Act, the Federal-Aid Highway Act of 1973, 33 U.S.C. § 526a.

The court is equally unpersuaded by AAA's emphasis on creating a surplus by removing projects from the ITN. *See, e.g.*, Pls.' Br. 13 ("If the realized revenue is greater than the required revenue—then the toll and fare rates as a package are excessive.  If the realized revenue is less than the required revenue—then the shortfall in revenue is the amount that could be raised by higher tolls or fares.").  First, even if removing the projects would create a surplus, plaintiffs offer no support for the proposition that a positive revenue number necessarily means the toll and fare increases are violative of the Dormant Commerce Clause.  Indeed, the cases indicate that tolls are permitted to generate "'a fair profit or rate of return.'"  *Angus Partners LLC v. Walder*, 52 F. Supp. 3d 546, 565 (S.D.N.Y. 2014) (quoting *Molinari v. N.Y. Triborough Bridge & Tunnel Auth.*, 838 F. Supp. 718, 725 (E.D.N.Y. 1993)).  Thus, as the Supreme Court has clarified, it "has never held that the amount of a user fee must be precisely calibrated to the use that a party makes of Government services."  *United States v. Sperry Corp.*, 493 U.S. 52, 60 (1989); *see also Selevan*, 584 F.3d at 98 ("There need not be a perfect fit between the use of the [Bridge] and the support of [the Bridge] by the toll.  The *Northwest Airlines* test is not inflexible; it simply requires 'reasonableness.'") (alterations in original) (citations omitted); *Bridgeport & Port Jefferson Steamboat Co. v. Bridgeport Port Auth.*, 567 F.3d 79, 86 (2d Cir. 2009) ("[T]here need not be a perfect fit between the use of the facilities and the support of those facilities by the fee.").  Importantly, AAA has simply not done the math demonstrating that, even using its preferred method of calculation, the increased tolls will create a positive rate of return for the ITN, let alone an unreasonably high rate of return.

Moreover, AAA has not pointed to any record evidence that calls into question the accuracy of the Port Authority's financials, or otherwise undermines the evidence demonstrating that the revenue collected from the toll and fare increases is insufficient to fund the ITN's

operations, capital needs, and debt service, nor that any such revenue was allocated to the

reconstruction of the World Trade Center site.

With regard to AAA's challenge to the inclusion of certain projects in the 2011 ITN

Capital Plan (i.e., the Lincoln Tunnel Access Project, Bayonne Bridge project, and the CIF), the

court is mindful that no challenge to these projects was made until AAA's second motion for a

preliminary injunction in 2014, nor did AAA seek to amend its Complaint to question the

propriety of the inclusion of these projects in the 2011 ITN Capital Plan.  *See Cruz v. City of*

*New York*, No. 15 Civ. 2265, 2016 WL 234853, at *6 (S.D.N.Y. Jan. 19, 2016) (finding a

plaintiff could not add allegations in a brief when the allegations were absent from the

complaint); *Olde Monmouth Stock Transfer Co., Inc. v. Depository Tr. & Clearing Corp.*, 485 F.

Supp. 2d 387, 393 (S.D.N.Y. 2007) ("'[I]t is long-standing precedent in this circuit that parties

cannot amend their pleadings through issues raised solely in their briefs.'") (citation omitted).

As defendant points out, "[r]ecognizing that the objective financial facts about the ITN defeat

[AAA's] claim, in its recent (and denied) Second PI Motion, AAA purported to challenge for the

first time certain items included in the preliminary ITN capital project plan—three years after its

submission—in the hopes it could narrow the gap."  Def.'s Br. 20.  Plaintiffs' sole contention in

their Complaint was that funds raised by the increase in tolls would be diverted to the

reconstruction of the World Trade Center.[9]  This claim is not even alluded to in their papers in

opposition to defendant's motion for summary judgment.

---

[9]     The only claim in AAA's Complaint was "[t]he revenues resulting from the 2011
toll increase are to be used by the Port Authority to unlawfully provide funding for the
reconstruction of the World Trade Center which is totally unrelated to the Port Authority's
integrated, interdependent transportation network."  *See* Compl. ¶¶ 2, 42.

Under Rule 8(a)(1), a plaintiff's pleading must contain a "short plain statement" which shows that it is entitled to relief.  Fed. R. Civ. P. 8(a)(1).  This statement is required to allege "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 86 (2d Cir. 2015).  Should a plaintiff fail to raise certain factual content or issues in its complaint, it may seek leave to amend its complaint under Rule 15.  *See* Fed. R. Civ. P. 15(a)(2).  Here, there is nothing in AAA's Complaint that would have alerted the Port Authority that the actual claim of diversion of funds was not related to the World Trade Center reconstruction, but to the "unrelated" expenditures.  Having failed to raise allegations about other projects in their pleadings, or to amend their pleadings to include a challenge to these three projects, which AAA has been aware of since 2011, the court cannot allow plaintiffs to add them through their brief on summary judgment.  *See Alali v. DeBara*, No. 07-CV-2916, 2008 WL 4700431, at *3 n.6 (S.D.N.Y. 2008) ("[I]t is inappropriate to consider claims not pleaded in the complaint in opposition to summary judgment." (citing *Kearny v. Cty. of Rockland*, 373 F. Supp. 2d 434, 440–41 (S.D.N.Y 2005))); *Thomas v. Egan*, 1 F. App'x 52, 54 (2d Cir. 2001).  Accordingly, these claims are not properly before the court, and therefore are dismissed.

Were the court to consider these arguments, however, they would not carry the day. AAA insists that the Port Authority's "cash flow analysis, and its conclusion that the ITN would lose $55 million over a ten year period (an average of only $5.5 million a year), are completely undercut when the billions of dollars for the Pulaski Skyway and New Jersey roads project, the Bayonne Bridge projects and the billion dollar 'placeholder' are deducted from the 'ITN capital plan.'"  Pls.' Br. 11.

The standard for whether a facility or project should be included in the ITN's capital base was first considered in *AAA 1989 II*.  *See AAA 1989 II*, 887 F.2d at 422.  In that case, AAA contended that only an "origin and destination" analysis could be used to prove a "functional relationship" between certain river crossings, and therefore only those facilities should be included in the ITN's rate base.  *Id*.  Under an "origin and destination" analysis, a functional relationship would exist if one mode of transportation can be easily substituted for another.  *Id*. ("If a large percentage of the people traveling between *A* in New Jersey and *B* in New York freely choose to use either river crossing *X* or river crossing *Y*, then *X* and *Y* have a functional relationship.").

In *AAA 1989 II*, however, the Port Authority maintained that AAA's proposed analysis alone was too narrow, as it overlooked the "spillover" effect.  *Id.*  The "spillover" effect recognizes that when certain facilities or functions are eliminated from the ITN, others will suffer as a result.  *Id*. ("If [70,000 PATH passengers] were to use the tunnels instead, the tunnels would become overcrowded.  Congestion in the tunnels would lead many travelers . . . to use the George Washington Bridge.  Others . . . could shift to the Staten Island bridges.").  Chief Judge Oakes agreed that "origin and destination" data is "useful but not sufficient" in determining functionality because "[i]t fails to take into account the full extent of the Port Authority's responsibilities."  *Id*.  As a result, in looking for a functional relationship to the ITN, this Circuit has adopted an approach that is aware of the Port Authority's "systemwide" interdependence.  *Id.* ("A functional relationship exists, then, among those facilities that contribute to the Port Authority's performance of its duty efficiently to provide transportation to travelers over and under the waterways between southern New York and northern New Jersey.").

It is apparent that AAA has failed to point to evidence that the three challenged projects are not functionally related to the ITN.  *See id.* ("As anyone who has ever sat in a line of traffic or a railroad station for a length of time is aware, the Port Authority's employees cannot think only in terms of traffic flowing smoothly and trains running on time; they must also anticipate and respond to disruptions and delays.  The Port Authority is entitled to prove that PATH is *related* to the bridges and tunnels with evidence that a *'spillover' effect* links even those river crossings that travelers do not normally use interchangeably.") (emphasis added).

Here, the Port Authority has cited to sufficient record evidence to establish that the three challenged areas of expenditure are sufficiently functionally related to the ITN so as to be included in it.  For instance, it is not disputed that the Lincoln Tunnel itself is part of the ITN. *See id.* at 418.  As to the Lincoln Tunnel Access Project, the Port Authority cites, in addition to the 2011 ITN Capital Plan, deposition testimony that the Project includes

> expenditures for those roadway projects that we are building that *have been certified as part of the Lincoln Tunnel facility* that align with the traffic routes on Wittpen Bridge . . . and the *Pulaski Skyway*[.  T]hey're a lead-in to creating a flow of traffic . . . to expedite traffic into the Lincoln Tunnel.  So it's supposed to improve traffic flows for our patrons into the Lincoln Tunnel.

Mark Decl. Ex. 8, at 185:20–186:8 (deposition of Michael Fabiano, Chief Financial Officer, Port Authority, Nov. 29, 2012) ("Fabiano Dep.") (emphasis added).  Also, the Port Authority points to the Rothschild Report, which states: "Significant projects include . . . (ii) infrastructure projects at the *Lincoln Tunnel to accommodate increasing traffic volumes and reduce congestion*."  Rothschild Report at 8 (emphasis added).

AAA has produced no evidence that the Lincoln Tunnel Access Project would not improve traffic flow to the tunnel.  Rather, plaintiffs merely assert "[t]he Pulaski Skyway and New Jersey roads, miles away from the Lincoln Tunnel, cannot be considered 'approaches,' unless the Port

Authority considers any road that eventually leads to the Lincoln Tunnel . . . to be an 'approach' to the Lincoln Tunnel." Pls.' Br. 20. This assertion, however, is not evidence. AAA also cites to state statutes that it says demonstrate that the bridges and roadways making up the project are not all owned by the Port Authority.[10] While this may be true, it is difficult to see how these statutes affect whether or not the bridges and roadways are functionally related to the ITN.

Second, as to the Bayonne Bridge project, the Port Authority offers a project overview from the record that describes some of the anticipated benefits of the project, including that "[w]ider lanes, shoulders and median dividers will make the bridge safer for drivers," a "bikeway and walkway the entire length of the bridge will make traveling the bridge easier for all of us," "[s]tairs will be replaced with access ramps," "[n]ew piers, a new roadway deck and new approach roads will ensure the bridge will be built to last for generations," and "[t]he design allows for future mass transit service." Decl. of Richard W. Mark in Opp'n to Pls.' Mot. for Prelim. Inj. Ex. G (Nov. 10, 2014) (ECF Dkt. No. 126-7) ("Mark P.I. Decl.") (Bayonne Bridge Navigational Clearance Project Description, Nov. 7, 2014) ("The new conceptual design highlights safety and design improvements: wider lanes, shoulders, a median divider, and the potential for future transit options."); *see also* Fabiano Aff. ¶ 7 ("The Bayonne Bridge over the Kill Van Kull will be rehabilitated to increase its vertical clearance to accommodate shipping and to meet modern highway and structural design standards."). Again, AAA points to no evidence that the project, although it will concededly aid navigation, will not result in a safer bridge for

---

[10] Although AAA cites to statutory provisions that it claims demonstrate that amounts spent on these projects would be improper, it makes no argument in its Complaint that these expenditures are *ultra vires* or otherwise unlawful and should therefore be stopped by this court. Rather, these citations to statutes are presented for the sole purpose of demonstrating that these projects are not properly part of the ITN. Thus, AAA has waived any claim that it might have made that the expenditures would be unlawful.

motor traffic, a safer bridge for bike riders, or provide for the installation of mass transit in the future.  AAA's entire claim rests on arguments, not facts.  Pls.' Br. 24 ("[T]he raising of the Bayonne Bridge roadway is a project undertaken . . . primarily for the benefit of navigation and Port Commerce, not for the benefit of the ITN.").

Third, as to the amounts credited to the CIF, it should be clear what the CIF is.  It is not, as plaintiffs seem to suggest, a parking place for funds that the Port Authority can later allocate to projects outside the ITN.  Rather, the amounts allocated to the fund can be spent only on ITN projects.  In keeping with this restriction, the Port Authority offers testimony that the $966 million, which was freed up after the Cross Hudson Tunnel Project was terminated, was thereafter allocated to the reserve fund titled the CIF "to be used within the [ITN] infrastructure." Fabiano Dep. at 191:6–191:19 ("It's a place holder that identifies what remained from [the cancelled project] until the [Port Authority Board of Commissioners] makes a collective decision on . . . what addition[al] capital projects it comes out of . . . .  But it's still anticipated that those dollars will be available to be used within the infrastructure."); Fabiano Dep. at 50:18–51:11 ("[T]here's hundreds of projects that comprise our capital plan, and these major projects were competing with [a] state of good repair work. . . .  [S]o you have to address [a] state of good repair, and then you need to layer these major capital initiatives on top of that.  So it's a balancing act, and that's what the capital group's role is, we provide the envelope and the window of capacity, how much, and it's up to capital people to determine which projects can get into the mix and which don't; engineering assessments are done on the criticality and timeliness of it and whether or not it can be delayed without impacting life safety and operational efficiencies.").  Indeed, each item in the 2011 ITN Capital Plan represents an estimate of future

costs for various projects within the ITN and, as the Port Authority contends, the CIF is no different.

Because the only evidence cited to by the parties demonstrates that moneys accounted for in the CIF can only be used for ITN projects, even if an amount on the CIF books is a "placeholder," it can only be committed to, and spent on, ITN projects and only ITN projects. Time, moreover, has overtaken AAA's argument. That is, although the CIF was not allocated to any specific project at the time of the 2011 ITN Capital Plan, it still reflected the anticipated costs for future ITN projects to be approved at a later date. Indeed, this is apparently what has occurred. While there was indeed a $996 million amount credited to the CIF in the 2011 ITN Capital Plan, the Port Authority's 2014 Capital Plan reveals that this amount was reduced to zero. Even with the full amount of the CIF having been committed to ITN projects, however, the ITN's capital needs exceeded those projected in the 2011 ITN Capital Plan. *See* Mulry Decl. Ex. N (Captial Plan Summary 2014–2023, Feb. 2014); Def.'s Reply Br. 14.

As with the other items of expenditures that it disputes, plaintiffs' claims about the CIF offer nothing beyond the assertions set forth in their brief.[11]  Importantly, AAA does not dispute

---

[11]     For instance, plaintiffs' argument with respect to the Lincoln Tunnel Access Project is that "[t]he connection to the Lincoln Tunnel . . . is illusory. The money is being spent not on the Lincoln Tunnel, but on New Jersey state bridge and road facilities: the Pulaski Skyway, N.J. Route 1 & 9, N.J. Route 7, and the WittPenn Bridge." Pls.' Br. 8. Next, AAA argues, "[t]he Pulaski Skyway is more than eight miles from the Lincoln Tunnel, and cannot in any way be considered an access roadway to the Lincoln Tunnel." Pls.' Br. 8. With respect to the Bayonne Bridge project, plaintiffs' entire argument is that, "[w]hile this project involves construction at a bridge, the Bayonne Bridge roadway is not being raised primarily for transportation, but instead for navigation and the Port Commerce line of business, because new larger container ships cannot pass under the current roadway." Pls.' Br. 9. Finally, as to the CIF, plaintiffs acknowledge that these funds were previously committed to a tunnel project that was cancelled, leaving "close to $1 billion [that] was not yet allocated at the time of the 2011 Toll Increases." Pls.' Br. 10. Therefore, AAA argues, the CIF "was included as simply a line item in the capital plan that did not reflect any transportation project" and is therefore "a $1 billion cushion that inflates the 'ITN capital plan.'" Pls.' Br. 10.

that CIF money can only be spent on ITN projects or that subsequent plans indicate the money has already been committed to ITN projects. Indeed, none of AAA's assertions are tied to any facts drawn from discovery or elsewhere.

Viewing the evidence in the light most favorable to AAA, it is apparent that plaintiffs have presented no evidence tending to show that revenue from the toll and fare increases was, or would be, used in a manner that violated the Dormant Commerce Clause. First, AAA points to no evidence that toll money will be spent on the new World Trade Center. Nor do plaintiffs cite to any evidence that the three challenged projects are not functionally related to the ITN. Indeed, AAA simply relies on its own arguments, rather than record support, to bolster its assertion that subtracting the costs of the three projects (i.e., the Lincoln Tunnel Access Project, the Bayonne Bridge project, and the CIF) would eliminate $3.8 billion worth of costs from the 2011 ITN Capital Plan, thereby freeing up funds for projects such as the reconstruction of the World Trade Center. *See* Pls.' Br. 11 ("Subtracting $3.8 billion from the 'ITN capital plan' turns CFO Fabiano's cash flow analysis positive."). Rather than citing to record evidence, AAA repeats verbatim the unsupported arguments it offered in its second motion for a preliminary injunction.

Finally, this case is distinguishable from *Bridgeport and Port Jefferson Steamboat Co. v. Bridgeport Port Authority*, in which the steamboat company successfully challenged several Bridgeport Port Authority projects, funded by ferry passenger fees, that provided no benefit to ferry passengers. *See Bridgeport*, 567 F.3d at 87 ("The limits of . . . excessiveness are plainly exceeded when the fees support a [Bridgeport Port Authority] budget that includes, for example, a development project for reducing traffic on the I-95, the interstate highway running generally along the Connecticut shore."). Here, unlike in *Bridgeport*, plaintiffs have not shown the challenged expenditures are of no "actual or potential" benefit to toll payers in their capacity as

29

bridge and tunnel users, or that there is any evidence that the increased tolls will result in a surplus that could be used for other projects.[12] *See id.*

It is worth repeating that the court's task in this case with respect to the Dormant Commerce Clause claims is to determine whether the toll and fare increases were (1) "based on some fair approximation of use of the facilities"; (2) "not excessive in relation to the benefits conferred"; and (3) not discriminatory "against interstate commerce." *Nw. Airlines*, 510 U.S. at 369. Here, AAA's argument is that there was revenue from the increases and that revenue was illegally allocated to fund the reconstruction of the World Trade Center site. To support these allegations, however, AAA points to no record evidence that tends to show the increases were not a fair approximation of the use of the ITN by its users, or were excessive in relation to the benefits conferred on them. Such evidence might include something from the record showing that revenue from the toll and fare increases was put to uses that bore no "functional relationship" to the Port Authority's operations. Under "our broad definition of 'functional relationship' [that] might extend to other facilities outside the Port Authority's domain," however, such a claim would need to include more than speculation as to particular items in the Port Authority's 2011 ITN Capital Plan or the deliberations of its Board of Commissioners. *AAA 1989 II*, 887 F.2d at 422 n.5. "[T]he requirement of a 'fair approximation' seeks reasonableness and broad proportionality. It does not require precise tailoring, or a *pre-enactment administrative record*, for toll amounts to be justified." *Janes v. Triborough Bridge & Tunnel*

---

[12]     Indeed, AAA's concept of what amounts to a "benefit" to toll payers is noticeably narrow, as it consists only of the "ability to cross from New York to New Jersey over Port Authority bridges and tunnels," and does not include other potential benefits such as decreased congestion or increased efficiency within the ITN. *See* Pls.' Br. 26; *see also AAA 1989 I*, 706 F. Supp. at 269 ("Similarly, improvements to one facility benefit the users of the others by reducing the congestion on others, thereby making the entire network more efficient.").

*Auth.*, 977 F. Supp. 2d 320, 340 (S.D.N.Y. 2013), *aff'd*, 774 F.3d 1052 (2d Cir. 2014), *cert.*

*denied*, 136 S. Ct. 80 (2015) (emphasis added).  Finally, AAA makes no mention of the third

prong of the *Northwest Airlines* test: that the increases discriminated against interstate

commerce.  At bottom, plaintiffs have simply failed to create a triable issue of fact as to whether

the toll and fare increases are not a "fair approximation of use of the facilities" and are

"excessive in relation to the benefits conferred" to users of the ITN.  *See Nw. Airlines*, 510 U.S.

at 369.

Based on the foregoing, the court finds that there is no triable issue of fact that would

tend to support AAA's Dormant Commerce Clause claim and that the Port Authority is entitled

to judgement on this claim as a matter of law.


## II.    AAA'S CLAIMS UNDER THE HIGHWAY ACT

Pursuant to the Highway Act, a toll and fare increase must be "just and reasonable."  *AAA*

*1989 II*, 887 F.2d at 418 ("Tolls on the Port Authority's bridges must be 'just and reasonable.'

This requirement originated in section 4 of the Bridge Act of 1906, 33 U.S.C. § 494 (1982).  In

1987, Congress repealed the statutory provision that gave the Secretary of Transportation the

power to prescribe 'just and reasonable' tolls.  At the same time, Congress retained the

requirement that tolls be 'just and reasonable.'  The House Conference Report accompanying the

Highway Act explained that the 'just and reasonable' requirement 'is not intended to interfere

with or in any way restrict existing authority granted to multi-modal transportation agencies,

such as the Port Authority of New York and New Jersey, that operate bridges along with other

facilities to use bridge toll revenues for nonbridge purposes or the pooling or combination of the

revenues from all of their facilities.'") (citations omitted).

As a threshold matter, the Port Authority argues there is no private right of action under the Highway Act.  Def.'s Br. 26.  In support of its position, it points to Third Circuit law and to the decision of a district court case in this Circuit that has considered the issue, both of which found that 33 U.S.C. § 508 does not create a private right of action.  *See Am. Trucking Ass'n, Inc. v. Del. River Joint Toll Bridge Comm'n*, 458 F.3d 291, 302–04 (3d Cir. 2006); *Molinari v. N.Y. Triborough Bridge & Tunnel Auth.*, 838 F. Supp. 718, 724 (E.D.N.Y. 1993).

Moreover, the Port Authority argues that, even if a private right of action is assumed for purposes of this motion, AAA's claim fails on its merits.  Def.'s Br. 28.  The Port Authority contends the test under the Highway Act is the same as that under the Commerce Clause, and therefore AAA's Highway Act claim "must be dismissed because there is no dispute that the toll increase revenues do not [fully] cover the ITN's expenses."  Def.'s Br. 29 ("AAA's contention that revenue is being diverted to support the [World Trade Center] reconstruction (or used to fund non-ITN projects) is belied by the uncontroverted financial state of the ITN.").

As to whether the Highway Act creates a private right of action, AAA responds by describing the statutory schemes that preceded the enactment of the Highway Act, which it believes demonstrate there is a private right of action under the Highway Act.  Pls.' Br. 33.  Specifically, AAA points out that "[p]rior to the enactment of the Highway Act, aggrieved parties had the right to challenge tolls first to the [Highway] Administrator and then to the federal courts.  Congress eliminated the first step, but it did not eliminate the second level of review, the courts."  Pls.' Br. 37.  Furthermore, plaintiffs contend that in amending the prior statute, Congress retained the "just and reasonable" standard, which shows that "Congress impliedly approved the previous system for challenging tolls."  Pls.' Br. 34.  "In other words," according to AAA, "Congress intended that parties aggrieved by unjust and unreasonable tolls

would continue to challenge such tolls, albeit without the burdensome administrative procedure." Pls.' Br. 34.

With respect to the merits, AAA responds that there are material factual issues as to whether the toll and fare increases violate the Highway Act.[13]  AAA argues that "there is no question based upon the testimony and documents from the Port Authority that the Commissioners approved a toll increase that was based on the needs of the *entire* Port Authority, not the needs of the ITN."[14]  Pls.' Br. 29 (emphasis added).  Thus, plaintiffs argue that "[t]he toll increases cannot be just and reasonable where they are not based on the needs of the ITN."  Pls.' Br. 30.  In other words, AAA argues the toll and fare increases fail the "just and reasonable" test "because there are issues of fact concerning whether they are supporting projects outside the ITN and its transportation mission."  Pls.' Br. 31.  In support of their position, plaintiffs repeat their claims, first raised in their second motion for preliminary injunction, regarding the inclusion of the Lincoln Tunnel Access Project, the Bayonne Bridge project, and the CIF in the 2011 ITN Capital Plan, which they claim "add at least $3.8 billion to the supposed 'ITN capital plan,'" and conclude "the toll increases based on that plan, inflated by almost $4 billion of non-ITN expense[s], is not 'just and reasonable.'"  Pls.' Br. 32.  Plaintiffs also repeat their financial analysis argument, contending "a rate of return analysis demonstrates that a toll increase was not

---

[13]     It should be noted, however, that like AAA's Dormant Commerce Clause claim, AAA's Complaint only contends that the 2011 toll and fare increases violate the Highway Act because they will be used to fund the World Trade Center reconstruction.  *See* Compl. ¶¶ 2, 45, 48 ("[T]he Port Authority forces bridge and tunnel users to fund cost overruns and subsidize the speculative and unprofitable reconstruction and operation of the World Trade Center.").

[14]     Despite AAA's arguments, as stated above, the relevant question in this case is what the revenue from the toll and fare increases was actually used for, not what potential uses were considered during preliminary planning and budgeting.

just and reasonable, and certainly not a massive toll increase spanning five years into the future."

Pls.' Br. 32.

As to the threshold question of whether a private right of action exists under § 508, the court agrees with Judge Holwell's analysis at an earlier stage in this case and finds it doubtful that Congress would provide for a "just and reasonable" requirement in the plain text of § 508 with no real enforcement mechanism:

> *American Trucking* focused on legislative history and relied on the four factor test in *Cort v. Ash*, 422 U.S. 66, 95 S. Ct. 2080, 45 L.Ed.2d 26 (1975) to find no private right of action under Section 508. 458 F.3d at 304. But more recent cases in this circuit and at the Supreme Court have emphasized that the "text and structure" of a statute are the primary indicators of a private right of action. *Alexander v. Sandoval*, 532 U.S. 275, 288, 121 S. Ct. 1511, 149 L.Ed.2d 517 (2001); *Lopez v. Jet Blue Airways*, 662 F.3d 593, 596 (2d Cir. 2011); *see also Lindsay v. Ass'n of Prof'l Flight Attendants*, 581 F.3d 47, 52 n.3 (2d Cir. 2009) (noting that the four-factored test in *Cort v. Ash* is subordinate to an analysis of the statutory text). The text of the Highway Act made two main changes to the laws regarding interstate bridges and bridges over navigable waters. First, it eliminated administrative review of tolls on these bridges by repealing sections of the General Bridge Acts of 1906 and 1946. Second, it added 33 U.S.C. § 508, mandating that tolls on these bridges "shall be just and reasonable." *See Molinari*, 838 F. Supp. at 722–23.
>
> The statutory construction in *American Trucking* leaves no means for enforcement of this deliberate latter addition, making the words "just and reasonable" mere surplusage and conflicting with the text and structure of the rest of the act. "[C]ourts should avoid statutory interpretations that render provisions superfluous . . . ." *State Street Bank and Trust Co. v. Salovaara*, 326 F.3d 130, 139 (2d Cir. 2003); *see also Williams v. Taylor*, 529 U.S. 362, 404, 120 S. Ct. 1495, 146 L.Ed.2d 389 (2000) (describing the rule against surplusage as a "cardinal principle of statutory construction"). The *American Trucking* court's suggestion that "the state political process could be the venue that Congress had in mind for the airing of toll grievances" is a bit of a dodge, as one state's legislature cannot unilaterally modify tolls on a bi-state bridge without impinging on the rights of the other state's citizens in violation of the Commerce Clause. *See Covington & C. Bridge Co. v. Commonwealth of Kentucky*, 154 U.S. 204, 222, 14 S. Ct. 1087, 38 L.Ed. 962 (1894). And, if the *American Trucking* court's reliance on legislative history was even appropriate, it waved away Committee reports from two earlier (but unpassed) versions of the Highway Act containing similar "just and reasonable" language, reports which stated that "the Committee has created a basis for which a user may commence suit in Federal court" upon belief "that actions of

34

a toll authority are not just and reasonable." *American Trucking Association*, 458 F.3d at 301.

The Third Circuit noted with favor Judge Korman's observation in *Molinari* that "the Supreme Court long ago refused to find a private right of action in statutory language indistinguishable from that used in § 508." *American Trucking Association*, 458 F.3d at 304 (citing *Molinari*, 838 F. Supp. at 724). But the cases cited in *Molinari* as containing similar "just and reasonable" requirements, *T.I.M.E. Inc. v. United States*, 359 U.S. 464, 79 S. Ct. 904, 3 L.Ed.2d 952 (1959) and *Montana-Dakota Utilities Co. v. Northwestern Pub. Serv. Co.*, 341 U.S. 246, 71 S. Ct. 692, 95 L.Ed. 912 (1951), are readily distinguishable as addressing statutes which included comprehensive regulatory enforcement mechanisms. *See T.I.M.E.*, 359 U.S. at 469, 79 S. Ct. 904 ("language of this sort in a statute *which entrusts rate regulation to an administrative agency* in itself creates only a 'criterion for administrative application in determining a lawful rate' rather than a 'justiciable legal right[.]'") (quoting *Montana-Dakota*, 341 U.S. at 251, 71 S. Ct. 692) (emphasis added). A better parallel might be drawn to *Wilder v. Virginia Hospital Association*, 496 U.S. 498, 110 S. Ct. 2510, 110 L.Ed.2d 455 (1990), which found that Congress "left no doubt of its intent for private enforcement" when it required States to pay an entitlement to Medicare providers that was reasonable and adequate, "with no sufficient administrative means of enforcing the requirement against States that failed to comply." *Gonzaga University v. Doe*, 536 U.S. 273, 280–81, 122 S. Ct. 2268, 153 L.Ed.2d 309 (2002).

*AAA I*, 842 F. Supp. 2d at 679 n.5. Accordingly, the court finds that there is a private right of action under § 508.

Nonetheless, AAA's arguments on the merits are unpersuasive. First, as with their claim regarding the Dormant Commerce Clause, the only claim plaintiffs actually raise in their Complaint with respect to the Highway Act is that the 2011 toll increases violate the Act by providing funding for the World Trade Center reconstruction. *See* Compl. ¶¶ 2, 45, 48. As has been discussed, AAA has presented no evidence tending to prove this claim. In addition, plaintiffs never sought leave to amend their Complaint, and thus the claims regarding the inclusion of the Lincoln Tunnel Access Project, the Bayonne Bridge project, and the CIF in the 2011 ITN Capital Plan cannot be heard. Finally, for the court, the "just and reasonable" standard found in § 508 is aligned with the *Northwest Airlines* test for reasonableness. *See AAA I*, 842 F. Supp. 2d at 679–80. That is, having found that AAA failed to "come forward with 'specific facts

35

showing that there is a *genuine issue for trial*'" with respect to its Dormant Commerce Clause claims, its identical claims made under the Highway Act, if viable, would similarly fail.  *See Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)).  In sum, because AAA raises the same arguments with regard to its claims under the Highway Act that it raised with respect to the Dormant Commerce Clause, those claims must also be dismissed.


## CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is GRANTED, and plaintiff's claims are dismissed in their entirety.


Dated:          November 18, 2016
                New York, New York


                                        /s/     Richard K. Eaton
                                         Richard K. Eaton, Judge